UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 06-CR-089 (RWR) |
| NIZAR TRABELSI | : | |

**MOTION TO COMPEL MODIFICATION
OF RESTRICTIONS IMPOSED IN VIOLATION OF FIRST AMENDMENT**

 On November 1, 2013, Acting Attorney General James M. Cole issued a memorandum to Stacia Hylton, Director, United States Marshals Service, instructing the U.S. Marshals to enforce Special Administrative Measures (hereinafter "SAMs") regarding the pretrial detention of Nizar Trabelsi.  *See* Exhibit 1 (SAMs).  Through undersigned counsel, Mr. Trabelsi respectfully submits that at least three of these restrictions violate his First Amendment right to freedom of speech.  Mr. Trabelsi respectfully moves this Honorable Court to compel the government to modify these restrictions.  Specifically, the following provisions violate Mr. Trabelsi's constitutional right to freedom of speech:  (1) the requirement that any statement made by Mr. Trabelsi during authorized, monitored and recorded, non-legal telephone calls may not be divulged in any manner to a third party (including Mr. Trabelsi's attorneys); (2) the restriction that Mr. Trabelsi may send and receive non-legal mail only to and from immediate family members and specified U.S. government officials and agencies; and (3) the restriction prohibiting Mr. Trabelsi from communicating by any means with any member or representative of the news media.  In support of this motion, counsel submits the following.

**Factual Background**

On September 13, 2001, Mr. Trabelsi was arrested in Brussels, Belgium, and charged with criminal conspiracy, attempt to detonate an explosive in order to destroy property or buildings where the perpetrator had to assume humans were present, illegal firearms possession, and membership in a private militia. He subsequently was convicted and sentenced to a ten year term of incarceration.

On November 7, 2006, a grand jury returned a four count superseding indictment in this matter, charging Mr. Trabelsi with conspiracy to kill United States nationals outside of the United States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a); conspiracy and attempt to use weapons of mass destruction, in violation of 18 U.S.C. §§ 2332a and 2; conspiracy to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B; and providing material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2. A superseding indictment, charging the same offenses was returned on November 16, 2007. The charged offenses arise out of the same alleged conduct that formed the basis for Mr. Trabelsi's convictions in Belgium.

Following the completion of his sentence in Belgium, Mr. Trabelsi was extradited to the United States and brought before the court for his initial appearance in this matter on October 3, 2013. At that time, upon the government's motion, Magistrate Judge Debra A. Robinson ordered Mr. Trabelsi held without bond, pending a detention hearing. On October 7, 2013, Mr. Trabelsi waived his right to a detention hearing, and this Court ordered him held without bond pending trial.

Mr. Trabelsi has been held in administrative segregation (solitary confinement) since his arrival in the United States. The United States Marshals Service initially held Mr. Trabelsi on "total lockdown" with no mail, telephone or visitation privileges. Mr. Trabelsi, through counsel contested these restrictions. *See* Motion to Modify Conditions of Pretrial Detention [Dkt. #19]. Before the Court ruled on Mr. Trabelsi's motion, on November 1, 2013, the Acting Attorney General issued the SAMs, which provides for very limited mail, telephone and visitation privileges. *See* Exhibit 1. The SAMs severely restricts Mr. Trabelsi's communications and contacts with other persons. For the reasons set forth below, the restrictions prohibiting his telephone contacts from divulging anything he says, limiting his communication by mail to immediate family members, and prohibiting him from communicating with the media violate Mr. Trabelsi's First Amendment right to freedom of speech.

## Argument

The Attorney General may issue Special Administrative Measures (SAMs) with regard to an individual prisoner if the restrictions are "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a); *see also United States v. Richard Reid*, 369 F.3d 619, 620-21 (1st Cir. 2004). The Attorney General may place an inmate in administrative detention and limit privileges only "as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." 28 C.F. R. § 501.3(a). The restrictions at issue here are not reasonably necessary to protect against such risks and infringe on Mr. Trabelsi's

First Amendment rights.  For these reasons, the Court should direct the government to modify the SAMs.[1]

Mr. Trabelsi has not been convicted of the charged offenses and retains his constitutional rights.  In fact, even convicted prisoners do not forfeit all of their constitutional rights.  *See Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."); *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this

---

[1]The government has previously suggested that this Court does not have the authority to address conditions of confinement and that Mr. Trabelsi must first exhaust administrative remedies before seeking relief from the Court.  There are no applicable administrative procedures through which Mr. Trabelsi could seek relief from the unconstitutional provisions of the SAMs.  Section 501.3(e) of the title 28 of the C.F.R. provides that an inmate may seek review of SAMs through the Administrative Remedy Program, 28 C.F.R. part 542, but that programs is available only to inmates in institutions operated by the Bureau of Prisons ("BOP").  *See* 28 C.F.R. 542.10(b).  It does not apply to federal pretrial detainees housed at the Rappahannock Regional Jail, where Mr. Trabelsi is detained.  *See United States v. Reid*, 369 F.3d 619 (1st Cir. 2004) (noting that government successfully argued that administrative remedies were unavailable to pretrial detainee who sought to challenge SAMs).  After the issuance of the SAMs, defense counsel contacted an attorney in the BOP's Office of General Counsel, who confirmed that Mr. Trabelsi cannot pursue an administrative remedy through the BOP because he is not a BOP inmate.  Counsel also contacted the office within the Department of Justice that oversees the SAMs program and was told that office does not handle administrative challenges to SAMs.  Counsel then contacted a represented from the United States Marshals Service, who indicated that there was no available administrative remedy through the Marshals Service.  Finally, counsel asked government counsel to identify the appropriate means to pursue challenges to the SAMs.  Government counsel provided a copy of the Rappahannock Region Jail's grievance procedures and asked that all requests -- including requests to add individuals to the list of approved contacts -- be made through the Rappahannock officials.  Counsel has worked with the Rappahannock officials to make accommodations *within* the parameters of the SAMs regarding, for example, legal visits, access to legal materials, and access to outside recreation.  However, the Rappahannock officials have informed counsel that they have no authority to modify the SAMs -- including no authority to approve additional contacts -- and cannot process requests to modify or amend the SAMs. On December 12, 2013, counsel again asked government counsel for the contact information for individuals with authority to modify the SAMs, but received no other information regarding any available administrative remedy.

country."). A pretrial detainee may be subject "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Bell v. Wolfish*, 441 U.S. 520 (1979). The restrictions at issue here "otherwise violate the Constitution" by infringing on Mr. Trabelsi's First Amendment rights.

All prisoners retain First Amendment rights to freedom of speech. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *see also Bell*, 441 U.S. at 546 ("pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners"). A prisoner's First Amendment rights includes the "right to the free flow of incoming and outgoing mail." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The SAMs interferes with and restricts Mr. Trabelsi's freedom of speech by limiting his communications with other individuals. Mr. Trabelsi respectfully submits that none of the imposed restrictions are "necessary to protect persons against the risk of acts of violence or terrorism," as required by 28 C.F.R. § 501.3(a). However, while reserving his right to challenge other provisions of the SAMs at a later date, herein Mr. Trabelsi challenges only three specific provisions of the SAMs which unlawfully restrict his First Amendment right to free speech:

(1) the requirement that any statement made by Mr. Trabelsi during authorized, monitored and recorded, non-legal telephone calls may not be divulged in any manner to a third party, SAMs at ¶ 3(b)(iii);

(2) the restriction providing that Mr. Trabelsi may send and receive non-legal mail only to and from immediate family members and specified U.S. government officials and agencies, SAMs at ¶ 3(g)(i) and (ii); and

(3) the restriction prohibiting Mr. Trabelsi from communicating by any means with any member or representative of the news media, SAMs at ¶ 4.

With regard to convicted prisoners, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) (prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system."). Restrictions on the constitutional rights of convicted defendants violate the constitution if the restrictions are an "exaggerated response" to legitimate concerns. *Turner*, 482 U.S. at 87 (citations omitted). In *Turner,* the Court set forth four factors to consider when determining the reasonableness of prison regulations imposed on convicted defendants, directing courts to consider: (1) whether there is a "'valid, rational connection'" between the regulation and a legitimate government interest; (2) whether there are "alternative means of exercising the right that remain open to the prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." *Turner*, 482 U.S. at 89-91.

 **(1) NO VALID RATIONAL CONNECTION**

The legitimate government interest that the SAMs is designed to address is the need to protect persons against the risk of acts of violence or terrorism. Mr. Trabelsi does not contest that preventing acts of violence and terrorism is a legitimate government interest, nor does he contest the authority of the Attorney General to issues SAMs to address this concern. However, the SAMs issued in the instant matter is not based on evidence that supports the restrictions imposed. Instead, the SAMs, provides an exaggerated response to the claimed potential threat.

The Attorney General issued the SAMs based on a finding that "there is a substantial risk that [Mr. Trabelsi's] communications or contacts with persons could result in death or serious bodily injury to persons." SAMs at 1. The Attorney General based this finding on the charges in the indictment and the allegations that form the basis for the charges. SAMs at 2. Mr. Trabelsi, of course, is presumed innocent of these charges and the evidence at trial will demonstrate that he is not guilty. Moreover, Mr. Trabelsi was arrested on September 13, 2001, and has been detained since that date. During that time, there has been no allegation that he used any means of communication to commit or aid and abet any act of violence or terrorism.

In addition to the charged offenses, the Attorney General based his finding on misstatements regarding several incidents that occurred after Mr. Trabelsi's arrest. First, the SAMs notes that, while serving his sentence in Belgium, Mr. Trabelsi was convicted of "assaulting a prison guard." SAMs at 1-2. Mr. Trabelsi was not convicted of physically assaulting a prison guard, but rather making a verbal threat. Moreover, regardless of the nature of that offense, it does not support the restrictions at issue here regarding Mr. Trabelsi's freedom of speech and communications with individuals outside the jail where he is detained.

The SAMs alleges that Mr. Trabelsi "attempted to escape from prison" in Belgium and "was considered a high security risk." *Id.* at 2. Mr. Trabelsi never made any such attempt. The SAMs alleges that a man who had been imprisoned with Mr. Trabelsi was heard (in an intercepted telephone call) speaking of his desire to break Mr. Trabelsi out of prison, but Mr. Trabelsi was not involved in that conversation or any other alleged "plot."[2] *Id.* The SAMs

---

[2] According to the SAMs, the only conversation in which Mr. Trabelsi was heard speaking to this man was allegedly regarding an attempt to get a cell phone to Mr. Trabelsi in prison. Even if that were true, that allegation does not support restriction on Mr. Trabelsi's

also refers to "open source reporting" regarding claims that there was "a plot by extremists to break Trabelsi out of prison." *Id.* The internet reports upon which this statement relies do not allege that Mr. Trabelsi had anything to do with any alleged plot, and the reports indicate only that a number of individuals were arrested and then released the following day. There is no other evidence in the SAMs regarding any escape plot and no one was ever so much as charged with such a plot.

The SAMs also notes that "[a]s recently as August 1, 2013, Belgian prison officials continued to regard Trabelsi as a security threat, and the Director General of the Belgian prison system determined that it was necessary to limit Trabelsi's contacts with other prisoners and take measures aimed at reducing the safety risks posed by Trabelsi's detention." SAMs at 3. The Belgian officials, however, did not impose measures as extreme as those imposed by the Attorney General. *See* Exhibit 2 (August 1, 2013 Memorandum). Mr. Trabelsi's telephone contacts were limited to approved contacts, but those contacts were not limited to immediate family members only and the contacts were not prohibited from divulging anything Mr. Trabelsi said. *Id.* at 2. In Belgium, Mr. Trabelsi's mail was monitored, but his communications by mail were not limited to immediate family members and the only restriction on mail was that he could not correspond with other inmates. *Id.* None of the restrictions in Belgium prohibited him from communicating with members of the media. *Id.*

In support of the SAMs, the Attorney General also refers to an October 2013 newspaper article which states there is a video on Facebook in which an Islamic extremist in Syria (who has

---

communications. There was no allegation that he planned to use a cell phone to commit or aid and abet any act of violence or terrorism.

no personal connection to Mr. Trabelsi) allegedly spoke of a desire to free Muslim prisoners, and named Mr. Trabelsi as one of those prisoners. Even if this newspaper report is accurate, the statements of some unidentified, unrelated individual are no reflection on Mr. Trabelsi's intentions and do not support a finding that Mr. Trabelsi would use communication privileges to commit or aid and abet any act of violence or terrorism.

The only other information the Attorney General cites in support of the SAMs is Mr. Trabelsi's statements made to Federal Bureau of Investigation (FBI) agents during the flight from Belgium to the United States on October 3, 2013. According to the SAMs, Mr. Trabelsi "continues to show a commitment to al Qaeda's goals" because he "spoke reverently about Osama bin Laden and other al Qaeda terrorist." SAMs at 3. The recording of the four-hour discussion the FBI agents had with Mr. Trabelsi on the airplane belies this claim. According to the recording, Mr. Trabelsi told the agents, "I renounce violence," and he "distanced" himself from "terrorism and violence." When he "spoke reverently" of Osama bin Laden, he only admired bin Laden's charitable works, not his acts of violence. The claim in the SAMs that "Mr. Trabelsi is highly sophisticated and remains dedicated to the cause of radical Islamist jihad," simply is false. There is not one shred of evidence to support that claim.

Moreover, even if the government's allegations regarding Mr. Trabelsi were true, there is no evidence to support the finding in the SAMs that Mr. Trabelsi "demonstrated sophistication in communicating his terrorist plans, even while imprisoned." The SAMs itself cites no evidence of "sophistication in communicating" any plans, and there is no such evidence.

The cases in which courts have upheld restrictions such as those at issue here do not compare to the circumstances of this case because here there is both no evidence that

9

Mr. Trabelsi will use contact with fellow prisoners or outside communications to attempt to commit or aid and abet any act of violence or terrorism, and there is affirmative evidence (the last twelve years of his confinement) that he will not do so.  *Cf. Basciano v. Lindsay*, 530 F.Supp. 2d 435 (E.D.N.Y. 2008) (restrictions imposed because defendant solicited murder and composed hit list while incarcerated); *United States v. El Hage*, 213 F.3d 74, 81-2 (2d Cir. 2000) (government maintained that restrictions were necessary to prevent defendant from communicating with and facilitating terrorist acts by unconfined co-conspirators and government supported assertions with "ample evidence").  There simply is no reason to believe that Mr. Trabelsi, who did not use his visitation, mail, or telephone privileges or his contact with others during the last twelve years to commit or aid and abet violence, would now do so.

### (2)  NO ALTERNATIVE MEANS REMAIN OPEN

The restrictions prohibiting the immediate family members who Mr. Trabelsi may communicate with by telephone from divulging what he says in telephone conversations to anyone (including Mr. Trabelsi's lawyers), prohibiting him from communicating by mail with anyone except his immediate family, and prohibiting him from contacting the media directly or indirectly are complete bans on his freedom of speech to anyone but his lawyers and his immediate family.  There are no alternative means of communication open to him.  As set forth below, such total bans are unnecessary given the manner in which his communications are monitored under the SAMs.

### (3)  NO IMPACT OF ACCOMMODATIONS ON GUARDS, OTHER INMATES, OR ALLOCATION OF PRISON RESOURCES

Mr. Trabelsi's request that those he speaks to by telephone be permitted to divulge what

he says to third parties, will have no impact on other inmates, prison authorities, or prison resources, because Mr. Trabelsi is not, at this time, asking to alter the SAMs with regard to telephone privileges in any other way. Because Mr. Trabelsi requests only the same mail privileges as the other inmates at the Rappahannock facility now have, his request to send and receive mail to and from anyone (monitored in accordance with the SAMs) will have no impact on other inmates, prison authorities or prison resources. Similarly, Mr. Trabelsi's third request -- that he be permitted to communicate with the media consistent with the other non-legal communications restrictions in the SAMs -- would not impact other inmates, prison authorities or prison resources.

### (4) ALTERNATIVES TO RESTRICTIONS READILY AVAILABLE

Even if there was reason to believe that Mr. Trabelsi may use communication privileges to promote acts of violence or terrorism, the unchallenged restrictions in the SAMs are sufficient alternative means to achieve the government's goal of prohibiting such communications. Mr. Trabelsi is not, at this time, requesting unmonitored (or completely unrestricted) telephone or mail privileges. The SAMs provides that Mr. Trabelsi may have non-legally privileged telephone calls only with immediate family members. SAMs at ¶ 3(a) and (d). These calls are contemporaneously monitored and recorded by the FBI, and if any "inappropriate activity" is detected, the FBI may immediately terminate the call. *Id*. at ¶ 3(d), (e). With regard to non-legal mail, the SAMs provides that all incoming and outgoing mail is copied and forwarded to the FBI. *Id.* at 3(g)(iii). The mail is then analyzed and only if it is approved is it forwarded to the addressee. *Id.* These restrictions alone are sufficient to ensure that Mr. Trabelsi is not abusing his communication privileges. The additional restrictions of forbidding his immediate family

members from repeating what he says during telephone calls and limiting his mail to immediate family members are not necessary to serve the purposes of the SAMs. Similarly, restricting Mr. Trabelsi from communicating with the media (either directly or through a third person) is not necessary given the limited means through which Mr. Trabelsi could possibly communicate with the media and the provisions for monitoring his telephone calls and mail.

The extreme restriction of limiting mail to immediate family members, when the mail is strictly monitored, was not imposed on Mr. Trabelsi over the last twelve years of his incarceration in Belgium and has not been imposed on other U.S. pretrial detainees charged with terrorism related offenses. *See, e.g., United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010) (SAMs permitted monitored visits and telephone calls with immediate family and monitored mail *with all others*). The restrictions imposed by the SAMs are extreme and excessive: Mr. Trabelsi was securely held for twelve years in Belgium without such extreme measures.

## Conclusion

For the foregoing reasons, and such other reasons as may be presented at a hearing on this motion, the restrictions placed on Mr. Trabelsi by the SAMs are unreasonable violations of his First Amendment right to freedom of speech. Mr. Trabelsi respectfully requests that this Honorable Court compel the government to modify the SAMs by eliminating: (1) the requirement that any statement made by Mr. Trabelsi during authorized, monitored and recorded, non-legal telephone calls may not be divulged in any manner to a third party; (2) the restriction providing that Mr. Trabelsi may send and receive non-legal mail only to and from immediate family members and specified U.S. government officials and agencies; and (3) the restriction prohibiting Mr. Trabelsi from communicating by any means with any member or representative of the news media.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20004
(202) 208-7500 ext. 109