# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 06-089 (RWR)** |
| **v.** | : | |
| **NIZAR TRABELSI,** | : | |
| **Defendant.** | : | |

### Government's Omnibus Opposition to Defendant's Motions to
### Compel Modifications to his Conditions of Confinement

The United States of America, by and through its undersigned counsel, respectfully opposes the defendant Nizar Trabelsi's motion to compel modification of restrictions incorporated into the Special Administrative Measures (SAMs) authorized by then-Acting Attorney General James M. Cole (ECF Docket No. 37, "SAMs Motion") and his motion to compel modification of non-SAMs restrictions authorized by prison officials (ECF Docket No. 40, "Non-SAMs Motion").  As discussed below, each of those motions is meritless and should be denied in its entirety.

The defendant is charged with conspiring with others to perpetrate a mass-casualty bombing directed against Americans and is now being held in custody in the United States, after fighting for years against that extradition, pending trial on charges for which he could face multiple life sentences.  That fundamental basis, buttressed by other indications of his dangerousness over the years of his previous incarceration in Belgium, amply supports that he is a threat to security both outside and inside the prison and the imposition of the SAMs and non-SAMs restrictions are appropriate.  The defendant's attempt to take issue with selected justifications supporting the imposition of those restrictions simply falls flat in the face of the overwhelming totality of circumstances justifying them.

The defendant challenges three provisions of the SAMs (SAMs Motion at 5) as an alleged violation of his First Amendment rights: (1) the restriction that any statement made by the defendant during an authorized non-legal (non-attorney) telephone call may not be divulged in any manner to a third party; (2) the restriction providing that the defendant may send and receive non-legal mail only to and from immediate family members and specified government officials and agencies; and (3) the restriction prohibiting the defendant from communicating by any means with any member or representative of the news media.  Each of these restrictions is reasonably necessary to safeguard against the substantial risk that defendant's communications or contacts with third parties could result in death or serious bodily injury to others.

The defendant also challenges three non-SAMs restrictions (Non-SAMs Motion at 1) as an alleged violation of his Sixth Amendment right to counsel: (1) the requirement that he remain handcuffed during meetings with counsel; (2) the requirement that he remain handcuffed while using a computer to review discovery; and (3) the restriction limiting his outside recreation time to designated areas.  Each of these restrictions is reasonably necessary for the safe and orderly administration of the detention facility and to prevent needless harm to others.

## I.   Procedural and Factual Background

The following is an overview of the charges pending against the defendant and the circumstances leading to his detention and the imposition of various restrictions on his confinement conditions, including the imposition of the challenged SAMs and non-SAMs restrictions.

### A.   Indictment on Federal Crimes of Terrorism

On April 7, 2006, a federal grand jury returned an indictment, charging the defendant with Conspiracy to Kill United States Nationals Outside of the United States, in violation of 18

U.S.C. §§ 2332(b)(2) and 1111(a) (Count One); Conspiracy and Attempt to Use Weapons of

Mass Destruction, in violation of 18 U.S.C. §§ 2332a and 2 (Count Two); Conspiracy to Provide

Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §

2339B (Count Three), and Providing Material Support and Resources to a Foreign Terrorist

Organization, in violation of 18 U.S.C. §§ 2339B and 2 (Count Four).  On November 16, 2007, a

federal grand jury returned a superseding indictment, charging the same offenses.  All of the

counts in the superseding indictment are listed as federal crimes of terrorism in 18 U.S.C. §

2332b(g)(5)(B).  Counts One and Two carry a maximum penalty of life imprisonment.

### B.   Defendant's Extradition, Initial Appearance and Order of Pretrial Detention

On October 3, 2013, the defendant was extradited to the United States from Belgium.

The defendant had his initial appearance in this Court that same day, before Magistrate Judge

Deborah A. Robinson.  The United States orally moved for the defendant's pretrial detention

under the Bail Reform Act, 18 U.S.C. § 3141, et seq., advising the Court that this case involves:

(1) crimes of violence and offenses listed in 18 U.S.C. § 2332b(g)(5)(B) (see 18 U.S.C. §

3142(f)(1)(A)); (2) offenses for which the maximum sentence is life imprisonment (see 18

U.S.C. § 3142(f)(1)(B)); and (3) a serious risk that the defendant will flee (see 18 U.S.C. §

3142(f)(2)(A)).  Defense counsel requested that the Court schedule a detention hearing.  The

Court set the hearing for October 8, 2013.  Pending the detention hearing, the Court ordered the

defendant remanded to the custody of the United States Marshal Service ("USMS").

On October 6, 2013, the United States filed a memorandum and proffer in support of

pretrial detention (ECF Docket No. 15), and at a status hearing held on October 7, 2013, the

United States orally proffered additional information in support of its detention request.  During

the course of that status hearing, the defendant orally waived his right to a detention hearing and

written factual findings in support of detention and consented to his pretrial detention, which this Court ordered.

**C.    Defendant's Detention at the Rappahannock Regional Jail**

Since his initial appearance before the Court on October 3, 2013, the defendant has been in the custody of the USMS and housed in the Rappahannock Regional Jail (RRJ) in Stafford, Virginia.  After careful evaluation of the significant charges pending against the defendant, his substantial prior criminal history (including convictions for terrorism-related offenses) and other information related to the defendant, the USMS and prison officials determined that the defendant would be placed in administrative segregation, along with restrictions on his outside contact via telephone, mail, and jail visitation.   This determination was based on security concerns for the safety of the public, RRJ staff, USMS personnel, and the defendant himself.

During the course of subsequent briefing regarding this administrative determination, the government submitted multiple declarations from USMS and prison officials detailing the justification for the defendant's placement and restrictions.  These declarations included the declarations of Chief Deputy United States Marshal ("CDUSM") David Baldwin, RRJ Deputy Superintendent D. Phil Grimes, and USMS Associate General Counsel Kelly McDonald.  See ECF Docket no. 26, Att. 1 (Baldwin Declaration) and Att. 2 (Grimes Declaration) and Docket no. 30, Att. 1 (McDonald Declaration).

**D.    Authorization and Implementation of the SAMs**

The SAMs were imposed pursuant to 28 C.F.R. § 501.3(a) and authorized by then-Acting Attorney General James M. Cole, by memorandum (Authorization Memorandum), dated November 1, 2013.  See SAMs Motion, Exh. 1.  In the Authorization Memorandum at page 3, the Acting Attorney General explained, "[b]ased upon information provided to me of Trabelsi's

proclivity for violence, I find that there is a substantial risk that his communications or contacts

with persons could result in death or serious bodily injury to persons, or substantial damage to

property that would entail the risk of serious bodily injury to persons." As a result, the Acting

Attorney General requested the implementation of SAMs to restrict the defendant's "access to

the mail, the media, the telephone, and visitors." Id.

The Authorization Memorandum detailed, over the course of three pages, the information

that was relied upon in making the Acting Attorney General's decision. That information

included, for example, reports that:

> Nizar Trabelsi is accused of being a member of al Qaeda who met Osama bin
> Laden in Afganistan, offered to carry out a suicide bomb attack against U.S.
> interests, and took substantial steps toward carrying out that attack, including
> purchasing chemicals to make a 1,000 kilogram bomb. Trabelsi was arrested in
> Belgium on September 13, 2001, before he was able to carry out the planned
> suicide bomb attack. In 2003, following his trial and conviction for terrorism-
> related offenses, he was sentenced to ten years in a Belgian prison. He served that
> sentence, as well as an additional six months for assaulting a prison guard. While
> in Belgian custody, Trabelsi attempted to escape from prison and was considered
> a high security risk. After completing his sentence, Trabelsi remained
> incarcerated pending his extradition.

Authorization Memorandum at 1-2.

By way of further example, the Authorization Memorandum set forth that "as recently as

August 1, 2013, Belgian prison officials continued to regard Trabelsi as a security threat, and the

Director General of the Belgian prison system determined that it was necessary to limit

Trabelsi's contacts with other prisoners and take measures aimed at reducing the safety risks

posed by Trabelsi's detention." Id. at 2-3. Moreover, the Authorization Memorandum

recognized that the defendant continues to show a commitment to al Qaeda's goals and

referenced his October 3, 2013 statements to the Federal Bureau of Investigation (FBI) during

transport to the United States, in which he spoke reverently about Osama bin Laden and other al

Qaeda terrorists, including that bin Laden had been like a father to him.  Id. at 3.

The Acting Attorney General concluded that the SAMs "are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity."  Id. at 17.  The Acting Attorney General further explained that "these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons."  Id.  The Authorization Memorandum also detailed, as discussed below, the rationale for each specific category of restrictions placed on the defendant's communications or contacts.  Id. at 17-18.

## II.    A Substantial Risk Exists that Removing the Restrictions on Defendant's Communications Could Endanger Others, and the SAMs Are Reasonably Tailored to Protect Against That Risk[1]

The challenged SAMs must be upheld, even assuming they impinge in some manner on defendant's constitutional rights, because they are reasonably related to the legitimate penological interest of ensuring that defendant does not cause harm either inside or outside the prison walls by engaging in prohibited communications with the media or third parties.

### A.    The SAMs Are Reasonably Related to a Legitimate Penological Interest

---

[1] The defendant is correct (SAMs Motion at 4 n.1) that administrative remedies must be exhausted before seeking relief from the Court for concerns regarding the SAMs. See 28 C.F.R. § 501.3(e) ("The affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program, 28 CFR part 542"); see also Al-Owhali v. Ashcroft, 279 F.Supp.2d 13, 17 n.5 (D.D.C. 2003) (recognizing that "a judicial challenge to the SAM that currently covers plaintiff could not be mounted at this time as plaintiff concedes that he has failed to exhaust his administrative remedies in regards to the existing SAM").  For the limited purpose of reaching an expeditious resolution of the issues raised in the instant motion, the government does not request the Court to dismiss this motion on grounds of failure to exhaust administrative remedies.

A detainee does not possess the full range of freedoms of an unincarcerated individual. Bell v. Wolfish, 441 U.S. 520, 545-46. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Pell v. Procunier, 417 U.S. 817 (1974) (citing Price v. Johnston, 334 U.S. 266, 285 (1948)). A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Id. at 822. The fact of confinement as well as the legitimate goals and policies of the penal institution limit these retained constitutional rights. Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977).

The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). In Turner, the Court set forth four factors to consider when determining the reasonableness of prison regulations imposed on defendants, directing courts to consider: (1) whether there is a "valid, rational connection" between the regulation and a legitimate government interest; (2) whether there are "alternative means of exercising the right that remain open to the prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." Id. at 89-91.

The burden is on the defendant to demonstrate that the challenged restrictions are unreasonable when evaluating the Turner factors. Covino v. Patrissi, 967 F.2d 73, 79 (2d Cir. 1992) ("The burden is upon the prisoner to show that a challenged prison regulation is unreasonable" under Turner). The Court "need not hold an evidentiary hearing, but may proceed by proffer" in conducting the Turner analysis. United States v. Hashmi, 621 F.Supp.2d 76, 86

(S.D.N.Y. 2008) (citing United States v. El-Hage, 213 F.3d 74, 82 (2d Cir. 2000)).

A review of the Acting Attorney General's SAMs determination leads to the inescapable conclusion regarding its reasonableness.

**1.    The SAMs Restrictions Bear a Clear Rational
Connection to a Legitimate Government Interest – the
Prevention of Death or Serious Bodily Injury To Others**

The defendant does not contest that preventing acts of violence and terrorism is a legitimate government interest, nor does he contest the authority of the Attorney General to issue SAMs to address that concern. SAMs Motion at 6.  Rather, the defendant asserts that the challenged SAMs provisions are "not based on evidence that supports the restrictions imposed" and represent an exaggerated response to the claimed potential threat. Id.  The defendant's assertions are meritless.  The Authorization Memorandum provides ample evidence of the defendant's connections to terrorism and demonstrates a clear rational relationship between the challenged restrictions and the legitimate governmental purpose of safeguarding the public and preventing acts that could lead to death or serious bodily injury.

**a.    The Challenged Restrictions Are Reasonably Necessary
to Prevent the Communication of Dangerous Messages**

The challenged communication restrictions are reasonably necessary to ensure others do not pass on, whether intentionally or inadvertently, forbidden messages from the defendant to the media or third parties.  The courts have long recognized this concern as a legitimate justification for special administrative measures under section 501.3(a).  See Turner, 482 U.S. at 93 ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); United States v. Hammoud, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); United States v. Johnson, 223 F.3d 665, 673 (7th Cir. 2000)

("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); United States v. Salameh, 152 F.3d 88, 108 (2d Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); United States v. Ali, 396 F.Supp.2d 703, 709 (E.D.VA 2005) (taking note that "al-Qaeda trains its followers to use a variety of means to communicate with their confederates from prison").

### b. The Authorization Memorandum Amply Supports the Imposition of the Challenged Restrictions

The Authorization Memorandum devotes numerous paragraphs to detailing the defendant's connections to terrorism and other dangerous activities, both leading up to and in the years subsequent to the defendant's arrest and conviction in Belgium on terrorist-related charges.

The Authorization Memorandum explains, for example at pages 2-3, that in September 2000, the defendant traveled to Afghanistan to attend training for jihad. In the spring of 2001, he met with Osama bin Laden and offered to carry out a suicide bomb attack against United States interests. He then attended an al Qaeda training camp in Afghanistan where he met with other conspirators with whom he was to form a cell for the purpose of carrying out the attack. Subsequently, the defendant traveled to Belgium and purchased a large quantity of chemicals to be used in manufacturing a 1,000 kilogram bomb. In August 2001, he conducted surveillance of the Kleine-Brogel Air Force Base in Belgium, a NATO base where American service members were stationed, as a target for the attack. In searching the defendant's apartment at the time of his arrest in September 2001, Belgian authorities found an Uzi sub-machine gun, ammunition, a list of chemicals for making the bomb, and fraudulent identification documents. Days later, Belgian authorities recovered a large quantity of chemicals from the business establishment of

the defendant's associate.

The Authorization Memorandum further details, at pages 2-3, the threat that the defendant posed to security following his conviction in 2003 for terrorism-related charges. Belgian authorities, for instance, uncovered a plot by associates to free Trabelsi from prison in 2007 and a plan to have a cellular telephone and charger smuggled into the Belgian prison for the defendant's use. The defendant also continued to show a commitment to al Qaeda's goals, including statements to the FBI on October 3, 2013, in which he spoke reverently about Osama bin Laden and other al Qaeda terrorists, even considering bin Laden to have been like a father to him. In addition, the defendant has been a source of inspiration to other Islamic terrorists. According to an October 23, 2013 article in the Belgian newspaper *De Standaard*, a Flemish fighter claims that he is in Syria and that plans exist to free Muslim brothers, including the defendant. The Authorization Memorandum recognizes the defendant as "highly sophisticated and remain[ing] dedicated to the cause of radical Islamist jihad." Id. at 3.

<blockquote>
c.      The August 2013 Decision of Belgian
Director General of Prison Facilities Further
Demonstrates that the Defendant "Presents
a Constant Security Threat"
</blockquote>

The Acting Attorney General's determination is consistent with the August 1, 2013, decision by the Belgian Director General of the prison facilities previously housing the defendant. SAMs Motion, Exh. 2 (hereinafter "Belgian Director General's Decision"). In that decision, the Director General determined that "the resumption of [a] special individual security regime [for the defendant] is still necessary to ensure both the internal and external security whilst finding the right balance in planning the detention of the concerned party." Belgian Director General's Decision at 1. That decision explained that the defendant "presents a constant security threat." Id. For example, "when in contact with other prisoners, he pressured other

individuals and engaged in proselytism . . . [and] succeeded in creating a protest movement thereby threatening the safety in one of these institutions." Id. The decision continues to explain that, "[t]he detention of [the defendant] [wa]s also further complicated by abundant information pertaining to his escape plans." Id. Additionally, the decision further elaborates that the "end of his detention in [a previous detention] facility in [May 29, 2013] did not go well; his behavior deteriorated, to the point of threatening retaliation against members of management." Id. The defendant's "specific situation with respect to judicial proceedings exacerbate[d] this problem . . . an extradition which he strongly oppose[d]." Id.

Although it was "decided to consider a relaxation of his [detention] regime" due to stabilizing of his behavior at one point, the more lenient "control measures and special safety measures turned out to be insufficient." Id. As a result, restrictions on the conditions of his confinement were implemented, such as various limitations on his personal activities, incoming and outgoing correspondence, personal visits, and phone use. Id. at 1-3. Those restrictions comprised of, for example, "systematic control of incoming and outgoing correspondence," including that the "contacts of the individual must be supervised to evaluate and mitigate risks to security and order." Id. at 2. The restrictions also comprised of "partial loss of use of the phone," including that the "interested party is allowed to call the numbers that were authorized by management" and emphasizing that "[g]iven the risk of escape, it is imperative to limit the contacts of Mr. Trabelsi which could facilitate an escape or put the security of the institution and staff at risk." Id. at 2-3.[2]

---

[2] Based apparently on the defendant's reading of these provisions and without further citation, he asserts (SAMs Motion at 8) that the challenged restrictions at issue here, regarding contacts with the media and third parties, were not in place in Belgium. That conclusion is not evident from merely the plain language of those provisions, and undersigned government counsel has not yet been able to verify that contention through efforts reaching out to Belgian government

**d.      The Defendant's Attempt to Undermine
the Justifications for the Challenged
<u>Restrictions Must Fail</u>**

Based on the defendant's relationships with senior members and associates of al Qaeda, his past proclivity for violence, his criminal conviction in Belgium, and his demonstrated sophistication in communicating even while imprisoned, the SAMs are the only means available to mitigate the threat posed by him.   The defendant cannot overcome the totality of the information supporting the imposition of those restrictions.  His attempt to forward his challenge by taking issue with selected justifications supporting those SAMs simply fails.

Notably for example, the defendant fails to even address the fundamental concern that he has already been convicted and sentenced to a ten-year term of incarceration for significant terrorism-related charges.  Similarly, as for the pending terrorism-related charges against him, the defendant merely states that he is presumed innocent of those charges and the evidence at trial will demonstrate that he is not guilty (SAMs Motion at 7).  This bald assertion does little to assuage the substantial security concern arising from the superseding indictment in which he is charged with attempting to perpetrate, in a conspiracy with others, a suicide bombing against American interests and could face multiple life sentences if convicted.

The defendant moreover cannot credibly distance himself from his recent statements during transport to the United States, in which he spoke reverently about Osama bin Laden and

---

officials.  To the extent that such clarification is received after the government's filing of the instant opposition, the government will notify the Court.  Even assuming, however, that the defendant's contention is correct, the Belgian Director General's Decision still clearly demonstrates that the defendant was a constant security threat in Belgium and required a special security regime to address the danger that he posed while incarcerated.  That the United States government decided to safeguard against the danger posed by the defendant through stricter, though nonetheless reasonable, restrictions is entirely appropriate.  That decision is especially appropriate considering the heightened concerns posed by the defendant now that he is in custody in the United States (the country that was the focus of his suicide bomb attack) and faces the potential of multiple life sentences if convicted of the pending charges.

said that he admired Abu Zabaida, another high level leader of al Qaeda.  The defendant's
contention that "he only admired bin Laden's charitable works, not his acts of violence" (SAMs
Motion at 9), is directly undermined by, among other things, the fact that the defendant
personally met with bin Laden and offered to carry out a suicide bomb attack against United
States interests.  Authorization Memorandum at 2.  The defendant then attempted to perpetrate
that attack with the support of al Qaeda operators.  On their face, the defendant's statements
demonstrate his continued sympathies to the goals of al Qaeda and the cause of radical Islamist
jihad.

The defendant's claim (SAMs Motion at 7-8) that he was never involved in an attempt to
escape from prison in Belgium is similarly meritless and directly at odds with the Belgian
Director General's Decision.  That decision specifically explains that, "the detention of [the
defendant] [wa]s also further complicated by abundant information pertaining to his escape
plans."  The Authorization Memorandum also explains that, among other evidence that
substantiated one such plot, Belgian authorities intercepted a call in January 2007 of a former
inmate who had been imprisoned with Trabelsi in 2002 but subsequently released, in which he
discussed the escape plot with his wife.[3]  Authorization Memorandum at 2.  Later in 2007,
Belgian security services thwarted a plot by extremists to break the defendant out of prison.  Id.
Numerous extremists were arrested, although the charges against them were dropped.  Id.
Moreover, the Authorization Memorandum refers to an Islamic extremist in Syria who spoke of
a desire to free Muslim prisoners and named the defendant as one of those prisoners.  Id. at 3.
Even assuming, as the defendant contends, that he was not personally involved in orchestrating

---

[3]  In another intercepted call, this former inmate and the defendant discussed plans to have a
cellular telephone and charger smuggled into the Belgian prison for the defendant's use (id.),
which further emphasizes the need to take precautions to prevent the defendant from
surreptitiously engaging in prohibited communications with others.

any of those escape plans, those plans still clearly demonstrate the defendant's ability to inspire others to commit criminal deeds on his behalf and the need to protect against communications by the defendant which could be designed to incite such acts.

The defendant's additional assertion that he "was not convicted of physically assaulting a prison guard, but rather making a verbal threat" (SAMs Motion at 7), even if true, still demonstrates his past proclivity for violence and similarly supports imposition of the SAMs.

> **2.     Under the SAMs Restrictions in Place, the Defendant Remains Able to Communicate with His Attorneys and Other Legal Staff Working on His Behalf, Immediate Family Members, and Even Non-Family Members on a Case-by-Case Basis**

Despite the significant security threat posed by the defendant, the SAMs do not totally restrict his communications with others.  The SAMs provisions do not constitute "complete bans on his freedom of speech to anyone but his lawyers and his immediate family," contrary to the defendant's bald assertion (SAMs Motion at 10).

The SAMs provide for unaccompanied visits, unmonitored telephone conversations, and unreviewed mail exchanges with his attorneys and other legal staff.  Authorization Memorandum at 5-9.  The SAMs additionally provide for monitored telephone calls, in-person visits and mail communications with immediate family members.  Id. at 10-14.  "Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis."  Id. at 10 n.7. The defendant also has mail privileges with "U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entitites."  Id. at 12.  In addition, "[i]f a USMS/[Bureau of Prison (BOP)]/[Detention Facility (DF)]- and/or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF."  Id. at 14.  The defendant is further allowed, and has had, Consular communications and visits, with

certain restrictions.  Id. at 17.  Notably, the government has worked with the defendant, where possible, to make accommodations during the implementation of the SAMs.  See, e.g., SAMs Motion at 4 n.1 ("Counsel has worked with Rappahannock officials to make accommodations within the parameters of the SAMs regarding, for example, legal visits, access to legal materials, and access to outside recreation."); See also Ali, 396 F.Supp.2d at 710 (taking "notice that the government has not been inflexible with the implementation of the SAMs upon Defendant" to conclude that the "government's implemention of the SAMs has been reasonable, and is not punitive in nature").

The provisions of the SAMs restricting the defendant's telephone contacts from divulging the content of their conversations, limiting the defendant's communication by mail primarily to immediate family members, and prohibiting the defendant from communicating with the media are reasonable restrictions given the security threat that he poses.  In the face of this legitimate security concern, no comparative justification exists why the defendant should be permitted access to the media and additional third parties, especially given the many others with whom he is able to discuss any personal concerns, such as his attorneys, the courts, Congress, and immediate family members.  See Turner, 482 U.S. at 90 ("Where 'other avenues' remain available for the exercise of the asserted right . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation'") (citing Pell, 417 U.S. at 827); Ali, 396 F.Supp.2d at 709-10 (finding persuasive that "[a]lthough he may not communicate with other inmates or non-family visitors, Defendant retains ability to meet with and talk to his attorneys and family members").

The express language of the Authorization Memorandum makes clear that these restrictions on his communications were not taken lightly.  Rather than a purported "exaggerated

response" as the defendant contends, the Authorization Memorandum, at page 17, explicitly states that "these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons."

The Memorandum further elaborates that "[w]ith respect to telephone privileges, the SAMs are reasonably necessary because of the high probability of calls to co-conspirators to arrange terrorist or criminal activities." Id. "With respect to mail privileges, the SAMs are reasonably necessary to prevent the inmate from receiving or passing along critically timed messages." Id. The Memorandum also specifically details why the prohibition on contact with the media is reasonably necessary. In particular, "[c]ommunications with the media could pose a substantial risk to public safety if the inmate advocates terrorist, criminal, and/or violent offenses, or if he makes statements designed to incite such acts." Id. at 18. Moreover, based upon the defendant's past behavior, the Acting Attorney General explains that "it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or terrorist act to justify such media restrictions." Id.

Given that, among other things, the defendant is charged with conspiring with others to perpetrate a mass-casualty bombing against American interests and he is now housed by American authorities, the Acting Attorney General's concerns are clearly justified. Another demonstrated attempt to conduct a violent or terrorist act should not be the threshold for imposition of the challenged restrictions; the restrictions are specifically designed to prevent the defendant from being able to make such an attempt in the first place. See 28 C.F.R. § 501.3(a) (special administrative measures "may be implemented upon written notification . . . that there is

a substantial *risk* that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons") (emphasis added).[4]

> **3.      In Addition to the Significant Security Risk, the Requested SAMs Modifications Will Have a Substantial Impact on the Allocation of Law Enforcement Resources**

The government "need not show that the SAMs are the least restrictive means of achieving its goal," Hashmi, 621 F.Supp.2d at 87 (citing Turner, 482 U.S. at 90), however, the Authorization Memorandum, as set forth above, explains that "these measures are the least restrictive that can be tolerated" given the danger posed by the defendant.  There is simply no basis for the defendant's contention (SAMs Motion at 10-11) that the requested modifications will have "no impact."

Not only will the requested modifications result in significant additional security risk, they will have a substantial impact on the allocation of law enforcement resources.   Most notably, with respect to the requested modifications that the defendant be permitted to "send and receive mail to and from anyone (monitored in accordance with the SAMs)" and be "permitted to communicate with the media" consistent with the other restrictions in the SAMs, the defendant fails to recognize the practical ineffectiveness of these alternatives or the significant burden that they will place on government personnel.

---

[4]  The defendant appears to argue (SAMs Motion at 7), incorrectly, that there cannot be a substantial risk that his unrestricted communications could harm others unless the government can specifically identify that he has already "used any means of communication to commit or aid and abet any act of violence or terrorism" while incarcerated in Belgium.  The defendant cites no authority for that proposition, and we are aware of none.  On the contrary, the courts have recognized that SAMs are a lawful means of preventing dangerous communications by detainees before any ever occur.  See, e.g., Ali, 396 F.Supp.2d at 710 (recognizing that the SAMs are intended to address "the risk posed by the *possible exchange* of information by a defendant") (emphasis added).

The effectiveness of monitoring all of these additional communications is substantially undermined by the fact that law enforcement would be called upon to complete the difficult task of deciphering any dangerous communications likely made in a foreign language and subtly or in code to avoid detection.  Such monitoring would necessarily involve the significant time and expense of linguists, who would be asked to translate the communications in the hopes that any hidden meaning would not be lost in translation.  Moreover, given that prohibited communications would likely be made subtly and in code, only law enforcement personnel well-informed and well-trained on the specifics regarding this matter likely could be devoted to this review, further adding to the burden of defendant's suggested modifications.  See Ali, 396 F.Supp.2d at 710 (giving weight to fact that "special accommodations would impose unreasonable additional burdens on the resources of the Alexandria Detention Center and the FBI") (internal citations omitted).

In addition to monitoring the content of each of these communications to and from third parties and the media, law enforcement would also need to evaluate the source or intended source of those communications -- communications likely be sent to and received from individuals thousands of miles away overseas.  Such evaluation of the defendant's additional contacts would likely require, among other things, the close coordination between United States and foreign law enforcement personnel.

Finally, even with the devotion of these significant additional resources and law enforcement's best efforts, the question would likely still remain whether all prohibited communications were detected between the defendant and others.  The risk associated with any such error would be especially dire with respect to contacts with the media, given that any prohibited communications could be quickly relayed by the media to a wide audience of entirely

unknown individuals around the world.  By limiting defendant's communications, the

Government can better ensure its objective of protecting the public's security and preventing

needless harm to others.

### 4. No Ready Alternatives Exist to the Challenged Modifications

The SAMs are narrowly-tailored for the specific purpose of preventing others from

passing on, whether intentionally or inadvertently, forbidden messages that could help facilitate

or incite terrorist attacks.  No ready alternatives exist to ensure that the defendant does not cause

harm either inside or outside the prison by engaging in such dangerous communications.  The

Supreme Court has recognized that the government is not required to "set up and then shoot

down every conceivable alternative method of accommodating [a defendant's] constitutional

complaint."  Turner, 482 U.S. at 90.

Contrary to defendant's contention (SAMs Motion at 11), the unchallenged restrictions in

the SAMs are not, alone, sufficient to protect against the danger posed by the defendant.  As

discussed above, the monitoring of defendant's communications with the media and other third

parties is not practically effective and will place a substantial burden on limited government

resources.  See El-Hage, 213 F.3d at 81 (upholding challenged restrictions, including strict

restrictions on communications, where those restrictions serve "the regulatory purpose of

preventing El-Hage from communicating with his unconfined co-conspirators, and thereby from

facilitating additional terrorist acts by those co-conspirators") (citing Bell, 441 U.S. at 535).

Moreover, the defendant incorrectly asserts that similar SAMs restrictions have not been

placed on other pretrial detainees charged with terrorism-related offenses.  See, e.g., Ali, 396

F.Supp.2d at 710 (finding the SAMs imposed upon defendant, including restricted access to "the

mail, the media, the telephone, and visitors," were "not unique," as "[t]errorism and espionage

matters present special security concerns because of the risk posed by the possible exchange of information by a defendant in such a case with someone outside the detention center," and referencing the cases against Zacarias Moussaoui and John Walker Lindh in that district).

### III.   The Defendant's Motion to Compel Modification of the Non-SAMs Restrictions Is Baseless and Should Be Denied

Due to the inherent nature of a prison, a place where dangerous individuals are confined together, a prison setting is "sometimes explosive, and always potentially dangerous." Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976).  Prison officials have the "unenviable task of keeping dangerous men in safe custody under humane conditions." Spain v. Procunier, 600 F.2d 189, 193 (9th Cir. 1979).   As a result, prison officials are given broad discretion to manage their correctional facilities.  Turner, 482 U.S. at 90.  A pretrial detainee may be subject "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." Bell, 441 U.S. at 536-37.  The Supreme Court has consistently held that a prison's internal security is a matter normally left to the discretion of prison administrators, and federal courts should rarely interfere with this discretion.  Hewitt v. Helms, 459 U.S. 460, 472-74 (1983); Bell, 441 U.S. at 547.  Courts are "ill equipped to deal with the increasingly urgent problems of prison administration," Turner, 482 U.S. at 84, and "the problems of prisons in America are complex and intractable, and . . . are not readily susceptible of resolution by decree." Id. at 84 (citing Procunier, 416 U.S. at 404-5.

As the Supreme Court stated:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive Branches of Government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of

powers concerns counsel a policy of judicial restraint.

Turner, 482 U.S. at 84-85.  In reviewing the constitutionality of decisions of prison

administrators, a lesser standard of scrutiny is appropriate for such decisions and great deference

should be given to the decisions of prison officials.  Id. at 84; Frazier v. Dubois, 922 F.2d 560,

562 (10th Cir. 1990).

As discussed above, when reviewing a prison restriction, the restriction must be

considered valid if it is reasonably related to legitimate penological interests.  Turner, 482 U.S. at

89.  The Supreme Court explained:

> In our view, such a standard is necessary if "prison administrators . . . ,
> and not the courts, [are] to make the difficult judgments concerning
> institutional operations."  Jones v. North Carolina Prisoners' Union, 433
> U.S. at 128.  Subjecting the day-to-day judgments of prison officials to an
> inflexible strict scrutiny analysis would seriously hamper their ability to
> anticipate security problems and to adopt innovative solutions to the
> intractable problems of prison administration.  The rule would also distort
> the decisionmaking process, for every administrative judgment would be
> subject to the possibility that some court somewhere would conclude that
> it had a less restrictive way of solving the problem at hand.  Courts
> inevitably would become the primary arbiters of what constitutes the best
> solution to every administrative problem, thereby "unnecessarily
> perpetuat[ing] the involvement of the federal courts in affairs of prison
> administration."

Turner, 482 U.S. at 89.

As discussed above, the Turner Court developed a four-pronged test to determine the

reasonableness of a prison restriction.  First, there must be a rational relationship between the

prison restriction and the legitimate governmental interest put forward to justify it.  Turner, 482

U.S. at 89.  Second, the reviewing court should determine whether there are alternative means by

which the inmates may exercise the asserted constitutional right.  Id. at 90.  Third, the court

should consider the impact that accommodation of the asserted right will have on the guards,

other inmates and allocation of prison resources.  Id.  Finally, the court must look for ready

alternatives to the challenged activity.  Id.  Throughout this review, the Court cautions,

substantial deference must be given to the decisions of prison administrators.

The defendant challenges three non-SAMs restrictions (Non-SAMs Motion at 1) as an

alleged violation of his Sixth Amendment right to counsel: (1) the requirement that he remain

handcuffed during meetings with counsel; (2) the requirement that he remain handcuffed while

using a computer to review discovery; and (3) the restriction limiting his outside recreation time

to designated areas.[5]  As with the challenged SAMs restrictions discussed above, reviewing the

challenged non-SAMs restrictions under the test enunciated in Turner reveals that those

reasonably necessary restrictions are wholly security oriented and not for the purpose of

punishment.  In particular, the attached declaration of RRJ Deputy Superintendent D. Phil

Grimes ("Grimes Decl."), dated February 28, 2014, amply demonstrates that those restrictions

promote the safe and orderly administration of the detention facility and prevent harm to others.

Notably, that declaration clarifies key factual inaccuracies in defendant's motion regarding his

conditions of confinement.

---

[5] As the defendant correctly states (Non-SAMs Motion at 3), the SAMs focus on restricting the
defendant's communications or contacts to safeguard against the substantial risk that such
communications or contacts could result in death or serious bodily injury to others.  See 28
C.F.R. § 501.3(a) ("These procedures may be implemented upon written notification . . . that
there is a substantial risk that a prisoner's communications or contacts with persons could result
in death or serious bodily injury to persons, or substantial damage to property that would entail
the risk of death or serious bodily injury to persons") (emphasis added).  The SAMs do not
address the restrictions at issue here regarding handcuffs during legal meetings, handcuffs while
reviewing discovery materials, and outside recreation limited to designated areas.  Rather, those
restrictions have been imposed based on the considered judgment of the prison officials.  The
SAMs were not intended to address such day-to-day decisions regarding the safe and orderly
management of detainees in the prison, which are best left to the judgment of prison officials
given their experience and expertise in those matters.  See Turner, 482 U.S. at 84-85
(recognizing the considerable deference that must be given to the decisions of prison officials
regarding the administration of the facility).  Furthermore, the SAMs specifically state that, "If
usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies
shall control."  Authorization Memorandum at 4.

**A.    The Challenged Non-SAMs Restrictions Serve the**
**Legitimate Government Interest of Maintaining**
**Security and Good Order in the Institution**

The restrictions requiring handcuffs during the defendant's use of the computer and legal

visits as well as the restriction regarding his use of designated recreational areas are based on the

legitimate governmental interest of maintaining security and good order in the institution.  These

restrictions are consistent with the defendant's placement in Administrative Segregation, as "a

high profile defendant with serious charges, a history of escape, and a serious criminal history

with convictions for dangerous offenses."  Grimes Decl., ¶ 9.[6]  That designation also is

consistent with the Authorization Memorandum's determination, at page 3, that there was "a

substantial risk that [the defendant's] communications or contacts with persons could result in

death or serious bodily injury to persons" given his "proclivity for violence."  Likewise, that

designation is consistent with the Belgian Director General's Decision, at page 1, recognizing

that the defendant "presents a constant security threat."

The defendant attempts to challenge that placement by taking issue with selected

justifications supporting that administrative determination (Non-SAMs Motion at 6-7).  Notably,

however, the defendant raises nearly the identical arguments to challenge that administrative

determination as he raised to challenge the authorization of the SAMs restrictions.  Accordingly,

---

[6] As noted above in Section I, the parties submitted briefing to the Court prior to the issuance of
the SAMs regarding the prison's determination to place the defendant in Administrative
Segregation.  The government submitted multiple declarations from USMS and RRJ officials
detailing the justification for the defendant's placement and restrictions.  These declarations
included an additional declaration by RRJ Deputy Superintendent Grimes (October 21, 2013), a
declaration by CDUSM David Baldwin (October 21, 2013), and a declaration by USMS
Associate General Counsel Kelly McDonald (October 29, 2013).  See ECF Docket no. 26, Att. 1
(Baldwin Declaration) and Att. 2 (Grimes Declaration) and Docket no. 30, Att. 1 (McDonald
Declaration).  Each of those declarations further supports the reasonableness of that
administrative determination and are respectfully incorporated herein by reference.  Of particular
note is the declaration of Kelly McDonald, which details numerous facts, both before and after
the defendant's arrest in Belgium, substantiating that determination.

similar to his challenge to the SAMs restrictions as discussed above in section II.A.1.d., the defendant cannot overcome the totality of the information supporting that administrative determination based on his security risk.

The defendant fails again, for example, to even address the fundamental concern that he has already been convicted and sentenced to a ten-year term of incarceration for significant terrorism-related charges.  Similarly, as for the pending terrorism-related charges against him, the defendant merely states that he is presumed innocent of those charges and the evidence at trial will demonstrate that he is not guilty (non-SAMs Motion at 6).  As set forth above, this bald assertion does little to alleviate the substantial security concern arising from the superseding indictment in which he is charged with attempting to perpetrate a suicide bombing against American interests.  In addition, the defendant likewise claims (Non-SAMs Motion at 6-7) that he was never involved in an attempt to escape from prison in Belgium; however, that contention is directly at odds with the Belgian Director General's Decision and other information.  The defendant's additional assertion that he was not convicted of physically assaulting a prison guard, but rather making a verbal threat (Non-SAMs Motion at 6-7), even if true, still demonstrates his proclivity for violence and similarly supports the placement determination.

Furthermore, the defendant misplaces his reliance on the allegation (Non-SAMs Motion at 7) that the defendant "was not required to wear shackles during legal meetings and had greater freedom within the prison facility" in Belgium.  As discussed above, undersigned government counsel has not yet been able to clarify the particulars regarding the defendant's confinement conditions in Belgium; however, even assuming that the defendant's allegation is correct, the totality of circumstances still clearly demonstrates that the defendant was a constant security threat in Belgium and required a special security regime to address the danger that he posed

24

while incarcerated there.  That prison officials here decided to safeguard against the danger

posed by the defendant through stricter, though nonetheless reasonable, restrictions is entirely

appropriate, especially given the heightened security concerns posed by the defendant now that

he is in custody in the United States -- the country that was the focus of his suicide bomb attack.

>   **B.   The Non-SAMs Restrictions Leave the Defendant with**
>   **Ample Alternative Means to Adequately Consult with**
>   **Counsel, Prepare for Trial, and Participate in Recreation Time**

The restrictions at issue, even if discomforting to the defendant, do not prevent him from

using the computer to review discovery, from meeting with his counsel, or from receiving

recreation time, and should not be modified given the need to maintain the institution's security.

See Bell, 441 U.S. at 540 ("Restraints that are reasonably related to the institution's interest in

maintaining jail security do not, without more, constitute unconstitutional punishment, even if

they are discomforting and are restrictions that the detainee would not have experienced had he

been released while awaiting trial").

The defendant is offered use of a computer in a classroom to review discovery "at least

three times a week for at least four hours per visit."  Grimes Decl., ¶ 15.  As staffing allows, he is

permitted additional use.  Id.  Notably however, despite his purported concerns regarding

discovery review time, the defendant has regularly refused to use the computer for such review,

amounting to over 20 times since December 14, 2013.  Id.  Moreover, Deputy Superintendent

Grimes personally verified that someone can type on the computer by wearing the same type of

handcuffs placed on the defendant.  Id., ¶ 6.  In addition, all officers at the prison are trained to

ensure that handcuffs are applied with the correct amount of space to allow appropriate

circulation. Id., ¶ 8.[7]  To Deputy Superintendent Grimes's knowledge, other prisoners "who have met with their attorneys and used the law library with restraints have done so without incident or complaint." Id.

Similarly, the defendant is provided with regular access to his counsel.  As stated above, although handcuffed, the defendant maintains the ability to handle discovery documents and notes during meetings (Id., ¶ 6), and the defendant has already met with his attorney on a number of occasions (Non-SAMs Motion at 3-4).[8]  See Young v. Larkin, 871 F.Supp. 772, 784 (M.D. Pa. 1994) (finding that prison's "requirement that [defendant] visit with counsel while handcuffed did not violate" constitutional right).  Moreover, although prisoners such as the defendant are transported from their cells handcuffed behind their backs, once in the visiting room/law library, the handcuffs are moved from the back to the front to aid in the prisoner's communication with the attorney.  Id., ¶ 18.

The defendant also is offered one hour of recreation daily, similar to other prisoners in Administrative Segregation. Id., ¶ 10.  Notably however, despite his purported concerns about receiving such time, the defendant routinely refuses to take his allotted time period. Id.  The determination of which recreation area to be used is based upon "availability, staffing, and the prisoner," and the defendant is offered the same recreation opportunities as other similarly situated prisoners. Id.; See Tavares v. Amato, 954 F.Supp.2d 79, 92 (N.D.N.Y. 2013) (in Eighth

---

[7] Deputy Superintendent Grimes' declaration further explains that the handcuffs used to restrain the defendant are standard issue with approximately two inches of separation between the cuffs, "utilizing altered handcuffs to increase the length between cuffs would compromise the security integrity" of those cuffs. Id., ¶ 8.

[8] As the defendant recognizes in this motion (non-SAMs Motion at 4), to aid in the discovery review process, the defendant "has some of the discovery (more than fifty reports of statements allegedly made by Mr. Trabelsi while in Belgian custody) in his cell and has been able to take notes regarding these statements while in his cell."  The defendant also "has been able to bring these materials to meetings with counsel" for review. Id.

Amendment context, defendant's "claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower during his one hour long recreation, prohibited from wandering around outside of his cell, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell," were insufficient to support a claim).

**C.     The Requested Modifications to the Non-SAMs Restrictions Would Have a Substantial, Negative Impact on the Administration and Safety of the Prison**

The security measures at issue are applied routinely and uniformly to similarly situated prisoners and are not for purposes of punishment.  Id., ¶¶ 16, 20.  The prison officials have determined that these measures are "necessary to maintain the safe and orderly functioning of the facility and making an exception for one prisoner would pose a danger to the secure and orderly running of the facility."  Id.  Notably, the RRJ has received accreditation from the American Correctional Association in 2013 and is complaint with the State of Virginia Department of Corrections requirements.  Id., ¶ 12.

If handcuffs were removed during attorney visits, counsel would be placed in harms' way during the meetings and staff would face danger when entering to resecure the defendant.  Id., ¶ 19.  The danger to the defendant's counsel is of special concern given that no staff is present in the room during legal visits.  Id., ¶ 17.  Leg irons are insufficient to protect visitors and staff from attack.  Id.  Notably, even if the defendant's counsel is not concerned about the security risk if handcuffs are removed during meetings, the prison should not be required to take that chance. The prison officials remain responsible for "ensuring the safety of all visitors, staff, prisoners, and the public, regardless of their preferences."  Id.  This visiting room, the same room used by the defendant as the law library, does not have tray slots to allow handcuffs to be safely removed by staff while the prisoner is secured.  Simply put, uncuffing the defendant during attorney visits

27

would "fall outside sound correctional practices" and pose a danger.  Id.

Removal of handcuffs during the defendant's use of the computer would also pose a danger.  Despite Trabelsi's contention that he is required to wear handcuffs and leg irons in a small room with armed guards (non-SAMs Motion at 7), he is left alone in the room to use the computer.  Id., ¶ 15.  No staff is present in the room or outside the room, and this room (like the visting room/law library) does not have tray slots to allow handcuffs "to be safely removed while the prisoner is secured."  Id.  Moreover, staff within the facility do not carry firearms and only certain staff are armed with tasers, none of whom are present while the defendant is working on the computer. Id.

Security would further be impacted if the defendant used a recreation area other than the ones currently available to him.  For security reasons, the defendant cannot use the recreation area used in General Population.  Id., ¶ 11.  Two additional recreational areas within Administrative Segregation are not available to the defendant because those outdoor recreational areas are separated by only a fence and "do not afford the same level of security" as the ones used by the defendant.  Id., ¶ 10.  Those two areas are "not only less secure generally, but the doors to these areas do not have tray slots to allow handcuffs to be safely removed by staff while [the defendant] is secured."  Id.[9]  Furthermore, each of those two areas is no larger than the recreational areas used by the defendant. Id.

### D.     No Ready Alternatives Exist to the Challenged Non-SAMs Restrictions

"It is incumbent upon the prisoners to point to an alternative that accommodates their rights at *de minimis* cost to security interests." Casey v. Lewis, 4 F.3d 1516, 1523 (9th Cir. 1993)

---

[9]  As these two areas are not as secure and allow communication between prisoners, they are generally used by prisoners in Administrative Segregation who are in protective custody. Id., ¶ 10.

(citing Turner, 482 U.S. at 91) (italics in original).  The defendant clearly has not carried his

burden.  In the considered judgment of the correctional administrators, as discussed above, the

challenged measures are "necessary to maintain the safe and orderly functioning of the facility"

and making an exception for the defendant would pose a danger to the "secure and orderly

running of the facility." Id., ¶ 20.

The fact that there may be possible, though reasonably rejected, alternatives to the prison

official's decisions does not necessitate that the prison's regulations are an "exaggerated

response" to their concerns.  This prong of the Turner test is not a "least restrictive alternative

test." Frazier, 922 F.2d at 562, n.2; See also Casey, 4 F.3d at 1523 (upholding the denial of

contact visits, despite existence of other alternatives, due to agency fears contact could lead to

harm).  As the Supreme Court stated:

> [W]hen prison officials are able to demonstrate that they have rejected a less
> restrictive alternative because of reasonably founded fears that it will lead to greater
> harm, they succeed in demonstrating that the alternative they in fact selected was not an
> "exaggerated response" under Turner.

Thornburgh v. Abbott, 490 U.S. 401, 419 (1987).

 The prison has set forth reasonable measures to provide for the defendant to review

discovery materials on the computer, meet with counsel, and access recreation time, while

meeting the security needs of the institution.  Such decisions should be accorded considerable

discretion, and the defendant presents no reason to do otherwise.  See, e.g., Turner, 482 U.S. at

90; Hewitt, 459 U.S. at 472-74;  Bell, 441 U.S. at 547.

## Conclusion

Based upon all of the foregoing, the defendant's motions to compel modifications to the SAMs and non-SAMs restrictions should be denied in their entirety.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447-889

_____/s/_____
OPHER SHWEIKI
Assistant United States Attorney
D.C. Bar Number 458-776
National Security Section
United States Attorney's Office
555 4th Street, N.W., 11th Floor
Washington, D.C. 20530
Opher.Shweiki@usdoj.gov
(202) 252-1751

_____/s/_____
COURTNEY SPIVEY URSCHEL
Assistant United States Attorney
New York Bar
National Security Section
United States Attorney's Office
555 4th Street, N.W., 11th Floor
Washington, D.C. 20530
courtney.spivey@usdoj.gov
(202) 252-7705

_____/s/_____
T. PATRICK MARTIN
Assistant United States Attorney
D.C. Bar Number 471-965
National Security Section
United States Attorney's Office
555 4th Street, N.W., 11th Floor
Washington, D.C. 20530