**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 06-CR-089 (RDM)** |
| | : | |
| | : | |
| **NIZAR TRABELSI,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S MOTION TO MODIFY SPECIAL ADMINISTRATIVE MEASURES

Defendant Nizar Trabelsi, through undersigned counsel, respectfully seeks an order modifying the special administrative measures ("SAMs") imposed upon him pursuant to 28 C.F.R. § 501.3.

There has been prior litigation in this case relating to Mr. Trabelsi's conditions of detention.   Modifications were sought on January 28, 2014 (Dkt No. 37) (Exhibit 1 to this motion) and February 12, 2014 (Dkt. No. 40) (Exhibit 2).   By Order issued on June 18, 2014 (Dkt. No. 55) (Exhibit 3), the Court partially granted and partially denied these prior requests. Further, it should be noted that on at least three separate occasions, years ago, the government alleged that Mr. Trabelsi violated his SAMs.   *See* Exhibits 4-6.

The current set of SAMs is set forth in a memorandum, dated October 30, 2017, from Raymond N. Hulser, Deputy Assistant Attorney General, to David Harlow, Acting Director, United States Marshals Service) (Exhibit 7).   These SAMs will expire on October 31, 2018. As Mr. Hulser's memorandum acknowledges, Mr. Trabelsi has been incarcerated – first in Belgium and then in the United States – since September 13, 2001, a period of time in excess of seventeen years.   Exhibit 7 at 2.   It is our understanding that the government is in the process

of formulating a new, more restrictive set of SAMs for Mr. Trabelsi, which would, *inter alia,*
restrict his contact with his current wife, who resides in Belgium, to written communications.

     A.     <u>Current SAMs Conditions Imposed by October 2017 Memorandum</u>

In Mr. Hulser's memorandum imposing the current set of SAMs, he requests that the
United States Marshals Service "continue to implement the SAM to restrict Trabelsi's access to
the mail, the telephone, visitors, other inmates, and the media." Exhibit 7 at 1.   In support of
this request, Mr. Hulser asserts that Mr. Trabelsi "continues to maintain a commitment to al
Queda's goals," citing in support of this assertion only an alleged statement Mr. Trabelsi made to
the FBI in October, 2013, four years earlier (Exhibit 7 at 3).   Further, according to Mr. Hulser,
Mr. Trabelsi "is a source of inspiration to other Islamic terrorists," citing in support of this
contention only an October, 2013 article in a Belgian newspaper quoting an unnamed Belgian
fighter who allegedly expressed, on an unspecified date, that a plan existed to free Mr. Trabelsi
and others from imprisonment. *Id.*

According to Mr. Hulser's October 2017 memorandum, Mr. Trabelsi continually violated
his SAM conditions.   Mr. Hulser relies upon the following nonspecific assertions to substantiate
this contention:

- Reports from "multiple media outlets" in Belgium that an unspecified "non-legal contact"
  (*i.e.,* a person other than Mr. Trabelsi) "discuss[ed]" the substance of her calls with Mr.
  Trabelsi in December, 2013.   Exhibit 7 at 4.

- In 2015 and thereafter, Mr. Trabelsi passed documents to other inmates with the
  "apparent intent" that they pass them on to third parties, including a prior SAMs
  memorandum.   Exhibit 7 at 4.   The memorandum references no specific
  communications, nor does it identify any of the other inmates who allegedly received

these communications.   It asserts that Mr. Trabelsi communicated "in code," but does not state what Mr. Trabelsi said nor identify the code used.   Exhibit 7 at 4-5.

Based on this scant proffer of stale information, Mr. Hulser's memorandum "find[s] that there is a substantial risk that [Mr. Trabelsi's] communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons."   Exhibit 7 at 5.   He prohibits Mr. Trabelsi from communicating with "any other inmate, visitor, attorney, or anyone else" (Exhibit 7 at 6), except as follows:

- Interpreters may assist in a limited manner with communications (Exhibit 7 at 6);

- Attorneys may communicate with Mr. Trabelsi, subject to stated limitations (Exhibit 7 at 6-11);

- Mr. Trabelsi is allowed to communicate with immediate family members, "as well as Salah Jelleli and Aziza Jelleli," with a minimum of one call per month (Exhibit 7 at 11); and

- Mr. Trabelsi is allowed visits and correspondence with "immediate family members," all of whom reside abroad (Exhibit 7 at 13-14).

Mr. Trabelsi is precluded from sharing a cell with, or communicating with, any other inmate.   Exhibit 7 at 16.

In practice, Mr. Trabelsi's conditions of confinement – which have changed to some degree following his recent transfer from the Rappahannock Regional Jail to the Northern Neck Regional Jail – include the following:

- Mr. Trabelsi is housed in a small, isolated cell.   His isolation only has increased since his transfer to Northern Neck, since now he typically cannot even hear the voices of other

inmates, let alone see or interact with them.    The pernicious effects of isolation upon Mr. Trabelsi are described in a recent report from a psychologist, Carol T. Giunta, Ph.D. (Exhibit 8), which she generated after visiting and interviewing Mr. Trabelsi at the Rappahannock Regional Jail shortly before his transfer to Northern Neck.    Mr. Trabelsi's counsel have made similar observations.    Mr. Trabelsi's isolation is substantially adversely affecting his mood, affect, perception of reality and ability to interact successfully with his counsel and prepare his defense.    These effects are unsurprising.    *See, e.g.,* collected authorities relating to effect of solitary confinement upon inmates (Exhibit 9).

- Mr. Trabelsi has been charged exorbitant rates per minute for telephone calls with relatives and his counsel, which has depleted his commissary account and impaired his ability to purchase food that he needs in order to supplement the diet provided by the institution.

- Mr. Trabelsi is being fed food items which do not contain necessary nutrients, in the guise of providing him with a "high-fiber diet."

- Mr. Trabelsi was unnecessarily physically mistreated while at the Rappahannock Regional Jail, in the course of imposing discipline upon him.

- Mr. Trabelsi is being denied access to a dedicated laptop computer with which to review electronically stored material, which impairs his and our ability to safeguard the attorney-client privilege and work product doctrine.

- Mr. Trabelsi has had no telephonic contact with his wife since *July, 2018.*    And, as noted above, the government now proposes to limit him to only written communications with her.

- Mr. Trabelsi is permitted only one hour of "exercise" per week, in a small, isolated area with no exercise equipment and no ability even to walk for any distance.   The official at Northern Neck who supervises Mr. Trabelsi, Major Phyllis Back, states that Mr. Trabelsi's allowed exercise is significantly greater (*see* Exhibit 10), but this is contrary to our understanding of the exercise Mr. Trabelsi actually receives.

B.      Argument

As the Court observed in its Order of June 18, 2014 (Exhibit 3), conditions of pretrial detention that are "reasonably related to a legitimate governmental objective" are permissible, whereas conditions that violate the Constitution or amount to punishment are impermissible. Exhibit 3 at 5.   Four factors must be assessed:   Whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it: whether there are alternative means of exercising the rights remaining open to the inmate; the impact that accommodation of a constitutional right would have on guards and other inmates; and whether ready alternatives exist.   Exhibit 3 at 4 (citing *Turner v. Safley,* 482 U.S. 78, 89-91 (1987).

We respectfully submit that the requisite showings of reasonableness and necessity cannot be made with respect to the conditions outlined above, to which Mr. Trabelsi is subjected. Our view is that the necessary predicate does not exist for any of the SAMs currently imposed upon Mr. Trabelsi, nor is there a basis for further restricting his contact with his loved ones. We request an evidentiary hearing at which we can present testimony concerning these conditions, and at which the government's rationale for them can be challenged.   We request that they be modified, *inter alia,* to allow Mr. Trabelsi adequate exercise, some limited, monitored contact with other inmates, the ability to have frequent, meaningful contact with his

immediate family, and access to a dedicated computer that would permit him to review the evidence in this case while safeguarding privileged information.   We anticipate asking the Court for authority, pursuant to Fed.R.Crim.P. 17(c), to serve subpoenas upon the institutions where Mr. Trabelsi has been housed in order to generate additional evidence that would aid the Court in evaluating the merit of this motion.

Respectfully submitted,

/s/   Barry Coburn
_____

Barry Coburn
DC Bar No. 358020
Coburn & Greenbaum PLLC
1710 Rhode Island Avenue, NW
Second Floor
Washington, DC   20036
Tel:  202-643-9472
Fax:  866-561-9712
Email:   barry@coburngreenbaum.com

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500 ext. 109

<u>Certificate of Service</u>

I hereby certify that a copy of this motion will be served upon all counsel of record via this Court's electronic filing service, this 15th day of October, 2018.


/s/ Barry Coburn

_____
Barry Coburn