UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal. No. 06-089 (RDM) |
| v. | : | |
| | : | |
| NIZAR TRABELSI, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE
THE TESTIMONY OF DEFENSE EXPERT DR. RICHARD A. LEO

The United States of America, moving by and through its undersigned counsel, respectfully

submits this motion in limine seeking to preclude the proposed expert testimony of Dr. Richard A.

Leo.  The defense has noticed its intention to call Dr. Leo as an "expert regarding interrogations,

psychological coercion, and false and unreliable confessions."  The Court should preclude Dr.

Leo's testimony because his expert notice is inadequate, his research fails to satisfy *Daubert*, and

the danger of unfair prejudice substantially outweighs the testimony's probative value.

Dr. Leo's false confession testimony fails to satisfy *Daubert*.  Indeed, Dr. Leo's research

underlying his testimony is "unreliable at every stage."  *People v. Kowalski*, 492 Mich. 106, 133

(Mich. 2012) (affirming the preclusion of Dr. Leo's testimony).  Dr. Leo "works backwards" and

employs an "unreliable methodology," leading him to his "own preconceived beliefs rather than

testable results consistent with an objective, scientific process."  *Id.*  Ultimately, Dr. Leo's false

confession testimony is "nothing more than guesswork."  *United States v. Deuman*, 892 F. Supp.

2d 881, 888 (W.D. Mich. 2012) (precluding the testimony of Dr. Leo).  Dr. Leo's work "provides

neither a useful nor appropriate basis to assist a jury in assessing whether a particular confession,

or even incriminating statement, was false."  *Id.* at 886.  Dr. Leo's testimony would "introduce the

jury . . . to a kind of faux science."  *United States v. Phillipos*, 849 F.3d 464, 472 (1st Cir.), *as*

*clarified on denial of reh'g*, 869 F.3d 15 (1st Cir. 2017) (quoting the district court decision, and affirming the decision to preclude Dr. Leo's testimony).  Moreover, it has been determined that "many of the suspects [who] Dr. Leo claims confessed falsely are actually almost certainly guilty," revealing a fundamental flaw underlying Dr. Leo's conclusions.  *United States v. Rodriguez-Soriano*, 2017 WL 6375970, *2 (E.D. Va. Dec. 11, 2017) (citing Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confession*, 22 HARV. J.L. & PUB. POL'Y 523 (1999)).  Accordingly, this Court should preclude Dr. Leo's testimony.[1]

### Background

On April 17, 2019, the Court issued a minute order directing that expert notices "shall be filed" on or before May 17, 2019.  Earlier, the parties had agreed upon the May 17th deadline and proposed it to the Court.  (ECF Doc. No. 189, Joint Proposed Schedule for Pretrial Proceedings).  The government filed expert notice by that deadline.  The defense failed to do so.

On May 16, 2019, the defense made an oral motion to extend its deadline for filing expert notice.  (May 16, 2019 Minute Entry).  The oral motion was granted, and the defense was ordered

---

[1]      In addition to the concerns expressed in the body of this motion, the government is also concerned that multiple courts have suggested Dr. Leo is deceptive.  For example, Dr. Leo contributed to a consensus document published in 2010 that undertook a normative comparison of interrogation procedures in the United States and England.  *See United States v. Deuman*, 892 F. Supp. 2d 881, 884 n.1 (W.D. Mich. 2012) (citing Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3 (2010)).  A court reviewing a motion to exclude Dr. Leo's testimony noted that the comparison in the document "seem[ed] somewhat deceptive" and "raise[d] concerns about the reliability of the authors' objectivity, analysis, and recommendations for interrogation."  *Deuman*, 892 F. Supp. 2d at 884 n.1.  Another court criticized Dr. Leo for being "less than candid" during his voir dire at a criminal trial *and* at a post-conviction relief proceeding when he testified that he "only recalled one case in which his expert testimony had been excluded based on the subject matter of the testimony."  *Vent v. Alaska*, 288 P.3d 752, 755 (Alaska 2012).

to file its expert notice by June 17, 2019.  No expert notice was filed with the Court on or by that date.

On June 17, 2019, the defense emailed the government a letter (Exh. 1, the "June 17 letter") purporting to be expert notice for Dr. Richard A. Leo.  To date, the letter has not been filed with the Court.  The June 17 letter is a mere list of testimony topics.  The letter fails to describe Dr. Leo's opinions or the bases and reasons for his opinions.  Indeed, the portion of the letter describing Dr. Leo's testimony consists of a single sentence.  That single sentence indicates that, among other topics, Dr. Leo will describe "interrogation techniques."  Yet, the letter fails to identify even a single such technique and fails to allege that any as-yet-unidentified technique was used on the defendant.  Similarly, the letter states Dr. Leo will describe "personality traits and characteristics" that may increase the risk of false confessions.  Yet, the letter fails to identify any such personality trait or characteristic and fails to allege that the defendant exhibits any such as-yet-unidentified trait or characteristic.  Moreover, the June 17 letter provides no indication that Dr. Leo has the requisite training or experience to diagnose a person's personality traits and characteristics, let alone that Dr. Leo has ever met the defendant such that he could begin to make such a diagnosis.

Dr. Leo's academic research on false confessions focuses almost exclusively on police interrogations within the American accusatorial system.  In the instant case, by contrast, defendant Trabelsi was not interviewed in the United States.  Rather, the majority of the defendant's interviews were conducted by a neutral Belgian judge, in the judge's comfortable office, within the context of Belgium's non-accusatorial system of investigation.  Within the Belgian system, the Judge is neutral and, in accordance with his impartial status, he conducts his interviews "with an eye on evidence of innocence as well as evidence of guilt."  Brigitte Pesquié et al., *The Belgian*

*System, in* EUROPEAN CRIMINAL PROCEDURES 107 (Mireille Delmas-Marty & J.R. Spencer ed., 2002).

During their interviews, the Judge and defendant Trabelsi would share home-cooked pastries and meals together.  The Judge's interpreter, like the defendant, was of Tunisian descent, and she often brought homemade Tunisian food for them to eat together.  One time, defendant Trabelsi's mother made pastries — called "the judge's ear" — which she sent to the Judge through defendant Trabelsi's attorney.  The Judge and defendant Trabelsi shared these treats together. Defendant Trabelsi was never restrained for the interviews.  He was given time to pray and, if he needed to use the restroom, he was escorted there without restraints.  Defendant Trabelsi was permitted to refuse to answer questions entirely, or he could choose to wait until his lawyer was present before answering.  During his interviews, defendant Trabelsi sometimes declined to answer questions.  In addition, Defendant Trabelsi was permitted to request additional interviews, which he did on occasion.  The Judge gave Defendant Trabelsi substantial control over the direction of the interviews.

Commenting on the interviews later, the Judge stated, "The lines of mutual respect and sympathy that bound Nizar Trabelsi and me during the duration of the investigation added a profoundly human dimension that I'm not about to forget."[2]  The defendant himself — speaking years later to a Flemish magazine — stated, "I believe in the Belgian legal system. . . .  The investigation here was very fair."  The defendant added that he felt "ashamed" that he ever "wanted

---

[2]     *See* Christian de Valkeneer, *Les "oreilles de juge" de la maman de Nizar Trabelsi*, LA LIBRE (Aug. 9, 2011) (available in the original French at https://www.lalibre.be/belgique/les-oreilles-de-juge-de-la-maman-de-nizartrabelsi-51b8d7d5e4b0de6db9c28d8e) (unofficial translation done by the undersigned).

to commit an attack on Belgian territory" after he encountered the "dignified manner" of the Belgian investigators.[3]

## ARGUMENT

Dr. Leo's testimony should be precluded.  The defense's expert notice is insufficient, the research underlying the witness's testimony fails to satisfy *Daubert*, and his testimony carries a danger of unfair prejudice that substantially outweighs any probative value.

### I.      Defendant's Notice for Dr. Leo Is Inadequate.

Defendant's expert notice is insufficient.  The notice contains only a single sentence describing Dr. Leo's testimony.  That single sentence is a mere list of topics.  It fails to describe Dr. Leo's opinions or the bases and reasons for his opinions.  Accordingly, the notice is deficient, and preclusion is warranted.

"Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure requires the defendant to provide, at the government's request, 'a written summary of any testimony the defendant intends to use' as evidence at trial under Rules 702, 703 or 705 of the Federal Rules of Evidence.'" *United States v. Naegele*, 468 F. Supp. 2d 175, 176 (D.D.C. 2007) (quoting Fed. R. Crim. P. 16(b)(1)(C)); *see also United States v. Rogers*, 2006 WL 5249745, at *2 (D.D.C. July 17, 2006).

A mere "list of testimony topics" is insufficient notice under Rule 16.  *Rogers*, 2006 WL 5249745 at *3 (string citations omitted); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics"); *see also United States v. Beavers*, 756 F.3d 1044, 1054 (7th Cir. 2014) (noting that expert notice was "insufficient[

---

[3]      During the same interview, defendant Trabelsi affirmed that he had volunteered to commit a suicide attack, that Osama bin laden was "like a father" to him, and that he had "no problem" with the attacks against "the Pentagon and the White House (sic)."

]" as it provided only a "general list of examination topics" and one sentence, conclusory in nature, about one opinion the witness would offer at trial); *United States v. Concessi*, 38 F. App'x 866, 868 (4th Cir. 2002) (upholding district court decision to exclude expert testimony where notice was provided late and "failed to describe the witnesses['] opinions or provide the bases and reasons for the witnesses' opinions"); *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (affirming that expert notices were "plainly inadequate" because they "merely listed general and in some cases extremely broad topics on which the experts might opine"), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018).

Proper expert notice must "describe the witness's opinions" and describe "the bases and reasons for these opinions." *Naegele*, 468 F. Supp. 2d at 176 (quoting Fed. R. Crim. P. 16(b)(1)(C)). The primary purpose of Rules 16(b)(1)(B) and (C) is to prevent unfair surprise at trial and to permit each party "to prepare rebuttal reports and to prepare for cross-examination at trial." *Id.* "Rule 16(b)(1)(C) is 'intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" *Id.* (quoting Fed. R. Crim. P. 16 advisory committee's note). A defendant is "not entitled to surprise the government with ill-defined expert testimony." *Beavers*, 756 F.3d at 1054.

"A failure to comply with these Rules may result in the exclusion of the proffered evidence." *Naegele,* 468 F. Supp. 2d at 176 (citing Fed. R. Crim. P. 16(d); *United States v. Barile*, 286 F.3d 749, 758–59 (4th Cir. 2002); *United States v. Day*, 433 F. Supp. 2d 54, 57 (D.D.C. 2006)).

Here, the defense has provided a mere list of topics. The defense has failed to describe the witness's opinions. The defense has also failed to provide any of the bases and reasons for the witness's opinions. "[E]xperts' opinions are worthless without data and reasons." *United States v.*

*Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (quoting *Kenosha v. Heublein,* 895 F.2d 418, 420 (7th Cir. 1990)).  Accordingly, the defense's expert notice is deficient.  Because the defense has failed to provide sufficient expert notice, Dr. Leo should be precluded from testifying.

**II.     Dr. Leo's Testimony on False Confessions Fails to Satisfy *Daubert*.**

Even assuming, arguendo, that the defense had provided sufficient expert notice, Dr. Leo's testimony must still be precluded because it fails to satisfy *Daubert*.

Dr. Leo's testimony is appropriately analyzed pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule 702.  Federal Rule of Evidence 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court of the United States established the trial judge as the gatekeeper of expert testimony under Federal Rule of Evidence 702.  509 U.S. at 589-90.  The *Daubert* Court directed the trial judge to employ a two-prong analysis when assessing the admissibility of expert opinion.  Under that analysis, courts are to examine (1) whether the expert is offering scientifically reliable and valid opinions and (2) whether such opinions are relevant and will assist the trier of fact in understanding or determining a fact in issue.  *Id*. at 590-91.  The Court recognized that the application of these standards "on occasion will prevent the jury from learning of authentic insights and innovations. . . .  That, nevertheless, is the balance struck by the Rules of Evidence, designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal

disputes." *Id*. at 597.  The proponent of the testimony must establish its admissibility by a "preponderance of proof." *Id*. at 592 n.10.

A.   *Daubert* **Prong #1:   Dr. Leo's False Confession Testimony Does Not Consist of Scientifically Reliable and Valid Opinions.**

"Most circuit courts to directly consider the admission of expert testimony on false confessions have determined such testimony is inadmissible." *United States v. Rodriguez-Soriano*, 2017 WL 6375970, at *2 (E.D. Va. Dec. 11, 2017) (citing *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014); *United States v. Dixon*, 261 F. App'x 800, 810 (5th Cir. 2008); *Mamah*, 332 F.3d at 478); *see also United States v. Phillipos,* 849 F.3d 464, 471 (1st Cir.), *as clarified on denial of reh'g*, 869 F.3d 15 (1st Cir. 2017), *and cert. denied,* 138 S. Ct. 683 (2018) (affirming district court's order excluding Dr. Richard Leo from testifying as an expert on false confessions); *United States v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010) (affirming district court's order excluding Dr. Richard Leo from testifying as an expert on false confessions); *Dixon*, 261 F. App'x at 804 (affirming district court's order excluding proffered expert testimony on false confessions); *Mamah*, 332 F.3d at 478 (same); *United States v. Benally*, 541 F.3d 990, 994 (10th Cir. 2008) (same); *United States v. Mazzeo*, 205 F.3d 1326, 1326 (2d Cir. 2000) (same).

Beyond the general concerns of purported expert testimony on false confessions, the testimony of Dr. Leo in particular raises serious additional concerns.  Time and again, courts have excluded his testimony on false confessions.  For example, the Michigan Supreme Court found that Dr. Leo's analysis is "unreliable at every stage." *People v. Kowalski*, 492 Mich. 106, 133 (Mich. 2012).  The court opined that the facts and data underlying his testimony are "unreliable," "prone to inaccuracy or bias," and "in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review." *Id.*  Moreover, his "unreliable methodology" leads him to

8

simply reaffirm his own "preconceived beliefs rather than testable results consistent with an objective, scientific process." *Id.*

Likewise, federal district court judge opined that the "false confession testimony of the kind Dr. Leo can offer is nothing more than guesswork." *United States v. Deuman*, 892 F. Supp. 2d 881, 888 (W.D. Mich. 2012). That court found that Dr. Leo's "research on false confessions and his theories based on that research are not sufficiently reliable to be of assistance to the jury in understanding the evidence or determining a fact in issue in a particular case." *Id.* at 886. His work "provides neither a useful nor appropriate basis to assist a jury in assessing whether a particular confession, or even incriminating statement, was false." *Id.*

Yet another district court judge found that Dr. Leo's opinions on false confessions failed to satisfy *Daubert. See United States v. Phillipos*, 849 F.3d 464, 471 (1st Cir.), *as clarified on denial of reh'g,* 869 F.3d 15 (1st Cir. 2017) (discussing district court case). The district court found that there was "no indication that there is a body of reliable material that constitutes understanding in this area," and that Dr. Leo's testimony would "introduce the jury . . . to a kind of faux science." *Id.* at 471-72 (quoting the district court decision, and affirming that decision); *see also Washington v. Rafay*, 285 P.3d 83, 112 (2012) (no abuse of discretion where "Leo was unable to testify about any meaningful correlation between specific interrogation methods and false confessions or provide any method for the trier of fact to analyze the effect of the general concepts on the reliability of the defendants' confessions").

"[Dr.] Leo's work has also been the subject of academic criticism, in particular from Judge Paul Cassell."[4] *United States v. Rodriguez-Soriano*, 2017 WL 6375970, *2 (E.D. Va. Dec, 11,

---

[4]     Paul Cassell is a former United States District Judge. He is currently the Ronald N. Boyce Presidential Professor of Criminal Law and University Distinguished Professor of Law at the University of Utah, College of Law. His faculty biography on the University website provides as

2017).  Among other criticisms, "Judge Cassell reviewed Dr. Leo's work and found that many of the suspects Dr. Leo claims confessed falsely are actually almost certainly guilty," revealing a fundamental problem with Dr. Leo's conclusions about identifying false confessions.  *Id.* (citing Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confession*, 22 HARV. J.L. & PUB. POL'Y 523 (1999)).  "[O]ther academics have also called Dr. Leo's methodology into doubt."  *Id.* (citing Major James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, 1999-AUG ARMY LAW 26. 42-43 (1999)).

Because Dr. Leo's false confession testimony amounts to "faux science" and "nothing more than guesswork" that is "unreliable at every stage," his testimony fails to satisfy *Daubert* and must be precluded.

> **B.    *Daubert* Prong #2:    Dr. Leo's False Confession Testimony Is Not Relevant to the Instant Case and Would Not Assist the Trier of Fact in Understanding or Determining a Fact in Issue.**

Dr. Leo's testimony should also be precluded because it is not relevant to the instant case and would not assist the trier of fact.  Dr. Leo's testimony is not relevant, as the defense has failed

---

follows:

> Paul G. Cassell received a B.A. (1981) and a J.D. (1984) from Stanford University, where he graduated Order of the Coif and was President of the Stanford Law Review. He clerked for then-Judge Antonin Scalia when Scalia was on the U.S. Court of Appeals for the D.C. Circuit (1984-85) and for Chief Justice Warren Burger of the United States Supreme Court (1985-86). Cassell then served as an Associate Deputy Attorney General with the U.S. Justice Department (1986-88) and as an Assistant U.S. Attorney for the Eastern District of Virginia (1988 to 1991). Cassell joined the faculty at the College of Law in 1992, where he taught full time until he was sworn in as a U.S. District Court Judge for the District of Utah in July, 2002. In November 2007, he resigned his judgeship to return full time to the College of Law to teach, write, and litigate on issues relating to crime victims' rights and criminal justice reform.

Biography of Prof. Cassell, available at https://faculty.utah.edu/u0031056-PAUL_G._CASSELL/hm/index.hml (last accessed on July 22, 2019).

to proffer any connection between Dr. Leo's research and the facts of this case.  Dr. Leo's testimony would not assist the trier of fact because his research fails to support "any meaningful correlation between specific interrogation methods and false confessions."  *Rafay*, 285 P.3d at 112.

    **1.**    ***Dr. Leo's Research Cannot Be Reasonably Applied the Instant Case with any Assurance of Scientific Validity.  Dr. Leo's Research Involves Police Interrogations in the United States within the American Accusatorial System. Here, Defendant Trabelsi Was Interviewed in a Materially Different Context.***

 Dr. Leo's research is not relevant to the instant case.  Dr. Leo's research addresses American police interrogations.  Defendant Trabelsi, however, was interviewed in a materially different context.

The bulk of Dr. Leo's work focuses on interrogation techniques in the context of custodial interviews between a suspect and the police.  *See United States v. Deuman*, 892 F. Supp. 2d 881, 889 (W.D. Mich. 2012) ("The bulk of Dr. Leo's work has focused on what occurs in the interrogation room when police use well-recognized interrogation techniques").  Furthermore, Dr. Leo's work focuses on the United States.  *See, e.g.*, Richard A. Leo and Tom Wells. THE INNOCENCE REVOLUTION: THE AMERICAN MOVEMENT AGAINST WRONGFUL CONVICTIONS (expected publication in 2019-2020); Richard A. Leo, POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard Univ. Press 2009); Richard A. Leo*, The Problem of False Confession in America,* CHAMPION, December 2007; Richard A. Leo & George C. Thomas, THE MIRANDA DEBATE: LAW, JUSTICE AND POLICING (Northeastern Univ. Press 1998).

Here, however, the defendant was interviewed in Belgium, not the United States.  The interviews were conduct under Belgian norms and procedures, which are different from those of the United States.  Unlike many European nations, the American justice system operates under an "accusatorial" framework. *Moran v. Burbine*, 475 U.S. 412, 434 (1986) (Stevens, dissenting).  By

contrast, the Belgian system is a mixed system rooted in the Napoleonic code.  Brigitte Pesquié et al., *The Belgian System, in* EUROPEAN CRIMINAL PROCEDURES 81, 84 (Mireille Delmas-Marty & J.R. Spencer ed., 2002).  Within the Belgian system, building up the case dossier — including interviewing a suspect — is inquisitorial, not accusatorial.  *Id.* at 84-85.  Moreover, the majority of the defendant's interviews were conducted by a neutral judge — referred to in French as the *juge d'instruction* — and not by the police or other law enforcement entity.  *See id.* at 107 (noting that the *juge d'instruction* is required to be impartial, and "[i]n accordance with his impartial status, the *juge d'instruction* investigates with an eye on evidence of innocence as well as evidence of guilt").

The defense has provided no scientifically-supported basis for believing that Dr. Leo's research — being focused on American police interrogations — can be fairly applied to the instant case where the defendant was interviewed in Belgium, by a neutral judge (not the police), within a non-accusatorial system.  Accordingly, his testimony is not relevant and should be precluded.

> **2.    *The Testimony Is Not Relevant.  No Connection Has Been Alleged Between Dr. Leo's Proposed Testimony About "Techniques" and the Facts of this Case.***

Dr. Leo's testimony should also be excluded because the defense has provided no indication that the "techniques" referenced in the expert notice were ever used in this case.  *See United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010) (affirming the district court decision to exclude Dr. Leo's testimony and quoting with approval the district court's statement that "the court, as gatekeeper, cannot permit Dr. Leo to testify regarding the possibility of a false confession due to police interrogation techniques when he can point to no evidence in the record that any of these techniques are present in this case").  In its June 17 letter, the defense proffers that Dr. Leo's testimony will "describe the social science research on the social psychology of interrogation; the techniques used; [and] how and why these interrogation techniques are designed

to work to move suspect from denial to admission."  However, the June 17 letter does not identify a single specific interrogation technique.  Moreover, the notice fails to allege that such techniques were used during the interviews of defendant Trabelsi.  In short, the defense has proffered no connection between Dr. Leo's testimony and the facts of this case.  Accordingly, his testimony should be excluded.

> **3.      *The Testimony Is Not Relevant.  No Connection Has Been Alleged Between Dr. Leo's Proposed Testimony About "Personality Traits" and the Facts of the Instant Case.***

Dr. Leo's testimony is also not relevant or helpful for the jury because the defense has provided no indication that the "personality traits" referenced in the June 17 letter are relevant to this case.  In its June 17 letter, the defense proffers that Dr. Leo's testimony will describe "which personality traits and characteristics may increase the risk of false confessions."  However, the defense does not identify any such personality trait or characteristic.  The defense also does not allege that defendant Trabelsi exhibited such a personality trait or characteristic.  Moreover, there is no indication that Dr. Leo has ever met the defendant or that he has the necessary training and expertise to diagnose the defendant's "personality traits."   Again, because the defense has proffered no connection between Dr. Leo's testimony and the specific facts of this case, his testimony should be excluded.

> **4.      *The Testimony Would Not Assist the Trier of Fact.***

Dr. Leo's testimony should also be excluded because it would not assist the trier of fact. Dr. Leo's research has no scientifically-validated predictive power in showing that specific techniques are more likely to lead to false confessions than true ones.  *See, e.g., Washington v. Rafay*, 285 P.3d 83, 112 (2012).  His research fails to support "any meaningful correlation between specific interrogation methods and false confessions."  *Id.*  In addressing the relevance of his

13

testimony in a previous case, Dr. Leo conceded that "[t]he police interrogation techniques [he] identified as being associated with *false confessions*" were also "associated with *true confessions*." *People v. Kowalski*, 492 Mich. 106, 147 (Mich. 2012) (Markman, J. concurring in part and dissenting in part) (emphasis in original).   Accordingly, Dr. Leo's proposed testimony is not relevant "in any way to the jury in deciding whether [a particular] *defendant* was a false confessor or nonfalse confessor." *Id.* (emphasis in original).  Because his testimony would not assist the trier of fact in understanding or determining a fact in issue, Dr. Leo's testimony should be precluded.

### III.   Dr. Leo's Testimony Creates a Risk of Unfair Prejudice that Substantially Outweighs its Probative Value.  His Testimony Should Be Precluded Accordingly.

Dr. Leo's testimony should also be precluded because its probative value is substantially outweighed by a danger of unfair prejudice and misleading the jury. *See* Fed. R. Evid. 403.  Even if testimony complies with *Daubert*, it can still be precluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Daubert*, 509 U.S. at 594.  "[B]ecause '[e]xpert evidence can be both powerful and quite misleading,' a court has greater leeway in excluding expert testimony under Rule 403 than it does lay witness testimony." *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 86 (D.D.C. 2012) (quoting *Daubert*, 509 U.S. at 595 (second alteration in original)); *United States v. Bikundi*, No. 14-CR-030 (BAH), 2015 WL 5915481, at *3 (D.D.C. Oct. 7, 2015); *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 67 (D.D.C. 2014).

As described above, Dr. Leo's testimony has little if any probative value.  His testimony is *not* based on reliable sources and methods. *See, e.g., Kowalski*, 492 Mich. at 133.  The research underlying his testimony is *not* applicable to the facts of this case.  *Cf. United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010) (affirming preclusion of Dr. Leo's testimony

14

where, as here, the defense had failed to show a factual connection between his testimony and the case at hand). And his research *lacks* any predictive power to assist a jury in deciding whether a particular defendant was a false confessor or nonfalse confessor. *Rafay*, 285 P.3d at 112; *Kowalski*, 492 Mich. at 147. Besides, a jury is fully capable of assessing the truthfulness of the defendant's statements without expert testimony. *See Rodriguez-Soriano,* 2017 WL 6375970 at *3 (holding that a jury is fully capable of assessing the truthfulness of the defendant's confession without expert testimony on false confessions). In sum, the probative value is nil.

By contrast, the danger of unfair prejudice is substantial. This prejudice stems, in part, from the fact Dr. Leo will be testifying as an "expert," thereby carrying a label of authority unavailable to most other witnesses at the trial. Accordingly, jurors may give his testimony more weight than it merits. Dr. Leo would carry this "expert" label even though, unbeknownst to the jury, numerous courts have precluded his testimony for being unreliable, mere guesswork, and faux science. As another federal district court already opined,

> The danger of allowing such testimony . . . is that the jury may conclude that Defendant's incriminating statements were false not because there is a sound evidentiary basis for doing so, but because Dr. Leo, an impressively-credentialed expert, says "it is so."

*United States v. Deuman*, 892 F. Supp. 2d 881, 886 (W.D. Mich. 2012).

The danger of unfair prejudice also stems from the emotional salience of the subject matter. Testimony of false confessions and coerced confessions will stoke jurors' passions and sympathies, especially given the recent popularity of podcasts and Netflix programs on false confessions and wrongful convictions.

The danger of unfair prejudice also stems from the risk of confusing the jury. Testimony about false confessions and coerced confessions will necessarily suggest to the jury that the defendant in this case may have been coerced and/or provided a false confession. Even if Dr. Leo

were to identify a specific interview technique or techniques used with defendant Trabelsi — and he has yet to identify any such technique — Dr. Leo is unable to provide any meaningful correlation between specific interrogation methods and false confessions. The jury is very likely to be confused if his speculative and unreliable testimony is presented to them.

The danger of prejudice and confusion also stems from the fact that jurors may be willing to give Dr. Leo's testimony more credit than it merits based on other false markers of authority. For example, Dr. Leo has a PhD. and has published numerous articles and other works. Yet, quantity is not evidence of quality. If Dr. Leo is permitted to testify, it would be a time-consuming but necessary task for the government to demonstrate to the jury, article by article, the strength of the unavoidable conclusion that numerous courts have already reached — that Dr. Leo's research is not worth crediting.

In sum, the danger of unfair prejudice and confusing the issues substantially outweighs the probative value of such testimony.

## IV.    The Court Should Not Grant Leave for the Defense to Revise Its Expert Notice.

The Court should not grant the defense leave to revise the expert notice for Dr. Leo now that the deadline has passed and the trial date is fast approaching. The government will be prejudiced by having to respond to revised expert notice on the eve of trial while also having to address the countless other tasks necessary to be ready for trial. Moreover, the initial deadline of May 17, 2019, was a deadline proposed *jointly by the parties.* The defense failed to meet the very deadline that it had proposed. If the Court gives the defense an opportunity to supplement or revise its expert notice, the government reserves the right to challenge the adequacy of the notice and the admissibility of any proposed testimony.

## **CONCLUSION**

For the foregoing reasons, the defense should be precluded from presenting Dr. Leo's proposed testimony at trial.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472-845

By:       /s/
THOMAS N. SAUNDERS
New York Bar Number 4876975
JEFF PEARLMAN
D.C. Bar Number 466-901
JOHN CUMMINGS
D.C. Bar Number 986-573
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, NW, 11th Floor
Washington, D.C. 20530
Thomas.Saunders@usdoj.gov
(202) 252-7790