# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NIZAR TRABELSI,<br><br>*Defendant.* | Criminal Action No. 06-89 (RDM) |

## MEMORANDUM OPINION AND ORDER

Defendant Nizar Trabelsi is charged with conspiring to kill U.S. nationals outside the United States in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a) and conspiring and attempting to use weapons of mass destruction in violation of 18 U.S.C. §§ 2332a and 2. Since 2013, Trabelsi has been held in pretrial confinement subject to special administrative measures ("SAMs") imposed on him pursuant to 28 C.F.R. § 501.3. Those measures, among other things, prevent him from having contact with inmates and other pretrial detainees and limit his contact with family members and others. In 2014, Trabelsi moved to compel modification of the conditions of his confinement, and the Court granted in part and denied in part that motion. *United States v. Trabelsi*, 2014 WL 12682266 (D.D.C. June 18, 2014). According to the government, Trabelsi has repeatedly violated his SAMs since then, and, as a result, it has modified the SAMs by, among other things, rescinding Trabelsi's authorization to have telephone contract with Asma Berrou, who Trabelsi identifies as his wife and who the government concedes Trabelsi married in a religious ceremony held over the telephone.

Trabelis now moves, once again, to modify his SAMs and, although not covered by the SAMs, to modify other conditions of his confinement. Dkt. 170, Dkt. 183. He first argues that the SAMs should be modified to allow him to communicate with Berrou by telephone and video

conference and to interact with other inmates. Dkt. 183 at 1. Second he argues that, independent of the SAMs, the Court should order the jail to allow him access to a dedicated laptop computer to assist in the preparation for his trial and to provide him with the opportunity for adequate exercise. Dkt. 170 at 8. Finally, Trabelsi requests that the Court authorize the issuance of a Rule 17 subpoena to the Rappahannock Regional Jail, where he was previously held, so he can seek information about purported mistreatment, which he contends may support his motion to modify the SAMS.

As explained below, the Court will deny Trabelsi's motions. With respect to the SAMs, Trabelsi has not shown that the conditions imposed, although onerous, are not reasonably related to legitimate governmental interests. With respect to the other conditions of his confinement, the Northern Neck Regional Jail, where he is currently being held, has adequately addressed the concerns he raises. Finally, with respect to Trabelsi's request that the Court issue a subpoena to the Rappahannock Regional Jail, the government investigated the allegations at the Court's direction and found no corroboration, and, in any event, because Trabelsi is no longer being held at that facility, his allegations do not support modification of the SAMs.

## I. BACKGROUND

In 2013, the Defendant was extradited to the United States from Belgium and housed in the Rappahannock Regional Jail ("RRJ") until September 2018, when he was transferred to Northern Neck Regional Jail ("NNRJ"). Dkt. 185 at 3. On November 1, 2013, the then-Acting Attorney General issued SAMs pursuant to 28 C.F.R. § 501.3 to govern the conditions of Defendant's confinement, *id*., which are reevaluated and renewed annually. The current SAMs are prescribed in a memorandum dated October 25, 2018, issued by Deputy Assistant Attorney General Raymond M. Hulser to the United States Marshal's Service. *See* Dkt. 185-2.

The SAMs provide, *inter alia*, that for non-legal communications, the Defendant is permitted to communicate via mail and telephone with certain pre-authorized individuals. *See* Dkt. 185-2 at 11–12. Such calls may not be recorded, and the individuals the Defendant speaks to are prohibited from disseminating his communications to third parties. *See id*. "These communication provisions have been in effect continuously since the implementation of the SAMs to the present," Dkt. 185 at 4, but the most recent extension of the SAMs excludes the Defendant's wife, Asma Berrou, from the list of individuals with whom he can communicate by telephone, *see id*. at 4 n.3. The SAMs also place limitations on the Defendant's interactions with other inmates:

> The inmate is limited, within . . . reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate . . . .that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other terrorism-related information.

Dkt. 185-2 at 6. Though the SAMs do not require administrative segregation, *see* Dkt. 185 at 4, which is a form of separation from the general prison population, both RRJ and NNRJ have determined that the Defendant should be held in administrative segregation. *See* Dkt. 185-3 at 1–2 (Back Decl. ¶¶ 5–6).

In 2014, Defendant challenged the SAMs provisions prohibiting statements from being divulged to a third party and those prohibiting him from communicating with members of the media, as well as non-SAMs provisions including the manner in which he was restrained by handcuffs during legal visits and restrictions on his recreation time. *See* Dkt. 37; Dkt. 42. Chief Judge Roberts denied these motions in large part, holding that the challenged conditions were reasonably related to legitimate governmental interests in preventing acts of violence and

terrorism. *See United States v. Trabelsi*, No. CR 06-89 (RWR), 2014 WL 12682266, at *3 (D.D.C. June 18, 2014).

Now, Trabelsi brings a different challenge to his conditions of confinement. He has filed two sets of motions, the first requesting modification of the conditions of confinement imposed by the SAMs and by NNRJ and the second seeking leave to file a subpoena on the prior facility at which he was held. *See* Dkt. 170; Dkt. 183; Dkt. 191. Defendant challenges the SAMs provisions (1) limiting his contact with other inmates; and (2) prohibiting him from communicating with Berrou via telephone. *See* Dkt. 170 at 8; Dkt. 183 at 10. These motions also challenge non-SAMs conditions imposed at NNRJ, including inadequate food and medical treatment, access to showers, and denial of a dedicated laptop computer for his legal use, *see* Dkt. 183 at 8–10; Dkt. 170 at 6–8, and allege mistreatment by prison officials and excessive charges for phone calls at the prior facility at which he was held, *see* Dkt. 183 at 9–10. Finally, the Defendant separately seeks leave to issue a third-party subpoena regarding his allegations of abuse at RRJ. *See* Dkt. 191.

## II. LEGAL STANDARD

The government may subject a pretrial detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Bell v. Wolfish*, 441 U.S. 520, 536–37 (1979). As a general matter, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The D.C. Circuit has emphasized the deferential nature of this standard:

> To prevent judicial overreaching into matters of prison administration, courts are to uphold prison regulations that impinge on inmates' constitutional rights as long as those regulations are reasonably related to legitimate penological interests . . . a

> stark departure from the inflexible strict scrutiny analysis that normally applies when the government infringes on constitutional rights.

*Hatim v. Obama*, 760 F.3d 54, 58 (D.C. Cir. 2014) (internal quotations and citations omitted). To determine if the restriction is reasonable, courts assess four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) whether there are ready alternatives. *Turner*, 482 U.S. at 89–91 (internal quotation marks omitted)). Courts, however, must undertake this analysis with the knowledge that "[t]he wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch." *Wolfish*, 441 U.S. at 562; *see also Turner*, 482 U.S. at 84–85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.").

### III. ANALYSIS

**A.  SAMs Conditions**

Defendant's challenge focuses on two particular provisions of the SAMs: (1) the provision limiting his contact with other inmates; and (2) the provision prohibiting him from speaking with Berrou via telephone. *See* Dkt. 170 at 8; Dkt. 183 at 10. Trabelsi argues that these conditions violate his First and Sixth Amendment rights[1] and are "not reasonably related to

---

[1] At oral argument on this motion, counsel for the defense indicated, for the first time, that Trabelsi's solitary confinement also amounts to an Eighth Amendment violation. *See* Dkt. 270 at 9 (Hrg. Transcript). Because this argument was not briefed, the Court does not address it here.

any legitimate governmental objective." Dkt. 170 at 7–8. The Court shares Trabelsi's concerns about the potential physical and psychological harm caused by solitary confinement. However, applying the *Turner* standard and mindful of judicial "deference to reasonable prison regulations," *Hatim*, 760 F.3d at 58, the Court concludes that Trabelsi has not shown that the challenged restrictions are unreasonable.

First, there is clearly a "valid, rational connection" between the challenged provisions and the "legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. The asserted government interest justifying both challenged provisions is the same: the 2018 SAMs indicate that "there continues to be a substantial risk that Trabelsi's communications or contacts with persons could result in death or serious bodily injury." Dkt. 185-2 at 1. Both provisions are aimed at "preventing Trabelsi's conversations from being disseminated to third parties who may not be authorized to speak to him," and the Court concurs with Judge Roberts that such restrictions are "logically connected to the government's interest in preventing acts of violence and terrorism." *United States v. Trabelsi*, No. CR 06-89 (RWR), 2014 WL 12682266, at *3 (D.D.C. June 18, 2014). Here, the Government explains that they adopted the challenged SAMs to address the "substantial risk" of "death or serious bodily injury to persons" posed by Trabelsi's communication to third parties. Dkt. 185-2 at 5. The Government has presented evidence of Trabelsi's risk level. For example, the 2018 SAMs memo justifies the restrictions based on:

> information provided [about] Trabelsi's proclivity for violence, including his plans to carry out terrorist attacks; his dedication to the cause of radical Islamist jihad, which has been unwavering; his ability and repeated efforts to influence others to act in furtherance of his cause; and his continuous disregard of SAM restrictions by attempting to pass information to third parties.

6

*Id*.  The government has identified a particular problem that it seeks to prevent—ensuring that Berrou and other inmates do not pass on, intentionally or inadvertently, forbidden messages to third parties—and the SAMs restrictions are tailored to address this problem.

Trabelsi's arguments to the contrary challenge the sufficiency of the Government's evidence, rather than the fundamental connection between the SAMs and the Government's legitimate interest.  For example, Trabelsi maintains that the Government's evidence regarding his risk level amounts to a "scant proffer of stale information," Dkt. 170 at 4, that he "poses no demonstrable risk to the personal safety of others," Dkt. 183 at 10, and that "in [his] long years of incarceration in the United States, there is not one instance of physical violence against anyone attributed to him," Dkt. 186 at 4.  However, in addition to the bases outlined in the 2018 SAMs, the Deputy Warden of NNRJ asserts that Trabelsi threatened her as recently as January 2019, yelling in her direction "I am going to kill someone! I give my life for my religion! I am going to kill someone here!"  Dkt. 185-3 at 3 (Back Decl. ¶ 15); *see also* Dkt. 186 at 3 (Defendant "admit[ting] that this assertion "is troublesome and is a factor to be considered by the Court").  Taken together, the justification provided in the SAMs and this more recent threat demonstrate the reasonableness of the Government's judgment concerning the continued threatening nature of the Defendant.  Perhaps most importantly, judgments about Trabelsi's risk level fall within the "wide range of judgment calls" that "are confided to officials outside of the Judicial Branch," so long as those judgments "meet constitutional and statutory requirements." *Wolfish*, 441 U.S. at 562 (internal quotation marks omitted).  The link between the challenged provisions and the Government's goal of preventing Trabelsi's statements from being disseminated to unauthorized parties is clear.

Second, the Court must consider whether the challenged provisions leave open alternative means for Trabelsi to exercise his First and Sixth Amendment rights. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Turner*, 482 U.S. at 90 (first quoting *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 131 (1977), then *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). With respect to his First Amendment right, Trabelsi is still permitted to communicate with Berrou via written correspondence and with other authorized individuals via telephone. As with the previously challenged SAMs conditions, "[b]ecause this is not a complete ban, but rather a restriction that 'bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned,' this factor weighs in favor of finding that the restriction is reasonable." *Trabelsi*, 2014 WL 12682266, at *4 (quoting *Turner*, 482 U.S. at 92). With respect to his Sixth Amendment right to counsel, the Court first notes that Defendant's main concern appears to be that the effects of his solitary confinement—exacerbated by the ban on telephone contact with Berrou—are undercutting his ability to participate in his defense.[2] *See* Dkt. 170 at 8. The Court is deeply sympathetic to this concern: the trauma that can result from prolonged periods of isolation should not be taken lightly. *See, e.g*, *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay) (noting "symptoms long associated with solitary confinement" including "severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Davis v. Ayala*, 135 S. Ct.

---

[2] It is uncontested that the Defendant still has access to unaccompanied visits, unmonitored telephone conversations, and unreviewed mail exchanges with his legal team.

8

2187, 2209 (2015) (Kennedy, J., concurring) (describing the "human toll wrought by extended terms of isolation").

That said, the government has identified a number of currently available measures to mitigate such effects. For example, the Defendant could take advantage of the opportunity to meet with a qualified mental health professional on a daily basis,[3] to communicate with other relatives via telephone and with Berrou via written correspondence, and to engage in recreation for two hours per week. *See* Dkt. 185-2 at 11–12; *id.* at 14–15; Dkt. 185-3 at 2–3 (Back Decl ¶¶ 7, 14). And "to the extent that Trabelsi has refused to take [advantage of] his recreation time" or these other opportunities, "he cannot simultaneously complain that his lack of recreation [and other provided resources] has negatively affected his competency." *Trabelsi*, 2014 WL 12682266, at *8. Again, the Court recognizes the gravity of these restrictions, and is mindful of the effect they may have on Trabelsi. However, "Supreme Court precedent teaches that alternative means of exercising the claimed right 'need not be ideal, however; they need only be available.'" *Hatim*, 760 F.3d at 61 (quoting *Overton,* 539 U.S. at 135). Thus, this factor weighs slightly in favor of the government.

Third, the Court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Neither party discusses the effect continued telephone calls with Berrou might have on NNRJ resources, but it is self-evident that this accommodation would at least

---

[3] Defense counsel indicated at oral argument that "Trabelsi is reluctant to take advantage of that because he's concerned that that information then may end up being shared with the government and could be used to his detriment." Dkt. 270 at 18 (Hrg. Transcript). At that time, the Court offered to enter an order directing that neither the psychiatrist nor any interpreter provided by NNRJ should share the content of any of the conversations that Trabelsi has with a psychiatrist pursuant to that daily treatment for any purposes related to this proceeding. If the Defendant so requests, the Court will enter such an order.

9

require prison officials to monitor additional calls. *See Turner*, 482 U.S. at 93 (noting that monitoring inmate correspondence "would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals"). Regarding Trabelsi's isolation from other inmates, the government contends that releasing him from administrative segregation and placing him in a general population setting, while simultaneously ensuring that he does not contact others to arrange criminal activities, "would be absurdly inefficient and expensive, if not impossible." Dkt. 185 at 27. Given that such a judgment is "peculiarly within the province and professional expertise of corrections officials," *Pell*, 417 U.S. at 827, this factor, too, weighs in favor of the government.

Finally, the Court is convinced that there are no readily available alternatives to the restrictions, at least at this time, that would address the government's security concerns regarding communication to third parties. This is perhaps best illustrated by Trabelsi's continued attempts to violate the SAMs. For example, the 2018 SAMs memo describes multiple instances in which the defendant has demonstrated his interest in using other prisoners to communicate to third parties in contravention of the SAMs. *See* Dkt. 185-2 at 4–5 (describing incidents in January 2015, August 2015, September 2016, and March 2017 in which Trabelsi attempted to pass messages to third parties via other inmates). Indeed, Trabelsi has specifically sought to use telephone conversations with Berrou to communicate with other individuals in contravention of the SAMs. *See, e.g.*, Dkt. 185 at 10 (in 2013, "multiple media outlets in Belgium reported on Berrou's discussion of the content of her calls with Trabelsi, including allegations of improprieties in his confinement conditions"); *id*. (in 2014, "Trabelsi requested that Berrou forward his regards to the Muslim community and tell the community about his situation"); *id*. at 11 (in 2016, Trabelsi "instructed [Berrou] . . . to record their conversations"); *id*. at 12–13 (in

2018, Trabelsi instructed Berrou to create a Facebook page dedicated to him and to share all the documents she gathered). Limiting Defendant's interactions with other inmates and with Berrou, then, is a reasonable response. Notably, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating" the Defendant. *Turner*, 482 U.S. at 90–91. Thus, even if there are other conceivable means of achieving the government's security goals, the deference afforded to prison officials to make those judgment calls weighs in favor of denying Trabelsi's motion.

The Court is, again, sympathetic to Trabelsi's concerns about the nature of these restrictions, particularly limiting telephone calls with his wife. As a result, the Court will deny Trabelsi's motion to modify his SAMs conditions, but will also order that the government reevaluate the appropriateness of this restriction after a period of 90 days.

B. **Non-SAMs Conditions**

The remainder of the Defendant's concerns focus on conditions of confinement that are not dictated by the SAMs. Trabelsi challenges separate conditions imposed at his current facility and at his former facility, and the Court will address these challenges in turn.

Trabelsi first challenges a number of non-SAMs conditions that he alleges are imposed by NNRJ, including: (1) "being fed food items which do not contain necessary nutrients, in the guise of providing him with a 'high-fiber diet,'" Dkt. 170 at 6; (2) not receiving necessary medical treatment or medication for his ulcer condition, Dkt. 183 at 8-9; (3) being housed in a cell that "makes it virtually impossible for him to shower with any regularity," *id*. at 8; and (4) "being denied access to a dedicated laptop computer with which to review electronically stored material" concerning his case, Dkt. 170 at 6.

As indicated by the declaration of Major Phyllis Back, the Deputy Superintendent of NNRJ, the first three of these allegations are lacking in factual support. The medical department

has recommended a high fiber diet for Trabelsi, and the NNRJ dietician then "prepares an appropriate menu . . . in accordance with his medical, caloric, and nutritional needs, per State of Virginia Department of Corrections requirements." Dkt. 185-3 at 3 (Back Decl. ¶ 11). Further, though Trabelsi's ulcer medication expired on December 28, 2019, he did not advise officials of the need for a refill as of February 5, 2019. *Id*. at 2 (Back Decl. ¶ 9). After reading the Defendant's motion and learning of this issue, Major Back "spoke with medical personnel and Northern Neck refilled the prescription." *Id*. In addition, Major Back asserts that the Defendant has been seen by a doctor whenever he has requested one. *Id*. Finally, with respect to Trabelsi's contention that it is "virtually impossible" for him to shower, Dkt. 183 at 8, Major Back notes that while Trabelsi has been moved from a cell with a shower to another without a shower, he is offered a shower once a day. *See* Dkt. 185-3 at 2 (Back Decl. ¶ 8). Contrary to Trabelsi's allegations, Major Back also contends that the shower is in sanitary condition and that the showerhead is at regulation height. *Id*. The Defendant did not respond to any of these assertions in its reply brief or at oral argument, and the Court concludes that Major Back's representations provide ample justification for the Court to deny Trabelsi's motion with respect to these conditions.

Trabelsi's fourth request, regarding use of a dedicated laptop, is one that falls within the discretion and expertise of prison officials. It is uncontested that NNRJ has denied Trabelsi access to a dedicated laptop, and also that he has access to a dedicated communal laptop at his request. However, Trabelsi argues that "use of a computer available to other inmates would not permit [him] adequate opportunity to review the extensive discovery material in his case, and could result in the disclosure of both privileged and classified information to unauthorized persons." Dkt. 170 at 6. NNRJ apparently has a practice of denying such requests because of

12

security concerns. *See* Dkt. 170-10 (email from Major Back noting that "laptops available to inmates are modified for security purposes"). The Court cannot conclude that such a practice is unreasonable. Since Trabelsi has been at NNRJ, a laptop has been available any time he has requested one, *see* Dkt. 185-3 at 3 (Back Decl. ¶ 12), and Major Back assured defense counsel that if his request was ever hindered by availability, she would address that issue, *see* Dkt. 170-10. Additionally, Trabelsi's concern about disclosure of privileged information is unfounded: "storage of discovery is by disc only; there is no storage on the computer itself. Therefore, information for one inmate would not be available to a second inmate." Dkt. 185-3 at 3 (Back Decl. ¶ 12). Because the Court must accord "[p]rison administrators . . . wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Bell,* 441 U.S. at 547, the Court denies Trabelsi's motion with respect to use of a dedicated laptop.

Finally, Trabelsi's motions contain a number of troubling allegations regarding mistreatment at RRJ, where he was previously housed. Defendant contends that:

> correctional officials put hair in his food; refused him access to soap; gave him water from a toilet to drink; gave him floor cleaner to use instead of soap; left his light on all night; retaliated against him for complaining about his mistreatment to Chief Judge Roberts by shoving him into a wall . . . ; undressed him until he was naked; refused to allow him to wash; denied him access to a Koran; denied him access to a toilet for days; did not clean the urine and feces in his cell; and limited him to two cups of water in five days.

Dkt. 183 at 9. In addition, Trabelsi argues that he was "grossly overcharged for telephone calls" during his time at RRJ. *Id*. Trabelsi asserts that if such misconduct occurred, "perpetrated by employees of the same state agency" as his current facility, "this would bear directly upon the reasonableness of the draconian restrictions imposed" by the SAMs. Dkt. 197 at 2. He thus separately seeks leave to issue a third-party subpoena on RRJ. *See* Dkt. 191. These allegations

13

of abuse are deeply concerning. The Court is not convinced, however, that they are in any way related to the motion to modify SAMs. Trabelsi is no longer housed at RRJ,[4] and has not made any similar allegations of mistreatment about his time at NNRJ. Even if such mistreatment did occur at a prior facility—and the Court makes no suggestion that it did—it is difficult to see how that would bear on the reasonableness of his current conditions of confinement. Trabelsi may well be able to seek recourse for his alleged mistreatment by different means, but his SAMs motion is not the proper vehicle to do so. The Court will therefore deny Trabelsi's motion seeking leave to issue a third-party subpoena.

## CONCLUSION

Trabelsi has failed to show that the restrictions imposed by the SAMs and by NNRJ are not reasonable, and has failed to show that any alleged mistreatment at a prior facility implicates this Court's consideration of his SAMs motion. For the foregoing reasons, Trabelsi's motions, Dkt. 170, Dkt. 191, are hereby DENIED. The Court, however, is sympathetic to Trabelsi's concerns about the restrictive nature of the SAMs, particularly the prohibition on telephone calls with Berrou. As a result, the Court also orders the government to reevaluate this condition within 90 days from the issuance of this opinion.

---

[4] According to Major Back, Trabelsi has asked to be transferred back to RRJ "on several occasions" since being transferred to NNRJ. *See* Dkt. 185-3 at 3 (Back Decl. ¶ 16). Though the Court makes no conclusions here about the merits of Trabelsi's claims of mistreatment, these requests perhaps cast some doubt on his allegations.

**SO ORDERED**.

                                                                                     <u>/s/ Randolph D. Moss</u>
                                                                                     RANDOLPH D. MOSS
                                                                                     United States District Judge

Date: July XX, 2019