# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES,

v.

NIZAR TRABELSI,

     *Defendant.*

No. 06-cr-89 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Nizar Trabelsi was extradited from the Kingdom of Belgium to the United States after serving a 10-year term of imprisonment in Belgium for, among other things, attempting to bomb the Kleine-Brogel Air Base ("Kleine-Brogel") in 2001. In September 2014, Trabelsi (1) moved to dismiss the U.S. indictment on the ground that his extradition violated the *non bis in idem* (or "not twice") principle contained in the extradition treaty between the United States and Belgium, which prohibits extradition for an "offense" for which the person sought has been convicted or acquitted in the state from which extradition has been requested, and, in the alternative, (2) moved to preclude the government from relying on four of the overt acts set forth in the U.S. indictment based on the doctrine of specialty, which prohibits prosecution for a crime other than the crime for which the defendant was extradited. Dkt. 70. This Court denied both motions, Dkt. 124 (Roberts, C.J.), and because Trabelsi's *non bis* challenge was analogous to a double-jeopardy challenge, he was allowed to take an interlocutory appeal of the Court's order declining to dismiss the indictment. On appeal, the D.C. Circuit rejected Trabelsi's *non bis* challenge and affirmed this Court's order. *United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017).

Two related motions are now before the Court. First, Trabelsi asks the Court to reconsider its decision—since affirmed by the D.C. Circuit—declining to dismiss the indictment on the ground that his extradition violated the *non bis* principle. Dkt. 345. In Trabelsi's view, an August 8, 2019 decision from the Brussels Court of Appeal constitutes "new evidence" that warrants reconsideration and reversal of that decision. *Id*. at 1. Second, he once again moves to compel compliance with the treaty doctrine of speciality (1) by excluding evidence related to a conspiracy or attempt to bomb Kleine-Brogel or, in the alternative, (2) by instructing the jury that it cannot convict him based solely on evidence of the alleged Kleine-Brogel conspiracy. Dkt. 210; Dkt. 262.

For the following reasons, the Court will **DENY** both motions.

## I. BACKGROUND

**A.    Trabelsi's Arrest, Belgian Prosecution, and Extradition**

On September 13, 2001, Trabelsi was arrested by the Belgian police. *Trabelsi*, 845 F.3d at 1184. He was charged with and convicted of, among other things, the following offenses under Belgian law:

> [First,] at an unknown date between July 3, 2001 and September 14, 2001, [Trabelsi] attempted to destroy, with the effects of an explosion, a building, bridge, dam, road, train rail, locks, store, yard, shed, ship, boat, car, train, aircraft, work of art, construction, motor vehicle, specifically in the present case, the military base of Kleine-Brogel belonging to the Belgian State, represented by the Minister of National Defense, the perpetrators having had to assume that one or more people were present at the time of the explosion, with the resolution to commit the crime having been demonstrated by outside acts that form a beginning of performance of that crime and that were only suspended or only failed to achieve their aim due to circumstances outside the will of the perpetrators[;]
>
> *    *    *
>
> [Second,] between May 1, 2001 and October 3, 2001, [Trabelsi was] the instigator of a conspiracy created for the purpose of carrying out attacks on people or property through the commission of crimes which carry a sentence from twenty to thirty

years, from fifteen to twenty years, or from ten to fifteen years (specifically in the present case, a conspiracy of individuals who, in one way or the other, promoted an enterprise for the purpose of carrying out a terrorist attack);

* * *

[Third,] at an unknown date between May 3, 2001 and October 1, 2001, in violation of Articles 1 and 2 of the Law of July 29, 1934, prohibiting private militias, [Trabelsi] created, assisted or joined a private militia or any other organization of individuals whose purpose was to use force[.]

Dkt. 367-3 at 24, 27, 31 (*The Federal Prosecutor v. Mohamed Fethi, et al.*)[1].  On September 30, 2003, Trabelsi was sentenced to ten years of incarceration in Belgium.  *Trabelsi*, 845 F.3d at 1184.

On April 7, 2006, while he was serving his sentence in Belgium, a grand jury in the United States indicted Trabelsi on charges of Conspiring to Kill U.S. Nationals Outside the United States, in violation of 18 U.S.C. §§ 1111(a) and 2332(b)(2); Conspiring and Attempting to Use Weapons of Mass Destruction, in violation of 18 U.S.C. §§ 2 and 2332a; Conspiring to Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and Providing Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2 and 2339B.  Dkt. 3.  Over a year later, on November 16, 2007, a grand jury returned a superseding indictment, charging Trabelsi with the same statutory violations, but revising the charged overt acts.[2]  *See* Dkt. 6.  On April 4, 2008, the United States requested that Belgium extradite Trabelsi to the United States and provided the

---

[1] All documents from the Belgian proceedings have been translated from the original French into English.  *See* Dkt. 367.  The original French-language versions, along with their English translations, are available on the docket.  *See* Dkt. 367 and attachments.

[2]  On the U.S. government's motion and with the consent of Trabelsi, Counts 3 and 4—which concerned the provision to material support to a terrorist organization—were subsequently dismissed with prejudice.  *See* Dkt. 231; Minute Order (June 10, 2019).

Belgian government with an affidavit describing the above charges and the governing U.S. law as well as a copy of the superseding indictment. Dkt. 367-7.

On November 19, 2008, the Court Chamber of the Court of First Instance of Nivelles ("Court of First Instance") issued the first of several Belgian-court decisions concerning Trabelsi's extradition. Dkt. 367-9. The only portion of that decision relevant to the pending motion addressed the *non bis* provision of the Extradition Treaty between the United States and the Kingdom of Belgium. Article 5 of the Treaty provides in pertinent part that "[e]xtradition shall not be granted when the person sought has been found guilty, convicted or acquitted in the Requested State for the offense for which extradition is granted." Article 5, Extradition Treaty Between the United States of America and the Kingdom of Belgium (the "Extradition Treaty" or "Treaty"), Apr. 27, 1987, S. Treaty Doc. No. 104-7. The Court of First Instance construed the term "offense," as used in Article 5, to mean "facts . . . or acts . . . falling under the scope of criminal law of one of the two States." Dkt. 367-9 at 7. From this premise, it reasoned that four overt acts included in the superseding indictment—numbers 23, 24, 25 and 26—"very precisely correspond to the offenses, committed on Belgian soil" on which Trabelsi's Belgian conviction was based.[3] *Id.* The court, accordingly, concluded that Trabelsi's extradition was permitted under Article 5 of the Extradition Treaty, except with respect to those overt acts. *Id.* at 8. That decision was affirmed by the Brussels Court of Appeal and, in turn, by the Belgian Court of Cassation. Dkt. 367-11; Dkt. 367-13; *see also Trabelsi*, 845 F.3d at 1184.

On November 23, 2011, the Belgian Minister of Justice issued a decision granting the request of the United States to extradite Trabelsi. Dkt. 367-17 at 14. With respect to the four

---

[3] Although the Court of First Instance omits reference to overt act 25 in its discussion, this was apparently an oversight; in the operative paragraph of the court's decision, it refers to all four of the overt acts at issue. Dkt. 367-9 at 8.

overt acts in question, the Minister of Justice explained that under the Extradition Treaty "it is *not the facts*, but their qualification, *the offenses*, that have to be identical." *Id.* at 11 (emphasis added). He further explained that the offenses of which Trabelsi was convicted in Belgium "do not correspond to the offenses listed under the counts . . . that appear in the arrest warrant on which the U.S. extradition request is based." *Id.* at 12. In the operative portion of his order, the Minister declared that "[t]he extradition of Nizar Trabelsi is granted to the United States government for the offenses for which it is requested" upon completion of Trabelsi's term of imprisonment in Belgium. *Id.* at 14. Trabelsi appealed that decision to the Council of State, an administrative court that reviews actions of the Belgian executive branch, which rejected Trabelsi's challenge to the order of extradition. *See* Dkt. 367-21.

On October 3, 2013, Belgium extradited Trabelsi to the United States. *Trabelsi*, 845 F.3d at 1185.

## B.     2014 Motion to Dismiss and Related Interlocutory Appeal

About a year after he was brought to the United States, Trabelsi moved to dismiss the indictment on the ground that his extradition violated Article 5 of the Extradition Treaty. Dkt. 70. He argued that the Minister of Justice "incorrectly concluded 'that the constitutive elements of the American and Belgian offenses respectively, their significance, and the place(s) and time(s) at which they were committed do not match.'" *Id.* at 14 (quoting Minister of Justice's Extradition Order (Dkt. 367-17 at 11)). The United States, in Trabelsi's view, charged a broader conspiracy than the plot to bomb the Kleine-Brogel Air Base merely "for the purpose of securing [his] appearance before this Court in violation of the [Extradition] Treaty." *Id.* at 15. He posited that, notwithstanding the breadth of the charges in the indictment, "the [U.S.] government will present at trial only the narrow evidence of the plot to bomb Kleine-Brogel and thereby

circumvent Article 5 of the treaty." *Id.* at 16. In other words, Trabelsi argued, the U.S. government seeks to do precisely what the *non bis* principle precludes—it seeks to try him in the United States for the same conspiracy for which he was previously tried and convicted in Belgium.

In the same filing, Trabelsi also argued that Belgium denied the U.S. request for his extradition with respect to those allegations "set forth in [o]vert [a]cts 23, 24, 25, and 26" and that, as a result, permitting the government to "continue[] to prosecute the Indictment based on th[o]se allegations" would violate the doctrine of speciality. Dkt. 70 at 19-26. That doctrine, which is incorporated in Article 15 of the Extradition Treaty, precludes the requesting country from trying or punishing a person for any offense, other than "the offense for which extradition has been granted." *Id.* at 20 (quoting Article 15, Extradition Treaty). "By continuing to pursue the[] allegation for which extradition was not authorized," Trabelsi argued, "the United States is in violation of . . . Article 15 and the doctrine of speciality." *Id.* at 26.

The United States opposed Trabelsi's motion and attached to its opposition brief a diplomatic note from the Kingdom of Belgium. Dkt. 80-1. That note reads, in relevant part: "the [Extradition] Order . . . makes clear that Mr. Trabelsi may be tried on all of the charges set out in [the superseding] indictment, and that any similarity between the United States case and the Belgian case does not give rise to any bar to his being tried on the charges in that indictment." *Id.* at 1. The note goes on to state that "[t]he [Extradition] Order is also clear that the prosecution may offer facts relating to overt acts 23 through 26 in prosecuting Mr. Trabelsi on the charges in the indictment" and that "[n]either Mr. Trabelsi's trial on the charges set out in the indictment[] nor the prosecution's offering proof as to any of the overt acts recited in the indictment[] is

inconsistent with the Order." *Id.* Finally, the note asserts that neither "trial" on those charges nor the "offering of proof" as to those overt acts would "violate the rule of speciality." *Id.*

This Court (Roberts, C.J.) denied Trabelsi's motion to dismiss the indictment, relying on a D.C. Circuit opinion counseling U.S. courts to accord deference to a foreign government's decision to extradite a defendant and applying the double-jeopardy test from *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Dkt. 124 at 8, 14–16 (discussing *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1982)). The Court then determined that the Belgian and U.S. offenses were different offenses under *Blockburger* and that proceeding to trial on the indictment, accordingly, would not violate Article 5 of the Extradition Treaty. *Id.* at 16–26. With respect to the doctrine of speciality, the Court held that because "Belgium has repeatedly consented to Trabelsi's prosecution under the superseding indictment," and because the Extradition Treaty confers the right to enforce Article 15 upon the signatory-nations, Trabelsi lacked standing to "challenge his extradition as a violation of Article 15." *Id*. at 29. Finally, the Court held that, "even if Trabelsi did have standing to raise a challenge under the doctrine of speciality," the challenge would fail in light of Belgium's repeated consent to the prosecution. *Id.* at 30.

Trabelsi filed an interlocutory appeal of the portion of the Court's order denying his motion to dismiss the indictment on *non bis* grounds. He argued that this Court erred in according deference to the decision of the Belgium state, erred in assuming that the Belgian authorities understood the conspiracy charged in the United States, and erred in applying "a strict *Blockburger* test" in comparing offenses from different nations. *United States v. Trabelsi*, No.

15-3075 (D.C. Cir. 2017), Appellant's Br. at 15, 23[4] (internal quotation omitted). Instead of applying the strict *Blockberger* test, in his view, "[c]ourts must look beyond the elements of the offenses and apply a modified and more flexible test of whether the same conduct or transaction underlies the criminal charges in both transactions." *Id*. at 33. Applying that test—or even the *Blockberger* test—Trabelsi maintained that the Belgian and U.S. charges were the same. *See id.* at 33–65. In his opening brief, Trabelsi further argued that the Minister of Justice's authority to grant the extradition request was limited by the decisions of the Belgian courts excluding overt acts 23, 24, 25, and 26, *id.* at 7-8, and, in his reply brief, he added that the Minister of Justice's extradition order must have, "as required under Belgian law, incorporated the exclusion of the Kleine-Brogel overt acts (23 through 26)," *United States v. Trabelsi*, No. 15-3075 (D.C. Cir. 2017), Appellant's Reply Br. at 33. According to Trabelsi, it was only after "recognizing the Belgian court-required exclusion of overt acts 23 through 26" that "the Minister made the conclusory statement" that "'[t]he essential elements of the respective U.S. and Belgian offenses . . . do not correspond.'" *Id.* at 34 (quoting Dkt. 367-17 at 12).

The D.C. Circuit affirmed this Court's order denying Trabelsi's motion to dismiss the indictment. The Court of Appeals described the relevant background as follows:

> On November 19, 2008, the Court [] Chamber of the Court of First Instance[] of Nivelles held that the United States arrest warrant was enforceable, except as to the overt acts labeled number[s] 23, 24, 25, and 26 in the indictment. The Court of Appeals of Brussels affirmed this decision on February 19, 2009. On June 24, 2009, the Belgian Court of Cassation affirmed the Court of Appeals.
>
> The Belgian Minister of Justice, who has final authority over extradition requests, granted the United States' request on November 23, 2011. The Minister rejected the position that the *non bis in idem* principle is implicated by Article 5, concluding instead that the narrower offense-based "double jeopardy" principle applies. *The Minister further rejected the limitation on overt acts,*

---

[4] Page numbers refer to the file-stamped page of the PDF, not the internal pagination of the document.

> explaining that they were "*not the offense for which an extradition [was] requested*" because "*an overt act is an element (of fact, or factual), an act, a conduct or transaction which itself cannot automatically be qualified as an offense.*" . . . Trabelsi appealed the Minister's decision to the Belgian Counsel of State, which also concluded that the United States offenses are different and that "'overt acts' constitute elements . . . to determine whether [Trabelsi] is guilty or not guilty," and rejected his application on September 23, 2013."

*Trabelsi*, 845 F.3d 1184–85 (emphasis added). The Court of Appeals went on to hold that that the Minister of Justice had "determined that Trabelsi's extradition would not violate the Treaty" and explained that, absent good cause, it would "not 'second-guess'" his decision to grant the U.S. request for extradition. *Id.* at 1189 (citing *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002)).

Because the Minster's "grant" of the U.S. request "did not exclude any of the offenses included in the request for extradition," the D.C. Circuit "presume[d] that Belgium [had] determined that none of the offenses in the indictment violate[d] Article 5 of the Treaty." *Id.* (citing *Casey v. Dep't of State*, 980 F.2d 1472, 1475 (D.C. Cir. 1992)). The court recognized that this "presumption" might be rebutted by evidence of "misconduct on the part of the United States in procuring an extradition" or by evidence that the requested party did not review the extradition request. *Id.* But, here, "Trabelsi . . . offer[ed] no such evidence." *Id.* To the contrary, the "United States sought Trabelsi's extradition," and Belgium granted that request— "without limitation"—"[a]fter comparing the offenses in the U.S. indictment with those of which Trabelsi was convicted in Belgium." *Id.* As the D.C. Circuit further noted, "the Minister adequately explained his decision, including his basis for rejecting the overt-acts exclusion." *Id.*

Finally, the D.C. Circuit held that the presumption of compliance with the *non bis* principle might "also be rebutted by a showing that the requested state or party did not apply the correct legal standard adopted in the Treaty," *id.* at 1189, but concluded that the Belgian Minister

of Justice reasonably construed the Treaty and reasonably concluded that "'the offenses for which [Trabelsi] was irrevocably sentenced . . . do to correspond to the offenses listed [in the indictment] that appear in the arrest warrant on which the U.S. extradition [was] based.'" *Id*. at 1190 (first two bracketed inserts in D.C. Circuit opinion) (quoting Dkt. 367-17 at 12). Having held that the Minister reasonably construed the Treaty to require an "offense-based analysis" and that Trabelsi had failed to offer anything "of merit to rebut the presumption" that Belgium had correctly construed the Treaty, the D.C. Circuit rejected Trabelsi's challenge without needing to "decide whether the charges in the U.S. indictment and the crimes for which Belgium convicted Trabelsi are identical under *Blockburger*." *Id.*

## C.    Recent Developments

After the D.C. Circuit affirmed this Court's denial of Trabelsi's motion to dismiss, this Court set a trial date of Sept. 9, 2019. Minute Entry (Apr. 16, 2018). Among numerous other pretrial motions, Trabelsi filed a motion to compel compliance with the Treaty and the doctrine of specialty. Dkt. 210. That motion renewed Trabelsi's argument that his extradition was conditioned on, and thus included, the exclusion of the four overt acts related to the plot to bomb the Kleine-Brogel Air Base. Trabelsi further argued that, because he could not be convicted based on those four overt acts, evidence of those acts should be excluded from the trial as bad-acts evidence under Federal Rule of Evidence 404(b). Dkt. 210 at 15–16. The government opposed that motion, arguing, as it had before the D.C. Circuit, that Trabelsi was extradited without the exclusion of the Kleine-Brogel overt acts. Dkt. 228.

On August 8, 2019, while that motion was pending and about a month before trial was scheduled to begin, the Brussels Court of Appeal issued a new decision concerning Trabelsi's extradition. *See* Dkt. 312-2. That decision concerned an "interim" challenge he brought seeking

to preclude Belgian officials from aiding in his upcoming U.S. trial on the ground that his extradition violated his treaty rights. *Id.* In the course of its analysis, the Belgian court construed Article 5 of the Extradition Treaty to require "a review of the identity of the *fact* and *not* of its *qualification*." *Id.* at 23 (emphasis added). It explained that Belgian courts had consistently construed the Extradition Treaty in this way but that "the ministerial extradition order of November 23, 2011 departs from this consistent interpretation . . . , arguing [instead] that the provision requires an identity of *qualifications*." *Id.* at 25 (emphasis added). As a result, the court held, "the Ministerial order on Extradition . . . could only validly grant the extradition by the United States within the limits of the exequatur granted to the arrest warrant, that is to say for the four counts mentioned in the arrest warrant, but not for the "[o]vert [a]cts" [numbered] 23, 24, 25, and 26, set out in paragraph 10 of Count 1 and supposed to be repeated in support of the other three counts." *Id.* at 26. The court concluded: "the extradition . . . does not allow" Trabelsi "to be tried for the 'overt acts' . . . [numbered] 23, 24, 25, and 26 . . . , namely the facts relating to the attempt of bombing the Kleine-Brogel military base." *Id.*

In light of this decision, both Trabelsi and the United States requested that this Court vacate the September trial date to provide time to brief the effect, if any, of the August 8, 2019 Belgian court decision on the proceedings before this Court. Aug. 15, 2019 Hrg. Tr. (Rough at 4, 7–8). This Court agreed to do so, *id.* (Rough at 9), and set a briefing schedule for Trabelsi's motion for reconsideration of his motion to dismiss, Minute Order (Sept. 5, 2019). On September 24, 2019, Trabelsi moved for reconsideration of this Court's prior denial of his motion to dismiss the indictment, arguing that the August 8, 2019 decision from the Brussels Court of Appeal constituted new evidence not previously available to the defense. Dkt. 345. He contends, in particular, that the August 8, 2019 decision shows that the Minister of Justice did

not reject and could not have rejected the Belgian courts' exclusion of overt acts 23, 24, 25, and 26, and that this Court and the D.C. Circuit mistakenly deferred to an interpretation of the Treaty that Belgium had rejected, and still rejects. *Id.* Because the U.S. case is dependent, in Trabelsi's view, on the excluded overt acts, he maintains that the only remedy for the Treaty violation is dismissal of the charges against him. *See id.*

The United States opposes this motion and, along with its opposition brief, has provided the Court with a second diplomatic note from the Kingdom of Belgium, this one dated November 13, 2019. *See* Dkt. 355; Dkt. 355-1. That note asserts that the August 8, 2019 Belgian court decision is "contrary to the Extradition order of 23 November 2011 and in our view, therefore contrary to the clear wording of article 5 of the [Extradition] Treaty." *Id.* at 1. For that reason, the note explains, the Belgian state has "appealed the [August 8, 2019] judgment before the Supreme Court." *Id.* The note further reaffirms the contents of its October 29, 2014 diplomatic note and explains that the Minister of Justice's 2011 extradition order "is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States," and it "makes clear that Mr. Trabelsi may be tried on all of the charges set out in [the] indictment[], and that any similarity between the United States case and the Belgian case does not give rise to any bar to his being tried on the charges in that indictment." *Id.* at 2. Finally, the note asserts that the 2011 extradition order was also "clear that the prosecution may offer facts relating to all 28 overt acts in prosecuting Mr. Trabelsi on the charges in the indictment." *Id.*

The Court originally scheduled a hearing on the motion for December 5, 2019 and, if needed, December 6, 2019. Minute Entry (Sept. 5, 2019). However, after both sides sought extensions of time, the Court rescheduled the hearing for January 8, 2020. Minute Order (Nov. 20, 2020). Upon filing his reply brief, Trabelsi also moved to continue the hearing "until the

appeals process in Belgium is complete"—effectively seeking to stay the proceedings indefinitely. Dkt. 360 at 2. The Court denied that motion, concluding that such an indefinite stay was unwarranted. Minute Order (Dec. 20, 2020).

On January 8, 2020, the Court heard testimony regarding Belgian extradition law from Professor Adrien Masset and argument from the parties. During argument, counsel for Trabelsi explained that Trabelsi's Belgian counsel sought, through members of the Belgian Parliament, to ask questions of the Belgian Minister of Justice regarding the extradition order and that those questions would be asked and answered in the coming weeks. Jan. 8, 2020 Hrg. Tr. (Rough at 19). The Court indicated that it would not issue its decision before the end of January and that Trabelsi could submit the results of that questioning in a supplemental filing. *Id.* (Rough at 37). The defense has not filed any evidence related to such questioning in support the pending motion.

On March 4, 2020, Trabelsi filed a translated version of a February 26, 2020 decision of the Francophone Court of First Instance of Brussels concerning Trabelsi's legal challenges in that country to his extradition and Belgium's continued cooperation with the United States in the U.S. prosecution. Dkt. 373; Dkt. 373-1. That decision ordered the Belgian state to provide a copy of the decision to U.S. officials and to "specify[] in the accompanying letter" the following:

> According to the analysis prevailing in Belgian law, the extradition of Mr. TRABELSI does not allow him to be prosecuted in the United States to be tried there for the facts set out in the "Overt Acts" Nos. 23, 24, 25 and 26 set out in paragraph 10 of the first count and which are supposed to be repeated in support of the other counts [*of the American arrest warrant which is the basis for the extradition (indictment of the Grand Jury of November 3, 2006, filed on November 16, 2007 at the Registry of the US District Court of the District of Columbia*], namely, the facts relating to the attempted attack on the Kleine-Brogel military base.

Dkt. 373-1 at 72 (brackets and emphasis in original). On March 6, 2020, the United States filed the February 26, 2020 decision and accompanying letter that it received from the Belgian State,

which informed the United States that the Court of First Instance of Brussels had ordered the

Belgian government to provide the U.S. with the decision and notice containing the language

quoted above. Dkt. 375-1.

## II. ANALYSIS

The pending motions turn on the scope of Belgium's grant of extradition and, in

particular, the breadth and effect of the Minister of Justice's extradition order. *See* Dkt. 210;

Dkt. 345. Both this Court and the D.C. Circuit have previously addressed that question. *See*

Dkt. 124; *Trabelsi*, 845 F.3d at 1190. Thus, before considering Trabelsi's arguments, the Court

must consider when, if ever, a district court may reconsider a question of law or fact, not only

previously decided by the district court, but also decided by an appellate panel in the very case

now back before the district court.

The general rule is easily stated: "courts involved in later phases of a lawsuit should"

typically refrain from "re-open[ing] questions decided." *United States v. Philip Morris USA*

*Inc.*, 801 F.3d 250, 257 (D.C. Cir. 2015) (quoting *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d

735, 739 (D.C. Cir. 1995)). At times, that rule is not binding but simply a principle of sound

judicial practice, designed to promote respect for the rule of law, judicial efficiency, and the

orderly conduct of litigation. In civil litigation, for example, district courts are generally free to

reconsider their own interlocutory orders and decision, as appropriate, prior to the entry of final

judgment. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017). Although nothing

in the Federal Rules of Criminal Procedure speaks to the question, it is also well understood that

district courts may—and, at times, should—do the same in criminal cases. *See*, *e.g.*, *United*

*States v. Cabrera*, 699 F. Supp. 2d 35, 40 (D.D.C. 2010); *United States v. Sunia*, 643 F. Supp. 2d

51, 60 (D.D.C. 2009); *United States v. Booker*, 613 F. Supp. 2d 32, 34 (D.D.C. 2009). Even in

that context, however, reconsideration should be reserved for "extraordinary circumstances" and

should not be used to bring to the Court's attention "arguments that could have been advanced

earlier." *Cabrera*, 699 F. Supp. 2d at 41. Ultimately, the decision whether to entertain a motion

for reconsideration of an interlocutory order typically lies in the sound discretion of the district

court.

Once the Court of Appeals has decided a question, whether in a final appeal leading to a

new trial or on interlocutory appeal, however, the district court is bound by the appellate

decision. Under the law-of-the-case doctrine, "the *same* issue presented a second time in the

*same* court should lead to the *same* result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir.

1996). This means that, "[w]hen there are multiple appeals taken in the course of a single piece

of litigation, . . . decisions rendered on the first appeal should not be revisited on later trips to the

appellate court." *Crocker*, 49 F.3d at 739. The law-of-the-case doctrine applies to all "issues

that were decided either explicitly or by necessary implication." *United States v. Ins. Co. of N.*

*Am.*, 131 F.3d 1037, 1041 (D.C. Cir. 1997). Although the law-of-the-case doctrine "is a

prudential rule," *Crocker*, 49 F.3d at 739–40, "an even more powerful version of the doctrine—

sometimes called the 'mandate rule'—*requires* a lower court to honor the decisions of a superior

court in the same judicial system," *LaShawn A.*, 87 F.3d at 1393 n.3 (citations omitted)

(emphasis added). Simply put, "'an inferior court has no power or authority to deviate from the

mandate issued by an appellate court.'" *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588,

596-97 (D.C. Cir. 2001) (quoting *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948)); *see also*

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) (it is "indisputable" that district courts

are "bound to carry the mandate of the upper court into execution and [may] not consider the

questions which the mandate laid to rest"); *Role Models of Am., Inc. v. Geren*, 514 F.3d 1308, 1311 (D.C. Cir. 2008).

Although the D.C. Circuit has not had an opportunity to address the question, decisions from this Court and from other circuits recognize that a district court may, nonetheless, permit re-litigation of a question previously resolved in an appellate decision, but only in "extraordinary circumstances." *United States v. Carta*, 690 F.3d 1, 5 (1st Cir. 2012) (citation omitted); *see also United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 120 n.5 (D.D.C. 2015); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 262 (D.D.C. 2002); *cf. Naples v. United States*, 359 F.2d 276, 277–78 (D.C. Cir. 1966) (per curiam) (law-of-the-case doctrine does "not operate to bar consideration of the admissibility of these confessions based upon material facts not heretofore adduced"). As the test is framed in at least two circuits, "[a] district court may depart from an appellate court's mandate" in response to "'(1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) [if] blatant error from the prior . . . decision would result in serious injustice if uncorrected.'" *United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996) (citation omitted); *see also United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993) (applying essentially the same test); *cf. United States v. Pineiro*, 470 F.3d 200, 205–06 (5th Cir. 2006) (applying a similar test, but permitting deviation from a mandate where evidence to be offered at "a subsequent trial" is "substantially different"). It bears emphasis, however, that respect for the proper roles of trial and appellate courts and the importance of judicial economy and order demand that district courts apply these exceptions "only in 'very special situations,'" *Carta*, 690 F.3d at 5, and that district courts avoid reopening

issues once decided or second-guessing the conclusions—express or implicit—of appellate courts.

Here, Trabelsi relies on the exception for newly discovered evidence. Because he seeks reconsideration of a question already decided by the D.C. Circuit, this means that he bears the heavy burden of demonstrating that the evidence is new, and not merely cumulative; that it would lead to a different result; and that the evidence could not have been previously adduced through reasonable diligence.

## A.     Motion for Reconsideration of the Denial of the Motion to Dismiss

With these principles in mind, the Court turns first to Trabelsi's motion for reconsideration. That motion hinges on Trabelsi's claim that the August 8, 2019 decision from the Brussels Court of Appeal constitutes significant new evidence at odds with the factual foundation of the D.C. Circuit's decision. According to Trabelsi, the D.C. Circuit's "decision rested on the inaccurate premise that the Minister of Justice had the authority to, and did in fact, reject the overt act exclusion imposed by the Belgian court . . . ." Dkt. 345 at 23. In his view, the D.C. Circuit's belief that the Minister of Justice authorized Trabelsi's extradition—without limitation—led that court, like this one, to defer to an extradition decision that the Belgian state never made. Without that unwarranted deference, Trabelsi continues, the D.C. Circuit would have been required to interpret the Treaty on its own, and it would have been required to conduct its own comparison of the U.S. and Belgian offenses. Dkt. 345 at 2. Had it done so, Trabelsi contends, the court would have concluded that the Belgian and U.S. offenses overlap and that Trabelsi was not subject to extradition to the United States on charges, like those in the pending indictment, that included a conspiracy or attempt to bomb the Kleine-Brogel Air Base. *Id.*

At the time he filed his motion for reconsideration, the only new evidence that Trabelsi cited in support of this contention was the August 8, 2019 decision from the Brussels Court of Appeal. *See* Jan. 8, 2020 Hr. Tr. (Rough at 13). That evidence is new and significant, according to Trabelsi, both because it "clarifie[s] that the Belgian Minister of Justice did not have the authority to 'reject' the exclusion imposed by the Belgian court," and, more importantly, because it shows that he did not in fact do so. Dkt. 345 at 23. This "clarifi[cation]," Trabelsi argues, can be found in the Belgian court's conclusion that the Minister of Justice's interpretation of the Treaty was at odds with the prior, binding Belgian court decisions. *Id.* at 23–24. The Belgian court concluded, for example, that the ministerial order on extradition "*could only* validly grant the extradition requested by the United States within the limits of the" prior Belgian court decisions—in other words, only with the exclusion of the four overt acts. Dkt. 345-1 at 26. By arguing that the Minister of Justice "did not have the authority to 'reject' the exclusion imposed by the Belgian court, nor did he," Dkt. 345 at 23, Trabelsi raises two distinct contentions about the Minister of Justice's decision. Neither warrants reconsideration of this Court's or the D.C. Circuit's decision.

Trabelsi first, and most significantly, contends that the August 8, 2019 decision clarifies that the Minister of Justice did not, in fact, order Trabelsi's extradition without limitation—that is, he was bound by the decisions of the Belgian courts, and his extradition order must therefore be read to exclude overt acts 23, 24, 25, and 26. The August 8, 2019 decision does not purport to amend the Minister's extradition order, nor does Trabelsi contend that the decision had any such operative effect. Instead, the August 8, 2019 decision is relevant to Trabelsi's motion for reconsideration only if it offers significant, new evidence about the meaning of the Minister's 2011 extradition order. In other words, reconsideration is unwarranted unless the August 8, 2019

decision presents previously unavailable evidence that controverts the D.C. Circuit's reading of the extradition order.

The starting point for resolving that question is, of course, the text of the extradition order itself. There is no doubt the Minister of Justice was aware of the decisions of the Belgian courts excluding the four overt acts; the extradition order discussed those decisions in detail and acknowledged that the Court of First Instance "rendered enforceable the arrest warrant issued on 7 April, 2006 by the Federal Court of the District of Columbia, 'except with respect to "overt acts" no. 23, 24, 25 and 26.'" Dkt. 367-17 at 3. Nor is there any doubt that the Minister carefully considered, on his own accord, whether the *non bis* principle required exclusion of the four overt acts; the extradition order discussed Article 5 of the Extradition Treaty and the *non bis*—or, in the Minister's nomenclature, the double jeopardy—principle at length, concluded that the Treaty embodies an offense-based approach, and the order determined that the "overt acts" are "elements in support of the charges" and that "[t]he 'double jeopardy' principle does not exclude the possibility to use these elements of fact or not." *Id*. at 10–13. The extradition order further stressed that "[t]he overt acts listed in the . . . indictment . . . are not the offenses for which an extradition [was] requested" but, rather, were "element[s]" of "fact" that do not "automatically qualify as an offense." *Id.* at 12. Overt act 23, for example, which alleges that Trabelsi "rented an apartment" in Brussels, Dkt. 6 at 8, "should obviously not be qualified as an offense," Dkt. 367-17 at 13. Accordingly, in the Minister's view, the overt acts did "not represent in any way the offenses for which an extradition was requested." *Id.* He, therefore, concluded that "the conditions and formalities for extradition" had "been met" and—without mention of any limitation or condition— he "granted" the request of the United States for extradition. *Id*. at 14.

With the text of the extradition order and the preceding decisions of the Belgian courts before it, the D.C. Circuit read the Minister of Justice's extradition order to grant extradition, without limitation. The D.C. Circuit observed, in relevant respects: "The Minister . . . rejected the limitation on overt acts, explaining that they are 'not offenses for which an extradition [was] requested' because 'an overt act is an element (of fact, or factual), an act, a conduct or a transaction which in itself cannot automatically qualify as an offense.'" *Trabelsi*, 845 F.3d at 1184–85 (quoting Dkt. 367-17 at 12). And, with this understanding in mind, the D.C. Circuit held that the Minister of Justice compared "the offenses in the U.S. indictment with those of which Trabelsi was convicted in Belgium;" "adequately explained his decision, including *the basis for rejecting the overt-acts exclusion*;" and "granted the extradition request *without limitation*." *Id.* at 1189 (emphasis added).

The question for this Court to decide is whether the August 8, 2019 decision offers significant new evidence that was previously unavailable and that shows that this Court and the D.C. Circuit mistakenly believed that the Minister had "reject[ed] the over-acts exclusion" and had "granted the extradition request without limitation." *See Webb*, 98 F.3d at 587; *see also LaShawn A.*, 87 F.3d at 1393 (requiring "extraordinary circumstances"). The August 8, 2019 decision does not come close to meeting that high bar. To the contrary, read correctly, the opinion addresses only whether the Minister of Justice acted lawfully, in the view of that court, when he ordered Trabelsi's extradition without excluding those overt acts. *See* Dkt. 345-1 at 23–26.

Trabelsi focuses on the following passage from the Belgian court's August 8, 2019 opinion in an effort to show that the D.C. Circuit's interpretation of the Minister's 2011 order was incorrect:

As a result of the foregoing, under Belgian law:

> Article 5 of the Extradition Convention refers to the identity of the fact and not the identity of the qualification;
>
> For this reason, the Belgian courts—order of the Nivelles Chamber of the Council of November 19, 2008, confirmed by the ruling of the Grand Jury of the Brussels Court of Appeal of February 19, 2009—have limited the exequatur given to the U.S. arrest warrant by granting it "*except in so far as it refers to the 'overt acts' n°23, 24, 25, and 26 set out in paragraph 10 of Count 1 and deemed to be repeated in support of the other three counts*;"
>
> These decisions of the Belgian courts have acquired the force of res judicata and are binding on the Belgian State;
>
> Similarly, the Ministerial Order on Extradition of November 23, 2011 could only validly grant the extradition requested by the United States within the limits of the exequatur granted to the arrest warrant, that is to say for the four counts mentioned in the arrest warrant, ***but not for the "Overt Acts" n° 23, 24, 25 and 26, set out in paragraph 10 of Count 1 and supposed to be repeated in support of the other three counts;***

Accordingly, as a result of the foregoing, according to the analysis which prevails in Belgian law, the extradition of the appellant does not allow to prosecute him in the United States in order to be tried <u>for the "overt acts"</u> ("Overt Acts") n° 23, 24, 25 and 26, set out in paragraph 10 of Count 1 and supposed to be repeated in support of the other three counts, <u>namely the facts relating to the attempt of bombing the Kleine-Brogel military base</u>.

Dkt. 345-1 at 26 (bold, italics, and underline in original).

In Trabelsi's view, the Belgian court's observation that "the Ministerial Order . . . could only validly grant the extradition . . . within the limits of" the "exequatur" of the Court of First Instance, Dkt. 345-1 at 26, which excluded the four overt acts, provides new evidence that the Minister, in fact, limited the extradition order in conformity with that order. *See* Dkt. 345 at 23. But that is not what the August 8, 2019 decision says; rather, consistent with the judicial decisions that preceded the Minister's decision—all of which were before the D.C. Circuit—the August 8, 2019 decision simply reaffirms the view of the Belgian judiciary regarding the meaning and application of Article 5 of the Extradition Treaty. Even if read to say that the Minister of Justice was, in the view of Brussels Court of Appeal, bound by those judicial

decisions and *should have excluded* the overt acts, that does not demonstrate that he *did exclude* them—or even that he agreed that he was bound by the "exequatur."

Far from presenting significant new evidence, a different portion of the August 8, 2019 decision shows that the Brussels Court of Appeal concurred with the D.C. Circuit understanding that the Minister of Justice, in fact, declined to exclude the four overt acts. The decision describes the view of the Court of First Instance that Article 5 of the Treaty "implies a review of the <u>identity of the fact</u> and not its qualification" and notes that, "on the basis of such review—a comparison of the facts for which the appellant was convicted in Belgium with the 'Overt acts' supporting the American changes"—the Court of First Instance granted "the exequatur to the U.S. arrest warrant "except in so far as it related to the 'overt acts' N° 23, 24, 25 and 26." Dkt. 345-1 at 23 (underline in original). The August 8, 2019 decision further notes that "[t]his order . . . was confirmed by the ruling of . . . the Brussels Court of Appeal" and that the appeal of the order "by the Belgian State was rejected by the Court of Cassation." *Id.* at 24. And it then observes that "[o]nly the ministerial extradition order of November 23, 2011 depart[ed] from this consistent interpretation of Article 5 of the Extradition [Treaty], arguing that the provision requires an identity of qualifications." *Id.* at 25. In other words, the Minister of Justice disagreed with the Belgian courts on the central premise of their decisions—that is, that "Article 5 of the [Treaty] refers to the identity of the fact and not the identity of the qualification" and that, "[f]or this reason," the exequatur given to the U.S. arrest warrant" was limited to exclude overt acts 23, 24, 25, and 26. *Id.* at 26. Thus, if anything, the August 8, 2019 opinion adds further support for—and certainly does not controvert—the D.C. Circuit's conclusion that the Minister of Justice granted extradition without limitation.

The February 26, 2020 decision from the Court of First Instance in Brussels, which was issued after briefing was completed on the pending motions, is not to the contrary. That decision, like the August 8, 2019 decision, interpreted Article 5 of the Treaty to require a fact-based rather than offense-based comparison of the U.S. and Belgian charges. *See* Dkt. 373-1 at 55. The Court of First Instance goes on to explain that, in its view, the Minister of Justice incorrectly based the grant of extradition on an offense-based, rather than fact-based, analysis, *id.* at 62–63, and that the extradition order "d[id] not specify that, as a result of the [overt act exclusion], Mr. Trabelsi cannot be sentenced in the United States for these acts," *id.* at 65. That action, according to the Court of First Instance, "constitute[d] an excess of power" because the Minister of Justice exceeded the limits on extradition set by the courts. *Id.* at 65. This Court need not—and, indeed, should not—engage with the question whether the Belgian Minister of Justice exceeded his authority under Belgian law by declining to conform his order to the "exequatur" granted by the Court of First Instance or to other pronouncements of the Belgian courts. *See infra* at 28–29. All that matters for current purposes is that the February 26, 2020 decision *confirms* the D.C. Circuit's understanding that the Minister of Justice did, in fact, order Trabelsi's extradition to the United States without excluding the four overt acts.

That conclusion is further confirmed by another piece of new evidence (albeit cumulative)—the most recent diplomatic note, which speaks directly to the Minister's intent. *See* Dkt. 355-1. That note offers the official position of the Belgian state and explains that the Minister of Justice's 2011 extradition order "is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States." Dkt. 355-1 at 2. More importantly, according to the diplomatic note, the extradition order "makes clear that Mr. Trabelsi may be tried [in the United States] on all of the charges set out in [the] indictment, and

that *any* similarity between the United States case and the Belgian case does not give rise to *any* bar to his being tried on the charges in that indictment." *Id.* (emphasis added). And, most importantly, the diplomatic note explains that the 2011 extradition order "is also clear that the prosecution may offer facts relating to all 28 overt acts in prosecuting Mr. Trabelsi on the charges in the indictment." *Id.* That assertion is consistent with the plain language of the 2011 order, the Belgian state's prior diplomatic note (which was before the D.C. Circuit), and with the D.C. Circuit's opinion.

Trabelsi claims that a recent communication from the Belgian state to the U.S. government concerning the February 26, 2020 decision constitutes "the unequivocal, official position of the State of Belgium in this matter" and argues that that communication "plainly states that Mr. Trabelsi cannot be prosecuted in the United States for the planned attack on Kleine Brogel." Dkt. 377 at 2 (discussing Dkt. 375-1 at 1). The Court is unpersuaded. The communication does not adopt the conclusion of the Court of First Instance as its own position, but, rather, merely apprises the U.S. government that the Court of First Instance "has ordered the Belgian Government to formally notify its judgment" and then recites the language that the Court of First Instance required the Belgian state convey to the United States. Dkt. 375-1 at 1. The Belgian state, in that communication, also explains that the February 26, 2020 opinion reached its conclusion "for the reasons set out in" the attached translated decision. *Id.* Those reasons, however, as already explained, do nothing to cast doubt on the D.C. Circuit's conclusion that the extradition order that was issued in 2011 did, in fact, extradite Trabelsi without excluding the four Kleine-Brogel overt acts. Accordingly, Trabelsi offers no evidence—much less significant, new evidence that was not previously available—that calls the D.C. Circuit's understanding of the extradition order into question.

Trabelsi also relies on the August 8, 2019 and February 26, 2020 decisions to support a second contention—that regardless of what the Minister of Justice may have intended, he was precluded as a matter of Belgian law from granting the extradition request without excluding the four overt acts because he was bound by the Belgian courts' decisions excluding those overt acts. That contention is easier to square with what the August 8, 2019 and February 26, 2020 decisions actually say, but it does not advance his motion for reconsideration for two reasons.

*First*, the D.C. Circuit's reasoning did not turn on whether the Minister of Justice was acting with lawful authority under Belgian law or in conformity with Belgian judicial decisions. Rather, the D.C. Circuit deferred to the decision of the Belgian state to grant the U.S. request for extradition. In considering whether to defer, the D.C. Circuit relied in substantial part on *United States v. Campbell*, 300 F.3d 202 (2d Cir. 2002), a Second Circuit case in which the U.S. court deferred to the foreign state's decision whether the offense for which extradition was sought fell within the scope of the extradition treaty. *Trabelsi*, 845 F.3d at 1188–89. In *Campbell*, the Second Circuit explained that "the question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." *Campbell*, 300 F.3d at 209. At least for purposes of the doctrine of specialty, that determination is one that "courts cannot second-guess." *Id.* In other words, according to *Campbell*, courts must "presume that if the extraditing country does not indicate that an offense specified is excluded from the extradition grant, the extraditing country considers the offense to be a crime for which the extradition is permissible." *Id.* Noting that the *non bis* challenge raised in the interlocutory appeal was distinct from the doctrine of specialty challenge at issue in *Campbell*, the D.C. Circuit nevertheless found "its approach . . . useful here." *Trabelsi*, 845 F.3d at 1188.

That *Campbell*'s reasoning undergirds the D.C. Circuit's deference to Belgium's decision to extradite Trabelsi to the United States shows that it is the decision of the foreign state, acting in the realm of international relations, to which deference is owed. The passage from *Campbell* that the D.C. Circuit relies upon is preceded by the following justification for that deference:

> Whether or not express terms in a treaty make the extraditing country's decision final as to whether an offense is extraditable, *deference to that country's decision seems essential to the maintenance of cordial international relations.* It could hardly promote harmony to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request.

*Campbell*, 300 F.3d at 209 (emphasis added); *see also Trabelsi*, 845 F.3d at 1187 ("Because the extradition implicates 'the sovereignty of a nation to control its borders and to enforce its treaties," judicial review of such a decision could implicate concerns of international comity." (citations omitted)). The interest protected by the deference regime, accordingly, focuses on the decision made by one party to a treaty to extradite a defendant to the other party to the treaty— that is, the state-to-state decision of the Minister of Justice to grant the request of the United States government to extradite Trabelsi.

The D.C. Circuit, moreover, was aware of the difference of opinions held by Belgian Minister of Justice and the Belgian judiciary at the time it deferred to the Belgian state's decision to extradite. Both Trabelsi and the United States recited the Belgian procedural history in their briefs to the D.C. Circuit, each careful to point out this difference of views. *See Trabelsi*, No. 15-3075, Appellant's Br. at 14–16; *Id.*, Appellee's Br. 14–16. Even more to the point, the D.C. Circuit noted that split in reciting the history of the case:

> On November 19, 2008, the Court Chamber of the Court of First Instance of Nivelles held that the United States arrest warrant was enforceable, except as to the overt acts labeled numbers 23, 24, 25, and 26 in the indictment. The Court of Appeals of Brussels affirmed this decision on February 19, 2009. On June 24, 2009, the Belgian Court of Cassation affirmed the Court of Appeals. . . . The Minister . . . rejected the limitation on overt acts, explaining that they were

> "not the offenses for which an extradition [was] requested" because "an overt act is an element (of fact, or factual), an act, a conduct or a transaction which in itself cannot automatically be qualified as an offense."

*Trabelsi*, 845 F.3d at 1184–85. The D.C. Circuit was thus aware of the decisions rendered by the Belgian courts, and it was aware that the Minister of Justice "rejected the limitation on overt acts" set forth in the decisions. With this background in mind, Trabelsi cannot reasonably maintain that the August 8, 2019 and February 26, 2020 decisions made available any new, and previously unavailable, line of argument. To the contrary, he previously made—and the D.C. Circuit considered—the same argument he is now making. *Compare* Dkt. 345 at 24 ("[T]he Belgian Minister of Justice did not have the authority to reject this exclusion, nor did he in fact reject it.") *with Trabelsi*, No. 15-3075, Appellant's Reply Br. at 30 ("The Minister [of Justice] could not and did not ignore this exclusion.").

To be sure, the D.C. Circuit's opinion does at times suggest that the "Belgian courts" and the Minister of Justice were in agreement as to the interpretation of the Extradition Treaty and its application to Trabelsi's case. Most notably, the D.C. Circuit "defer[red] to th[e] decision of the Belgian courts and Minister of Justice that, based on an offense-based analysis, Trabelsi's extradition comports with Article 5 of the Treaty." *Trabelsi*, 845 F.3d at 1190. That sentence, however, is best understood to refer to the decision by the Council of State—an administrative court in Belgium that exercises jurisdiction over the review of administrative acts, *see* Council of State of Belgium, The Institution, Legal Powers, http://www.raadvst-consetat.be/?page=about_competent&lang=en (last accessed Mar. 13, 2020)—which rejected Trabelsi's appeal of the Minister of Justice's extradition order on the ground that it violated

Article 5 of the treaty, *see* Dkt. 367-21 at 28–29.[5] The D.C. Circuit, like the Minister of Justice, interpreted the Treaty to require an offense-based analysis. And, the Council of State's opinion does not contravene that view. *See* Dkt. 367-21 at 28–29. The fact that other Belgian courts construed the Treaty to apply an identity-of-the-facts analysis does not undercut the deference U.S. courts owe to the decision of the Belgian state to grant the U.S. request for extradition, without limitation. In the words of the *Campbell* decision, "[i]t could hardly promote harmony" for the United States, having successfully extradited Trabelsi to the United States, to "take the stance that the extraditing nation was wrong to grant the request." *Campbell*, 300 F.3d at 209

*Second*, to the extent Trabelsi's argument would require this Court to declare that the Belgian Minister of Justice violated Belgian law by ignoring a domestic judicial decree, the act-of-state doctrine bars the Court from doing so. The act-of-state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). It applies when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within" its boundaries. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405, (1990). It serves as "a rule of decision for the courts of this

---

[5] Trabelsi separately argues that the decision of the Council of State further demonstrates that the Minister of Justice excluded the four overt acts from his grant of extradition. Dkt. 345 at 8–9. That argument fails because (1) it is far from clear that the Council of State's decision, which simply refers to the remaining twenty-four overt acts a "among . . . those for which the extradition is granted," Dkt. 367-21 at 26–27, can carry that weight; (2) the Council of State decision was available at the time the D.C. Circuit decided the interlocutory appeal and, indeed, the D.C. Circuit cited to that decision, 845 F.3d at 1185; and (3) despite that decision, the D.C. Circuit held that the Minister of Justice "rejected the limitation on overt acts," *id.*

country," *id.* at 405 (quoting *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 310 (1918)), requiring that, "in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid," *id.* at 409. The doctrine is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 404 (quoting *Sabbatino,* 376 U.S. at 423). The act-of-state doctrine advances "international comity, respect for the sovereignty of foreign nations in their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Id.* at 408. Federal courts must tread lightly when they wade into disputes between the two other branches of the U.S. government. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). They should proceed with even greater trepidation when asked to wade into a dispute between two branches of a foreign government.

For all of these reasons, Trabelsi has failed to offer any significant, new, and previously unavailable evidence that would warrant departure from the mandate rule. The Court will, accordingly, deny Trabelsi's motion for reconsideration, Dkt. 345.

**B.    Motion to Compel Compliance With Doctrine of Specialty and to Exclude Rule 404(b) Evidence**

Trabelsi also moves "to compel compliance with" the doctrine of specialty and to exclude evidence of the Kleine-Brogel plot as inadmissible under Federal Rule of Evidence 404(b). Dkt. 210. The doctrine of specialty provides that, "once extradited, a person can be prosecuted only for those charges on which he was extradited." *United States v. Sensi*, 879 F.2d 888, 892 (D.C. Cir. 1989). The extradition treaty between the United States and Belgium incorporates this principle. Extradition Treaty, Art. 15 ("A person extradited under this Treaty may not be

detained, tried, or punished in the Requesting State except for . . . the offense for which extradition has been granted . . . .").

Trabelsi previously moved to dismiss the indictment on the ground that it violated the doctrine of specialty, enshrined in Article 15 of the Treaty. *See* Dkt. 70 at 20–26. This Court (C.J. Roberts) denied that motion on two independent grounds. First, while recognizing that it was an open question in this circuit whether a defendant may challenge his extradition on specialty grounds, the Court held that "it appears that Trabelsi cannot challenge his extradition as a violation of Article 15" because he lacked standing to do so. Dkt. 124 at 28–29. Second, the Court explained that, even if Trabelsi did have standing to assert a defense under the doctrine of specialty, the operative test is "whether the requested state has objected or would object to prosecution." *Id.* at 30 (quoting Restatement (Third) of Foreign Relations Law § 477 cmt. b (1987)). The Court then concluded that, because Belgium "ha[d] repeatedly consented to prosecution under the superseding indictment as a whole, Trabelsi's [specialty] challenge must fail." *Id.*

Trabelsi now argues that because overt acts 23, 24, 25, and 26 were "excluded" from the Minister of Justice's extradition order, he cannot be prosecuted for those acts. Dkt. 210 at 12–16. Even beyond the charges he can face, moreover, Trabelsi argues that all evidence of the four overt acts—and, more generally, evidence relating to the Kleine-Brogel plot—must be excluded as inadmissible bad-acts evidence under Federal Rule of Evidence 404(b). *Id.* at 16. Finally, and in the in alternative, he requests a jury instruction about the limited purpose for which any such evidence might be considered. *Id.* at 19–21.

Trabelsi's motion fails because it turns on the scope of Belgium's grant of extradition. As already explained, the D.C. Circuit has already concluded that the Minister of Justice rejected

the Belgian courts' overt act exclusion and that Belgium extradited Trabelsi without that exclusion. *See Trabelsi*, 845 F.3d at 1184–85. Thus, with respect to that issue, the Court is bound, barring "extraordinary circumstances." *See Cabrera*, 699 F. Supp. 2d at 41; *LaShawn A.*, 87 F.3d at 1393, 1393 n.3. And, as already explained, the facts relating to the extradition decision have not changed since the D.C. Circuit reached that conclusion. Because Trabelsi's invocation of the doctrine of specialty and Rule 404(b) rests entirely on this rejected premise, the Court denies that motion as well.

Nor has Trabelsi offered anything in his motion that would warrant reconsideration of this Court's prior holding that "the standard for adjudicating a [specialty motion] in the United States is whether the requested state has objected or would object to prosecution," and that, under that standard, the motion fails. Dkt. 124 at 30. That approach is consistent with the approach taken by the Second Circuit in *Campbell*, where the court relied not only on the extraditing state's decision to extradite but also on "the record of communications between the two nations," including post-extradition clarifications provided by the extraditing state, in order to reject the defendant's motion to dismiss on the basis of the doctrine of specialty. *Campbell*, 300 F.3d 211–12. Trabelsi has not offered any evidence that suggests that "the record of communications" demonstrates a violation of the terms of the 2011 extradition. Rather, in response to this newest round of briefing, the Belgian state submitted a diplomatic note, again consenting to Trabelsi's prosecution without the exclusion of any overt acts, notwithstanding the continued conflicting position of the courts of Belgium. *See* Dkt. 355-2. Moreover, as already explained, the most recent communication—which merely provided, without adopting, the conclusion of the February 26, 2020 judicial decision to the U.S. government—does not evidence a change in the Belgian state's views. *See* Dkt. 375-1.

Accordingly, the Court once again rejects the premise at the core of Trabelsi's motion.  It follows that Trabelsi's trial on the superseding indictment—without any limitation on the enumerated overt acts—would not violate the doctrine of specialty enshrined in Article 15 of the Treaty, and that Trabelsi's motion is, therefore, unavailing.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel compliance with the treaty, Dkt. 210, and motion for reconsideration, Dkt. 345, are hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 13, 2020