UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal. No. 06-89 (RDM) |
| v. : | |
| : | |
| NIZAR TRABELSI, : | |
| : | |
| Defendant. : | |

**MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS THAT WERE ALLEGEDLY PART OF PLEA DISCUSSIONS**

The United States of America, by and through its attorney, the acting United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's motion to suppress his statements made over the course of nine interviews from June 28 to October 16, 2002, which were conducted in Belgium. The defendant argues that he made these statements with the understanding that he was engaged in plea discussions such that his statements would not be admissible as evidence. However, the defendant was advised repeatedly at the start of these interviews that his statements could be used as evidence and that he was not required to make any statement. *See, e.g.*, Exhibit A at 2, June 28, 2002 Interview ("your statement may be used as legal evidence and . . . you have the right not to make any statement"); Exhibit D at 2, July 10, 2002 Interview ("your statements may be used as evidence in legal proceedings and . . . you have the right not to make any statement"); Exhibit E at 2, August 29, 2002 Interview at 2 ("your statement may be used as evidence in court and . . . you have the right not to make any statement"); Exhibit F at 2, August 30, 2002 Interview ("your statements may be used as evidence in legal proceedings and . . . you have the right to remain silent"); Exhibit G, September 2, 2002 Interview (same).

1

In July 2002, U.S. officials flew to Belgium and conducted three investigative interviews of the defendant. These were investigative interviews, not plea discussions. The government was still gathering information and evidence and was nowhere close to being ready either to charge the defendant or to dispose of this matter with a plea. The first indictment in this matter did not issue until more than three years after these interviews, and the defendant was not extradited to the United States until a decade after these interviews. During the interviews, no plea offer was made. No offer to drop specific charges was made, and no discussion of sentencing guidelines for the purpose of negotiating a plea occurred. Also, although the defendant had Belgian counsel, no attorney was retained to assist in the formal plea bargaining process for a criminal matter in American courts. The parties entered into a written proffer agreement that governed these interviews, and the agreement was definitive that the government was not making any representations about even the likelihood that the government would enter into a plea agreement in the future. Now, despite these facts, the defendant claims that these interviews, and other interviews occurring in the same general time period, were actually plea discussions wherein the parties perceived their efforts as reaching toward a disposition of this case. The defendant's motion is contradicted by the evidence. The parties were not engaged in plea discussions, and the defendant's statements during these investigative interviews are admissible at trial.

## **Legal Standard**

Federal Rule of Evidence 410 prohibits the use against a criminal defendant of statements made during plea discussions. Fed. R. Evid. 410(d); *United States v. Wood*, 879 F.2d 927, 935 (D.C. Cir. 1989). However, not all statements made by a defendant in hopes of cooperating or receiving a benefit from law enforcement constitute "plea negotiations" for the purposes of Rule 410. *See, e.g., United States v. Graham*, 91 F.3d 213, 219 (D.C. Cir. 1996). The question of

whether a discussion between a defendant and the government was a "plea discussion" protected by Rule 410 "is a factual question that must be determined on a case-by-case basis." *S.E.C. v. Johnson*, 534 F. Supp. 2d 63, 67 (D.D.C. 2008) (quoting *U.S. v. Serna*, 799 F.2d 842, 848 (2d Cir. 1986) (citing *U.S. v. Grant*, 622 F.2d 308, 312 (8th Cir. 1980))). Moreover, because Rule 410 "constitutes an exception to the general principle that all relevant evidence is admissible at trial," courts construe the Rule narrowly. *United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) (citing *United States v. Mezzanatto*, 513 U.S. 196, 205, (1995)).

In *United States v. Wood*, the D.C. Circuit concluded that the parties were engaged in plea discussions because the surrounding circumstances indicated that the parties perceived their discussion to be part of "efforts to *dispose* of the matter" through extraction of information from the defendant and possibly a plea. *Wood*, 879 F.2d at 936 (emphasis added); *see also Johnson*, 534 F. Supp. 2d at 67 (asserting that the "test for our Circuit" is "whether the parties intended to 'dispose of the matter through extraction of information and, possibly a plea'"). The D.C. Circuit reached this conclusion after noting that the proffer agreement between the parties in *Wood* stated that their discussion was "off-the-record" and included a reference to "the procedures which will be followed as we continue our negotiations concerning the possible disposition of the above-captioned case." *Wood*, 879 F.2d at 936.

The D.C. Circuit has not identified what specific factors a court must consider when determining whether, in fact, the parties perceived their discussion to be part of "effort to dispose of the matter." In some sense, law enforcement and prosecutors are always seeking to resolve criminal matters—that is, seeking to gather evidence and information to hold accountable those who have committed a crime and exonerate those who have not. It is also frequently true that, when a defendant (or potential defendant) willingly provides incriminating information to law

3

enforcement, he does so with the hope of receiving some benefit, such as a plea or cooperation agreement. However, Rule 410 is not so broad that it encompasses the government's every investigative interview or a defendant's every offer to cooperate. *See United States v. Edelmann*, 458 F.3d 791, 804 (8th Cir. 2006) (holding that Rule 410 does not apply to investigative interview)*; see also Graham*, 91 F.3d at 219 (noting that Rule 410 applies only to "'plea' negotiations, not to every offer of cooperation") (citing *United States v. Hare*, 49 F.3d 447, 450–51 (8th Cir. 1995); *United States v. Leon Guerrero*, 847 F.2d 1363, 1367 (9th Cir. 1988)).

In *Hare*, 49 F.3d 447, 451 (8th Cir. 1995) (cited approvingly by the D.C. Circuit in *Graham*)*,* and in *Edelman,* the Eighth Circuit provided more specific guidance for lower courts applying Rule 410. In *Edelmann*, 458 F.3d 791, 806 (8th Cir. 2006), the Eighth Circuit identified five facts that indicate a defendant's statements were not made as part of a plea discussion—they are:

> (1) no specific plea offer was made; (2) no deadline to plead was imposed; (3) no offer to drop specific charges was made; (4) no discussion of sentencing guidelines for the purpose of negotiating a plea occurred—only generalized discussion to give the suspect an accurate appraisal of his situation occurred; and (5) no defense attorney was retained to assist in the formal plea bargaining process.

*Edelmann*, 458 F.3d at 804 (quoting *United States v. Morgan*, 91 F.3d 1193, 1196 (8th Cir. 1996)). In *Edelmann*, the defendant's attorney testified that the defendant engaged in pre-indictment interviews with the government in order to "*cooperate with the government in return for a favorable deal*." *Id.* at 804-05 (emphasis added by the Eighth Circuit). The defense attorney acknowledged that, in his discussions with the prosecutor about a potential deal, the discussion never "got anything more specific than a *vague fraud statute*." *Id.* at 805 (emphasis added by the Eighth Circuit). The defense attorney also testified that "[t]here was never a firm agreement. There was a firm understanding that's what we were expecting and that's what we were trying to

4

get to." *Id.* By comparison, the government's rendition of the facts was that the government informed the defendant she was the "prime suspect of criminal wrong doing and any statement made by her could be used against her." *Id.* The government affirmed that, while the meetings sought a benefit for the defendant "down the road," a formal agreement was never signed. *Id.* There was no firm offer to plead to specific charges, or any discussion of the Sentencing Guidelines, or any deadline placed on accepting or rejecting an offer. *Id.* Based on these facts, the Eighth Circuit held that Rule 410 did not apply.

Similarly, in *Hare*, the Eighth Circuit concluded that the defendant's statements were not made during "plea discussions" for the purposes of Rule 410. 49 F.3d at 450-51. The Eighth Circuit acknowledged that the defendant spoke with the prosecutor "hopeful" perhaps of improving his situation and eventually gaining a motion for substantial assistance. *Id.* at 451. The Eighth Circuit also acknowledged that, during these discussions, the prosecutor discussed with the defendant the Sentencing Guidelines "somewhat" and "told him that a 5K motion would reduce his exposure under the guidelines." *Id.* Still, the court held that these discussions were not plea discussions for the purposes of Rule 410 because no specific plea bargain was offered "or even contemplated at that point." *Id.*

The policy that animates Rule 410 highlights the difference between an investigative interview on the one hand and a plea discussion on the other. Unlike in an investigative interview, where the government seeks to obtain information and evidence that could be used at trial and which will inform the government's prosecutive decisions, Rule 410 was created to promote active plea negotiations in which a defendant is "free to negotiate without fear that his statements will later be used against him," so that the parties can finalize a disposition of the case. *Johnson*, 534 F. Supp. 2d at 66 (quoting *United States v. Davis*, 617 F.2d 677, 683 (D.C. Cir. 1980)). Thus

where, as here, an interviewee is warned repeatedly that his statements may be used as evidence, the interview falls outside the scope what Rule 410 was intended to cover.

It is also well-established that a defendant may waive the protections of Rule 410. *See, e.g., United States v. Burch*, 156 F.3d 1315, 1319-322 (D.C. Cir. 1998).  Thus, even assuming, counterfactually, that the interviews identified in the instant motion were plea discussions, Trabelsi would have waived those protections when he was informed that his statements could be used as evidence in court and he continued with the interviews anyway.

In addition, Rule 410 does not bar the admission of statements made to foreign law enforcement officials. *United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003).

## Argument

Here, the defendant seeks to suppress statements made in nine interviews conducted from June 28 to October 16, 2002.  For analytical purposes, these nine interviews can be grouped into three categories: (1) the one interview conducted before the time period agreed upon in the proffer agreement—on June 28, 2002; (2) the three interviews conducted during the time period expressly agreed upon in the proffer agreement—on July 5, July 9, and July 10; and (3) the five interviews conducted with American officials present after the period agreed upon in the proffer agreement—on August 29, August 30, September 2, October 3, and October 16.

### A.  The June 28, 2002 Interview

Trabelsi was arrested in Belgium by Belgian law enforcement on September 13, 2001.  He was then interviewed repeatedly by European law enforcement and European judicial officials, including being interviewed repeatedly by Christian De Valkeneer, the Examining Judge of the Court of First Instance of Brussels.  During these European interviews, Trabelsi confessed that he was engaged in a conspiracy to commit a suicide bombing attack with the intent to kill Americans.

Then, on June 28, 2002, Judge De Valkeneer interviewed Trabelsi again, at Trabelsi's request.  Three days earlier, Trabelsi had informed Judge De Valkeneer that he was concerned about the possibility of being prosecuted in the United States and wanted to seek some type of agreement with U.S. authorities.  The June 28 interview was conducted in Judge De Valkeneer's chambers in a Brussels courthouse.  Also present were the clerk of the court, two members of Belgian law enforcement, a Belgian prosecutor, an interpreter, Trabelsi's Belgian attorney, and two legal attachés from the U.S. Embassy in Brussels.  No U.S. prosecutors were present.  At the start of the interview, Trabelsi was advised, "***your statement may be used as legal evidence*** and . . . you have the right not to make any statement."  Exhibit A at 2, June 28, 2002 Interview (emphasis added).  Trabelsi chose to make a statement after he and his Belgian counsel were so advised.[1]

Rule 410 does not apply to the interview held on June 28, 2002, because it was conducted by Belgian authorities and not U.S. officials.  *See Orlandez-Gamboa*, 320 F.3d at 332 (noting that Rule 410 does not bar the admission of statements made to foreign law enforcement officials).  In addition, the parties were not engaged in plea discussions, and the parties did not include the June 28 interview in the list of interview dates in their proffer agreement.  Also, the June 28 Interview was not part of any plea discussion because the U.S. government was nowhere close to being ready to "dispose" of this matter.  No specific plea offer was made; no deadline to plead was imposed; no offer to drop charges was made; no discussion of sentencing guidelines occurred; and no attorney was ever retained to assist in the formal plea bargaining process for a criminal matter in

---

[1]     During the interview, Trabelsi was shown a series of 23 photographs provided by the U.S. authorities.  Trabelsi stated that he recognized, or believed to recognize, some of the individuals in those photographs.  For example, he referred to one of the people in the photographs as "an individual whom I met at the airport camp in Kandahar.  It was when a party had been organized against the Americans and Ayman Zawahiri had shaken Usama Bin Laden's hands as a sign of alliance against the Americans." Exhibit A at 2.

7

American courts. Furthermore, although two officials from the U.S. Embassy attended the June 28 interview, these individuals were not prosecutors empowered to engage in plea negotiations. As with many of Trabelsi's interviews, he was advised at the start of the June 28 interview that his statements could be used as evidence and that he was not required to proceed with the interview. This fact is further evidence that June 28 interview was not a plea discussion to which the parties intended Rule 410 to apply.

### B. The Proffer Agreement and Interviews Conducted Pursuant to that Agreement

U.S. officials met with Trabelsi's Belgian counsel on July 4, 2002, to discuss the conditions under which Trabelsi would agree to speak with the U.S. authorities. That agreement was memorialized in a written proffer agreement (hereinafter the "Proffer Agreement," available at Def.'s Exh. 3). The parties to the Proffer Agreement were Trabelsi and the "Government." The Proffer Agreement defined "Government" as being "the United States Department of Justice and the Federal Bureau of Investigation." Proffer Agreement at 1. Neither the Belgian Government nor any Belgian official was a party to the agreement. Throughout the Proffer Agreement, Trabelsi was referred to as "Witness," and never as "Defendant." No U.S. criminal charges had yet been brought against him.

In the Proffer Agreement, Trabelsi agreed to provide U.S. officials with information and to answer their questions so that the U.S. officials "may evaluate Witness's information and responses in making prosecutive decisions." *Id.* The Proffer Agreement contained an express proviso that the U.S. officials were not agreeing to make any representations in U.S. Courts or to enter a cooperation, plea, or immunity agreement with Trabelsi. The Proffer Agreement also included an express statement that the agreement was "not a cooperation, plea or immunity

8

agreement" and that the U.S. officials were making "no representations about the likelihood that any such agreement will be reached in connection with this proffer." *Id.*

The Proffer Agreement expressly stated that it would apply to meetings between the defendant and the U.S. officials (i) on July 5, 2002; (ii) during the week of July 7, 2002; and (iii) to [any] continuation of these meetings on the dates that appear below." *Id.* The parties never agreed to continue these meetings and, thus, no dates were ever added to the written Proffer Agreement. In other words, no dates ever "appear[ed] below." The Proffer Agreement also stated that "no understandings, promises, agreements and/or conditions have been entered into with respect to meetings other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties." *Id.* U.S. officials were present for the three interviews of the defendant covered by the terms of the Proffer Agreement.[2] These interviews occurred on July 5, July 9, and July 10, 2002.

Rule 410 does not apply to these interviews because the Proffer Agreement was not an agreement to engage in plea discussions. The Proffer Agreement made clear that the government

---

[2] None of these interviews was a joint venture between the U.S. and Belgian officials. Indeed, Trabelsi tried to exploit the lack of coordination between the two governments for his own ends. An FBI agent present for the July 9, 2002 interview noted as follows:

> Trabelsi will provide information to a point where he begins to feel uncomfortable. . . . [W]hen Trabelsi reaches this point, he will either engage IM [Investigative Magistrate] DeValkeneer in a different subject that he knows will be of interest to IM DeValkeneer or will ask the IM to use the washroom, which he is then allowed to use. While more often than not, this tends to be an obstruction, IM DeValkeneer has had discussions with Trabelsi in the washroom that have led to additional information.

Exhibit C at 2, July 9, 2002 Interview. The same FBI agent made a similar observation about the previous interview, noting, "It was at this point of the interview that IM DeValkeneer got into a very long conversation with Trabelsi regarding the hotel and a previous statement that had been made by Trabelsi." Exhibit B, July 5, 2002 Interview at 2. The FBI agent "attempted to get the interview back on track," but Judge De Valkeneer insisted that he speak with Trabelsi. After that conversation between Trabelsi and De Valkeneer, De Valkeneer terminated the interview.

9

was not offering, discussing, or agreeing to consider any plea offer. The Proffer Agreement stated definitively that it was "not a cooperation, plea or immunity agreement." The Proffer Agreement also stated definitively that the government was making "no representations about the likelihood that any such agreement will be reached in connection with this proffer." Nowhere in the Proffer Agreement did the parties agree that Trabelsi's statements would be "off-the-record."

Moreover, when these interviews occurred, the U.S. government was still in the early stages of investigating this matter, gathering evidence and information and deciding how to proceed. The government was nowhere close to being ready to "dispose" of the matter, as would be required under the *Wood* standard. Indeed, the first indictment was not issued in this matter until **almost four years** after these interviews occurred. The defendant was not extradited to the United States in this matter until **eleven years** after these interviews. In short, these were investigative interviews, not plea discussions.

Furthermore, all of the factors listed in *Edelman* further support the conclusion that these interviews were not plea discussions for the purposes of Rule 410: No specific plea offer was made; no deadline to plead was imposed; no offer to drop specific charges was made; and no discussion of sentencing guidelines for the purpose of negotiating a plea occurred. Also, although the defendant had Belgian counsel, no attorney was ever retained to assist in the formal plea bargaining process for a criminal matter in an American court.

The fact that the government agreed, in the Proffer Agreement, to provide a payment to Trabelsi's beneficiaries is further evidence that these interviews were not plea discussions. The government agreed to provide a modest payment for Trabelsi's child and a woman that Trabelsi claimed to be his wife. The government also held out the possibility of similar future payments contingent upon the truthfulness, value, and completeness of the information he provided. The

10

fact that the parties expressly included this provision for current and future payments but excluded any mention of a current plea offer, or even a future plea offer, contingent on Trabelsi providing true, valuable and complete information is further evidence that the interviews were not plea discussions.

The fact that Trabelsi was advised during at least one of these interviews that his statements could be used in court and yet he chose to make a statement anyway is further evidence that the parties did not perceive these interviews to be plea discussions subject to the protections of Rule 410. Plus, the policy rationale animating Rule 410—encouraging a defendant to speak openly without concern that his statements may be used in court—simply does not apply when the defendant is informed at the start of an interview that, yes, his statements may indeed be used in court.

In sum, the interviews conducted on July 5, 9, and 10, 2002, were not plea discussions, and Rule 410 does not apply.

### C. The Five Interviews Conducted After the Proffer Agreement

The defendant was interviewed five times in Belgium with U.S. officials present from August 29 to October 16, 2002, after the expiration of the Proffer Agreement. None of these interviews was a plea discussion. At the time of these five interviews, the government was still nowhere close to being ready to "dispose" of this matter. The government was still investigating the crime—gathering evidence and information for a potential prosecution. The government was years away from an indictment and a decade away from the extradition. During these interviews, as with the others, no plea offer was made; no deadline to plead was imposed; no offer to drop specific charges was made; no discussion of sentencing guidelines occurred; and no attorney was ever retained to assist in the formal plea bargaining process for a criminal matter in American

courts. In addition, these interviews were conducted by Belgian officials, so Rule 410 would not apply. *See Orlandez-Gamboa*, 320 F.3d at 332 (noting that Rule 410 does not bar the admission into evidence of the statements made to foreign law enforcement officials). Moreover, at the start of each and every one of these five interviews, the defendant was advised that his statements could be used as evidence. Yet, he proceeded with the interviews anyway.[3] The fact that he proceeded with the interviews after being so advised is strong evidence that neither Trabelsi nor his attorneys intended these interviews to be plea discussions subject to the protections of Rule 410. In addition, for the interviews held on October 3 and October 16, 2002, while two U.S. officials were present, there were no U.S. prosecutors in attendance.

### D. Waiver

Even assuming, counterfactually, that one or more of the interviews encompassed by the defendant's motion could be considered a plea discussion for the purposes of Rule 410, the defendant waived the protections of Rule 410 when he chose to speak with U.S. authorities after he was repeatedly advised that any statement he made could be used as evidence. *See Burch*, 156 F.3d at 1319-322. He received this advisement in interviews conducted before, during, and after the period covered by the Proffer Agreement.

### E. Case Relied on by the Defendant

The cases relied on by the defendant are inapposite. They do not support the suppression of any of the statements that he made during any of the interviews encompassed by the instant motion. In *S.E.C. v. Johnson*, a district court in this jurisdiction concluded that a defendant's statements were made in the context of plea discussions. 534 F. Supp. 2d at 66-69. The court in

---

[3] During the August 30, 2002 interview, Trabelsi was shown a series of photographs and given an opportunity to comment on them. He was asked if he had anything to declare. He responded simply, "No," and the interview concluded. Exhibit F, August 30, 2002 Interview.

*Johnson* considered a number of factors. *Id.* First, that case involved more than a mere offer to cooperate—the government initiated contact with the defendant and "actively sought his cooperation," telling the defense counsel that "in order to pursue the plea negotiation process, [the defendant] would have to agree to meet and talk with the prosecutors." *Id.* at 67. Second, the prosecutor initiated the meetings with the defendant in the context of broader plea negotiations with other potential defendants, some of whom reached plea agreements. *Id.* Third, the parties had a signed proffer agreement, *id.* at 67-68, which provided that "[n]o statements or other information provided by [the defendant] will be admissible against him in the government's case-in-chief in any future civil or criminal proceeding." Exhibit J, Proffer letter dated August 25, 2003, also available at *S.E.C. v. Johnson*, 05-cv-36, Doc. Entry No. 248-1 (filed on Dec. 28, 2007).[4] Fourth, both the prosecutor and U.S. defense counsel were present. *Johnson*, 534 F. Supp. 2d at 68. Fifth, during the proffer session, the prosecutor presented the defendant with a specific Sentencing Guideline calculation. *Id.* And sixth, the defendant was told he was working under a fixed deadline—that is, the indictment return deadline—to resolve the proffer session. *Id.* at 68-69.

In Trabelsi's case, none of these factors is present. Unlike in *Johnson,* the government did not initiate contact with Trabelsi and did not actively seek out Trabelsi's cooperation. Rather, the government responded to Trabelsi's offer and agreed to hear his statement only under the specific conditions laid out in the Proffer Agreement. Also unlike in *Johnson*, the government was not engaged in broader plea negotiations with other potential defendants at the time of the interviews, and the government did not later reach plea agreements with any such potential defendants. Unlike

---

[4] The court in *Johnson* stated that, although a written proffer agreement may be "indicative" of an intent to engage in plea discussions, the existence of a proffer agreement does not "automatically turn any subsequent discussion into plea bargaining." *Johnson*, 534 F. Supp. 2d at 68.

13

the proffer agreement in *Johnson*, the Trabelsi's agreement did not indicate that his statements would not be admissible in the government's case-in-chief. Moreover, Trabelsi's agreement expressly stated that the government was making absolutely no representations about the likelihood of a plea agreement. The instant cases is also different from *Johnson* in that, at the time of the interviews, Trabelis was not represented by counsel licensed to practice law in the United States who was representing him in U.S. litigation. Also unlike in *Johnson*, the interviews with Trabelsi did not involve a specific discussion of the U.S. Sentencing Guidelines. And lastly, further distinguishing this case from *Johnson*, Trabelsi was not told that he was working under a fixed deadline—and certainly not a deadline of the indictment, which would not issue until years later.

The defendant's reliance on *United States v. Wood* is also misplaced. In *Wood*, the defendant-appellant claimed that her trial counsel had been ineffective for failing to challenge the government's use at trial of statements the defendant made during plea bargaining sessions. 879 F.2d at 934. The government used one of these statements to impeach the defendant as a prior inconsistent statement. *Id.* at 934-35. The defendant made the relevant statement during a proffer session only two months before trial. *Id.* at 934. Prior to the session, the prosecutor provided the defendant's counsel with a letter containing "ground rules" for any "'off-the-record' proffer session." *Id.* One of the ground rules stated, "[I]n the event your client is a witness at the trial . . . and offers testimony materially different from any statements made or other information provided during the 'off-the-record' proffer or discussion, the attorney for the government may cross-examine your client concerning any statements made or other information provided . . . ." *Id.* The defendant and her counsel signed the proffer letter, signaling their agreement with these ground rules. *Id.* The D.C. Circuit concluded that the parties were engaged in plea negotiations, noting

that the proffer letter characterized their pre-trial meeting as an "'off-the-record' proffer or discussion." *Id.* The D.C. Circuit also observed that the letter "included a reference to 'the procedures which will be followed as we continue our *negotiations* concerning the possible *disposition* of the above-captioned case.'" *Id.* at 936 (emphasis added). The D.C. Circuit concluded that "this reference indicates that the government perceived the discussion to be part of their efforts to *dispose* of the matter—through extraction of information from [the defendant] and, possibly, a plea." *Id.* (emphasis added). Despite its conclusion that the parties in *Wood* were engaged in plea discussions, the D.C. Circuit ultimately decided that the government was permitted to cross-examine the defendant regarding statements she made during the proffer session because, by agreeing to the terms of the proffer letter, the defendant had expressly waived a protection that would otherwise apply pursuant to Rule 410. *Id.* at 936-937.[5]

*Wood* does not support the defendant's instant motion. Here, unlike in *Wood*, the Proffer Agreement did not say that the proffer session was "off-the-record." To the contrary, Trabelsi was repeatedly advised that his statements could be used as evidence. Also unlike in *Wood*, Trabelsi's proffer sessions were conducted early in the government's investigation of the crime—years before an indictment would issue and a decade before Trabelsi was extradited—whereas the proffer in *Wood* was conducted less than two months before trial. *Wood* is also inapposite to the instant case because in *Wood* the proffer letter expressly stated that the parties were engaged in

---

[5]     It is worth noting that the part of *Wood* upon which the defendant relies is arguably dicta. The defendant relies on the D.C. Circuit's conclusion that the defendant in *Wood* was engaged in plea discussions. However, the Circuit's ultimate holding was that the defendant's waiver contained in the proffer letter was valid. Thus, the Circuit could have avoided making any ruling on whether the parties were engaged in plea discussions. Given that the determination of whether the parties were engaged in plea discussions was not essential to the determination of the case in *Wood*, it is perhaps unsurprising that the D.C. Circuit in *Wood* did not provide the same detailed and specific framework that other courts have developed for evaluating such determinations. *See, e.g., Hare,* 49 F.3d at 451; *Edelman,* 458 F.3d at 806.

negotiations concerning the possible "disposition" of the case. The D.C. Circuit referenced this fact in its ultimate conclusion, when it stated:

> We believe that Wood and the government were in fact engaged in plea bargaining negotiations, and that this reference indicates that the government perceived the discussion to be part of their efforts to *dispose* of the matter—through extraction of information from Wood and, possibly, a plea.

*Id.* at 936 (emphasis added). Trabelsi's proffer agreement, by contrast, did not indicate that the parties were negotiating a disposition. To the contrary, the government stated clearly in the agreement that it was not making any representations concerning the likelihood of reaching a disposition and the government was receiving the defendant's statements only "so that the Government may evaluate Witness's information and responses in making prosecutive decisions," not for the purposes of negotiating a plea. At the time of the proffer sessions, the government was not anywhere close to being ready to dispose of this matter.

The defendant's motion seeks to equate "making prosecutive decisions" (the language used here) with "negotiations concerning a possible disposition" (the language used in *Wood*). Yet, the two tasks are not the same. The purpose of almost every investigative interview is to collect evidence and information that will inform prosecutive decisions. As investigators and prosecutors collect information during witness interviews, they make a variety of prosecutive decisions throughout the course of an investigation and case. They often face a long road before a disposition, if any, is reached. To put it otherwise, if a witness statement was deemed inadmissible merely because the government sought the witness's statement in the expectation it might inform the government's prosecutive decisions, then virtually every witness statement would be inadmissible. Rule 410 does not sweep so broadly.

16

Further distinguishing the instant case from *Wood*, the defendant in *Wood* participated in the proffer session with counsel who was representing her in the matter being negotiated. Trabelsi, by contrast, was not represented by U.S.-licensed counsel in connection with this U.S. prosecution—a prosecution that, indeed, would not result in an indictment or an arrest for years to come. In sum, the Proffer Agreement and the surrounding circumstances indicate that the interviews with Trabelsi, unlike the negotiations in *Wood*, were not plea discussions subject to Rule 410.

## Conclusion

For the foregoing reasons, the defendant's motion to suppress, Docket Entry No. 419, should be denied without a hearing.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
N.Y. Bar No. 4444188

By: */s/ Thomas N. Saunders*
THOMAS N. SAUNDERS
New York Bar Number 4876975
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: 202-252-7790
Email: Thomas.Saunders@usdoj.gov