# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal. No. 06-89 (RDM)** |
| **v.** | : | |
| | : | |
| **NIZAR TRABELSI,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OMNIBUS OPPOSITION TO THE DEFENDANT'S MOTION TO EXCLUDE EVIDENCE AND MOTIONS *IN LIMINE* TO EXLCUDE EXPERT TESTIMONY

The United States, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Exclude Evidence for Failure to Preserve (ECF No. 413); Motion *In Limine* to Preclude Testimony and Evidence of "Video and Still Photography" of Explosive Devices (ECF No. 414); and Motion *In Limine* to Preclude Testimony of Government's Proposed Expert on Chemical Testing (ECF No. 416).

## FACTUAL BACKGROUND

On September 13, 2001, members of the Belgian Federal Police executed a search warrant at Nizar Trabelsi's apartment in Brussels, Belgium (Exhibit 1). This search warrant was the result of a Belgian counterterrorism investigation that had included extensive surveillance and wiretaps of Nizar Trabelsi. The warrant was approved by Magistrate Judge De Valkeneer who was overseeing the Trabelsi investigation. Trabelsi was located inside the apartment and was placed under arrest. Inside Trabelsi's apartment, officers located and seized an Uzi-style machine gun, ammunition, and a soccer book that contained a handwritten list of several chemicals including acetone and sulphur. *Id.* During the execution of the search warrant, a second individual, Abdelcrim El Haddouti, arrived at Trabelsi's apartment with food and clothes for Trabelsi. *Id.* The

police had previously identified El Haddouti as one of Trabelsi's potential coconspirators, and he too was placed under arrest. *Id.*

On September 14, 2001, the defendant provided the first of a series of voluntary statements to Magistrate Judge De Valkeneer.[1] In his first statement, the defendant admitted that he had purchased the machine gun, but claimed it was not his (Exhibit 2). With respect to the notations in the soccer book, he admitted that he created these notations while in Afghanistan, that he knew they were chemicals, but that he did not know what they "might correspond to." *Id.* Finally, the defendant admitted that he had known El Haddouti for approximately four years, and that he frequented Le Nil Restaurant (which was operated by the El Haddouti family). *Id.* A second interview was conducted on the afternoon of September 14, 2001 (Exhibit 3). During the afternoon interview, Trabelsi admitted that the machine gun belonged to him. When questioned about the notations in the soccer book, Trabelsi denied that he planned to build a bomb and claimed that he did not know how to build a bomb. *Id.*

On September 20, 2001, the Belgian Federal Police executed a search warrant authorized by Magistrate Judge De Valkeneer at Le Nil Restaurant in Brussels (Exhibit 4). During the course of the search, officers located two cardboard boxes that were wrapped in plastic with a handwritten note that stated "DO NOT TOUCH." *Id.* at 14. Inside each box there were a large number of small

---

[1]  On September 14, 2001, at his first interview, the defendant was informed of the charges against him and advised that: (1) he could request that the interview be recorded verbatim; (2) he could request additional instructions be given by the investigating judge or another interview conducted; (3) his statements could be used as evidence in court; (4) he had the right not to make any statement; (5) he could use documents in his possession during the interview and require those documents to be attached to the interview transcript; (6) a copy of his interview would be given to him; (7) he had the right to read the statement memorializing the interview or have it read to him and to make corrections or additions; (8) he could pause the interview as he saw fit; and (9) he had the right to select an attorney. The defendant was repeatedly informed of these rights, or a combination of these rights.

sealed bags containing a yellow powdered substance. These bags (61 in total) were all labeled with a sticker that identified the substance (in both French and Dutch) as one kilogram bags of sulphur. *Id.* Beneath one of the boxes, officers located a large plastic drum containing a liquid that the officers on the scene believed to be approximately 30 liters of ether. *Id.* at 4.

Magistrate Judge De Valkeneer ordered the officers to seize the sulphur and ether and to transfer custody of the chemicals to the Belgian military base at Heverlee. The Belgian Federal Police escorted the chemicals to the military base at Heverlee where, in the early morning hours of September 21, 2001, the chemicals were received and secured by Sergeant Major Diego Posocco, a member of the Belgian military's bomb disposal unit (referred to as "SEEDEE" or "DOVO") (Exhibit 5).

SEEDEE/DOVO Sergeant Major Carl Isenborghs took samples of the sulphur and the suspected ether and delivered them to Bart Smedts, an Air Force Captain and chemist who was then assigned to the Royal Military Academy (Exhibit 6). In his documentation regarding the samples he collected, Sergeant Major Isenborghs identified the liquid substance as acetone, not ether (Exhibit 7).

On September 26, 2001, Magistrate Judge De Valkeneer continued his interviews of Trabelsi. During the September 26, 2001 interview, Trabelsi was shown a picture of Djamel Beghal (a/k/a Abou Hamza), who had previously implicated Trabelsi in a plot to attack the United States Embassy in Paris.[2] After admitting that he knew Beghal, Trabelsi stated: "All that I want to talk about are two things – I came to BELGIUM to carry out an attack – I do not belong to any group, I act in isolation" (Exhibit 8 at 8-9). Trabelsi then had what was described as "a nervous

---

[2] Beghal later recanted this statement after alleging that he had been tortured in the United Arab Emirates.

fit." *Id.* Trabelsi calmed down and indicated that he "regretted" his previous statement. Magistrate Judge De Valkeneer did not pursue Trabelsi's statement about carrying out an attack. Trabelsi did, however, make additional admissions regarding the chemicals, stating "I wish to explain the presence of chemical products in the backyard of the restaurant [Le Nil] on the boulevard Lemonnier. I take full responsibility for this purchase. I purchased 100 kg of sulfur and acetone." *Id.* at 10.

During his October 26, 2001 and November 8, 2001 interviews, Trabelsi did not make any further statements regarding the chemicals. In the course of the November 8, 2001 interview, Magistrate Judge De Valkeneer confronted Trabelsi with details regarding Djamel Beghal's accusations regarding Trabelsi. In response, Trabelsi claimed that he had not been to a training camp in Afghanistan; he had not been placed on Al Qaeda's Martyr's list; and he was not sent to Europe by Al Qaeda to carry out a suicide attack against the United States Embassy in Paris, France (Exhibit 9).

On November 19, 2001, Captain Smedts spent 16 hours analyzing the suspected sulphur and acetone using a variety of techniques including gas spectrometry, infrared light, ultraviolet light, and differential scanning calorimetry (Exhibits 10, 11). Captain Smedts maintained the data from his testing which revealed that the suspected substances were sulphur and acetone contaminated with trichloroethylene and toluene. Captain Smedts returned the untested samples of the sulphur and acetone to SEEDEE/DOVO (Exhibit 11 at 1).

On December 3, 2001, Magistrate Judge De Valkeneer contacted the chief prosecutor in the Trabelsi case, Bernard Michel, to determine if Mr. Michel agreed to the "destruction of the sulphur and the acetone after taking enough samples to perform additional tests" (Exhibit 12). That same day, Mr. Michel responded that "I believe that the sulphur and the acetone which have been

seized present some risks inherent to their being kept and due to the absence of a solution to this issue, they may be destroyed. It is important that the samples and the photographs *which have been taken at the time of the seizure* be attached to the case file" (Exhibit 13 (emphasis added)).

On December 6, 2001, Magistrate Judge De Valkeneer sent an order to a military commander at Heverlee and notified him "that the sulphur and the acetone seized can be destroyed *after samples have been taken* and they have been photographed. The photographs and the report with regards to the destruction of the sulphur and the acetone must be sent to the chambers of investigating Magistrate DE VALKENEER" (Exhibit 14 (emphasis added)).

On December 12, 2001, Commander Valentin responded to Magistrate Judge De Valkeneer's order. The response included the requested photographs of the sulphur and acetone (Exhibit 15). A caption beneath a photograph of the sulphur stated that two "bags were used to perform the test and as an *exhibit*." *Id.* at 2 (emphasis added). Commander Valentin then informed Magistrate Judge De Valkeneer that "the *exhibits* will be destroyed as soon as the weather conditions are favorable" and that "[a]fter the destruction of the *elements*, a report will be sent to you for further action." *Id.* at 1 (emphasis added). Significantly, Commander Valentin did not indicate that any "sample" or "exhibit" would be retained.[3]

The defendant continued to participate in interviews conducted under the direction of Magistrate Judge De Valkeneer. While acknowledging his travels in Pakistan and Afghanistan, Trabelsi denied any active participation in military training, association with Al Qaeda, contact with Al Qaeda operatives after returning to Belgium, or otherwise planning an attack in Europe.

---

[3]  The government is not in possession of an additional report notifying Magistrate Judge De Valkeneer that the destruction was completed. As discussed *infra,* the government is continuing to try to gather this information.

On May 28, 2002, Magistrate Judge De Valkeneer confronted Trabelsi with statements that Amal Halim had made to a judge in France. In her statement to French authorities, Ms. Halim stated that Trabelsi had received military training in Afghanistan and that Trabelsi was part of a plot to carry out a terrorist attack in Europe (Exhibit 16). Trabelsi denied these accusations and claimed that Ms. Halim had been coerced into making the statement to the French authorities. *Id.*

On or about June 5, 2002, Trabelsi requested a meeting with Magistrate Judge De Valkeneer and the chief prosecutor (Exhibit 17). Trabelsi began by attempting to exculpate Abdelcrim El Haddouti, claiming that El Haddouti had not participated in any plots to commit acts of terrorism "in Belgium or elsewhere in Europe." *Id.* at 2. Trabelsi stated that the chemicals he had written down in the soccer book were items that he intended to purchase in Europe, and that El Haddouti had helped Trabelsi to purchase sulphur, acetone, and sulfuric acid believing that Trabelsi intended to send these chemicals to Tunisia. *Id.* Trabelsi claimed that had personally purchased 800 kilograms of nitrate, as well as glycerin, aluminum powder, and "black pellets." *Id.* at 1-2. Trabelsi explained that he had originally stored the sulphur and acetone in his apartment, but he moved the chemicals to Le Nil because he believed that the police were watching his apartment. *Id.* Trabelsi then admitted that he intended to use these chemicals, as well as hydrazine that had been obtained by a coconspirator, to make a bomb. *Id.* at 2.

On June 18, 2002, Trabelsi, after consulting with his attorneys, provided additional details regarding his plan to carry out a terrorist attack to Magistrate Judge De Valkeneer (Exhibit 18). Trabelsi began by explaining that "[a]fter having thought for a long time and talked with my attorneys, I wish to tell you all the truth concerning my presence on Belgian territory between July and September 2001." *Id.* at 2. Trabelsi then admitted that he planned to carry out a terrorist attack in Belgium against "American interests," but adamantly denied that he was part of a plot to bomb

the United States Embassy in Paris, or other American targets in Europe. *Id.* Trabelsi went on to explain that he had been introduced to Osama Bin Laden by Abu Zoubeida shortly after the attack on the USS Cole.[4] After first meeting Bin Laden, Trabelsi made several return trips to meet with him. During one of these meetings, Bin Laden told Trabelsi to consider Bin Laden to be his "father," which according to Trabelsi is "why I love him very much." *Id* at 5. Trabelsi detailed how he was first introduced to, and became influenced by, Al Qaeda propaganda materials, leading him to obtain military training in Al Qaeda's training camps. *Id.* at 5-7. Trabelsi explained to Magistrate Judge De Valkeneer that he decided that he wanted to participate in a suicide attack against the United States and that he obtained authorization from Bin Laden to launch an attack under the direction of Abu Hafs.[5] *Id.* at 7. Trabelsi was added to the Martyr's list, was given several potential targets including a United States military base in Belgium, and received training about where and how to place a bomb. Trabelsi was not taught how to construct the bomb, but was tasked with obtaining the chemicals that would be used by his fellow cell members to construct a bomb. *Id.* at 8-9. During this training, Trabelsi memorized the chemicals that he was supposed to purchase, and he later recorded the names of the chemicals in the soccer book. *Id.* at 9. When he returned to Belgium, Trabelsi began to gather the chemicals for the bomb including acetone and sulphur. *Id.* at 10. Trabelsi also stated that he participated in reconnaissance of a potential target – the Kleine-Brogel military base in Belgium. *Id.*

---

[4] Abou Zoubeida was a high-ranking member of Al Qaeda who is currently detained in Guantanamo Bay as a result of his role in the 9/11/2001 attacks. The bombing of the USS Cole occurred on October 12, 2000, in Yemen.

[5] Abu Hafs, also known as Mohammed Atef, was one of Bin Laden's closest advisors and a senior military leader in Al Qaeda. He was killed in a U.S. airstrike in November 2001.

On July 10, 2002, the defendant provided additional details regarding a plan to attack Kleine-Brogel (Exhibit 19). These details included that the attack would take place at lunch time, that the target was the U.S. canteen, that there would be approximately 50-70 Americans at the base at the time of the attack, and that the defendant would rent a van that would be used by the defendant and his coconspirators to transport the bomb to the base and to carry out the attack. *Id.* at 4.

During an August 29, 2002 interview, Trabelsi also provided a detailed description of different combinations of chemicals that could be used to construct a nitrate-based bomb (Exhibit 20). Trabelsi drew a table describing these different explosive combinations and explained that he had learned about these combinations from Abu Hafs. *Id.* at 7-8.

During subsequent interviews with Magistrate Judge De Valkeneer, Trabelsi repeatedly stated that he had purchased the acetone and sulphur. At no time did Trabelsi claim that the substances located at Le Nil were anything other than sulphur and acetone. Indeed, as outlined above, Trabelsi identified the substances as acetone and sulphur before they were even tested by Captain Smedts.

In 2003, the defendant was found guilty in Belgium of charges related to his plot to bomb the Belgian military base at Kleine-Brogel.

On April 7, 2006, a federal grand jury returned an Indictment (ECF No. 3), charging defendant with, Conspiracy to Kill United States Nationals Outside of the United States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a) (Count One); Conspiracy and Attempt to Use Weapons of Mass Destruction, in violation of 18 U.S.C. §§ 2332a and 2 (Count Two); Conspiracy to Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count Three); and Providing Material Support and Resources to a Foreign

Terrorist Organization, in violation of 18 U.S.C. §§ 2339B and 2 (Count Four).  On November 16, 2007, a federal grand jury returned the superseding Indictment (ECF No. 6), charging defendant with the same offenses.[6]

In April of 2008, the United States conveyed to the Belgian authorities a request for defendant's extradition for the four charges set forth in the Indictment, based on an arrest warrant issued by Magistrate Judge Alan Kay on November 16, 2007. On November 23, 2011, Belgium granted the United States' extradition request (ECF No. 210-8). On October 3, 2013, Belgium extradited the defendant to the United States. On October 10, 2013, the court entered a protective order governing discovery in this case (ECF No. 18).

On November 1, 2013, the government produced nearly 10,000 pages of documents that the government had received from Belgium pursuant to MLAT requests (Exhibit 21). This discovery production included translations of many of the key documents contained within the disclosed Belgian file. *Id.* The November 1, 2013, disclosures included the Belgian and translated versions of the documents related to the sampling and destruction of the sulphur and acetone (T-2304 – T-2308; Exhibits 12 – 15).

On September 10, 2014, members of the prosecution team interviewed Captain Smedts in Belgium (Exhibit 11 at 1). During that interview, Captain Smedts acknowledged that he had conducted the testing of the sulphur and acetone. He described the testing as "straightforward" and produced a copy of the final report with the underlying graphs to a Belgian Federal Police officer so that the report and graphs could be transferred to the United States through the MLAT process.

---

[6]  Counts 3 and 4 were subsequently dismissed by this court upon motion of the government (ECF No. 231; Minute Order June 10, 2019).

*Id.* During the interview, Captain Smedts stated that he was willing to travel to the United States to participate in Trabelsi's criminal trial. *Id.*

On October 1, 2018, members of the prosecution team re-interviewed Captain Smedts (Exhibit 11 at 3). Captain Smedts provided additional details regarding the testing that he had conducted, the methods he had utilized, and his conclusions. *Id.* 3-4. At the conclusion of the interview, Captain Smedts indicated that although he was reluctant to come to the United States to testify, he would do so if necessary.

On October 15, 2018, the government produced a translated copy of Captain Smedts's findings and the underlying technical documentation to the defense (Exhibits 10 and 22). The government's cover letter specifically identified the chemical analysis of the chemicals seized from Le Nil as part of the enclosed discovery materials.

On June 5, 2019, the defense made their first request for samples of the sulphur and acetone (ECF No. 413-7). Based on the documentation that the government had received from Belgium, the government informed the defense of its understanding that "the chemicals were tested and destroyed in Belgium by Belgian officials with the permission of a Belgian judicial authority" and that documentation regarding the destruction had been provided to the defense in discovery (ECF No. 413-8).

On July 27, 2019, less than two months before trial, and more than five years after the government had first disclosed documentation regarding the sampling and destruction of the sulphur and acetone, the defense submitted a discovery demand to the government requesting 25 different pieces of technical data regarding the testing that had occurred in 2001 (ECF No. 413-9).

While noting its objections to the timing of the request, the government reported that it had forwarded the defense's letter to the Belgian authorities in an attempt to respond to the defense

requests (ECF No. 413-10). Given the late timing of the defense request, the government scheduled a videoconference call with Captain Smedts at the United States Embassy in Belgium for August 14, 2019 (Exhibit 23). The government sought to use that meeting to try and respond to the defense's July 27, 2019 requests.

As this court is aware from prior litigation in this matter, on or about October 23, 2018, the defendant and his attorneys in Belgium had brought an action in the Court of First Instance of Brussels which sought to interfere with the ability of the United States to proceed to trial through limiting access to Belgian government witnesses and seeking to revisit the Minister of Justice's extradition order. *See generally* ECF No. 424 at 7-8.  In its August 8, 2019, ruling, the Belgian Court of Appeals denied a defense request to prohibit the Belgian government from cooperating with the United States in its prosecution (ECF No. 424-2 at 22). The court's decision was based in part on the Belgian government's argument that "the cooperation took place and is over, the investigation is completed and the trial is scheduled to begin on September 9, 2019." *Id.* Despite the fact that the Belgian government's statement was made in the past tense, the defendant's Belgian attorneys sought to use the court's language to dissuade witnesses from cooperating in the future.

On August 13, 2019, members of the defense team contacted Captain Smedts by email and providing a misleading interpretation of the Belgian Court of Appeals decision (Exhibit 24). In their letter, the Belgian defense team claimed that:

> The Court of Appeals clearly establishes that the criminal proceedings, as currently initiated in the United States, violate the extradition agreement concerning our client . . . in paragraph 30 of the judgment, please note that the Court of Appeals establishes that the Belgian state declares that, as of this date, it will no longer be cooperating with the U.S. Department of Justice in this case.

> In accordance with the Belgian state declaration before the Brussels
> Court of Appeals, we believe that your testimony will take place
> privately, outside any official cooperation from the Belgian state
> based on the bilateral cooperation treaty between Belgium and the
> United States. Otherwise, it seems to us that the situation would be,
> as per the Belgian state, contrary to the spirit of the judgment issued
> by the Court of Appeals.

Captain Smedts failed to appear for the August 14, 2019, videoconference. Captain Smedts cited the letter from the defense when officials from the Belgian Federal Police asked why he was no longer willing to cooperate. He remains uncooperative.[7]

## ARGUMENT

### 1. The Defendant's Motion to Exclude Evidence Regarding the Seized Chemicals

The Defendant's Motion to Exclude Evidence for Failure to Preserve (ECF No. 413) should be denied because the United States was never in possession of the seized chemicals, and in any event, the defendant has failed to establish that the chemical samples were destroyed in bad faith or that the chemical samples contained exculpatory evidence.

#### a. Defendant's Rule 16 Argument

The defendant argues that the destruction of the chemical samples warrants sanctions because the government failed to preserve the chemicals as required by Federal Rule of Criminal Procedure 16. *Id* at 5-6. Because the chemicals have been destroyed, it appears that the defense is seeking to prevent the government from using information derived from the seized chemicals including photographs, testimony, and testing results. The fundamental flaw in the defense's Rule

---

[7] The government recently tried to reengage with Captain Smedts in order to address the outstanding discovery demands regarding his testing of the chemicals and the destruction of the samples. During recent conversations with Belgian authorities, the government was informed that Captain Smedts had consulted with a member of the Ministry of Defense's legal staff, and that he was advised not to cooperate with the prosecution, despite contrary advice from the Ministry of Justice. The government is in the process of seeking a new MLAT request to try to obtain Captain Smedts' cooperation.

16 argument is that the production of evidence pursuant to Rule 16 is expressly limited to evidence that is "within the government's possession, custody, or control." Fed. R. Crim. P. 16 (a)(1)(E). Here, it is clear that the United States government never had actual possession, custody, or control of the seized chemicals or samples thereof.

The defendant attempts to circumvent this requirement by arguing that the United States and Belgium "were jointly investigating Trabelsi" (ECF No 413 at 6-7). Citing the government's multiple requests for cooperation pursuant to the Treaty on Mutual Assistance between the United States and Belgium, the defense argues that a joint investigation arose because "the governments were working together." *Id*. at 7. The mere fact that Belgium provided information to the United States pursuant to multiple MLAT *requests* does not render this a "joint investigation" pursuant to the joint venture doctrine.  While there is not a bright line test to determine the existence of a joint investigation, *United States v. Yousef,* 327 F.3d 56, 146 (2d Cir. 2003), courts generally focus on whether the "United States possesses a significant degree of investigative control or authority" over the foreign investigative body. *United States v. Abu Ali,* 528 F.3d 210, 230 n.5 (4th Cir. 2008).

While it is clear that an investigation becomes a joint venture when U.S. law enforcement agents "actively participate[]" in questioning or investigations conducted by foreign law enforcement, *Yousef,* 327 F.3d at 145, the doctrine does not apply merely because U.S. officials were "present and cooperated in some degree." *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir. 1965). Rather, the participation of U.S. law enforcement must be "substantial," *United States v. Peterson,* 812 F.2d 486, 490 (9th Cir. 1987), or the foreign officials must be shown to have acted as "agents" of U.S. law enforcement. *United States v. Morrow,* 537 F.2d 120, 139–41 (5th Cir. 1976) (finding no joint venture where United States officers merely furnished information to foreign officials and noting that "normal lines of communication between the law enforcement

agencies of different countries are beneficial without question and are to be encouraged"). *See also United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (joint venture exists "where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials").

The threshold to establish a joint venture is a high one: "[i]n the absence of active participation by a United States official in the evidence-gathering event, a joint venture can only exist when foreign officials are rendered 'agents' of the United States government . . . or when the cooperation was designed to evade the constitutional requirements applicable to American investigators." *United States v. Karake*, 443 F. Supp. 2d 8, 94 n.114 (D.D.C. 2006) (citations omitted). Even close cooperation between governments does not create a joint venture. For example, in *Abu Ali* the defendant was arrested in Saudi Arabia and interrogated repeatedly by Saudi officials without receiving *Miranda* warnings. In finding that there was no joint venture, the court noted that "the governments of Saudi Arabia and the United States . . . cooperate with each other in foreign terrorist investigations. The U.S. and Saudi governments share intelligence information, conduct investigations of terrorist acts, and . . . the Saudi government will return individuals detained in Saudi Arabia to the United States." 395 F. Supp. 2d at 382. Despite such cooperation, the court in *Abu Ali* declined to find the existence of a joint venture. *Id.* at 383; *see also, United States v. Mundt*, 508 F.2d 904, 906-07 (10th Cir. 1974) (upholding trial court's finding that joint venture did not exist where DEA officer had coordinated with Peruvian officers in operation and had played a "substantial part" in events leading up to the defendant's arrest).

The defense claims that the MLAT requests in this case cross this high bar are unavailing. Indeed, this Court previously reviewed, *ex parte,* the MLAT requests from the United States to Belgium between September 19, 2001, through October of 2002, in order to determine whether

the MLATs contained evidence of a joint venture between the United States and Belgium (ECF 351 (sealed), ECF 352 (redacted)). As with all of the MLATs in this case, the MLATs requested cooperation, and therein the United States did not claim to have, or attempt to exercise, any authority over the Belgian investigation. After reviewing these materials, this Court did not order the government to provide the MLATs to the defense.

Beyond the voluntary nature of the MLATs themselves, the defense's joint venture argument also ignores the factual context in which the chemicals were destroyed. At the time the chemicals were destroyed, presumably in late 2001, or early 2002, Trabelsi had yet to admit that he was targeting United States interests in Belgium. As discussed above, Trabelsi did not begin to make detailed admissions regarding the plot to attack American interests in Europe until June of 2002 (Exhibits 17, 18). As a further indicator that the United States only had a generalized interest in Trabelsi up to that point in time, FBI agents did not even attend any of the Belgian interviews with Trabelsi until June 28, 2002, after Trabelsi had made admissions regarding an alleged plot to attack Kleine-Brogel (*See* ECF No. 233 at 1 n.1).

Thus, both as a legal and factual matter, the defense has failed to establish that the chemicals and samples were in the "possession, custody, or control" of the United States prior to their destruction, and therefore Rule 16 is inapplicable.

**b.** **Defendant's Due Process Arguments**

The defendant also argues that the failure to preserve the chemicals in this case was the result of "bad faith" and resulted in the destruction of "potentially useful evidence" (ECF 413 at 9). Both of these claims fail.

To establish a violation of the Due Process Clause, "the *defendant* bears the burden of proving that the government failed *in bad faith* to preserve *material* and *potentially exculpatory*

evidence." *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). The Court's opinion in *Youngblood* "narrowed the Government's constitutional obligations regarding the preservation of evidence." *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016). While *Youngblood* found the absence of bad faith to be irrelevant where the government failed to disclose *exculpatory* material, "if 'no more can be said' about the evidence 'than that it could have been subjected to tests, the results of which might have exonerated the defendant,' there is no denial of due process unless a criminal defendant can demonstrate the Government's bad faith." *Id.* (quoting *Youngblood,* 488 U.S. at 57–58).

The defendant does not even attempt to articulate how the samples of sulphur and acetone are exculpatory, stating only the obvious, that "[h]ad the chemicals been preserved, these samples could have been tested by a defense chemical expert" (ECF 413 at 9). Viewing the samples as having any potential exculpatory value ignores the record in this case, including the evidence that: 1) acetone and sulphur were both included in the list of chemicals in the soccer book; 2) the sulphur was packaged in bags labeled in French and Dutch as sulphur; 3) Carl Isenborghs identified the substances as sulphur and acetone before they were tested by Captain Smedts; 4) the defendant identified the substances as sulphur and acetone *before* the substances were tested by Captain Smedts; 5) the defendant repeatedly provided details about how he had obtained the acetone and sulphur; and finally 6) Captain Smedts conducted a scientific examination of the chemicals and corroborated the defendant's statements that the chemicals were in fact acetone and sulphur. Because the defendant can say "no more" than testing "might have exonerated the defendant," the defendant must demonstrate bad faith.

Again, the defense offers no concrete argument that the government (or for that matter the Belgian government) acted in bad faith, saying only that the "significance of the chemicals was

abundantly clear to everyone involved in the investigation" (ECF No. 413 at 10).[8] Curiously, the defense also argues, without citation, that "[t]he government also was aware that other individuals reported that that the chemicals were not intended for a bomb." *Id.* Given the lack of citation it is unclear what the defense is referring to, however, the defendant's coconspirator, Abdelcrim El Haddouti, claimed that he, not Trabelsi, had purchased the *sulphur and acetone*. El Haddouti's acknowledgment that the chemicals were sulphur and acetone corroborates the testing results and undercuts the defendant's claim that the Belgian government acted in bad faith in destroying the samples before they could be independently tested. The government is unaware of any evidence in the voluminous record of this case that the substances recovered from Le Nil were anything other than acetone and sulphur.

The destruction of the samples by the Belgian military appears to have been the result of inadvertence. Magistrate Judge De Valkeneer's order that the chemicals could be destroyed did not specify that new samples should be taken, as claimed by the defense, but that the chemicals could be destroyed after samples "have been taken" (Exhibit 14). Of course, by the time that Commander Valentin responded to Magistrate Judge De Valkeneer on December 12, 2001, samples *had been taken*, and *had been tested*. Commander Valentin's response to Magistrate Judge De Valkeneer stating that all of the "exhibits" would be destroyed, indicates the remaining samples, which were labeled as "exhibits" may have been destroyed along with the bulk of the

---

[8] The government agrees that the significance of the chemicals was clear, which is why the government was surprised by the late requests for detailed discovery regarding the testing of the chemicals, nearly 18 years after the chemicals had been tested.

chemicals (Exhibits 7 and 15).[9] The United States played no role in the discussions surrounding the destruction of the chemicals or any retained samples, and the defense makes no contrary claim.

In the absence of any bad faith or demonstrated exculpatory value in the samples that were destroyed, there is no basis to exclude information derived from the seizure of the chemicals or to provide a missing evidence instruction. *See California v. Trombetta*, 467 U.S. 479, 488 (1984) (results from breathalyzer test admissible even though breath samples were intentionally destroyed "in good faith and in accord with normal practices").

### 2.   The Defendant's Motions to Exclude Expert Testimony Regarding Video and Images of Explosive Devices and the Testing of the Chemicals

The defendant moves *in limine* to preclude the government from having its explosives expert, Dr. Kirk Yeager, use several demonstrative exhibits to display the damage that could have been caused by the type of device Trabelsi intended to build and use against American citizens (ECF No. 414) and to preclude Captain Smedts from testifying regarding his testing of the chemicals recovered from Le Nil (ECF No. 416). Alternatively, the defendant requests a *Daubert* hearing. Because this proposed evidence and testimony is relevant, would assist the trier of fact, and is based on established scientific principles, and its probative value is not outweighed by the substantial risk of undue prejudice, the defendant's motions fail.

### a.   Applicable Legal Principles

Federal Rule of Evidence 702 provides the basis for expert witness opinion testimony in federal court. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993); *Kumho Tire Co. v.*

---

[9] The government has never received additional documentation regarding the actual destruction date and any information that may be contained therein. As discussed *supra* regarding Captain Smedts's lack of cooperation since August of 2019, the government is continuing to pursue this information through the MLAT process and will supplement the record if additional information is received.

*Carmichael,* 526 U.S. 137, 147 (1999). Rule 702 provides that a qualified expert may offer opinion testimony if the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand evidence or determine a fact in issue. FED. R. EVID. 702. In *Daubert*, the Court explained that Rule 702 confers a "gatekeeping role" on trial judges to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The inquiry is "a flexible one." *Id.* at 594. Although there is no "definitive checklist or test" to strike this balance, the *Daubert* Court set forth factors that could be relevant to the inquiry: (1) whether the theory or technique can be or has been tested; (2) whether it "has been subjected to peer review and publication"; (3) whether there is a "known or potential rate of error"; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Id.* at 593–94. "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142 (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143 (1997)).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Vigorous cross-examination . . . [is a] traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010) as amended (Apr. 27, 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing *Daubert*, 509 U.S. at 598). Nonetheless, expert testimony may only be admitted if it will in some way "assist the trier of fact." *Daubert*, 509 U.S. at 591.

A trial court has "latitude . . . to decide whether or when special briefing or other proceedings are needed to investigate reliability." *Kumho Tire*, 526 U.S. at 152. "District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific

evidence." *See In re Hanford Nuclear Reservation Litig.,* 292 F.3d 1124, 1138–39 (9th Cir.2002) (citing *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir.2000)).

Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure requires the government to provide "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705."   A mere "list of testimony topics" is insufficient notice under Rule 16.  *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics"); *see also United States v. Beavers*, 756 F.3d 1044, 1054 (7th Cir. 2014) (noting that expert notice was "insufficient[ ]" as it provided only a "general list of examination topics" and one sentence, conclusory in nature, about one opinion the witness would offer at trial); *United States v. Concessi*, 38 F. App'x 866, 868 (4th Cir. 2002) (upholding district court decision to exclude expert testimony where notice was provided late and "failed to describe the witnesses['] opinions or provide the bases and reasons for the witnesses' opinions").

Proper expert notice must "describe the witness's opinions" and describe "the bases and reasons for these opinions."  *United States v. Naegele*, 468 F. Supp. 2d 175, 176 (D.D.C. 2007) (quoting Fed. R. Crim. P. 16(b)(1)(C)). The primary purpose of such expert notice is to prevent unfair surprise at trial and to permit each party "to prepare rebuttal reports and to prepare for cross-examination at trial."  *Id.*

### b.  <u>Notice Regarding Dr. Kirk Yeager's Testimony is Sufficient</u>

The defense argues (ECF 414 at 7) that the government's notice regarding Dr. Yeager's proposed testimony regarding "other devices" mentioned in its expert notice is insufficient. In its expert notice (ECF No. 414-1), the government provided a detailed description of Dr. Yeager's background including his professional background and numerous publications, and included a copy of his detailed curriculum vitae (Exhibit 25). The areas of expert testimony the government

identified included the feasibility of building a bomb with the chemical mixtures described by the defendant during his Belgian interviews, the feasibility of building a bomb with the chemicals listed in the soccer book, and the destructive power of a 1,000 kilogram device using either of the mixtures described by the defendant or the chemicals contained in the soccer book. As to this final point, the government's notice disclosed that Dr. Yeager might rely on videos and images from other explosive devices to "help illustrate to the jury the destructive power of *such a device*." *Id.* at 2 (emphasis added).

The defendant's motion *in limine* is limited to Dr. Yeager's testimony regarding these demonstrative exhibits. The heart of the defendant's complaint regarding the expert notice is that the government's notice did not contain sufficient evidence to "assess the reliability of the testimony of Dr. Yeager with respect to irrelevant, random bombs and explosions having nothing to do with this case" (ECF No. 414 at 7). By tying the proposed demonstrative exhibits to "the destructive power of *such a device*," the expert notice necessarily linked the demonstrative exhibits to the type of device the defendant intended to use in his planned attack against American interests. The government acknowledges that it will have to lay an adequate factual foundation to show a similarity between the devices that Trabelsi intended to construct and the devices and methods depicted in the demonstrative exhibits.[10]

It is important to note that the evidence in this case includes detailed descriptions by the defendant of not only the chemicals that he bought and gathered, but also the amounts of chemicals he purchased, Exhibit 17 at 1-2 (where defendant describes purchasing 800 kilograms of nitrate fertilizer); the method he planned to use to carry out the attack, Exhibit 19 at 4 (the use of a vehicle-

---

[10] To the extent that the defense seeks a *Daubert* hearing on this limited issue, the government does not object.

borne bomb); and details regarding the different chemical combinations he planned to use to construct a bomb, Exhibit 20 at 7-8). The government's expert notice to the defense included copies of the demonstrative exhibits that portrayed attacks and devices that were similar to the type and/or size of the device the defendant was planning to use during the attack.[11] The government provided these demonstrative exhibits to the defense to avoid any surprise and to permit the defendant's own noticed explosives expert to review these materials. Such a notice served its purpose of notifying the defense regarding the proposed testimony of its expert, the information he relied upon, and to avoid undue surprise at trial.

  **c. <u>The Proffered Testimony of Dr. Yeager is Relevant.</u>**

  The defense next argues (ECF No. 414 at 8-9) that Dr. Yeager's proposed testimony regarding the demonstrative exhibits is not relevant because it would not assist the jury in deciding whether or not the defendant "conspired to kill U.S. nationals" or that the defendant attempted to "use a weapon of mass destruction." The defendant is currently charged with Conspiracy to Kill United States Nationals Outside of the United States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a) (Count One); and Conspiracy and Attempt to Use Weapons of Mass Destruction, in violation of 18 U.S.C. §§ 2332a and 2 (Count Two). In order to prove a violation of § 2332(b)(2), the government will have to prove, in part, that the defendant conspired with another "to commit a killing." To prove a violation of § 2332a the government will have to prove, in part, that the defendant attempted to use a "destructive device" and that he intended to use that destructive device "against a national of the United States while such national is outside of the United States."

  "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R.

---

[11] The government can provide these exhibits to this Court upon request.

Evid. 401. Here, because the government will be required to prove that the defendant intended to use a destructive device such as a bomb "against" American nationals, and that the bomb was intended to kill, the force and potential damage that could have been caused by the type of bomb that Trabelsi was attempting to build is of tantamount importance. In addition to the information the government has gathered regarding the type of bomb the defendant was building and its potential components, the defendant also provided details regarding the planned attack, including his intention to use a van to transport the bomb and carry out the attack (Exhibit 19 at 4). Demonstrating the type of damage that a 1,000 kg, vehicle-borne bomb could cause is, therefore, highly relevant. Permitting the jury to see videos and photographs of damage caused by similar devices will inform the jury's decision regarding whether the device the defendant was building was a "destructive device" that could have been used "against" Americans and whether or not the device was intended to kill.

### d. **Dr. Yeager's Proffered Testimony Regarding the Demonstrative Exhibits is Reliable**

The defendant's final objection regarding Dr. Kirk's proposed testimony based on *Daubert* and Rule 702 focuses on whether Dr. Kirk "personally viewed" or had firsthand knowledge regarding the explosions depicted in the proposed demonstrative exhibits. Such an inquiry has minimal value because "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert,* 509 U.S. at 592 (internal citations omitted). The government notes that unlike its demands for additional information regarding Captain Smedts and the testing of the chemicals, the defense has not previously requested additional information regarding the potential demonstrative exhibits that the government supplied to the defense along with its expert notice.

The government is in possession of the following additional information regarding those exhibits. First, with respect to the video named "50 lb Anfo Mid View Slo Edit," that video was created by Dr. Yeager and depicts the impact of a 50-pound charge detonated within a vehicle. Second, the video entitled "WTCUniHill" contains video of a Federal Bureau of Investigation ("FBI") test conducted in 1994 that recreated the 1993 World Trade Center bombing using a 1200 pound Urea Nitrate charge. Still photographs of this test were previously provided to the defense in discovery. Dr. Yeager witnessed that test, although he was not with the FBI at the time. Third, with respect to the Manchester bombing materials, the government notes that the video provided to the defense includes the date of the bombing, June 15, 1996. The 1996 Manchester bombing is a well-documented and reported upon vehicle-borne bombing, and is likely well-known to the defense's own explosives expert. That bombing, like the bombing planned by the defendant, involved the use of a vehicle-borne bomb containing an explosive mixture that included nitrate. At the time of the 1996 Manchester attack, Dr. Yeager was conducting research with investigators from the United Kingdom who conducted the investigation of the bombing. Dr. Yeager learned additional details regarding the bombing from those investigators.

In short, Dr. Yeager is well-equipped to explain the similarities (and differences) between the demonstrative exhibits and the bomb and attack planned by the defendant.

### e.  The Proposed Use of Demonstrative Exhibits by Dr. Yeager does not Violate Federal Rule of Evidence 403

The Defendant's final argument regarding Dr. Yeager is that his use of the proposed demonstrative exhibits and related testimony violate Rule 403 because its probative value is substantially outweighed by the risk of unfair prejudice. Federal Rules of Evidence 401 and 402 "establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable" is admissible. *Huddleston v. United States,* 485 U.S. 681, 687

(1988). Additionally, as with the admission of all evidence, Rule 403 limits the introduction of otherwise admissible, relevant evidence "if its probative value is *substantially outweighed* by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

As discussed *supra,* evidence regarding the effect of a bomb that was consistent with formulas provided by the defendant, or made with the chemicals contained in the soccer book, is highly relevant in light of the government's obligation to demonstrate to the jury that the defendant intended to design a bomb that could have been used "against" the Americans and whether or not such a device was intended to kill. The demonstrative exhibits that the government indicated Dr. Yeager might use all had similarities to the device that the defendant described during his interviews in Belgium, namely a vehicle-borne, nitrate-based explosive, weighing at least 800 kilograms. Courts have focused on such similarities when determining whether experimental recreations of explosive devices can be shown to the jury. *See, e.g. United States v. Baldwin,* 418 F.3d 575, 579–80 (6th Cir. 2005) ([E]xperimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation."); *accord United States v. Metzger,* 778 F.2d 1195, 1204 (6th Cir. 1985) (noting "the substantially similar standard is a flexible one which, even when construed strictly, does not require that all variables be controlled"). Where, as here, the demonstrative exhibit "is probative of an element of the offense [it] should be admitted in all but the most egregious cases." *United States v. Smith,* 502 F.3d 680, 687–88 (7th Cir. 2007) (admitting replica of pipe bomb) (citing *United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005)).

Unlike the examples cited by the defense, the demonstrative exhibits that Dr. Yeager may refer to do not contain images of victims or injuries or require narratives regarding specific terrorist groups. Indeed, of the three samples provided to the defense, only the images of the Manchester bombing contain footage and images of an actual crime scene, while the other two videos were taken in a controlled setting. The absence of such potentially inflammatory images or narratives reduces the risk of any undue prejudice. *See United States v. Jones,* 124 F.3d 781, 787 (6th Cir. 1997) (in order to demonstrate the existence of a bomb or destructive device the government was permitted to play a videotaped explosion of a replica device, but was not permitted to show impact of shrapnel on nearby styrofoam silhouettes).

### f.   The Government's Rule 16 Notice Regarding Captain Smedts was not Insufficient and any Outstanding Issues Regarding that Notice or Questions Regarding the Reliability of Testimony are Attributable in Part to Interference by the Defense

Contrary to the claims raised by the defense, the government's May 17, 2019, Rule 16 expert notice regarding Captain Smedts, particularly in combination with the prior discovery the government has provided to the defense, adequately described the witness's opinions and described the bases and reasons for those opinions. That notice summarized Captain Smedts educational experience and identified the specific scientific methods that he had used when he tested the suspected sulphur and acetone (ECF No. 416-1). The notice also included the relevant opinion that Captain Smedts would testify to at trial, namely that he identified the substances that he tested as sulphur and acetone. *Id.* at 2. The government also identified the technical reports that the government had previously provided to the defense in discovery that documented Captain Smedts's analysis, including copies of the data Captain Smedts collected during testing and comparisons to known samples (Exhibit 10); Sergeant Major Isenborgh's sampling report (Exhibit 7); and the 302 documenting Captain Smedts meeting with the FBI in 2014 (Exhibit 11 at 1-2).

Although the FBI 302 describing Captain Smedts's October 2018 interview with the prosecution team had not yet been finalized and produced to the defense, the expert notice included additional details regarding the testing methods that Captain Smedts had disclosed during the 2018 interview (*compare* ECF No. 416-1 *with* Exhibit 11 at 3-4). In short, in its expert notice, the government provided the defense with all of the materials and information in its possession regarding the tests that Captain Smedts had conducted in 2001.

As the government has described *supra,* on July 27, 2019, the defense filed a lengthy discovery demand seeking 25 separate items relating to the testing that had occurred over 18 years earlier. This demand letter included requests for copies of bracketing proficiency results, traceability reports, a copy of the 2001 quality control manual, instrument maintenance reports, internal audit reports, and even *American* Society of Crime Lab Directors accreditation and on-site inspection reports, notwithstanding the fact that the testing was conducted in Belgium in 2001. Despite the overbroad and untimely nature of this request, the government, in good faith, attempted to gather any responsive materials it could by sending the request to Belgium and scheduling an August 14, 2019, videoconference call with Captain Smedts to determine if any of the requested information was available (Exhibit 23).[12]

The defendant's August 13, 2001, letter to Captain Smedts effectively deterred Captain Smedts from cooperating with the prosecution. Having inhibited the government's ability to communicate with Captain Smedts, and thereby respond to the defense's outstanding discovery demands, the defense now complains that it lacks sufficient information to evaluate Captain

---

[12] Among the documents the government did hope to obtain was a copy of Captain Smedts's curriculum vitae which the government had previously requested, but had not received.

Smedts's testimony or to prepare to cross-examine him. This Court should not reward such conduct.

In response to a defense inquiry in November of 2020, the government contacted Belgian officials to see if Captain Smedts was now willing to cooperate with the prosecution. When the government was advised that Captain Smedts would not cooperate based in part on advice he had received from an attorney in the Ministry of Defense, the government explored additional options. The government is currently in the process of formalizing a new MLAT request that will seek to secure Captain Smedts's cooperation for trial and to obtain any information that is responsive to the defense's outstanding requests or sheds further light on the disposal of the sulphur and acetone samples.

In light of the detailed information that the government has produced to date, in particular the raw data that Captain Smedts generated while testing the sulphur and acetone samples, the government believes that it has complied with its discovery and expert notice obligations to date. However, because the government is continuing its efforts to gather additional information, the more prudent action may be to hold any findings regarding Captain Smedts and his proposed expert testimony in abeyance.[13]

## CONCLUSION

For the foregoing reasons, the defense's motions should be denied, or in the case of the defense's motion *in Limine* to preclude the testimony of Captain Smedts, held in abeyance.

---

[13] The defense also argues that Captain Smedts's expert testimony is not relevant and that any probative value to that testimony is substantially outweighed by the risk of unfair prejudice because the chemicals seized at Le Nil cannot be grounds for the defendant's conviction under the defendant's double jeopardy theory. Without conceding the point, the government declines to be drawn into relitigating, yet again, the defendant's failed double jeopardy arguments regarding his extradition to the United States.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY
N.Y. Bar Number 4444188

By:

          /s/ Thomas N. Saunders
Thomas N. Saunders
N.Y. Bar Number 4876975
Assistant United States Attorney
United States Attorney's Office
555 4th Street, NW
Washington, DC  20530
(202) 252-7790
Thomas.Saunders@usdoj.gov