**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES,

v.

NIZAR TRABELSI,

      *Defendant.*

No. 06-cr-89 (RDM)

**MEMORANDUM OPINION AND ORDER**

Defendant Nizar Trabelsi was convicted in Belgium of several crimes, including attempting to bomb the Kleine-Brogel Air Base ("Kleine-Brogel") in 2001. After serving his sentence in Belgium, Trabelsi was extradited to the United States to face various conspiracy and terrorism charges. Since 2008—both before and after his extradition—he has filed an ever-expanding array of cases and motions in Belgium, the European Union, and the United States challenging the lawfulness of his extradition. Much of that litigation has focused on the question of whether his extradition violated the *non bis in idem*—or, simply, *non bis*—provision of the Extradition Treaty between Belgium and the United States, which prohibits extradition "when the person sought has been found guilty, convicted[,] or acquitted in the Requested State for the office for which extradition is" sought. *See* Extradition Treaty Between the United States of America and the Kingdom of Belgium, art. 5, Apr. 27, 1987, S. Treaty Doc. No. 104-7 ("Extradition Treaty" or "Treaty").

In November 2015, this Court determined that Trabelsi's extradition did not violate the *non bis* provision of the Treaty and thus rejected Trabelsi's motion to dismiss his U.S. indictment, *United States v. Trabelsi*, No. 06-cr-89, 2015 WL 13227797 (D.D.C. Nov. 4, 2015)

("*Trabelsi I*"), and, in January 2017, the D.C. Circuit affirmed that decision, *United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017) ("*Trabelsi II*").  Then, on the eve of trial, Trabelsi moved for reconsideration of the ruling from the court of appeals in light of an intervening decision from a Belgian court.  At the parties' request, the Court adjourned the trial date to permit briefing on whether developments in the Belgian courts shed new light on Trabelsi's *non bis* claim.  After considering the parties' arguments, however, the Court concluded that none of the intervening events that Trabelsi proffered as a basis for reconsideration called into question the prior decisions of this Court and the D.C. Circuit.  *United States v. Trabelsi*, 2020 WL 1236652 (D.D.C. March 13, 2020) ("*Trabelsi III*"), and Trabelsi has appealed that decision, *see United States v. Trabelsi*, No. 20-3028 (D.C. Cir.) (appeal docketed Mar. 31, 2020).

Now before the Court are two motions related to the pending appeal.  In one, Trabelsi asks the Court to stay further proceedings in the district court while his appeal is pending.  Dkt. 402.  In the other, he invokes yet further developments in the long-running Belgian litigation to seek an indicative ruling from the Court reconsidering its prior order denying reconsideration of this Court's (and the D.C. Circuit's) rejection of his *non bis* argument.  Dkt. 401.  In the meantime, the D.C. Circuit has held Trabelsi's appeal in abeyance pending resolution of his motion for an indicative ruling.  *See* Order, *United States v. Trabelsi*, No. 20-3028 (D.C. Cir. Dec. 1, 2020).

For the following reasons, the Court will **GRANT** Trabelsi's motion to stay the district court proceedings pending resolution of his appeal but will **DENY** his motion for reconsideration, as permitted by Federal Rule of Criminal Procedure 37.

## I.  BACKGROUND

A.    **Trabelsi's Belgian Prosecution and Extradition**

The factual background of this case is set forth in greater detail in several prior opinions.

*See Trabelsi I*, 2015 WL 13227797, at *1; *Trabelsi II*, 845 F.3d at 1184–85; *Trabelsi III*, 2020

WL 1236652, at *1–7.  Here, the Court focuses on the procedural history of the case, as relevant

to resolving the pending motions.

The Belgian police arrested Trabelsi on September 13, 2001, *Trabelsi II*, 845 F.3d at

1184, and he was charged with and ultimately convicted of several offenses under Belgian law,

including charges of conspiring and attempting to bomb Kleine-Brogel.  *See Trabelsi III*, 2020

WL 1236652, at *1–2 (citing Dkt. 367-3 at 24, 27, 31).  On September 30, 2003, Trabelsi was

sentenced to ten years of incarceration in Belgium.  *Trabelsi II*, 845 F.3d at 1184.  On April 7,

2006, while Trabelsi was serving his sentence in Belgium, a U.S. grand jury indicted him for

Conspiring to Kill U.S. Nationals Outside the United States, in violation of 18 U.S.C. §§ 1111(a)

and 2332(b)(2); Conspiring and Attempting to Use Weapons of Mass Destruction, in violation of

18 U.S.C. §§ 2 and 2332a; Conspiring to Provide Material Support and Resources to a Foreign

Terrorist Organization, in violation of 18 U.S.C. § 2339B; and Providing Material Support and

Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2 and 2339B.

*Trabelsi III*, 2020 WL 1236652, at *2 (citing Dkt. 3).  On November 16, 2007, a grand jury

returned a superseding indictment, which charged Trabelsi with the same statutory violations but

revised the charged overt acts.[1]  *Id.* (citing Dkt. 6).  And on April 4, 2008, the United States

asked Belgium to extradite Trabelsi to the United States "and provided the Belgian government

---

[1]  Many years later, the United States dropped the material support counts.  *See* Minute Order
(June 10, 2019); Dkt. 231.

with an affidavit describing the above charges and the governing U.S. law as well as a copy of the superseding indictment."  *Id.* (citing Dkt. 367-7).

The extradition request set off what has become a long-running dispute between the Belgian state and the Belgian courts as to the proper interpretation of the Extradition Treaty and the permissible scope of Trabelsi's extradition under the Treaty.  The disagreement pertains to a provision of the Treaty dictating that "[e]xtradition shall not be granted when the person sought has been found guilty, convicted[,] or acquitted in the Requested State for the offense for which extradition is granted."  Extradition Treaty, art. 5.  This provision embodies a principle of international law known as *non bis in idem* (meaning "not twice"), akin to the double jeopardy rule in American law.[2]

On November 19, 2008, the Court Chamber of the Court of First Instance of Nivelles issued a decision addressing, inter alia, the application of the *non bis* principle to Trabelsi's

---

[2] Whether the Treaty in fact incorporates the *non bis* principle is itself a matter of some dispute in this case.  At least as interpreted in many European courts, the *non bis* principle provides protection against double prosecutions based on not only the same offenses, but also based on any of the same underlying facts, even if those facts are used in support of different charges.  *See* John A.E. Vervaele, *Ne Bis In Idem: Towards a Transnational Constitutional Principle in the EU?*, 9(4) Ultrect L. Rev. 211 (2003) (discussing this "*idem factum* approach").  In extraditing Trabelsi, the Belgian state thus referred to the operative portion of the Treaty as embodying a "double jeopardy principle," rather than "a *non bis* principle," given the Treaty's use of the term "offense."  Dkt. 367-17 at 12.  But the *non bis* principle can also have a more generic meaning, encompassing either fact-based or offense-based prohibitions on double prosecutions.  *See* Jennifer E. Costa, *Double Jeopardy and Non Bis in Idem: Principles of Fairness*, 4 U.C. Davis J. Int'l L. & Pol'y 181 (1998).  When used in this more generic way, *non bis* can refer to a rule, like the one in the Treaty, that prohibits separate sovereigns from bringing subsequent prosecutions for the same crimes, whereas "double jeopardy" refers to a rule against subsequent prosecutions within a single sovereign.  *Id.* at 183.  The Court uses the term *non bis* to refer to the relevant Treaty provision for the sake of clarity and consistency and to avoid confusion with the American law of double jeopardy.  But the Court's use of the term is not intended to convey support for a fact-based understanding of the Treaty provision.  On the contrary, the Court finds persuasive the Belgian state's arguments for why the Treaty incorporates an offense-based approach.

proposed extradition.  Dkt. 367-9.  The court read the word "offense" in Article 5 to mean "facts . . . or acts . . . falling under the scope of criminal law of one of the two States."  Dkt. 367-9 at 7. Based on that interpretation, the court reasoned that the overt acts numbered 23, 24, 25, and 26 in the superseding indictment—specifically, those acts related to the attempted bombing of Kleine-Brogel—"very precisely correspond to the offenses[] committed on Belgian soil" for which Trabelsi had already been convicted.  *Id.*  The Belgian court thus held that the Extradition Treaty permitted Trabelsi's extradition, except as to those four overt acts.  *Id.* at 8.  The Brussels Court of Appeal, Dkt 367-11, and the Belgian Court of Cassation, the country's highest court, Dkt. 367-13, affirmed the decision from the Court of First Instance.

The Belgian state, however, took a different position.  On November 23, 2011, the Belgian Minister of Justice granted the request from the United States to extradite Trabelsi. Dkt. 367-17 at 14.  The Minister's order included substantial legal analysis, including of the *non bis* principle embodied in Article 5 of the Extradition Treaty and the possible exclusion of overt acts 23, 24, 25, and 26.  *Id.* at 10–14.  Looking to the text of the Treaty, the Minister explained that "Belgium and the United States have mutually committed to reject an extradition under this treaty if the person to be extradited was acquitted in the Requested State or was sentenced there for the same offense as the one for which the extradition is requested."  *Id.* at 11.  But because the treaty uses the word "offense," the Minister reasoned that "it is not the facts, but their qualification, the offenses, that have to be identical" for the *non bis* provision to apply.  *Id.*  That is, "the 'double jeopardy' principle mentioned in Article 5 of the Extradition Treaty is limited to the same offenses or to offenses that are substantially the same."  *Id.* at 12.  Overt acts, the Minister reasoned, are not "offenses," but instead "operate as elements in support of the charges."  *Id.*  Unless all the elements constituting an offense are the same under both U.S. and

Belgian law, "[t]he 'double jeopardy' principle does not exclude the possibility to use these elements." *Id.*

Applying this understanding of the Extradition Treaty to Trabelsi's case, the Minister concluded that the offenses of which Trabelsi was convicted in Belgium "do not correspond to the offenses listed under the counts . . . that appear in the arrest warrant on which the U.S. extradition request is based." *Id.* The Minister thus ordered that "[t]he extradition of Nizar Trabelsi is granted to the United States government for the offenses for which it is requested," without any mention of exclusions for the four disputed overt acts. *Id.* at 14.

Trabelsi appealed the Minister's extradition order to the Council of State, an administrative court that reviews decisions of the Belgian executive. On September 23, 2013, the Council of State affirmed the extradition order and concluded that overt acts 23, 24, 25, and 26 did not constitute "offenses" within the meaning of the Treaty. Dkt. 367-21. The Council reasoned that the overt acts in the superseding indictment were not themselves offenses, but rather "'overt acts' constitute elements that shall serve the U.S. judicial authorities to determine whether the applicant is guilty or not guilty of the four charges brought against him." *Id.* at 29. On October 3, 2013, Belgium extradited Trabelsi to the United States. *Trabelsi II*, 845 F.3d at 1185.

**B.     *Trabelsi I***

Nearly a year after his extradition, on September 15, 2014, Trabelsi moved to dismiss the superseding indictment on two grounds. Dkt. 70. First, he argued that his extradition violated the *non bis* provision of the Extradition Treaty because the Minister of Justice "incorrectly concluded that '[t]he constitutive elements of the American and Belgian offenses respectively, their significance, and the place[](s) and time(s) at which they were committed do not match.'"

*Id.* at 14 (quoting Minister of Justice's Extradition Order (Dkt. 367-17 at 12)).  Although the United States had charged a broader conspiracy than had been alleged in Belgium, Trabelsi argued that "the [U.S.] government will present at trial only the narrow evidence of the plot to bomb Kleine-Brogel and thereby circumvent Article 5 of the Treaty."  *Id.* at 16.  "In other words, Trabelsi argued, the U.S. government seeks to do precisely what the *non bis* principle precludes—it seeks to try him in the United States for the same conspiracy for which he was previously tried and convicted in Belgium."  *Trabelsi III*, 2020 WL 1236652, at *3. Alternatively, Trabelsi argued that Belgium had, in fact, denied his extradition with respect to the allegations set forth in overt acts 23, 24, 25, and 26, and that his prosecution based on those acts would therefore violate the doctrine of "speciality."  Dkt. 70 at 19–26.  That doctrine[3] is embodied in Article 15 of the Treaty, which permits the requesting country to try or to punish a person for only "'the offense for which extradition has been granted.'"  *Id.* at 20 (quoting Extradition Treaty, art. 15).  Trabelsi argued that, "[b]y continuing to pursue the[] allegation for which extradition was not authorized, the United States is in violation of . . . Article 15 and the doctrine of speciality."  *Id.* at 26.

Along with its opposition to that motion, the United States filed a diplomatic note from the Belgian state.  Dkt. 80-1.  The note, dated October 29, 2014, explained that the Extradition Order, "which is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States, makes clear that Mr. Trabelsi may be tried on all of the charges set out in [the superseding] indictment, and that any similarity between the United

---

[3] In the United States, the name of this doctrine is usually spelled "specialty," but the Extradition Treaty uses the British spelling, "speciality."  *See Trabelsi I*, 2015 WL 13227797, at *10 n.9. The prior opinions in this case have used the two spellings interchangeably.  In this opinion, the Court uses the American spelling, "specialty," unless quoting from the Treaty or a pleading that uses the British spelling.

States case and the Belgian case does not give rise to any bar to his being tried on the charges in that indictment." *Id.* at 1.  Specifically with respect to overt acts 23, 24, 25, and 26, the note explained that "[t]he order is also clear that the prosecution may offer facts relating" to those acts, and "[n]either Mr. Trabelsi's trial on the charges set out in the [superseding] indictment[] nor the prosecution's offering proof as to any of the overt acts recited in the indictment[] is inconsistent with the Order." *Id.*  The note added that neither "trial" nor "offering of proof" based on those acts would "violate the rule of specialty." *Id.*

The Court (Roberts, C.J.) denied Trabelsi's motion to dismiss. *Trabelsi I*, 2015 WL 13227797, at *11.  As a threshold matter, the Court explained that "'an American court must give great deference'" to a foreign government's decision to extradite a defendant, as a matter of international comity. *Id.* at *4 (quoting *Casey v. Dep't of State*, 980 F.2d 1472, 1476–77 (D.C. Cir. 1992)).  Next, in the absence of a clear legal test for applying the *non bis* provision of the Extradition Treaty, the Court fell back on the double-jeopardy test from *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *Id.* at *5–6.  Based on a comparison of the elements, as required by *Blockburger*, the Court determined that the Belgian offenses were different than those charged in the superseding indictment. *Id.* at *6–9.  The Court thus concluded that Trabelsi could be tried on all of the U.S. charges without violating the *non bis* provision of the Extradition Treaty. *Id.*  Turning to the doctrine of specialty, the Court held that Trabelsi did not have standing to bring a claim under Article 15 of the Treaty because "Belgium has repeatedly consented to Trabelsi's prosecution under the superseding indictment." *Id.* at *10.

C.     *Trabelsi II*

Trabelsi took an interlocutory appeal of the Court's order denying his *non bis* motion,[4] and the D.C. Circuit affirmed.  *Trabelsi II*, 845 F.3d at 1193.  Relying on *United States v. Campbell*, 300 F.3d 202 (2d Cir. 2002), the D.C. Circuit took a "deferential approach."  *Id.* at 1189.  Interpreting "the scope of Article 5 [was] a matter for Belgium," and the court of appeals declined to "'second-guess [Belgium's] grant of extradition.'"  *Id.* at 1188–89 (quoting *Campbell*, 300 F.3d at 209) (alteration in original).  Because "[t]he extradition grant did not exclude any of the offenses included in the request for extradition," the court thus "presume[d] that Belgium has determined that none of the offenses in the indictment violate Article 5 of the Treaty."  *Id.* at 1189.

The court of appeals explained, however, that this presumption could be rebutted with evidence of (1) "misconduct on the part of the United States in procuring an extradition;" (2) "the absence of review of the extradition request by the requested party;" or (3) "a showing that the requested state or party did not apply the correct legal standard adopted in the Treaty." *Id.*  Trabelsi had presented no evidence of either misconduct on the part of the United States or a lack of review on the part of Belgium.  *Id.*  As to whether Belgium had applied the correct legal standard, the D.C. Circuit concluded that the Belgian state interpreted the Treaty reasonably, especially in light the Treaty's use of the term "offense" in Article 5, rather than "acts."  *Id.*

---

[4] Because double-jeopardy decisions are subject to immediate interlocutory appeal, and because Trabelsi's *non bis* argument was akin to a double-jeopardy challenge, Trabelsi was permitted to take an immediate appeal of the Court's order declining to dismiss the indictment.

Based on the deference that it accorded to Belgium's interpretation of the Extradition Treaty, the D.C. Circuit declined to consult the *Blockburger* test that the district court had employed.[5]  *Id.*

## C.  *Trabelsi III*

After the D.C. Circuit's affirmance, the Court set a trial date of September 16, 2019. Minute Order (April 18, 2019).  Trabelsi then filed a motion to compel compliance with the Treaty and the doctrine of specialty, renewing his argument that his extradition had excluded the four overt acts related to the plot to bomb Kleine-Brogel.  Dkt. 210.  He also argued that evidence of those acts should be excluded under Federal Rule of Evidence 404(b).  *Id.*

While that motion was pending, the Belgian courts weighed in again.  On August 8, 2019, roughly a month before the trial was scheduled to begin, the Brussels Court of Appeal issued a new decision regarding Trabelsi's extradition.  Dkt. 312-2.  In considering a claim from Trabelsi that Belgian officials should be precluded from aiding the U.S. prosecution because his Treaty rights had been violated, the Belgian court again disagreed with the Minister of Justice's interpretation of the Extradition Treaty.  The Belgian court construed the *non bis* provision as

---

[5]  In at least one place in its opinion, the D.C. Circuit appeared to elide the disagreement between the Belgian courts and the Belgian state, stating that it was "defer[ring] to th[e] decision of the Belgian courts and Minister of Justice that, based on an offense-based analysis, Trabelsi's extradition comports with Article 5 of the Treaty."  *Trabelsi II*, 300 F.3d at 1190.  Elsewhere in the opinion, however, the D.C. Circuit explained in detail the procedural history of the case, including the back-and-forth between the Belgian courts and the Belgian state.  *See id.* at 1184–85.  Although not entirely clear, it may be that at this point in its opinion, the court of appeals was referring to the Belgian Council of State, which is an administrative court that concurred in the Minister's extradition order.  *See Trabelsi III*, 2020 WL 1236652, at *13.  But, in any event, this Court has little doubt that the D.C. Circuit (1) understood that the Belgian courts—and, particular, the Court of First Instance in Nivelles, the Brussels Court of Appeal, and the Belgian Court of Cassation—had concluded that the four overt acts should be excluded from the extradition order; (2) understood that the Belgian Minister of Justice "rejected the limitation on overt acts, explaining that they were 'not the offices for which an extradition [was] requested' because 'an overt act is an element . . . which in itself cannot automatically be qualified as an offense;'" and (3) understood that the Minister spoke on behalf of the Belgian state on matters affecting international relations.  *Trabelsi II*, 300 F.3d at 1184–85.

requiring "a review of the <u>identity of the fact</u> and not of its qualification." *Id.* at 23 (emphasis in original). As the court explained, the Belgian courts had unanimously interpreted the Extradition Treaty as requiring a fact-based analysis, and only the Minister's "extradition order of November 23, 2011 departs from this consistent interpretation." *Id.* at 25. The Belgian court further explained that "the Ministerial order on Extradition . . . could only validly grant the extradition by the United States within the limits of the exequatur granted to the arrest warrant, that is to say for the four counts mentioned in the arrest warrant, *but not for the '[o]vert [a]cts' 23, 24, 25, and 26.*" *Id.* at 26 (emphasis in original). The court thus concluded, "according to the analysis which prevails in Belgian law." that "the extradition . . . does not allow" Trabelsi "to be tried for the 'overt acts'" in dispute, "<u>namely the facts relating to the attempt of bombing the Kleine-Brogel military base</u>." *Id.* (emphasis in original).

Following this decision, both Trabelsi and the government asked the Court to postpone the trial. Aug. 15, 2019 Hrg. Tr. (Rough at 4, 7–8). Trabelsi moved for reconsideration of this Court's and the D.C. Circuit's decisions rejecting his *non bis* argument and declining to dismiss the indictment on that ground. Dkt. 345. In Trabelsi's view, "the August 8, 2019 decision [of the Belgian court] show[ed] that the Minister of Justice did not reject and could not have rejected the Belgian courts' exclusion of overt acts 23, 24, 25, and 26, and that this Court and the D.C. Circuit mistakenly deferred to an interpretation of the Treaty that Belgium had rejected, and still rejects." *Trabelsi III*, 2020 WL 1236652, at *6.

The government opposed the motion and provided the Court with a second diplomatic note from the Kingdom of Belgium, this one dated November 13, 2019. Dkt. 355-1. This note asserted that the August 8, 2019 decision of the Brussels Court of Appeal was "contrary to the Extradition order of 23 November 2011 and in our view, therefore contrary to the clear wording

of article 5 of the Treaty." *Id.* at 1.  The note further explained that, based on this disagreement, the Belgian government had appealed the decision to the Belgian Court of Cassation.  *Id.*  The note went on to reaffirm that the Minister of Justice's 2011 extradition order "is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States." *Id.* at 2.  The note sought to "make[] clear that Mr. Trabelsi may be tried on all of the charges set out in [the] indictment, and that any similarity between the United States case and the Belgian case does not give rise to any bar to his being tried on the charges in that indictment." *Id.*  Finally, the note asserted that the 2011 extradition order was "clear that the prosecution may offer facts relating to all 28 overt acts in prosecuting Mr. Trabelsi on the charges in the indictment." *Id.*

Before the Court ruled on Trabelsi's motions, another Belgian court issued a decision addressing Trabelsi's ongoing challenge to his extradition.  On February 26, 2020, the Francophone Court of First Instance of Brussels ordered the Belgian state to provide a copy of this decision to U.S. officials and to "specify[ ] in the accompanying letter" the following:

> According to the analysis prevailing in Belgian law, the extradition of Mr. TRABELSI does not allow him to be prosecuted in the United States to be tried there for the facts set out in the "Overt Acts" Nos. 23, 24, 25 and 26 set out in paragraph 10 of the first count and which are supposed to be repeated in support of the other counts [*of the American arrest warrant which is the basis for the extradition (indictment of the Grand Jury of November 3, 2006, filed on November 16, 2007 at the Registry of the US District Court of the District of Columbia*], namely, the facts relating to the attempted attack on the Kleine-Brogel military base.

Dkt. 373-1 at 72 (brackets and emphasis in original).

In *Trabelsi III*, this Court rejected Trabelsi's motion for reconsideration.  As an initial matter, the Court explained the "heavy burden" that Trabelsi faced in seeking reconsideration from a district court of a decision from the court of appeals.  *Trabelsi III*, 2020 WL 1236652, at *8.  Although a district court may reconsider a question previously resolved in an appellate

decision in "extraordinary circumstances," including where significant new evidence has come to light, the Court emphasized "that respect for the proper roles of trial and appellate courts and the importance of judicial economy and order demand that district courts apply these exceptions only in very special situations." *Id.* (internal quotation marks and citations omitted).  Because Trabelsi sought reconsideration of a question already decided by the D.C. Circuit, he bore "the heavy burden of demonstrating that the evidence is new, and not merely cumulative; that it would lead to a different result; and that the evidence could not have been previously adduced through reasonable diligence." *Id.*

Next, the Court clarified that, in reconsidering the earlier decisions, its inquiry was limited to the proper interpretation of the original 2011 extradition order.  That is, the subsequent judicial decisions from the Belgium court were relevant only if they provided "significant, new evidence about the meaning of the Minister's 2011 extradition order." *Id.* at \*9.  The text of the extradition order itself, however, weighed heavily against reconsideration.  The extradition order directly addressed the Belgian court decisions excluding the four overt acts, and the Minister of Justice expressly rejected those courts' reasoning in a lengthy legal analysis.  *See* Dkt. 367-17 at 10–14.  The Minister concluded that the overt acts did "not represent in any way the offenses for which an extradition [was] requested." *Id.* at 13.  Based on this text, "the D.C. Circuit read the Minister of Justice's extradition order to grant extradition, without limitation." *Trabelsi III*, 2020 WL 1236652, at \*9.

With those considerations in mind, the Court held that the subsequent decisions from the Belgian courts did "not come close to meeting th[e] high bar" of showing that the D.C. Circuit's interpretation was mistaken.  *Id.* at \*10.  On the contrary, when read carefully, these decisions

confirmed that the Minister of Justice had ordered Trabelsi's extradition without exclusion, although, in the view of the Belgian courts, he had done so without legal authority.

Starting with the August 8, 2019 decision of the Brussels Court of Appeal, the Court explained that the opinion "addresses only whether the Minister of Justice acted lawfully, in the view of that court, when he ordered Trabelsi's extradition without excluding those overt acts." *Id.* This Court rejected Trabelsi's argument that the August 8, 2019 decision demonstrated that "the Minister, in fact, limited the extradition order in conformity with" the prior decisions of the Belgian courts. *Id.* As the Court explained, "Even if read to say that the Minister of Justice was, in the view of Brussels Court of Appeal, bound by those judicial decisions and *should have excluded* the overt acts, that does not demonstrate that he *did exclude* them." *Id.* (emphasis in original). Other portions of the August 8, 2019 decision, moreover, showed that the Brussels Court of Appeal agreed with the D.C. Circuit's reading of the extradition order. *Id.* The Belgian court observed that "[o]nly the ministerial extradition order of November 23, 2011 depart[ed] from [the Belgian courts'] consistent interpretation of Article 5 of the Extradition [Treaty]." Dkt. 345-1 at 25. This Court, accordingly, concluded that, "if anything, the August 8, 2019 opinion adds further support for—and certainly does not controvert—the D.C. Circuit's conclusion that the Minister of Justice granted extradition without limitation." *Trabelsi III*, 2020 WL 1236652, at *10.

The Court then turned to the February 26, 2020 decision from the Court of First Instance in Brussels. That decision again held that "the Minister of Justice incorrectly based the grant of extradition on an offense-based, rather than fact-based, analysis," in contravention of the prior decisions of the Belgian courts. *Id.* at *11 (citing Dkt. 373-1 at 62–65). The Court of First Instance held that the Minister's extradition order thus "'constitute[d] an excess of power'

because the Minister of Justice exceeded the limits on extradition set by the courts." *Id.* (quoting Dkt. 373-1 at 65). But this Court explained that it "need not—and, indeed, should not—engage with the question whether the Belgian Minister of Justice exceeded his authority under Belgian law by declining to conform his order to the 'exequatur' granted by the Court of First Instance or to other pronouncements of the Belgian courts." *Id.* Rather, all that mattered for the Court's purposes was "that the February 26, 2020 decision *confirms* the D.C. Circuit's understanding that the Minister of Justice did, in fact, order Trabelsi's extradition to the United States without excluding the four overt acts." *Id.* (emphasis in original).

The Court found further support for its conclusion in the November 13, 2019 diplomatic note. *Id.* As the Court observed, this diplomatic note "offer[ed] the official position of the Belgian state and explains that the Minister of Justice's 2011 extradition order 'is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States.'" *Id.* (quoting Dkt. 355-1 at 2). The diplomatic note did not equivocate as to the meaning of the original extradition order, explaining that the order "is also clear that the prosecution may offer facts relating to all 28 overt acts in prosecuting Mr. Trabelsi on the charges in the indictment." *Id.* "That assertion," the Court concluded, "is consistent with the plain language of the 2011 order, the Belgian state's prior diplomatic note (which was before the D.C. Circuit), and with the D.C. Circuit's opinion." *Id.*

The Court placed relatively little weight, however, on a communication from the Belgian state to the United States government concerning the February 26, 2020 decision from the Court of First Instance in Brussels. "The communication does not adopt the conclusion of the Court of First Instance as [the Belgian state's] own position, but, rather, merely apprises the U.S. government that the Court of First Instance 'has ordered the Belgian Government to formally

notify its judgment' and then recites the language that the Court of First Instance required the Belgian state convey to the United States." *Id.* (quoting Dkt. 375-1 at 1).  In essence, the Belgian state merely acted as a messenger for the Belgian courts, and the communication, accordingly, did not cast doubt on the D.C. Circuit's understanding of the Minister's original extradition order.  Pulling these various strands together, the Court concluded that "Trabelsi [had] offer[ed] no evidence—much less significant, new evidence that was not previously available—that calls the D.C. Circuit's understanding of the extradition order into question." *Id.*

The Court then considered Trabelsi's related contention "that regardless of what the Minister of Justice may have intended, he was precluded as a matter of Belgian law from granting the extradition request without excluding the four overt acts because he was bound by the Belgian courts' decisions excluding those overt acts." *Id.*  The Court rejected that argument for two reasons.  First, "the D.C. Circuit's reasoning did not turn on whether the Minister of Justice was acting with lawful authority under Belgian law or in conformity with Belgian judicial decisions." *Id.* at 12.  Second, "to the extent Trabelsi's argument would require this Court to declare that the Belgian Minister of Justice violated Belgian law by ignoring a domestic judicial decree, the act-of-state doctrine bars the Court from doing so." *Id.* at *13.  That doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  Most fundamentally, whether framed under the act-of-state doctrine or otherwise, interests of international comity and respect for the sovereignty of foreign nations counseled against "wad[ing] into a dispute between two branches of a foreign government." *Trabelsi III*, 2020 WL 1236652, at *13.

Finally, the Court rejected Trabelsi's separate motion to compel compliance with the doctrine of specialty and to exclude Rule 404(b) evidence.  *Id.* at \*14.  That motion was premised on interpreting the extradition order as excluding overt acts 23, 24, 25, and 26.  *Id.*  But the Court had already rejected that interpretation and, like the D.C. Circuit, concluded that "Belgium extradited Trabelsi without that exclusion."  *Id.*

The Court's decision in *Trabelsi III* is now on appeal to the D.C. Circuit.  See *United States v. Trabelsi*, No. 20-3028 (D.C. Cir.) (appeal docketed Mar. 31, 2020).  In one of the two pending motions addressed in this opinion, Trabelsi moves to stay the district court proceedings until his interlocutory appeal is resolved.  Dkt. 402.  Meanwhile, the D.C. Circuit has held Trabelsi's appeal in abeyance pending this Court's resolution of his motion for indicative ruling, Dkt. 401.  *See* Order, *United States v. Trabelsi*, No. 20-3028 (D.C. Cir. Dec. 1, 2020).

## D.     Further Developments in Belgian Courts and Motion for Indicative Ruling

In arguing that intervening events have cast further doubt on the lawfulness of his extradition, Trabelsi focuses on two decisions from Belgian courts and two court pleadings filed by the Belgian executive.

### 1.     *May 28, 2020 Decision*

On May 28, 2020, the Francophone Court of First Instance in Brussels issued a decision in the ongoing litigation over the legality of Trabelsi's extradition.  Dkt. 401-1.  Trabelsi had sued the Minister of Justice for approximately € 50,000 on a claim that the Minister's November 13, 2019 diplomatic note, discussed above, violated the Brussels Court of Appeal's judgment of August 8, 2019.  *Id.* at 11.  In that August 8, 2019 judgment, the Brussels Court of Appeal ordered the Belgian state "to officially notify the US authorities" with " a copy of this ruling, inviting the US authorities to acquaint themselves with the legal analysis" in the opinion,

specifically its conclusion that extradition was improper as to the four overt acts, "under a penalty of € 5,000 per day of delay, with a maximum of € 50,000." *Id.* at 12.  Trabelsi argued in his recent suit that the Belgian state had violated that injunction by maintaining its position that Trabelsi could be prosecuted based on those overt acts in its November 13, 2019 diplomatic note. *Id.* at 11.

The Court of First Instance explained that the "disputed injunction" from the Brussels Court of Appeal was "aimed at and was sufficient to [] protect, on the one hand, Mr. TRABELSI's right not to be tried in the United States for acts which had already led to his conviction in Belgium (*non bis in idem*), and on the other hand, his right not to be tried there for acts foreign to those for which his extradition had been granted (principle of specialty)."  *Id.* at 13.  Such an injunction had been necessary, the Belgian court posited, "due to the fact that the Belgian State's position on the possibility of [Trabelsi] being tried in the United States for the acts linked to the attempted attack on the Kleine Brogel military base was somewhat opaque and therefore a source of confusion on the part of the American authorities."  *Id.* at 14.  Once this Court was made aware of the August 8, 2019 decision, however, "the confusion was cleared up and the threat, in all logic, removed."  *Id.*  But "confusion" was reintroduced, the Court of First Instance reasoned, when the Belgian state, in its November 13, 2019 note, reaffirmed its position that Trabelsi's extradition included no limitation with respect to the four disputed overt acts.  *Id.* That diplomatic note "sought to destroy the effect which the Brussels Court of Appeal's injunction should normally have had, namely to remove any ambiguity" as to the interpretation of the Extradition Treaty prevailing in Belgian law, and the note had thus "revived the threat to Mr. TRABELSI's rights."  *Id.* at 14–15.  The Court of First Instance held that the Belgian state

had acted without authority in issuing that note, because it gave the impression that "irrevocably settled" questions of law "would still be open to discussion." *Id.* at 15.

In discussing the harm that the Belgian state had caused, the Court of First Instance observed that, "in the international legal order, a declaration by a Minister of Justice is likely to be legally binding on the State on behalf of whom he is acting vis-à-vis the State to which it is addressed." *Id.* As the Belgian court explained, the Minister of Justice's actions are binding on Belgium where "the Minister of Justice expresses himself in a matter within his jurisdiction, provided, on the one hand, that the declaration in question demonstrates a willingness to commit himself and, on the other hand, that its purpose is sufficiently clear and precise,[] *which was the case here.*" *Id.* at 16 (emphasis added). As such, "the Belgian State has therefore not only revived the threat to Mr. TRABELSI's rights, it has also aggravated it." *Id.*

2.      *July 8, 2020 Pleading*

The Minister of Justice appealed the May 28, 2020 decision of the Court of Instance holding that the Belgian state had violated the August 8, 2019 injunction. On July 8, 2020, the Minister filed a brief arguing why the state had complied with the injunction. Dkt. 401-3. The Minister's primary argument was that he had complied with the literal text of the injunction because, on August 9, 2019, he had officially sent U.S. authorities a copy of the August 8, 2019 opinion "inviting the US authorities to acquaint themselves with the legal analysis." *Id.* at 7. According to the Minister, nothing more was required. *Id.* As for the November 13, 2019 diplomatic note, the Minister wrote that the note "was only intended to inform the U.S. judicial authorities that the BELGIAN STATE had filed an appeal in cassation." *Id.* at 11. But with that said, in the very next sentence of his brief, the Minister acknowledged that the note not only "explain[ed] the reasons for the appeal" but also reiterated the Belgian state's "point of view

19

regarding the concept of *non bis in idem*." *Id.* Given the ongoing appeal, the Minister argued,

the applicability of the *non bis* principle to Trabelsi's extradition was "not definitely decided."

*Id.* In any event, however, the Minister argued that the November 13, 2019 diplomatic note did

not revive any threats to Trabelsi's rights, given that his March 5, 2020 communication had

"again notified the American authorities of the content of a new ruling [the February 26, 2020

decision] served in Belgium and which confirmed the content of the ruling of the Brussels Court

of Appeal." *Id.* at 13. Even more to the point, the Minister stressed that the November 13, 2019

note was not dispositive because the U.S. courts were well aware of the various decisions from

the Belgian courts and had nevertheless rejected Trabelsi's *non bis* argument. *Id.* (discussing

*Trabelsi III*).

3.   *July 15, 2020 Decision*

In response to this Court's decision in *Trabelsi III*, Trabelsi returned to the Brussels

Court of Appeal seeking an additional injunction requiring the Belgian state to notify this Court

that he could not be prosecuted for offenses related to the four disputed overt acts. Dkt. 401 at

13. Specifically, he sought an order requiring the Belgian state to cease any cooperation in his

prosecution in the United States and "to confirm again to the US authorities, within two days of

the serving of the upcoming ruling, that the proceedings against Mr. TRABELSI cannot refer to

the 'reported acts' 23 to 26, nor to any event taking place on the territory of the Kingdom,

including the 'attempted attack' on the military base of Kleine Brogel." Dkt. 401-7 at 24.

Curiously, Trabelsi also requested "that the Belgian State, in the interests of effectiveness of the

measures prescribed by the judgment to come, be prohibited from mentioning, express or

implied, that its actions are carried out following a conviction by the judiciary." *Id.* He even

went so far as to ask the court to "[p]rohibit the Belgian State from mentioning the fact that the

said diplomatic note is issued as a result of a new judicial conviction, neither by making explicit reference to it, nor by using quotation marks or any other procedure likely to suggest that the executive would divest itself of the position thus expressed" and to "[p]rohibit the Belgian State from sending communications to the United States authorities other than that to which it is obliged by the judgment to be served, concerning the litigating issue." *Id.* at 26.

The Brussels Court of Appeal denied his request. Dkt. 401-7. It held that Trabelsi had not established "the need to have a new diplomatic note sent out," given that the Belgian state had already notified U.S. authorities of the August 8, 2019 decision. *Id.* at 32. The Belgian court questioned the utility of a further note, because the "American decisions," especially the D.C. Circuit's in *Trabelsi II*,

> make it clear that the American Courts are applying their own law and the law of international relations, that they have full knowledge of the dissensions between the Belgian Courts and the Belgian government, that they take into account the Belgian judicial decisions but that they consider that there is no reason, **by virtue of their own law**, over which this Court does not have the power to substitute its assessment, **and the law of international relations**, . . . to give priority to these Belgian judicial decisions over the ministerial order on extradition, which these decisions do not modify or cancel and the effects of which they do not suspend.

*Id.* at 34 (bold in original).

Unsurprisingly, the Belgian court also concluded that Trabelsi's request that the court order the Belgian state to withhold certain information from this Court (and potentially to mislead the Court) would be inappropriate and ineffective. In the view of the Belgian court,

> it would, at the very least, be contrary to procedural loyalty and the principle of separation of powers, to instruct the BELGIAN STATE to issue a diplomatic note in terms which would be dictated by the Court and to hide from the American Courts that the issuance of this diplomatic note would be ordered by a Court decision, in an *attempt* to make these jurisdictions believe that the government is issuing a personal and new interpretation of the Ministerial extradition order.

*Id.* (emphasis in original).

4.      *July 31, 2020 Pleading*

In a separate action in Belgian court, Trabelsi against sought damages from the Belgian

state, this time alleging that the Belgian state had not complied with the February 26, 2020

decision from the Court of First Instance in Brussels, discussed above, and the accompanying

injunction.  In responding to Trabelsi's argument, the Belgian state argued that

> the fact that the notification made by the Belgian State specified that it is
> carried out on court order, *including the details it contains, does not mean that
> the Belgian State would have* []*distanced itself once again from what was
> decided by the ruling of February 26, 2020, nor that the Belgian State has,
> again, not executed the ruling of the Court of First Instance of Brussels of
> February 26, 2020.*

Dkt. 401-9 at 7 (emphasis in original).

Based on these additional Belgian court materials, Trabelsi asks the Court to reconsider,

yet again, its denial of his motion to dismiss the superseding indictment based on an alleged

violation of Article 5 of the Treaty.

## II. ANALYSIS

### A.      **Motion to Stay**

Although Trabelsi filed his motion to stay proceedings in the District Court, Dkt. 402,

after his motion for indicative ruling, Dkt. 401, the Court will address the motion to stay first,

because the motion for indicative ruling is premised on the assumption that the Court does not

have jurisdiction during the pendency of the appeal.

Trabelsi's argument in support of his motion to stay is straightforward.  He contends that

the filing of his currently pending interlocutory appeal conferred jurisdiction on the D.C. Circuit

and divested this Court of jurisdiction.  Dkt. 402 at 1 (citing *Griggs v. Provident Consumer Disc.

Co.*, 459 U.S. 56, 58 (1982) (per curiam) and *United States v. DeFries*, 129 F.3d 1293, 1302

(D.C. Cir. 1997) (per curiam)).  The government acknowledges that an interlocutory appeal of a

double jeopardy claim typically divests the district court of jurisdiction. Dkt. 424 at 14 (citing *Abney v. United States*, 431 U.S. 651, 657, 659–62 (1977)). But the government contends, relying on out-of-circuit precedent, that "a district court may continue to exercise jurisdiction over a case if the district court finds that the basis for the interlocutory appeal is frivolous or dilatory. *Id.* (citing *United States v. Farmer*, 923 F.2d 1557, 1565 (11th Cir. 1991) and *United States v. Dunbar*, 611 F.2d 985, 987 (5th Cir. 1980) (en banc)). Although the D.C. Circuit has not—to date—explicitly adopted a similar limitation on the default rule that an appeal divests the district court of jurisdiction, it has observed that other courts "have carved out a few narrow exceptions to [the general] rule, such as where the defendant frivolously appeals . . . or takes an interlocutory appeal from a non-appealable order . . . ." *DeFries*, 129 F.3d at 1302–03 (internal citations omitted); *see also United States v. Black*, 759 F.2d 71, 73 (D.C. Cir. 1985).

This Court agrees with the government and that out-of-circuit precedent that there must be some limit on the ability of a defendant to cause delay through the filing of serial interlocutory appeals. As the Tenth Circuit has observed, the rule that an appeal divests the trial court of jurisdiction "should not leave the trial court powerless to prevent intentional dilatory tactics by enabling a defendant unilaterally to obtain a continuance at any time prior to trial by merely filing a motion, however frivolous, and appealing the trial court's denial thereof." *United States v. Hines*, 689 F.2d 934, 936–37 (10th Cir. 1982). At a January 8, 2020 hearing, this Court expressed a similar concern, noting that Trabelsi had already appealed once on the same double-jeopardy issue. Dkt. 370 at 116. The Court asked whether Trabelsi "could . . . come back the next week and do it again" and expressed skepticism of that proposition, observing that "it can't be that you get to keep doing that." *Id.* at 117.

More generally, the Court continues to share the government's concern about the potential for dilatory conduct in this case.  Trabelsi should not be permitted to delay his trial indefinitely by bringing an unending stream of litigation in Belgium and then asking this Court to respond to each successive development in a foreign court.  As time goes on, each new Belgian court decision is further and further removed from the Belgian state's extradition order and thus provides diminishing insight for interpreting that order.  This case has been pending for many years, and further delays could result in the loss of key evidence or the deterioration of the memories of key witnesses.  The Court will therefore move this case to trial as expediently as possible, consistent with Trabelsi's legal rights.

With all of that said, wherever the line lies between a legitimate appeal and a frivolous or dilatory one, the Court cannot agree with the government that Trabelsi's current appeal crosses that line.  The August 8, 2019 decision from the Brussels Court of Appeal was (at least arguably) a significant development, which the government acknowledged when it joined Trabelsi in requesting that the Court postpone his trial to provide time to consider the implications of that Belgian court decision for Trabelsi's *non bis* claim.  Although the Court ultimately denied Trabelsi's motion for reconsideration in *Trabelsi III*, his motion presented the substantial legal question of how to resolve the ongoing conflict between the Belgian courts and the Belgian executive—a question that the D.C. Circuit did not fully address in *Trabelsi II*.  Trabelsi's appeal is not frivolous.

As for whether Trabelsi has prosecuted his appeal in a dilatory manner, it appears from the appellate docket that he filed several motions to extend his briefing deadlines, before asking the court of appeals to hold the case in abeyance pending this Court's resolution of his motion for indicative ruling.  *See United States v. Trabelsi*, No. 20-3028 (D.C. Cir.).  And although the

government did not oppose any of those motions, the government may not have recognized the need to expedite the appeal because Trabelsi only recently asserted that the pendency of the appeal precludes this Court from addressing substantive motions; indeed, the parties participated in scheduling hearings before this Court at which Trabelsi's counsel never suggested that his second interlocutory appeal had divested the Court of jurisdiction.  In addition, Trabelsi could have asked this Court for an indicative ruling and could have asked the D.C. Circuit to hold the appeal in abeyance months earlier than he did.  Even so, there is no evidence that Trabelsi's extension requests before the D.C. Circuit were made in bad faith or merely for the purpose of delay or that he intentionally dragged his feet in seeking an indicative ruling.

The Court agrees that it is imperative that all work together to move this case along as promptly as possible, both before this Court and the D.C. Circuit.  To the extent the government seeks expedition before the court of appeals, however, it must raise its request in that forum.

The Court will therefore stay this case pending the resolution of Trabelsi's appeal. Trabelsi argues that the stay should apply to "all non-ministerial proceedings." Dkt. 402 at 4.  In *Abney*, the Supreme Court held that a trial court's rejection of a double jeopardy claim is subject to immediate interlocutory appeal under the collateral order doctrine.  *See Abney*, 431 U.S. at 662.  Generally, when a party appeals a discrete collateral issue, the district court would retain jurisdiction over the remainder of the case.  But the Double Jeopardy Clause protects against not only double convictions but also against even the "risk" or "potential" of a second conviction for the same crime.  *Id.* at 661.  It is thus generally understood that "an interlocutory appeal from an order refusing to dismiss on double jeopardy . . . grounds relates to the entire action and, therefore, it divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant." *Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990) (emphasis in

original).  The Court will therefore stay the case with respect to any substantive matters to preserve Trabelsi's double-jeopardy-like rights pending appeal.  The Court need not decide at this juncture whether, given the collateral nature of the interlocutory appeal, the Court retains jurisdiction to address procedural or ministerial matters and, if so, which matters properly remain before the Court.

## B.    Motion for Indicative Ruling

Although the case will be stayed, the Court may still resolve Trabelsi's motion for an indicative ruling.  Rule 37 of the Federal Rules of Criminal Procedure provides a mechanism for a district court that lacks jurisdiction over a pending motion for relief because of a pending appeal nevertheless to indicate how it would rule on the motion if it were to have jurisdiction. Fed. R. Crim. P. 37(a).  A district court presented with a motion for relief while an appeal is pending has three options.  It may "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." *Id.*  The third of these options is called an indicative ruling.  Here, Trabelsi requests that the Court indicate how it would rule on a motion for reconsideration of its decision in *Trabelsi III*, based on additional Belgian court filings and decisions.  Dkt. 401.  That is, he asks the Court whether, if it had jurisdiction, it would reconsider its earlier decision in *Trabelsi III* declining to reconsider its decision in *Trabelsi I* and the D.C. Circuit's decision in *Trabelsi II*.

As in *Trabelsi III*, Trabelsi faces a heavy burden.  He asks the Court to reconsider three prior decisions declining to dismiss the charges against him, including one from the D.C. Circuit. As the Court explained in *Trabelsi III*, the "mandate rule," which is "an even more powerful version" of the law-of-the-case doctrine, "*requires* a lower court to honor the decisions of a

superior court in the same judicial system." *Trabelsi III*, 2020 WL 1236652, at *8 (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 n.3 (D.C. Cir. 1996)) (emphasis in original). In asking the Court to reconsider not only its own prior decisions but also the earlier decision of the D.C. Circuit, Trabelsi "bears the heavy burden of demonstrating that the evidence is new, and not merely cumulative; that it would lead to a different result; and that the evidence could not have been previously adduced through reasonable diligence." *Id.*

As before, moreover, the Court's focus is on "the breadth and effect of the Minister of Justice's extradition order" of November 23, 2011. *Id.* at *7. For Trabelsi to succeed, then, he must present new evidence that would alter the Court's interpretation of that order, which issued almost a decade ago. It would not be enough, for example, for Trabelsi to call into question the Court's prior interpretation of the November 13, 2019 diplomatic note, unless the new evidence about the meaning of the note also undermined the Court's reading of the extradition order itself.

The Court will address in turn each of the recent Belgian court decisions and filings upon which Trabelsi relies. Although Trabelsi picks out the passages from each document most favorable to his position, the Court sees nothing in these recent Belgian judicial records that undermines the understanding of the extradition order relied upon in *Trabelsi I*, *II*, and *III*.

1.    *May 28, 2020 Decision*

Trabelsi first contends that the May 28, 2020 decision from the Court of First Instance in Brussels demonstrates that this Court's interpretations of the November 23, 2011 extradition order, the August 8, 2019 decision from the Brussels Court of Appeal, and the November 13, 2019 diplomatic note, as well as the D.C. Circuit's reading of the extradition order, were all incorrect. Trabelsi suggests that "[a]ccording to the representations of the Minister in a court of law, the August 8, 2019 decision made clear that overt acts 23–26 were excluded from the

extradition, and he officially conveyed that exclusion in the August 9, 2019 communication." Dkt. 401 at 10.  He also argues that "the May 28, 2020 decision held that the 2011 extradition order had *not* been clear that Mr. Trabelsi could be prosecuted in the U.S. on overt acts 23–26" and, instead, was "'opaque'" and "'a source of confusion.'"  *Id.* (quoting Dkt. 401-1 at 14) (emphasis in original).  And even beyond that, Trabelsi contends that the Minister acknowledged in the Belgian litigation that the November 13, 2019 diplomatic note's "sole purpose was merely to apprise the U.S. authorities that the Belgian state had appealed the August 8, 2019 decision and of the 'point of view' that it would press in the appeal."  *Id.* at 9.

When read in its entirety, the May 28, 2020 decision of the Court of First Instance does not support Trabelsi's arguments.  That decision addressed a claim from Trabelsi seeking € 50,000 from the Minister of Justice on the ground that the Minister's November 13, 2019 diplomatic note had violated an earlier injunction.  The court held that the Minister had violated the injunction because the November 13, 2019 note "revived the threat" that Trabelsi would face prosecution in the United States.  Dkt. 401-1 at 15.  In considering Trabelsi's claim, the court thus rejected the interpretation that Trabelsi advances here that the November 13, 2019 diplomatic note functioned merely to notify the United States of the Belgian state's litigating position on appeal.

It is true that the Court of First Instance observed that "the Belgian State's position on the possibility of [Trabelsi] being tried in the United States for the acts linked to the attempted attack on the Kleine Brogel military base was somewhat opaque and therefore a source of confusion on the part of the American authorities."  Dkt. 401-1 at 14.  But that characterization is difficult to square with the text of the extradition order itself, which stated plainly that "it is not the facts, but their qualification, the offenses, that have to be identical" for Article V of the Treaty to apply and

that the overt acts did "not represent in any way the offenses for which an extradition [was] requested." Dkt. 367-17 at 11, 13. And the court's statement is likewise difficult to square with the following language from the August 8, 2019 decision, which the Court of First Instance itself quotes: "Only the ministerial extradition order of November 23, 2011 deviates from [the Belgian courts'] constant interpretation of Article 5 of the Extradition Convention, arguing that the provision required an identity of qualifications." Dkt. 401-1 at 8.

Moreover, although the May 28, 2020 decision suggested that the August 8, 2019 decision, "in all logic," should have ended the "threat" of Trabelsi's prosecution in the United States, *id.* at 14, it concluded that, instead, the November 13, 2019 diplomatic note resolved the ambiguity in favor of Trabelsi's trial under the superseding indictment without limitation. That is, contrary to Trabelsi's arguments here, the Court of First Instance read the November 13, 2019 diplomatic note as taking a clear position on the scope of Trabelsi's extradition. Far from simply stating a litigating position, the November 13, 2019 diplomatic note, according to the May 28, 2020 decision, "sought to destroy the effect which the Brussels Court of Appeal's injunction should normally have had, namely to remove any ambiguity" as to the interpretation of the Extradition Treaty prevailing in Belgian law and thus "revived the threat to Trabelsi's rights." *Id.* at 14–15. The views of the Belgian state carried unique importance, in the view of the Court of First Instance, because it is the position of the Belgian state, rather than the position of the Belgian courts, that is likely to receive deference in the U.S. courts. As the May 28, 2020 decision explained, "in the international legal order, a declaration by a Minister of Justice is likely to be legally binding on the State on behalf of whom he is acting vis-à-vis the State to which it is addressed." *Id.* at 15.

In sum, the May 28, 2020 decision offered no reason to question or to reconsider this Court's understanding that the Minister's November 23, 2011 extradition order declined to exclude the four overt acts.  Beyond that, it affirmed the Court's view that the November 13, 2019 diplomatic note reiterated the position of the Belgian state that the *non bis* provision of the Extradition Treaty does not apply in this case.  As the Belgian court explained, the diplomatic note "not only revived the threat to Mr. TRABELSI's rights, it has also aggravated it."  *Id.* at 16.

    2.   *July 8, 2020 Pleading*

Trabelsi next contends that the Minister of Justice's July 8, 2020 pleading on appeal of the May 28, 2020 decision undermines this Court's decision in *Trabelsi III*.  But Trabelsi misreads certain portions of the pleading and takes others out of context.  Trabelsi first relies on the Minister's statement that the November 13, 2019 diplomatic note "was only intended to inform the U.S. judicial authorities that the BELGIAN STATE had filed an appeal in cassation."  Dkt. 401-3 at 11.  He concludes from this statement that "the August 8 decision and the August 9 diplomatic note conveying that decision put the U.S. authorities on notice from the Belgian state that Mr. Trabelsi could not be prosecuted in the U.S. for overt acts 23–26, and the November 13 note informed those authorities that the official position of the Belgian state could change if it is successful in its pending appeal."  Dkt. 401 at 11–12.  Trabelsi's reading, however, ignores the very next sentence of the pleading, which says that the November 13, 2019 diplomatic note not only apprised the Court of the Belgian state's litigating position on appeal but also explained the Belgian state's "point of view regarding the concept of *non bis in idem*."  Dkt. 401-3 at 11.  Regardless, contrary to Trabelsi's contention, nothing in the July 8, 2020 pleading suggests that the Belgian state had adopted the August 8, 2020 decision from the Brussels Court of Appeal as its own official position.  Instead, the Minister's primary argument in his pleading was that he

had complied with the literal terms of the injunction because, on August 9, 2019, he sent U.S. authorities a copy of the August 8, 2019 opinion "*inviting the US authorities to acquaint themselves with the legal analysis*," which was all the injunction required. *Id.* at 7 (emphasis in original).

Trabelsi also contends that the Minister's July 8, 2020 pleading acknowledged that his March 5, 2020 communication, which conveyed the February 26, 2020 decision, "'confirmed the content of the ruling'" that Trabelsi could not be tried on the four overt acts. Dkt. 401 at 12 (quoting Dkt. 401-3 at 13). Here, Trabelsi appears to misread the pleading. The entire phrase from which Trabelsi pulled that snippet asserted:

> it is difficult to claim, in this context, that the diplomatic note of November 13, 2019 would have "revived" threats on the rights of Mr. TRABELSI in the United States, or even "aggravated" them . . . [because,] since the sending of this note, the Belgian State has again notified the American authorities of the content of a new ruling served in Belgium and *which confirmed the content of the ruling* of the Brussels Court of Appeal . . . .

Dkt. 401-3 at 13 (emphasis added). The most natural reading of this sentence is that it was the "new ruling" of February 26, 2020, rather than the communication from the Minister, that "confirmed the content of the [August 8, 2019] ruling." *Id.* As the government points out, the March 5, 2020 communication explicitly "informed the United States that the Court of First Instance of Brussels had ordered the Belgian government to provide the U.S. with the decision" and did not adopt the Belgian court's holding as the Belgian state's own position. *Trabelsi III*, 2020 WL 1236652, at *7.

3.    *July 15, 2020 Decision*

Trabelsi does not rely on the Brussels Court of Appeal's July 15, 2020 decision but, rather, seeks to minimize it. He argues that the "court threw up its hands" and "held that since this Court seems to have required unequivocal proof that the August 9, 2019 and March 5, 2020

31

diplomatic note[s] reflect the 'personal' view of the Minister, there would be no point in requiring that person to issue a new note that was court-ordered." Dkt. 401 at 13–14. But Trabelsi elides the most important aspects of the July 15, 2020 decision. Far from simply throwing up its hands, the Belgian court recognized that the "American decisions," especially the D.C. Circuit's in *Trabelsi II*,

> make it clear that the American Courts are applying their own law and the law of international relations, that *they have full knowledge of the dissensions between the Belgian Courts and the Belgian government*, that they take into account the Belgian judicial decisions but that *they consider that there is no reason*, by virtue of their own law, over which this Court does not have the power to substitute its assessment, and the law of international relations, . . . *to give priority to these Belgian judicial decisions over the ministerial order on extradition*, which these decisions do not modify or cancel and the effects of which they do not suspend.

Dkt. 401-7 at 34 (emphasis added and bold removed). Significantly, then, the Brussels Court of Appeal recognized that (1) the Belgian state and judiciary disagreed about the meaning of the *non bis* provision; (2) the U.S. courts understood this "dissension[;]" (3) the U.S. courts saw "no reason" to defer to the decisions of the Belgian judiciary, as opposed to the Belgian state; and (4) the decisions of the Belgian judiciary did not have the effect of modifying or canceling the November 23, 2011 extradition order. *Id.* These conclusions are fatal to Trabelsi's claim that new evidence now demonstrates that this Court and the D.C. Circuit misread the extradition order. The question before this Court is the proper interpretation of that order, and the Belgian courts themselves acknowledge that the Belgian state and Belgian judiciary are of two minds about the meaning of the Extradition Treaty and that the relevant judicial decisions have not altered (and cannot alter) the meaning of the extradition order.

4.      *July 31, 2020 Pleading*

Finally, Trabelsi argues that an assertion from the Belgian state in a July 31, 2020

pleading confirms that the Belgian state has adopted the position of the Belgian courts as its own.

In responding to an argument from Trabelsi concerning the March 5, 2020 diplomatic note, the

Belgian state argued that

> the fact that the notification made by the BELGIAN STATE specified that it is
> carried out on court order, *including the details it contains, does not mean that
> the BELGIAN STATE would have []distanced itself once again from what was
> decided by the ruling of February 26, 2020, nor that the Belgian State has,
> again, not executed the ruling of the Court of First Instance of Brussels of
> February 26, 2020.*

Dkt. 401-9 at 7 (emphasis in original).  As the government contends, the Belgian state was

simply explaining that it had complied with the Court's order to transmit its decision to the U.S.

authorities.  Dkt. 405 at 19.  The Belgian state's assertion that it did not "distance[] itself" from

the Belgian court's decision is a far cry from the Belgian state adopting the court's position as its

own.

The Court does not doubt that the Belgian state is in a delicate position when litigating

these issues in Belgian courts.  The Belgian state and Belgian judiciary are not in agreement (at

least to date) on an important issue, and the Belgian state has faced multiple lawsuits alleging

that it has failed to comply with various Belgian judicial decrees.  But as the Court explained in

*Trabelsi III*, "[t]his Court need not—and, indeed, should not—engage with the question whether

the Belgian Minister of Justice exceeded his authority under Belgian law."  *Trabelsi III*, 2020

WL 1236652, at *11.  Under principles of international comity and separation of powers, this

Court has no role to play in a dispute between coordinate branches of a foreign state.  Instead,

"[a]ll that matters for current purposes is that the [recent Belgian court pleadings and decisions]

*confirm*[] the D.C. Circuit's understanding that the Minister of Justice did, in fact, order

33

Trabelsi's extradition to the United States without excluding the four overt acts." *Id.* (emphasis in original).

Because the Court would deny Trabelsi's motion for reconsideration if not for his pending appeal, Rule 37 permits the Court to reach the merits of the motion. *See* Fed. R. Crim. P. 37(a)(2). The Court will therefore reach the merits and will deny the motion in accordance with Rule 37 and in the interest of judicial economy. *Cf. United States v. Martin*, No. 18-cr-834-7, 2020 WL 1819961, at *2 (S.D.N.Y. Apr. 10, 2020).

## CONCLUSION

For the foregoing reasons, Trabelsi's motion to stay proceedings in the district court pending the resolution of his appeal, Dkt. 402, is hereby **GRANTED**. Trabelsi's motion for an indicative ruling and for reconsideration, Dkt. 401, is hereby **DENIED**. In order to avoid further delay in these proceedings, the parties shall promptly convey this Memorandum Opinion and Order to the D.C. Circuit.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: February 5, 2021