UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>NIZAR TRABELSI,<br><br>   *Defendant.* | No. 06-cr-89 (RDM) |

## MEMORANDUM OPINION AND ORDER

In April 2006, a grand jury returned an indictment against Defendant Nizar Trabelsi containing four counts, two of which the government later dismissed. Dkt. 3. The two remaining counts allege that Trabelsi conspired to kill U.S. nationals outside the United States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a), and conspired and attempted to use weapons of mass destruction, in violation of 18 U.S.C. §§ 2332a and 2.[1] Dkt. 6 at 1–9. Among other overt acts, the indictment alleges that Trabelsi "met with Osama bin Laden" in the Spring of 2001 near Kandahar, Afghanistan "and offered to carry out a suicide bomb attack against United States interests," Dkt. 6 at 6; that he "obtained money from an al Qaeda associate for use in carrying out his mission to bomb a United States target," *id.* at 7; that in July and August 2001, Trabelsi "bought quantities of chemicals" in Belgium "to be used in manufacturing a 1,000-kilogram bomb," *id.* at 8; and that he "traveled at night with conspirators to scout the Kleine-

---

[1] The original indictment also charged Trabelsi with conspiring to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and with providing material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2. Dkt. 3 at 9–10. On the U.S. government's motion and with the consent of Trabelsi, these two counts were subsequently dismissed with prejudice. *See* Dkt. 231; Min. Order (June 10, 2019).

Brogel Air Force Base—a facility used by the United States and the United States Department of the Air Force, and at which United States nationals were present—as a target for a suicide bomb attack," *id.* In 2013, after serving a ten-year sentence in Belgium for, among other things, attempting to destroy the Kleine-Brogel Air Force Base, *see* Dkt. 367-3 at 24, Trabelsi was extradited to the United States on the instant charges. Trial is set to commence on May 8, 2023.

Presently before the Court is the government's sealed motion to take a Fed. R. Crim. P. 15 deposition of a foreign-national witness outside of the United States. Dkt. 501; Dkt. 505. The government asserts that the witness, Ms. Amal,[2] was in a relationship with Trabelsi between 2000 and 2001 and can provide "unique testimony about Trabelsi's criminal conduct, including his travel to Afghanistan where he met Osama bin Laden, enlisted to become a martyr, and received training to commit an attack." Dkt. 505 at 6. The government represents, moreover, that "[t]he witness [has] definitively stated that she is not willing to travel to the United States to testify." Dkt. 544 at 1. In light of these representations, and for the reasons that follow, the Court will **GRANT** the government's motion for leave to take this Rule 15 deposition, Dkt. 501; Dkt. 505, to the extent that the deposition substantially comports with the procedures set forth in the parties' joint status report, Dkt. 576.

## I. ANALYSIS

### A.   Fed. R. Crim. P. 15

Federal Rule of Criminal Procedure 15 provides that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial" and that "[t]he court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R.

---

[2] With the parties' consent, the Court has ordered that the witness shall be referred to as "Ms. Amal" and that her family name may not be referenced on the public record or in public filings.

Crim. P. 15(a)(1). "To demonstrate that 'exceptional circumstances' necessitate a Rule 15 deposition, the party seeking the deposition must show: '(1) the materiality of the testimony; and (2) the unavailability of the witness to testify at trial.'" *United States v. Cooper*, 947 F. Supp. 2d 108, 112 (D.D.C. 2013) (quoting *United States v. Kelley*, 36 F.3d 1118, 1125 (D.C. Cir. 1994)); *see also United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) ("It is well-settled that the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial.").

1. *Materiality*

The Court begins with the question of materiality. "In assessing whether testimony is material for Rule 15(a)(1) purposes, courts have used the standard developed for applying and interpreting *Brady v. Maryland*, 373 U.S. 83 (1963)." *United States v. Vo*, 53 F. Supp. 3d 77, 81 (D.D.C. 2014); *see also United States v. Sanford, Ltd.*, 860 F. Supp. 2d 1, 4–5 (D.D.C. 2012). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "[T]he witness need not provide totally unique testimony; nor does she need to be a 'critical' witness." *Vo*, 53 F. Supp. 3d at 82. But the offering party must show that, with the witness's testimony, "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (quoting *Smith*, 565 U.S. at 75).

Trabelsi does not contest that Ms. Amal's testimony is material; nor could he convincingly do so. According to the government, Ms. Amal was in an intimate relationship with Trabelsi in 2000 and 2001, the years leading up to his alleged crimes, Dkt. 505 at 6;

3

Trabelsi goes a step further and contends that Ms. Amal was his wife during this period, Dkt. 511. The government and Trabelsi agree that Trabelsi is the father of Ms. Amal's eldest child.[3]

Regardless of the specific nature of the relationship, the government has proffered that Ms. Amal "personally observed . . . the defendant's radicalization and the path he traveled . . . in his effort to become a martyr." Dkt. 505 at 6. And, according to the government, the witness can "testify firsthand" about Trabelsi's "relationship with . . . Djamel Beghal and Jerome Courtaillier, who have both been convicted of terrorism offenses," as well as about "loading ammunition belts for the defendant in Afghanistan." *Id.* She can also testify about conversations she had with Trabelsi, which "corroborate the statements that the defendant made to Belgian authorities after his arrest"—including his statements that "he met Osama bin Laden, that he was going to be a martyr, [and] that he received training on weapons and explosives from al Qaeda." *Id.* The government asserts, moreover, that this evidence would not be cumulative because "no other witness can provide such a quantity of corroboration from such a close relationship with the defendant." *Id.* at 7. Given the importance of this evidence, the Court concludes that the government has met its burden of showing that she is "likely to provide testimony that is highly material to the charges in the indictment." *Cooper*, 947 F. Supp. 2d at 112 n.2.

2. *Unavailability*

The Court turns, next, to the government's contention that Ms. Amal is unavailable to testify at trial—an assertion that Trabelsi does contest. Courts evaluate whether a witness is "unavailable" for purposes of Rule 15(a)(1) "by reference to Federal Rule of Evidence 804(a),

---

[3] Although Trabelsi seeks to exclude "privileged marital communications" in a different motion, Dkt. 511, he does not squarely invoke that claim as a basis for resisting a Rule 15 deposition. In any event, and as explained at the April 25, 2023 motions hearing, Trabelsi has not carried his burden of establishing that the marital communications privilege protects his communications with Ms. Amal.

4

which provides, in relevant part, that a witness is unavailable if he or she is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." *Vo*, 53 F. Supp. 3d at 81 (omission in original) (quoting *United States v. Straker*, 567 F. Supp. 2d 174, 180 (D.D.C. 2008)). But "the party seeking the deposition need not prove conclusively that the prospective deponent will be unavailable to testify at trial." *Cooper*, 947 F. Supp. 2d at 113; *see also United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993) ("It would be unreasonable and undesirable to require the government to assert with certainty that a witness will be unavailable for trial months ahead of time, simply to obtain authorization to take his deposition." (quoting *United States v. Sines*, 761 F.2d 1434, 1439 (9th Cir. 1985))); *United States v. Mann*, 590 F.2d 361, 366 (1st Cir. 1978) ("When the question is close[,] a court may allow a deposition in order to preserve a witness' testimony, leaving until trial the question of whether the deposition will be admitted as evidence."). Rather, a witness is "unavailable" for purposes of Rule 15(a) if "a substantial likelihood exists that [she] . . . will not testify at trial." *Drogoul*, 1 F.3d at 1553; *see also Vo*, 53 F. Supp. 3d at 81; *Cooper*, 947 F. Supp. 2d at 113.

Here, the government has made a sufficient showing to satisfy the Rule 15 standard. The government represents that, on March 29, 2023, "[t]he witness definitively stated that she is not willing to travel to the United States to testify," Dkt. 544 at 1, notwithstanding the government's "long, diplomatic face-to-face discussions with [her] about the importance of her testimony," Dkt. 570-1 at 2. Although a foreign witness's reasons for declining to come to the United States to testify have no direct bearing on whether the witness is unavailable for purposes of Rule 15(a)(1), the government points to multiple factors that confirm the government's view that it is very unlikely that Ms. Amal will have a change of heart and will, at a later time, decide to come

5

to the United States to testify. First, the government represents that Ms. Amal "is terrified of the defendant" and that "[s]he perceives [him] []as a threat," which she has "tried to escape" by creating "a new life for herself." *Id.* at 2. In addition, "[t]wo of her minor children were struck by a car in March and [were] seriously injured." *Id.* As a result of the accident, ███████ ██████████████████████████████████████████ *Id.* Ms. Amal, according to the government, ██████████████████████ ██████████ *Id.* In short, it will be a significant hardship for Ms. Amal even to travel to Paris for a two-day deposition, much less to travel to the United States, far from her children and work. *See* Apr. 19, 2023 Hrg. Tr. (Rough at 31:6–32:2). The Court, accordingly, finds that there is a "substantial likelihood" that Ms. Amal "will not testify at trial." *Drogoul*, 1 F.3d at 1553.

Moreover, because Ms. Amal is a foreign national who lives in France, she is beyond the Court's subpoena power. *See Cooper*, 947 F. Supp. 2d at 114 (finding it material that the witnesses were "beyond the Court's subpoena power" and that they could "decide not to testify before the trial begins," leaving the Court unable to "compel[]" their testimony); *Drogoul*, 1 F.3d at 1557 (explaining that "[t]he possibility remains that the[] [witnesses] could change their minds, in which case it would be impossible for the government to present their testimony"); *Vo*, 53 F. Supp. 3d at 81 (noting that, "[o]nce [the witness] is returned to Vietnam, she will be beyond this Court's process"). Under Federal Rule of Criminal Procedure 17(e)(2), "[i]f the witness is in a foreign country, 28 U.S.C. § 1783 governs the" service of a trial subpoena. Section 1783, however, applies only to witnesses who are "national[s] or resident[s] of the United States" and who are overseas at the time of trial. 28 U.S.C. § 1783(a). In the words of the D.C. Circuit, this statute "has never been read as permitting issuance of a subpoena to an alien residing outside the United States." *FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*,

6

636 F.2d 1300, 1320 n.116 (D.C. Cir. 1980). Here, Trabelsi does not dispute that the Court lacks any means to compel Ms. Amal's attendance at trial, and neither he nor his standby counsel (who briefed the Rule 15 issue at his request) has identified any law that would allow the Court to compel her attendance.

Instead, Trabelsi contends that Ms. Amal is "[a]vailable [a]nd [w]illing [t]o [t]ravel [t]o [t]he United States;" that she has "repeatedly met with the United States government and foreign law enforcement;" that she has previously "confirmed she was willing to travel to the United States . . . to testify for trial" in 2019; and that she has "the full support of [her] host nation, France." Dkt. 506 at 6–7. But the fact that the witness's position on testifying at trial has evolved since 2019 does not, in itself, undermine her most recent "definitive[] state[ment] [to attorneys for the government] that she is not willing to travel to the United States to testify," Dkt. 544 at 1—or the government's representation that "[s]he is not leaving France because of her children, that is a fact," Apr. 19, 2023 Hrg. Tr. (Rough at 32:1–2). Nor is the Court persuaded by standby counsel's assertion that the government has failed to carry its burden of showing that Ms. Amal's is unavailable because "[t]here has been no direct affidavit from [the witness]" or "from any law enforcement officer in France." *Id.* at 20:25–21:4. The government need not, at the Rule 15 stage, "prove *conclusively* that the prospective deponent will be unavailable to testify at trial," *Cooper*, 947 F. Supp. 2d at 113 (emphasis added), and standby counsel has cited no caselaw for the proposition that establishing "a substantial likelihood . . . that [the witness] will not testify at trial" requires a sworn statement of such unavailability, *Drogoul*, 1 F.3d at 1553; *see also Vo*, 53 F. Supp. 3d at 81. In evaluating the propriety of a Rule 15 deposition, the Court credits the veracity of government counsel's representations that Ms. Amal personally and definitively told them that she is unwilling to come to the United States to testify—and an FBI

7

302 corroborates those assertions. In any event, Trabelsi is free to verify government counsel's representations "with [Ms. Amal] during the deposition itself." Apr. 19, 2023 Hrg. Tr. (Rough at 22:12–14).

The Court, accordingly, concludes that the government has made a sufficient showing of unavailability to warrant a Rule 15 deposition.

3.      *Deposition Outside the United States*

Finally, the Court addresses whether the government may "tak[e]" this deposition "outside the United States . . . without the defendant's presence." Fed. R. Crim. P. 15(c)(3). To allow the government to do so, the Court must find, as it has above, that "the witness's testimony could provide substantial proof of a material fact in a felony prosecution;" that "there is a substantial likelihood that the witness's attendance at trial cannot be obtained;" and that "the witness's presence for a deposition in the United States cannot be obtained." Fed. R. Crim. P. 15(c)(3)(A)–(C). As discussed above, Ms. Amal's testimony about her conversations with Trabelsi "could provide substantial proof" that Trabelsi was planning "to become a martyr" and that "he received training on weapons and explosives from al Qaeda" to that effect. Dkt. 505 at 6; *see also* Fed. R. Crim. P. 15(c)(3)(A). The government has established, moreover, a "substantial likelihood that the witness's attendance at trial cannot be obtained," Fed. R. Crim. P. 15(c)(3)(B). And, as noted, the government "firmly" represented—"as officers of the Court"— that the witness "[i]s unwilling to come to the United States for deposition," and there is more than sufficient reason to credit that representation. Apr. 18, 2023 Hrg. Tr. (Rough at 238:12– 239:1); *see also* Apr. 19, 2023 Hrg. Tr. (Rough at 32:1–2) ("She is not leaving France because of her children, that is a fact . . . .").

8

For present purposes, the Court must also make case-specific findings that (1) "the [in-custody] defendant cannot be present [in France] because . . . secure transportation and continuing custody cannot be assured at the witness's location;" and (2) the defendant "can meaningfully participate in the deposition through reasonable means." Fed. R. Crim. P. 15(c)(3)(D)–(E). As to Trabelsi's presence, the government has submitted the declaration of Stephen Panepinto, Chief of the Office of International Operations in the United States Marshals Service. Dkt. 526-1 at 1 (Panepinto Decl. ¶ 1). Panepinto avers that his "office has determined [that] it cannot safely and securely arrange for . . . Trabelsi to travel to Europe" for several reasons, including that "[t]he United States Marshals Service does not have authority to maintain custody of a prisoner in a foreign country," *id.* at 1 (Panepinto Decl. ¶¶ 2–3), and that "Trabelsi is subject to Special Administrative Measures (SAMs), which would be impossible for the U.S. Marshals to enforce while . . . Trabelsi is within a European country," *id.* at 2 (Panepinto Decl. ¶ 7). Panepinto observes, moreover, that "it is very likely that a European government would not permit inmate Trabelsi to enter their country . . . , especially while he is not in custody," *id.* at 1 (Panepinto Decl. ¶ 3), and that, because of the "heightened safety concerns" related to Trabelsi, "no commercial airline is likely to accept [him] as a passenger on one of their aircraft[s]," *id.* at 2 (Panepinto Decl. ¶ 6). Panepinto's declaration establishes, accordingly, that Trabelsi cannot be "secure[ly] transport[ed]" to France for the deposition and that his "continuing custody" cannot be assured while there, especially because the Marshals Service "does not have authority to maintain custody of a prisoner in a foreign country. *Id.* at 1 (Panepinto Decl. ¶ 3).

Although Trabelsi "cannot be present" in France, the parties have worked diligently to ensure that he "can meaningfully participate in the deposition though reasonable means." Fed. R. Crim. P. 15(c)(3)(E). Trabelsi will be present in the U.S. courthouse and will himself ask

9

questions—translated by court-certified French-English interpreters—of the witness via Zoom. Dkt. 576 at 3 (Status Report). And "[a]t all times[,] Mr. Trabelsi [will] be able to see the witness and observe her demeanor." *Id.* During the deposition, "[o]ne camera will face the person posing questions," including Trabelsi when is doing so, and "[t]he second camera will face the video monitor showing Ms. Amal." *Id.*; *see United States v. Ahmed*, No. 12-cr-661, 2014 WL 7399298, at *1 (E.D.N.Y. Dec. 30, 2014) (noting, under a Rule 15(c)(3)(E) inquiry, that "defendants will 'virtually' participate via contemporaneous live-streaming video"). One of Trabelsi's standby counsel, moreover, will be present in the French courthouse with the witness, and the other will be present with Mr. Trabelsi at the U.S. courthouse in the District of Columbia. Standby counsel will be able to "communicate via text, email, or other electronic messaging platform" with one another "during the testimony," Dkt. 576 at 3, and thus standby counsel in France will be able to communicate confidentially with Mr. Trabelsi in real time. The Court concludes, accordingly, that the requirements of Rule 15(c)(3) are satisfied and that the deposition may proceed with the witness in France and with Trabelsi in the District of Columbia.

The Court's determination that the Rule 15 deposition may proceed "does not determine [the deposition's] admissibility" at trial. Fed. R. Crim. P. 15(f). To introduce all or parts of Ms. Amal's deposition at trial, the government will have to establish that "the prosecution cannot procure her with good-faith, reasonable efforts" and that "the defendant has had a prior opportunity to cross-examine" the witness consistent with the Confrontation Clause. *United States v. Burden*, 934 F.3d 675, 685–86 (D.C. Cir. 2019) (internal quotation marks omitted); *see also United States v. Abu Khatallah*, 282 F. Supp. 3d 279, 282–84 (D.D.C. 2017) (discussing the Confrontation Clause considerations of admitting a Rule 15 deposition). That is a different standard than the Rule 15 standard, and it is question that the parties have yet to address. For

10

present purposes, however, the Court is satisfied that exceptional circumstances require taking Ms. Amal's deposition to preserve her testimony for trial.

**B.    Confrontation Clause**

Although an in-depth Confrontation Clause analysis is more appropriately suited to consideration of the deposition's admissibility at trial, the Court pauses briefly to address a series of confrontation-related concerns that Trabelsi raised in response to the government's initial Rule 15 motion. In his initial opposition, Trabelsi objected that (1) the witness would not be required to testify under oath; (2) Trabelsi would not be allowed to question the witness himself, despite his right to do so under *Faretta*; and (3) the deposition would not be sufficiently lengthy to permit effective cross-examine the witness. Dkt. 506 at 3–6. Because the proposed procedures would "not comply with the requirements of the confrontation clause," Trabelsi argued, "conducting the deposition when there is no conceivable way it can be admissible would drain the resources of the parties and the Court." *Id.* at 3 (citing *Drogoul*, 1 F.3d at 1555 ("The court need not, at the cost of time and money, engage in an act of futility by authorizing depositions that clearly will be inadmissible at trial.")).

In the meantime—and in response to concerns raised by both Trabelsi and the Court—the government's proposed procedures for the Rule 15 deposition have evolved significantly. The parties now agree that Trabelsi himself will question the witness either in French or in English; that his questions will be translated for the witness and for the record by two sets of "court-certified French-English interpreters;" and that "Ms. Amal will . . . agree to answer any and all questions posed to her unless the Magistrate Judge and/or Judge Moss rules that she does not have to answer." Dkt. 576 at 2–3. The witness, moreover, will testify under an oath administered by Magistrate Judge Upadhyaya: Before the deposition begins, "the witness will

11

acknowledge her agreement and understanding to the oath, including, but not limited to, the power of the United States District Court for the District of Columbia to enforce any violation of the oath in connection with her testimony, including the sanction of perjury." Dkt. 576 at 2; *see also* Dkt. 546 at 1. Notably, the U.S. perjury statute expressly applies extraterritorially, *see* 18 U.S.C. § 1623(b), and the government represents—without objection or dispute from the defense—that "French law criminalizing perjury" will also apply. Dkt. 546 at 2 (quoting Code Pénal (Penal Code), Article 434-13 (found at: https://www.legifrance.gouv.fr/codes/article_lc/LEGIARTI000006418637) (English translation: https://cjad.nottingham.ac.uk/documents/implementations/pdf/France_Penal_Code.pdf)). These revised procedures address the Confrontation Clause concerns that Trabelsi initially raised. Dkt. 506 at 3–6. Accordingly, the Court is unconvinced, at this stage and in light of the parties' proposed deposition procedures, Dkt. 576, that authorizing the deposition would constitute an "act of futility" because the deposition will be "clearly . . . inadmissible at trial," *Drougol*, 1 F.3d at 1555. *Cf. Abu Khatallah*, 282 F. Supp. 3d at 282–83 (concluding that the defendant had an effective opportunity to cross-examine a witness in a Rule 15 deposition where the witness testified under oath, the defendant could view the proceedings and communicate with counsel abroad, the cross-examination lasted three hours and covered a wide range of topics, and where the deposition was videotaped to allow the jury a full, visual impression of the witness's responses on cross-examination).

Lastly, there remains Trabelsi's concern about the amount of time allocated for the Rule 15 deposition, which is presently scheduled to span two very full days from 9:00 a.m. until 6:00 p.m. Dkt. 576 at 1; *see* Apr. 19, 2023 Hrg. Tr. (Rough at 29:23–30:2). In Trabelsi's view, that time will still be "insufficient" to cross-examine this "key witness," who "has generated

hundreds of pages of statements, including grand jury testimony in 2007," Dkt. 506 at 5–6 (objecting to two half-day sessions of a deposition); *see also* Apr. 19, 2023 Hearing (Rough at 15:21–16:3), and asks for "her to come a third day or do a third day later," *id.* at 37:1, 37:20–21. The government counters that, due to severe ongoing medical concerns with the witness's children and the fact that she must travel away from her family to Paris for the deposition, she has "agreed to testify . . . only for two days"—although she is willing to "start at 8:00 a.m. or earlier (which is 2:00 p.m. in Paris)" and "is . . . willing to stay as late as 6:00 p.m. (which is midnight her time)." Dkt. 570-1 at 2–3 (emphasis omitted). The government also represents that, in the interest of allowing extensive cross-examination, "[their] goal has been to cut [their] direct examination of Ms. Amal] down . . . to the bare minimum;" the government represents that it anticipates completing its questioning in three to four hours and will provide the remaining allotted time for Trabelsi's cross-examination. Rough Tr. at 4:1–7 (April 19, 2023 Hearing).

To be sure, if the current two-day deposition is insufficient to provide Trabelsi with a meaningful opportunity to conduct an adequate cross-examination, the parties will either have to schedule further time for cross-examination of the witness or will, if the witness refuses further questioning, "have ample opportunity to challenge the admissibility of the testimony on confrontation grounds." *Cooper*, 947 F. Supp. 2d at 116. But the Court cannot, at the outset and before the deposition has even begun, conclude that a two-day deposition will provide insufficient opportunity for Trabelsi to cross-examine Ms. Amal—especially in light of the government's reported efforts to limit the length of its direct examination. The Court has had the opportunity to observe Trabelsi's examination of two witnesses to date and is compelled to note that many (indeed, most) of his questions were argumentative, repetitive, or irrelevant. He is entitled to some leeway because he is representing himself. But he remains bound by the Federal

Rules of Evidence. He must, accordingly, limit his examination to proper and relevant questions within the scope of the government's direct examination of its witness, and he may not deprive the government of a witness by engaging in significant, unnecessary delay.

The Confrontation Clause does not afford a defendant an opportunity for unlimited cross-examination: "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (emphasis in original)). In light of these considerations, the Court once again encourages Trabelsi—with the assistance of standby counsel—to focus his deposition preparation to ensure that he has time to ask the witness those questions that are necessary to his defense. *See* Apr. 19, 2023 Hrg. Tr. (Rough at 35:19–36:2). The Court cautions that if Trabelsi conducts his examination in a manner that is "harass[ing]," "repetitive[,] or only marginally relevant" to his case, he runs the risk that he will be left without adequate time. *Van Arsdall*, 475 U.S. at 679.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the government's motion for a Rule 15 deposition of Ms. Amal, Dkt. 501; Dkt. 505, is **GRANTED**. The parties are further **ORDERED** to comply with the deposition procedures set forth in the parties' joint status report, Dkt. 576.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: April 25, 2023