# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES,

v.

NIZAR TRABELSI,

*Defendant.*

No. 06-cr-89 (RDM)

## MEMORANDUM OPINION AND ORDER

In April 2006, a grand jury returned an indictment against Defendant Nizar Trabelsi containing four counts, two of which the government later dismissed.  Dkt. 3.  The two remaining counts allege that Trabelsi conspired to kill U.S. nationals outside the United States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a), and conspired and attempted to use weapons of mass destruction, in violation of 18 U.S.C. §§ 2332a and 2.[1]  Dkt. 6 at 1–9.  Among other overt acts, the indictment alleges that Trabelsi "met with Osama bin Laden" in the Spring of 2001 near Kandahar, Afghanistan "and offered to carry out a suicide bomb attack against United States interests," Dkt. 6 at 6; that he "obtained money from an al Qaeda associate for use in carrying out his mission to bomb a United States target," *id.* at 7; that in July and August 2001, Trabelsi "bought quantities of chemicals" in Belgium "to be used in manufacturing a 1,000-kilogram bomb," *id.* at 8; and that he "traveled at night with conspirators to scout the Kleine-

---

[1] The indictment also charged Trabelsi with conspiring to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and with providing material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2.  Dkt. 3 at 9–10.  On the government's motion and with the consent of Trabelsi, these two counts were dismissed with prejudice in 2019.  *See* Dkt. 231; Min. Order (June 10, 2019).

Brogel Air Force Base—a facility used by the United States and the United States Department of the Air Force, and at which United States nationals were present—as a target for a suicide bomb attack," *id.*  In 2013, after serving a ten-year sentence in Belgium for, among other things, attempting to destroy the Kleine-Brogel Air Force Base, *see* Dkt. 367-3 at 24, Trabelsi was extradited to the United States on the instant charges.  Trial commenced with jury selection on May 8, 2023.

Before trial began, the Court authorized the government to take a videotaped deposition of a foreign-national witness living in France "in order to preserve [her] testimony for trial." Fed. R. Crim. P. 15(a)(1); *see* Dkt. 578.  The government now moves to admit that video-taped deposition at trial, Dkt. 588, and Trabelsi has cross-moved to strike that testimony from the record, Dkt. 590.[2]  Trabelsi argues that admitting this testimony would violate his Sixth Amendment right to "be confronted with the witnesses against him," U.S. Const. amend. VI, because, among other things, the deposition occurred via videoconference and because he was provided, in his view, an insufficient opportunity to cross-examine the witness during the time allotted for the deposition.  For the reasons that follow, the Court will **GRANT** the government's motion, Dkt. 588, and will **DENY** the defendant's cross-motion, Dkt. 590.

---

[2] Although Trabelsi's motion is styled as a motion to strike, the deposition has not yet been admitted into the record.  The Court will, accordingly, treat this filing as a motion to preclude admission of the deposition at trial or, in the alternative, as an opposition to the government's motion.

# I. BACKGROUND

## A.    Authorization to Take the Deposition

In January 2023, the government moved to take the deposition of Ms. Amal[3]—a foreign-national witness living in France—pursuant to Federal Rule of Criminal Procedure 15. *See* Dkt. 501; Dkt. 505. That rule allows for "a prospective witness [to] be deposed in order to preserve testimony for trial" if merited by "exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). In support of its Rule 15 motion, the government represented that Ms. Amal was in a relationship with Trabelsi between 2000 and 2001 and could, as a result, provide "unique testimony about Trabelsi's criminal conduct, including his travel to Afghanistan where he met Osama bin Laden, enlisted to become a martyr, and received training to commit an attack." Dkt. 505 at 6. The government further explained that a deposition was necessary to preserve this material testimony because the witness had "definitively stated [to government counsel] that she [was] not willing to travel to the United States to testify," Dkt. 544 at 1, notwithstanding the government's "long, diplomatic face-to-face discussions with [her] about the importance of her testimony," Dkt. 570-1 at 2. The government also reported that Ms. Amal had reluctantly agreed to travel to Paris for a two-day video deposition, but—due to severe ongoing medical concerns with her children and the fact that she had to travel away from her family to Paris for the deposition—had "agreed to testify . . . only for two days." *Id.* at 2–3 (emphasis omitted).

---

[3] With the parties' consent, the Court has ordered that the witness shall be referred to as "Ms. Amal" and that her family name not be referenced on the public record or in public filings. The Court struck this balance to protect the safety of the witness and her family while avoiding any prejudice to the defendant in proceedings before the jury, which will know the witness only by this name.

Trabelsi, who was *pro se* at the time but was assisted by standby counsel in briefing the Rule 15 motion, opposed the pretrial deposition. He contested the government's representations that Ms. Amal was unavailable for trial and argued, most centrally, that a two-day deposition would be "insufficient" to cross-examine this "key witness." Dkt. 506 at 5–6; *see also* Apr. 19, 2023 Hrg. Tr. (Rough at 15–16).

After briefing and argument on the Rule 15 motion, this Court authorized the government to proceed with its proposed two-day deposition. Dkt. 578. The Court concluded that "exceptional circumstances" merited a Rule 15 deposition because the government had established both "the materiality of [Ms. Amal's] testimony" and "the unavailability of the witness to testify at trial." Dkt. 578 at 3 (quoting *United States v. Cooper*, 947 F. Supp. 2d 108, 112 (D.D.C. 2013)); *see also United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) ("It is well-settled that the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if that witness is unavailable to appear at trial."). As to materiality, the Court noted that Ms. Amal— unlike the other witnesses in the case—was apparently prepared to testify "firsthand" about "loading ammunition belts for the defendant in Afghanistan;" about witnessing "the defendant's radicalization and the path he traveled . . . in his effort to become a martyr;" and about Trabelsi's "relationship with . . . Djamel Beghal and Jerome Courtailler, who have both been convicted of terrorism offenses." Dkt. 578 at 4 (quoting Dkt. 505 at 6). There was a substantial likelihood, moreover, that the witness would not testify at trial: she is not only beyond the Court's subpoena power, but she had also, by then, "definitively stated that she [was] not willing to travel to the United States to testify." *Id.* at 5–6 (quoting Dkt. 544 at 1). The Court also concluded that "it [was] very unlikely that Ms. Amal w[ould] have a change of heart and . . . decide to come to the

4

United States to testify" at trial in light of the government's representations that she "is terrified of the defendant" and that two of her minor children "were struck by a car in March and [were] seriously injured." *Id.* at 6 (internal quotation marks omitted). The Court noted, on this point, that Ms. Amal's ███████████ daughter "was required to remain in bed, immobile" as a result of that accident, and that, as of mid-April, her daughter "continue[d] to receive medical care," ████████████████████████████████████████████████. *Id.* (quoting Dkt. 570-1 at 2).

The Court further concluded that Fed. R. Crim. P. 15(c)(3) allowed the government to "tak[e]" this deposition "outside the United States . . . without the defendant's presence." *Id.* at 8. Critically, the Court explained, Trabelsi could not be "present [in France]" for the deposition because his "secure transportation and continuing custody c[ould not] be assured at the witness's location." Dkt. 578 at 9 (quoting Fed. R. Crim. P. 15(c)(3)(D)–(E)). In particular, Stephen Panepinto, Chief of the Office of International Operations in the United States Marshals Service, attested that "[t]he United States Marshals Service does not have authority to maintain custody of a prisoner in a foreign country," *id.* (quoting Dkt. 526-1 at 1 (Panepinto Decl. ¶ 3)), and that it "would be impossible for the U.S. Marshals to enforce" the Special Administrative Measures (SAMs) to which Trabelsi is subject "while . . . Trabelsi is within a European country," *id.* (quoting Dkt. 526-1 at 2 (Panepinto Decl. ¶ 7)).

Finally, the Court addressed Trabelsi's Confrontation Clause concern as to the limited length of the deposition. The Court explained that, although "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). And "at the outset and before the deposition ha[d] even begun," the Court could not conclude that "a two-day deposition w[ould]

provide insufficient *opportunity* for Trabelsi to [effectively] cross-examine Ms. Amal—
especially in light of the government's reported efforts to limit the length of its direct
examination." Dkt. 578 at 13 (emphasis added).  Drawing on its observation that "many (indeed,
most) of [the] questions" Trabelsi had asked of two prior witnesses who appeared at a
suppression hearing "were argumentative, repetitive, or irrelevant," the Court also warned
Trabelsi that he should "limit his examination to proper and relevant questions within the scope
of the government's direct examination of its witness" and, as it had on several prior occasions,
encouraged him "to focus his deposition preparation to ensure that he ha[d] time to ask the
witness those questions that are necessary to his defense." Dkt. 578 at 13–14; *see also* Apr. 25,
2023 p.m. Hrg. Tr. (Rough at 4–5) ("[I]t's . . . very important that [Trabelsi] be as efficient as he
can and that he ask questions that are relevant[,] that are questions and not testimony[,] that are
short and to the point[,] [and [that] relate to the direct testimony that the government is
eliciting, . . . includ[ing,] if appropriate[,] impeachment of that testimony."). He could not, the
Court cautioned, "deprive the government of a witness by engaging in significant, unnecessary
delay" during the deposition. Dkt. 578 at 14.[4]

   After observing Trabelsi's over-long and unfocused cross-examination of one of the
witnesses at the suppression hearing, moreover, the Court set forth a general rule of thumb to
guide the examination of future witnesses.  "[R]ecognizing that Mr. Trabelsi is proceeding *pro*

---

[4] These warnings echoed the Court's cautions during the *Faretta* Hearing at which Trabelsi
elected—over the advice of the Court—to represent himself.  At that hearing, the Court warned
Trabelsi that he would be "disadvantage[d]" by his self-representation because, among other
things, the "rules [of evidence and criminal procedure]" are complicated" and that the Court
"c[ould] [not] help [Trabelsi]" or rule in his favor "just because [he was] representing [him]self."
July 8, 2022 Hrg. Tr. (Rough at 20–21).  The Court further advised Trabelsi that he would "be
better off with a trained lawyer." *Id.* at 25.).  Trabelsi acknowledged that he would not "benefit"
from "special treatment," *id.* at 20, and that he was aware of the risks of self-representation, *id.* at
22, but he nevertheless insisted on representing himself *pro se*.

*se*, and recognizing that the issues in the case are of enormous importance to him"—as well as

the need "reasonably to manage the case"—the Court proposed "allow[ing] Mr. Trabelsi . . . as a

rule of thumb to have twice the time the government takes with respect to [its] direct"

examination to conduct his cross-examinations.  Apr. 19, 2023 Hrg. Tr. (Rough at 4–5).  To

merit "any time beyond [that]" at the deposition or otherwise, the Court explained, Trabelsi

"would have to make a showing of specific need and would have to explain to [the Court] why

he needs more than two times the amount of time the government is using for its direct."  *Id.* at 4.

In a further effort to promote efficiency and fairness, the Court requested that Magistrate Judge

Upadhyaya preside over the deposition, and she graciously agreed to do so.  *See* Apr. 18, 2023

Hrg. Tr. (Rough at 235) (explaining that Judge Upadhyaya would "make sure things are run

efficiently" and that "there's not any harassment of the witness").

Cognizant, however, of Trabelsi's concern about the length of the deposition, the parties

and the Court planned to maximize the witness's availability during the two-day window on

April 26, 2023 and April 27, 2023.  The deposition was scheduled to begin each day at 9:00 a.m.

and to end "at or around 6:00 p.m. EST" (i.e., midnight in Paris), Dkt. 579 at 1; Judge

Upadhyaya warned that "[b]oth sides should be prepared to conclude their questioning of Ms.

Amal in the time allotted, by 6 p.m. EST on Thursday, April 27, 2023," *id.* at 3.  And, although

Trabelsi and government counsel would be given the opportunity to preserve objections for the

record, the Court urged the parties, in the interest of saving time, to state their objections

concisely (*e.g.*, "object [as to] . . . form" or "[lack of] foundation") without further explanation or

argument during the deposition itself.[5]  Apr. 26, 2023 a.m. Dep. (Tr. at 8).  According to the

_____

[5] The Court subsequently held a lengthy, multi-part hearing to rule on the parties' objections and
provided both the government and the defense with ample opportunity to expand upon any

government, moreover, it substantially curtailed the scope if its direct examination of Ms. Amal, limiting its questions "to the bare minimum," to ensure that Trabelsi would have sufficient time for cross-examination, Apr. 19, 2023 a.m. Hrg. Tr. (Rough at 4). "We want to create a record," the government explained, "so that the Court can say the government got their questions done in two to two and a half hours, and the defendant had all that other time to get his cross-examination in." *Id.*; *see also* Apr. 18, 2023 Hrg. Tr. (Rough at 230) ("[W]e're carefully culling . . . all of our questions to reduce []our direct to the bare minimum."). And, again, the Court encouraged Trabelsi to "sit down with [his standby counsel] in advance and [to prepare] an outline" in the interest of "mak[ing] the best use of [his] time" on cross-examination. Apr. 18, 2023 Hrg. Tr. (Rough at 233). The Court further invited standby counsel to conduct the deposition in Trabelsi's stead. Apr. 24, 2023 Hrg. Tr. (Rough at 102). It was apparent to the Court, however, that one of the reasons why Trabelsi decided to exercise his *Faretta* rights and to proceed *pro se* was precisely so that he could personally question this witness.

**B.      The Rule 15 Deposition**

The deposition began on April 26, 2023 at approximately 9:50 a.m.—a delay that was attributable to minor technological difficulties with the videoconferencing software. Apr. 26, 2023 a.m. Dep. Tr. (Rough at 8). Trabelsi, one of his standby counsel, and government counsel were physically present in Courtroom 5 of E. Barrett Prettyman Courthouse in Washington, D.C. The witness, Trabelsi's second standby counsel, two representatives of the U.S. government, and several representatives of the French government were physically present at the deposition in Paris. Ms. Amal testified via the video-conferencing technology Jabber; that technology allowed

---

objections made during the deposition, no matter how briefly. *See* Min. Entry (June 1, 2023); Min. Entry (June 2, 2023); Min. Entry (June 5, 2023).

her to see Trabelsi in the Courtroom and for Trabelsi simultaneously to observe her during her testimony. Trabelsi represented himself at the deposition. His questions were translated from French to English for the record, and then back to French by the remote interpreters for Ms. Amal; the witness's French answers, in turn, were translated back into English for the record and back to French for Trabelsi. Dkt. 579 at 4. At the outset, Ms. Amal acknowledged her understanding that "the oath . . . require[d] [her] to tell the complete truth" and that, if she did not do so, she would "be subject to certain sanctions, including sanction of perjury." Apr. 26, 2023 a.m. Dep. (Tr. at 11).

      1.    *Direct Examination*

On direct examination, Ms. Amal testified that she entered a romantic relationship with Trabelsi in Dusseldorf, Germany around 1998, when she was about 19 or 20 years old. *Id.* at 13–14. Ms. Amal explained that "[a]t some point in [their] relationship," before the two resided together, Trabelsi told her that "he had gone to see an imam," and he "presented to [her] a paper . . . [which] said that [they] were married." *Id.* at 14. She further testified that, after Trabelsi announced that they were married, she personally observed, overheard, or was informed by Trabelsi about various plans and events relevant to the government's allegations. According to that testimony:

- She observed, on several occasions, Trabelsi watching videos with "violent imagery" with his "Muslim brothers," including videos of "Israelis eating the intestines of Palestinian or Chechnyan women," of "people . . . learning to shoot guns and weapons," *id.* at 23–24, and of explosions of a building in Nairobi, Kenya, Apr. 26, 2023 p.m. Dep. (Tr. at 9). Ms. Amal also testified that "Mr. Trabelsi was happy while watching these videos, and at the same time . . . was shouting: 'Allahu Akbar. Allahu Akbar.'" *Id.* at 10.

- In 2000, she overheard conversations in her apartment between Trabelsi, Djamel Beghal, Mouloud el Mourabit, Salman, and Jerome Courtailler, about traveling to Afghanistan. Apr. 26, 2023 a.m. Dep. (Tr. at 26–28).

- In September 2000, she spent "several weeks in Paris," staying at Djamel Beghal's house, "to prepare for the trip to Afghanistan." *Id.* at 32.

- She traveled with Trabelsi to Peshawar, Pakistan, using what she understood to be a fraudulent visa created by Djamel Beghal, where she stayed for several weeks alone while Trabelsi traveled to Afghanistan for "explosives training." *Id.* at 29–40.

- She relocated to Jalalabad, Afghanistan, from Peshawar, where she lived in a house purchased by Trabelsi, Apr. 26, 2023 p.m. Dep. (Tr. at 4–5), and where Trabelsi left her for days at a time for "explosives training" sponsored by Al Qaeda, *id.* at 6–7.

- She learned, from Trabelsi and "other brothers," how to fire a Kalashnikov rifle while in Jalalabad. *Id.*

- She visited Osama Bin Laden's house for the wedding of Bin Laden's son. *Id.* at 11.

- She heard Trabelsi say, after visiting Osama Bin Laden, that Bin Laden "was his father, his idol and his benchmark." *Id.*

- She learned from Trabelsi that he "took part in blasting . . . statu[es]" of Buddha; that he "was very happy about it;" and that "he brought back a bag full of earth from the statu[es]." *Id.* at 12.

- She observed Trabelsi coming back from meeting Osama Bin Laden with "a note on him saying that he would . . . become a martyr" and learned from Trabelsi that he "was going to go to Europe and stage an attack there," *id.* at 13, "that he would have the U.S. embassy in Paris be the target of this attack by explosion," *id.* at 14, and that she would, after the attack "marry someone else," *id.* at 16.

- In Trabelsi's home, she observed "weapons and chemical products." *Id.* at 31.

According to Ms. Amal, she was arrested and questioned by French law enforcement officers in September 2001, after Trabelsi's arrest and while she was pregnant. *Id.* at 32–33. She testified that she "did not tell the truth" when she was first arrested "because [she] was very scared." *Id.* at 33. She explained, however, that, "later, [she] did tell the truth, and the whole truth," *id.*; that her lies were "an error of youth," *id.* at 35; and that she "decide[d] to tell the truth" later "so that [she] would be able to save everyone," *id.* All told, the government represents—and defense counsel does not dispute—that the direct examination of Ms. Amal lasted less than 3 hours. Dkt. 588 at 2.

10

2.    *Cross-Examination*

Trabelsi began his cross-examination of Ms. Amal around 3:00 p.m. on April 26, 2023.

*See id.* at 37 (instruction from Judge Upadhyaya that Trabelsi had "three more hours today").

Some of the delay up to this point (about 50 minutes) was occasioned by three bathroom breaks

that Trabelsi requested for what appears to have been a legitimate medical reason.   At the outset,

Trabelsi expressed concern about whether "the time [would] be enough" and articulated his fear

that "ask[ing] [the witness] question[s] under pressure" would mean that he could not "work as

[he] wish[ed]." *Id.* at 36.   Acknowledging his concern, Judge Upadhyaya once again warned

Trabelsi to "ask the important questions," to "use [his] time wisely," and not "to waste time." *Id.*

at 37.

Trabelsi promptly ignored Judge Upadhyaya's instructions.   He began his cross-

examination with a series of personal questions to the witness: "Are you doing okay?" "Is my

son doing well?" "And your children, are they well?" *Id.* at 44.   Again, a few minutes later, he

asked: "Are you afraid of some harm that could happen to you and the children?"—a question

the government objected to as "designed to intimidate the witness." *Id.* at 48.   After Trabelsi

asked, "What can I do for your children to help you?" *id.* at 49, Judge Upadhyaya reminded

Trabelsi that "these are not questions that are relevant, Mr. Trabelsi, about her children," and she

urged him to focus on "questions about the case." *Id.*

Trabelsi at least briefly heeded Judge Upadhyaya's instruction, turning to questions about

the veracity of Ms. Amal's initial statements to the French authorities after her arrest in

September 2001 and her purported motivations to lie to the French police when she was first

questioned. *Id.* at 52–54.   But he quickly turned back to questions that were irrelevant (or of

marginal relevance), repetitive of undisputed matters already in the record, or merely argumentative. He asked, for instance:

> Q. [M]y question is in general, do you think that any woman who is pregnant and who is having problems, any kind of problems, has the right to swear to God and then to lie to other people?
>
> A. It's true that I was pregnant, but I really don't understand your question. It really is out of bounds.
>
> Q. Is it because you are pregnant that you think you have the right to swear to God and then to lie to hurt other people to protect yourself?
>
> . . .
>
> [A.] First of all, those questions don't interest me. And second of all, yes, I was pregnant and of course I thought of myself, and then I decided to tell the truth.

*Id.* at 55. Again, a few minutes later, Trabelsi asked: "Mrs. Amal, were you a married and happy woman or a married and very unhappy woman?" *Id.* at 60. Judge Upadhyaya again reminded Trabelsi "to focus on questions about the case." *Id.*

Notwithstanding the repeated warnings to use his time efficiently, Trabelsi spent much of his time on cross-examination testifying at length about his case. For example:

> Q. Mrs. Amal, do you remember coming to see me in jail with my son when he was four months old, and they refused to let you in because you didn't have a visit authorization; and so you were very upset, and you called my lawyer, and my lawyer called the judge to ask him to authorize the visit; and when you were in France at the airport—in the airplane actually, the investigating judge, Mr. [Christian] De Valkeneer—I questioned him yesterday, he was here, he called you on your mobile phone and he said that it was 4:15 p.m., and he said the next time you come to Belgium to see your husband, call me and I will organize a visit; and so you called him to give him a date, and he did the necessary to organize the visit in his office; and so I came to his office, and it was a big surprise, because I saw my baby, he was four months old, and that was the first time and the last time I saw him?
>
> . . .
>
> [A.] Honestly, it's been 22 years, and I don't remember this incident exactly.

Q. Did I understand that you do not remember the first and the last time that my son saw me, is that it?

A. I know that I did go to Belgium and that the judge was there, but the circumstances I don't remember exactly.

Q. I'm going to ask you a question, Madam Amal. I am asking you to take all the necessary time to answer, because I want to move forward very, very quickly. So you have no recollection on a visit in Belgium, either in the judge's office or in the jail, is that what I really understand?

. . .

[A.] I said already that I don't recall. I know I did go to Belgium. I know that there was the judge. I knew that Mr. Trabelsi saw his son. But the circumstances I no longer remember.

Q. Do you remember coming to the jail or not? Do you remember going into a jail?

. . .

A. I don't remember exactly.

*Id.* at 68–70. As explained in greater detail below, *see infra* at 53 & n.14, the deposition ended at around 4:40 p.m. on the first day—one hour and twenty minutes earlier than anticipated—when Trabelsi's standby counsel stated on the record: "Your Honor, I'm sorry to interrupt, but the French prosecutor says they're done for the day." *Id.* at 70.

The second day of questioning proceeded much like the first. After a short delay in connecting with the witness on Jabber, Trabelsi began his cross-examination around 9:25 a.m. Apr. 27, 2023 a.m. Dep. (Tr. at 8.) He spent the subsequent hour and forty-five minutes asking Ms. Amal, principally, about the legal status of her relationship with him, as well as about her relationships with prior romantic partners. The following exchange illustrates the nature of the questioning:

Q. We are going to talk about our marriage. Do you recall that you said yourself about me this: "Of this man, I . . . currently expect a child. In regards to the Quranic law, I am married to this man. . . . [T]here was a ceremony before the imam with witnesses, two men. . . .

13

. . .

A. So yes, I do remember this statement. But however, I was married to you, you know very well that you had said that I was married because of the Quran. I do remember this. But there was no ceremony. And according to Quranic law, yes, we were married. But according to French or German or Belgian or any other country's law, we were not married. You only brought to me a piece of paper that said we were married from the imam. And Your Honor, this dates back to such a long time ago that I really have no memory of this.

Q. I'm going to help you to remember this detail. Ms. Amal, do you know that it's totally impossible for two human beings to get married without the signature of the other person, otherwise it's not a marriage?

. . .

[A.] When you get married, as far as I'm concerned, generally by law you get married at a city hall or at another place where you have an official marriage certificate. This piece of paper that you brought me from the imam doesn't have any value, it's not an official document as far as I'm concerned. I do agree that we spent time together, but that's all.

Q. Do you know that a religious wedding paper must be signed by you and me, but do you know—. . . If a marriage is recognized by God, it is a marriage[?]

. . .

A. Mr. Trabelsi, this is between yourself and you. I don't feel concerned about this. And I'm asking you to go on with your questions, please.

Q. Mrs. Amal, you asked me to stop and to move forward. I apologize, but I have no intention to do so. Why? Because I'm in jail for 20 years—22 years. And since I've met you . . . all my life has changed. So I'm going to keep asking questions about this marriage in detail.[6]

*Id.* at 11–14. Judge Upadhyaya again "remind[ed] [Trabelsi] of [his] time today" and cautioned

him "to use it wisely." *Id.* at 15. Trabelsi ignored that instruction, asking Ms. Amal about her

childhood instead: "When you were in France," he queried, "you made statements . . . with the

FBI that you and your sister had been mistreated by your father who was hitting you and you had

---

[6] The transcript is filled with many more questions like these from Trabelsi; the questions highlighted in this section are, as a general matter, merely a selection.

been placed in a foster family; is that correct?" *Id.* at 17. (The government objected to this line

of questioning as "harassing and unnecessarily personal." *Id.*). Again, a few minutes later: "Do

you remember that you left [Dusseldorf] because you had no family, you had no friends and you

went to a house for women at age 25, do you remember that?" *Id.* at 24. And, after eliciting that

Ms. Amal married someone named "George Beyer" in 1999, *id.* at 29, Trabelsi repeatedly—and

at length—pressed the witness about whether she was married to yet another man before

marrying Mr. Beyer. He asked, for example:

> Q. Mrs. Amal, I am a human being, and I was married with you, you are my
> son's mother and you swore to God to tell the truth. And God is the witness.
> Yesterday, you lied 19 times. I have proof that you lied. So I want to ask
> you again to pay special attention, because I don't want you to have
> problems. I want you to think about things, because I have proof that you
> lied. So I'm asking you again, are you sure that you were never married
> before Mr. George Beyer?
>
> . . .
>
> Q. Mrs. Amal, my question is this: In your mind, in your head, in your soul—
> and I'm thinking about the past, so you have no recollection of being married
> to your cousin, is that your testimony?
>
> . . .
>
> Q. So here's my question, ma'am: You stated clearly that you've never been
> married before marrying Mr. Beyer. So this is really clear, ma'am, that
> you've used this marriage as a mean to an end. And you stated that you were
> not married, however you accused me of hitting you, of raping you. You
> consider me as a human being who does not exist, and all you are doing is
> hurting all of us.

*Id.* at 30, 38, 45. Trabelsi then asked Ms. Amal about various letters that she sent to him in

prison. He read at least one of the letters into the record, which prompted another reminder from

Judge Upadhyaya: "[S]pending time reading into the record a long letter [when] . . . [the witness]

understood Arabic [and read the letter herself], that time is going to cut against you. This is your

time, so just use it wisely. I've said it a million times, I'm going to keep reminding you." *Id.* at

59.

     Although Trabelsi moved on from the letter, he ignored the import of Judge Upadhyaya's

advice and started questioning the witness about their relationship dynamic. He asked:

> Q. I want to ask you if you remember in June 2001 we had a conversation in
> Afghanistan, and you were—you had been pregnant and you had lost the
> baby. And I wanted to have four girls, and you wanted to have two boys and
> two girls. And I proposed you to authorize me to marry another woman, and
> you got very upset and you started crying and you were very upset and you
> threatened me. Do you remember that?
>
> . . .
>
> Q. Do you know that many Muslim men have the right to get married again and
> again and again, they don't even ask permission from their wife to get
> married?
>
> . . .
>
> Q. My next question: Were you a jealous woman?
>
> . . .
>
> Q. So when you married me, did you observe that I was always wearing very
> fancy clothes like Europeans?
>
> . . .
>
> Q. So my question is very clear: Can you confirm that you were young, that you
> were a professional manipulator, yes or no?

*Id.* at 64–66, 74. Before the lunch break, Judge Upadhyaya again cautioned Trabelsi to "start

asking her questions instead of simply making statements on the record, which is really

testimony by you." *Id.* at 75. "At this point," she observed, "there have been some topics which

you have gone into over and over and over again," and she cautioned, "as you think about over

this next break what questions you're going to ask next, keep in mind how much time you have

left and ask your questions accordingly." *Id.* at 83.

But Trabelsi continued, after the lunch break, to use his questions to testify—this time, about the beginning of their romantic relationship. He began:

> Q. I met you on March 17, 2006, between 5 p.m. and 6 p.m. Do you remember that you were in a phone booth, speaking to a relative, and you were crying?
>
> . . .
>
> A. I don't remember exactly.
>
> Q. Thank you. Thank you. I heard something. Because I saw a woman who was crying, so I offered my aid, my help. . . . So, we offered, myself and another brother, to go gather some coffee, to know what you're worried about—to know what your suffering was, so we could find a solution to help you.
>
> . . .
>
> A. I remember that we had—we had a little bit of an exchange, we exchanged a few words. But regarding the details and the circumstances, I no longer recall the details.
>
> Q. Thank you. Thank you. So you told us your story. You said you had two problems, the first one was that your boyfriend was beating you. The second one was that you had been raped by the owner of your mother's house in Corsica and that is why you went to Germany, is that right?
>
> . . .
>
> A. As I said, Mr. Trabelsi, I don't remember exactly what . . . had happened, what occurred, the details. I know we exchanged some words. But this story that you're telling, I don't know if it's something that you have invented. I know that we had an exchange of a few words, but regarding the details of what it was that was said, I no longer remember.

Apr. 27, 2023 p.m. Dep. (Tr. at 9–10). Trabelsi's questioning continued as such for much of the afternoon. A few minutes later he asked, again:

> Q. So do you remember that—something you said in D.C., in 2007: So when you came back from Morocco and you arrived at the airport in Dusseldorf, and I was calling you. And your boyfriend was there with his son. And so that was at the airport, that you were very surprised, and that's when you decided to come with me, instead of your boyfriend. Do you remember that?
>
> . . .

17

[A.] Once again, I don't recall.

. . .

Q. When . . . you came back from Morocco and you got to the airport, I was waiting for you. . . . And your ex-boyfriend, the violent one, was there also with his son. And we got out, we went to the parking lot, and when we got to my car, I got out a weapon and I threatened him if he was getting close to you. Do you remember that?

. . .

A. I do remember that Mr. Trabelsi did have weapons and that he did threaten me. I remember that he had weapons and he had threaten several times, but when exactly I don't know. And he's continuing harassing. But regarding the trip to Morocco, yes, I remember coming back. But who exactly came to pick me up, that I don't have any recollection of anymore.

*Id.* at 12–16. After a brief interlude, Trabelsi returned, again, to their purported marriage:

Q. Do you remember that I agreed to your marriage proposal and I started buying you furniture for the apartment?

A. I remember that you came to my apartment and that we talked, but I don't remember things in such detail.

Q. [A]s you know, for religious reasons, we could not have relationship or have children out of wedlock without being married first?

MR. TORTORICE: Objection. Form.

Q. If memory serves me right, we met a few times, several times. Do you remember telling me at the onset that we were going to be a family, just like everyone else, and we hope that God will heal us?

A. I don't recall exactly what I had said to you, but we did talk together. But specifically, I don't remember what we said.

Q. Do you remember telling the FBI, in 2007, in Washington, D.C., that we went to see the [i]mam so that we could prep for the wedding?

MR. TORTORICE: Objection. Form.

A. I don't precisely recall what I said, Your Honor.

*Id.* at 30–31. After a reminder from Judge Upadhyaya that "she's answered your question a couple different ways," *id.* at 32, Trabelsi continued:

Q. Is it clear that you've stated that you've never been married?  Yes or no?

A. I've already answered this question.

   . . .

THE COURT: What was your previous answer, please?

[A.] I don't recall, Your Honor.  This goes back such a long time.

   . . .

Q. So, right now, you persist on saying this.  It is your testimony that you were never married to me?

   . . .

THE COURT: Mr. Trabelsi, it's the last question on the topic.  She can answer.

[A.] I state again, just like before, we were never officially married.  We were married, according to you, according to [Quranic] law, but you said you have a document.  But as far as I'm concerned, you're only my son's father and nothing else.  You were never my husband.

*Id.* He also revisited Ms. Amal's visit to him in prison: "Ma'am," he queried, "do you remember meeting me at the judge's office, accompanied with our son?  And I came to see you and this was at your request." *Id.* at 39.

The government moved to end the deposition around 4:00 p.m. EST on the second day. *Id.* at 49.  "[T]he government's direct examination was a little under three hour[s]," counsel explained, and "Mr. Trabelsi has now been going for a little over six hours." *Id.* at 49–50. Government counsel noted, moreover, that Trabelsi had not "made effective and efficient use of his time.  He has read from documents at length that there has been no proper foundation laid for. He has asked questions, sometimes up to ten minutes." *Id.* at 50.  In response, Trabelsi's standby counsel represented that Trabelsi had "a number of buckets" to explore further, including (1) "the issue of [the witness's] unavailability" at trial; (2) "threats and promises that were made to her related to this case;" and (3) the fact that "the witness has said clearly that she takes the

19

position that they were never married." *Id.* at 62.  Judge Upadhyaya denied the government's

motion and allowed Trabelsi to continue asking questions of the witness. *Id.*  "[Y]ou've got

those topics to cover and you've got to get it done," Judge Upadhyaya explained to Mr. Trabelsi.

*Id.* at 63.

After that reprieve and six hours into his cross-examination, Trabelsi asked Ms. Amal

several relevant questions about whether she "received money from the U.S. government related

to [his] case," *id.* at 63; whether she "receive[d] any support, any help from the U.S. government

or the French government for a new passport in Montpellier," *id.* at 65–66; and whether she now

had French citizenship, *id.* at 72.  He further explored her "arrest[] on September 15th, 2001;"

whether she was "afraid of getting arrested," *id.* at 73; and whether she had been "charged with

the association of criminals" at the time, *id.* at 74.  He questioned, moreover, whether Ms. Amal

"changed [her] story" and "started telling things that [she] had never told before" to the U.S.

government after they "told [her] that [she] should be truthful with them and they will help

[her]." *Id.* at 77.  But he also returned, yet again, to whether they were "religious[ly] marr[ied]"

and, when Ms. Amal testified that they "ha[d] never been officially married," Trabelsi stated that

he "want[ed] Allah to hear [her] testimony . . . because if [she] said that, then [she] committed

adultery and . . . had a child out of wedlock." *Id.* at 78.  "Do you realize that saying that you are

not married," he continued, "and you have God as witness—that you committed adultery

because you had a child with me out of wedlock?" *Id.* at 79.  (The government, once again,

objected that "this line of questioning is harassing and intimidating." *Id.* at 79.).  He also asked

Ms. Amal some questions about when, exactly, she identified the U.S. embassy in Paris as the

alleged target of his plot, *id.* at 81–82; about why she told investigators in September 2001 that

she had "never heard anything" about a plot against the U.S. embassy, *id.* at 83, 85; and about her previous statements that they had gone to Afghanistan "to help poor people," *id.* at 88–89.

At 6:03 p.m. EST—shortly after midnight in France—the French prosecutor stated that "we will have to stop now." *Id.* at 91. She explained, "In France, [one is] not . . . allowed to question a witness more than four hours," and, here, "[t]he witness was interrogated six hours yesterday, seven hours today." *Id.* at 91–92. Standby counsel objected that "for the first time we've heard that it's being ended pursuant to French law, which would be a whole new issue and a whole new wrinkle that we would have to tackle," *id.* at 92, and asked Judge Upadhyaya to "order [the witness] to continue to answer questions," *id.* at 94. The Court explained that "[t]here was an agreement to go until 6 p.m." and noted that the Court "gave him much more" than "two times the amount of time that the government had." *Id.* at 96. The deposition ended at 6:18 p.m. EST. *Id.* at 99.

## C.   After the Deposition

At the next motions hearing, standby counsel indicated that counsel would be filing, on Trabelsi's behalf, a motion to "continue the deposition under the [C]onfrontation [C]lause or . . . to strike the entire testimony." May 1, 2023 Hrg. Tr. (Rough at 164). The Court explained that—to the extent Trabelsi "feels as though there were topics that he did not have time to cover"—the Court would "need to know with real specificity what those were," including exactly which "relevant and important questions" Trabelsi did not have time to ask. *Id.* at 166. The Court also emphasized, repeatedly, that "the best thing would be if the witness could make herself available for some additional limited examination" because the government would, otherwise, "run the risk that [the deposition is] not going to come in." *Id.* at 166–67.

The next day, Trabelsi moved to relinquish his *Faretta* rights: he explained that he "realized . . . in the last three weeks" that he could not "be [his] own lawyer." Dkt. 586. Before ruling on that motion, the Court heard Trabelsi's proffer as to "what questions he still wanted to ask of Ms. Amal and didn't have a chance to ask . . . at her deposition." May 3, 2023 Hrg. Tr. (Rough at 2). He represented, without detail as to how he would do so, that he wanted to address the following topics, among other issues:

- "I know that Ms. Amal was charged in . . . 2002 and . . . I found evidence that she was charged with a criminal association with intention of committing an attack. So I want to ask questions on that." *Id.* at 4.

- "[S]he stated that . . . I had watched videos of attacks in Nairobi that killed . . . U.S. and Muslim people and she said that I was very happy that I laughed when I saw these videos[.] . . . I want to show her from the phone conferences that I had after 9/11 where I was very sad . . . and so I want to show she lied about talking about these attacks." *Id.* at 5.

- "I want to ask . . . about her statements that she made all the time from 2001 to 2005, and I want to talk about the [humanitarian] work I did in Afghanistan and actually she was there herself took part in that." *Id.* at 5.

- "I want to talk about . . . the last will and testament[.] . . . [S]he stated that I signed a document because I was going to die and she was going to get everything that I had, and I want to show that she lied. In fact, I never signed any document . . . ." *Id.* at 9–10.

- "I want to ask her [about] my relation with [Jamal Beghal] and [Jerome Courtailler][.] . . . So, she's accusing them of being my accomplices, which is false." *Id.* at 10.

- "I want to ask questions about . . . [the] passport . . . [and] about . . . the 20 counts for women in Afghanistan, which don't exist . . . . [and] about the allegations . . . [that] several people in her life . . . hit[] her and beat[] her. . . . I never hit her. I never beat her. . . . I want to ask questions about the . . . wedding of . . . bin Laden's son. And her relationship with bin Lad[e]n and his wife she never met any wife of his . . . that's craziness." *Id.* at 10–12.

- "I also want to ask questions about her bank account before she married me . . . so I want to [show] Ms. Amal is a big criminal, big manipulator, and she really took advantage of me to steal money." *Id.* at 12.

- "I want to ask two questions about how she tried to get some money from somebody while I was in jail." *Id.* at 13.

- "I want to ask questions about the chemicals that she said she saw with her own eyes . . . in my house, which is false." *Id.*

- "I want to ask also about several letters [she] sent to me when she says clearly that I am incapable of hurting anybody or anything, not even a fly." *Id.*

- "I want to show her all these statements that she gave when she was not under the influence of the French government. . . . Just to show how dangerous she is. . . . And to . . . ask for at least to stop lying and if she pass at least the lie detector test. And also to ask finally why was she proud to be married and she pronounce the word married [] 176 times.  And what happened after my arrest for her to change completely her behavior." *Id.* at 16–17.

The next day, on May 4, 2023, the Court granted Trabelsi's motion to relinquish his

*Faretta* rights and to appoint his standby counsel as counsel "for purposes of his upcoming trial."

*See* Min. Order (May 4, 2023).  That same day, the government filed a motion to admit the

deposition of Ms. Amal at trial.  Dkt. 588.  Defense counsel cross-moved the following day to

strike her testimony or, in the alternative, to continue the Rule 15 deposition.  Dkt. 590.  Defense

counsel argued that "Trabelsi did not receive a fair opportunity to conduct a meaningful

examination of Ms. Amal" and proffered a new list of "topics Mr. Trabelsi [would] seek to cover

in additional testimony," including "statements Ms. Amal made about her lack of knowledge of

Mr. Trabelsi's activities in Afghanistan," her cooperation and interactions with Belgian, French,

and U.S. law enforcement officers, her availability to travel to the United States for trial, the

"status of their relationship between 2000 and 2002 . . . [and] statements Ms. Amal made about a

religious marriage with Mr. Trabelsi in 2000," "illegal conduct by Ms. Amal before she met Mr.

Trabelsi," and "Ms. Amal's contact with Mr. Trabelsi after his arrest."  Dkt. 590 at 6–7.  The

defense argues that, absent further examination on these topics, admitting the deposition "would

violate, both facially and as applied, Mr. Trabelsi's Sixth Amendment right under the United

States Constitution to confront Ms. Amal."  *Id.* at 8.

The government, meanwhile, endeavored to make Ms. Amal available for further cross-examination by Trabelsi.  On May 10, 2023, government counsel wrote to their French counterparts (through whom the government communicates with the witness) and explained:

> [O]ur Judge has expressed his grave concerns about whether or not to allow Ms. [Amal]'s deposition to be shown to the jury.  The Judge believes it would be better to allow the defense attorney to question Ms. [Amal] for a few more hours. If she agrees to answer more questions, it would be the defense attorney asking the questions, not Mr. Trabelsi, so the process should go much smoother and be much shorter.  In brief, I am asking you whether Ms. [Amal] will agree to answer questions for a few more hours.  Indeed, I'm urging you to ask Ms. [Amal] if she will agree to it. . . .
>
> I completely understand and respect Ms. [Amal]'s deep reluctance to testify again.  I realize it was a great burden on her psychologically, and I respect the tremendous strength and courage she showed during the deposition.  But it is so important that the jury hears this evidence.  If it is suppressed, it would be a tragedy.  It would be a terrible, miscarriage of justice.  Her testimony is powerful, and we want to be sure the jury has the opportunity to hear it.
>
> I realize this is a delicate subject to discuss with Ms. [Amal], but the sooner we can get an answer from her, the sooner our Judge can make his decision.  We hope you will be able to speak with her this week.

Dkt. 600-2 at 2–3.  The next day, on May 11, 2023, the French officials responded:

> We fully understand the issue of this hearing, but we will not be able to respond favorably to your request.
>
> We contacted Ms. [Amal] who categorically refused to participate in a new witness hearing.  She told us that she was no longer in a psychological state to participate in such an exercise and told us that she experienced a major depressive event following her two days of particularly trying hearings before the American Court.  She says she answered all the questions and has nothing more to say.  Her answer is unequivocal and can only be respected in view of the commitments made to her.

*Id.* at 1.

In an ideal world, of course, Trabelsi—or, even better, the lawyers who now serve as his counsel—would have had a further opportunity to cross-examine Ms. Amal, even if such cross-examination is not required under the Confrontation Clause.  In general, it is better to err on the

side of giving a defendant—and particularly a *pro se* defendant—substantial leeway in cross-examining a key witness. But in light of Ms. Amal's "categorical[] refus[al]" to submit to further questioning, *id.*, and the fact that she is beyond this Court's subpoena power, the Court cannot simply decide, as a matter of discretion, to continue the deposition for another hour or two—merely to err on the side of caution or forbearance for a *pro se* defendant. Instead, the Court must determine whether admitting the video-taped Rule 15 deposition as-is comports with Trabelsi's rights under the Sixth Amendment.

## II. ANALYSIS

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "Courts have long recognized the critical importance of a criminal defendant's 'opportunity to cross-examine and impeach a witness at trial before the jury that will decide his innocence or guilt.'" *United States v. Burden*, 934 F.3d 675, 685 (D.C. Cir. 2019) (quoting *United States v. Lynch*, 499 F.2d 1011, 1022 (D.C. Cir. 1974)). The long-established right to a witness's live testimony in the courtroom gives the defendant an opportunity "not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–43 (1895). But the right to a witness's presence at trial is not absolute. The testimony of a witness who does not appear at trial is admissible if (1) the witness "is unavailable" to testify at trial and (2) "the defendant has had a prior opportunity to cross-examine" that witness. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see also* Fed. R. Evid.

804(b)(1). Trabelsi contends that neither condition is satisfied here, and the Court, accordingly, takes up each prong in turn.

    1.    *Unavailability*

To establish a witness's unavailability under *Crawford* and Fed. R. Evid. 804(b)(1), the prosecution bears the burden of showing that it "cannot procure her with good-faith, reasonable efforts." *Burden*, 934 F.3d at 686. Although there is substantial overlap between this standard and the unavailability inquiry under Fed. R. Crim. P. 15 that the Court considered in its prior opinion, *see* Dkt. 578, *Crawford* requires a more definitive showing of unavailability than Rule 15. In authorizing the deposition, the Court considered not whether the government had established that it "cannot procure" Ms. Amal's attendance at trial, but only whether there was a "substantial likelihood" that Ms. Amal "w[ould] not testify at trial." Dkt. 578 at 6 (quoting *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993)); *see also Drogoul*, 1 F.3d at 1553 ("It would be unreasonable and undesirable to require the government to assert with certainty that a witness will be unavailable for trial months ahead of time, simply to obtain authorization to take his deposition." (quoting *United States v. Sines*, 761 F.2d 1434, 1439 (9th Cir. 1985))).

But even under this higher standard, "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated in part on other grounds by Crawford*, 541 U.S. at 60–69. "'The law does not require the doing of a futile act' such as producing a witness who has died, but 'if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation.'" *Burden*, 934 F.3d at 686 (emphasis in original) (quoting *Roberts*, 448 U.S. at 74). "At least where the evidence indicates that a crucial government witness . . . is within the jurisdiction of the court, the prosecution must demonstrate that it has

been unable to obtain the witness' presence through a search exercised both in good faith and with reasonable diligence and care." *United States v. Lynch*, 499 F.2d 1011, 1023 (D.C. Cir. 1974); *see also United States v. Vo*, 53 F. Supp. 3d 77, 81 (D.D.C. 2014) (explaining that Fed. R. Evid. 804(a) provides "that a witness is unavailable if he or she is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means" (quoting *United States v. Straker*, 567 F. Supp. 2d 174, 180 (D.D.C. 2008))). Mere "possibility" that the witness might "refus[e]" a request to testify, moreover, "is not the equivalent of asking and receiving a rebuff." *Roberts*, 448 U.S. at 76 (internal quotation marks omitted).

Here, the question is not whether the prosecution has searched for Ms. Amal "in good faith and with reasonable diligence." *Lynch*, 499 F.2d at 1023. Although the government is well-aware of Ms. Amal's location, she is a foreign national living in France and is, accordingly, beyond the Court's subpoena power. Under Federal Rule of Criminal Procedure 17(e)(2), "[i]f the witness is in a foreign country, 28 U.S.C. § 1783 governs the" service of a trial subpoena. Section 1783, however, applies only to witnesses who are "national[s] or resident[s] of the United States" and who are overseas at the time of trial. 28 U.S.C. § 1783(a); *see FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1320 n.116 (D.C. Cir. 1980) (explaining that the statute "has never been read as permitting issuance of a subpoena to an alien residing outside the United States"). Ms. Amal, moreover, has repeatedly and emphatically refused to travel to the United States to testify at Mr. Trabelsi's trial. Although she had, at one point in 2017, been "willing, although reluctant, to testify at trial in person," Dkt. 501 at 10, that is no longer her position. On March 31, 2023, the prosecutors met with Ms. Amal in France, where she was—according to an FBI-302 presented by the parties to the Court—"adamant [that]

she did not want to travel to the United States to testify in the trial," *see* Apr. 19, 2023 Hrg. Tr.

(Rough at 36) (discussing this FBI-302), notwithstanding the prosecutor's apparently "long,

diplomatic face-to-face discussions with [her] about the importance of her testimony," Dkt. 570-

1 at 2; *see also* Apr. 19, 2023 Hrg. Tr. (Rough at 30) (representation by government counsel that

he was "in the room with [Ms. Amal] . . . and [that] she was in tears and told us that she is not

willing to come to the United States to testify").   Moreover, government counsel asked Ms. Amal

at the Rule 15 deposition on April 26, 2023 whether she was "willing to travel to the United

States to testify in this proceeding;" she answered, without hesitation, "No, I can't come."  Apr.

26, 2023 a.m. Dep. (Tr. at 12).  She also confirmed, in response to questions from Trabelsi

himself, that she would "refuse[] to come to the trial" and that she "cannot come to Washington,

to the trial, because [she] ha[s] several sick children who need [her] 24 hours a day."  Apr. 27,

2023 p.m. Dep. (Tr. at 57–58).  And lastly, the French prosecutors confirmed, in an email to the

U.S. government prosecutors on May 11, 2023, that Ms. Amal was "categorically refus[ing] to

participate in a new witness hearing" after "experienc[ing] a major depressive event following

her two days of particularly trying hearings before the American Court."  Dkt. 600-2 at 1.

Trabelsi does not dispute that the Court lacks means to compel Ms. Amal's attendance at

trial; nor has he identified any law that would allow the Court to compel her attendance.  He

contends, rather, that "Ms. Amal's claimed justification [for her inability to attend] is [both]

inadequate on its face" and "squarely contradicted by the fact that Ms. Amal's children were all

at home, and ably cared for by an individual paid by the U.S. government, while Ms. Amal was

at her Rule 15 deposition." Dkt. 590 at 9–10.  The Court, however, has no reason to doubt Ms.

Amal's sworn testimony that her children "need [her] 24 hours a day," Apr. 27, 2023 p.m. Dep.

(Tr. at 57–58), and, in any event, "it is not the Court's job to adjudicate whether . . . [Ms. Amal]

*should* attend trial," *United States v. Abu Khatallah*, 282 F. Supp. 3d 279, 282 (D.D.C. 2017).

"Rather, where a witness cannot be compelled by legal process to attend trial, the only question

is whether the proponent of the deposition has made reasonable, good-faith efforts to make h[er]

available." *Id.* (citing *Barber v. Page*, 390 U.S. 719, 725 (1968)); *see also United States v.*

*Sanford, Ltd.*, 860 F. Supp. 2d 1, 4 (D.D.C. 2012) ("A witness who resides abroad and outside

the reach of a court's subpoena power is not automatically 'unavailable' without a further

showing that he or she will not testify in court." (quoting *United States v. Warren*, 713 F. Supp.

2d 1, 4 (D.D.C. 2010)); *United States v. Siddiqui*, 235 F.3d 1318, 1323–24 (11th Cir. 2000)

(concluding that two witnesses were unavailable and admitting their prior Rule 15 depositions

where the witnesses testified, respectively, that it would be "impossible for [the first witness] to

travel to the United States for trial" and that "[the second witness] d[id not] want to go, if

possible"). *Cf. Hamilton v. Morgan*, 474 F.3d 854, 859 (6th Cir. 2007) ("If the desired witness is

beyond the subpoena power of the trial state but an established procedure of voluntary

cooperation exists, then the government must go to reasonable lengths to utilize that procedure to

locate, contact, and arrange to reasonably transport the witness.").

Where, as here, the government has made "reasonable, good-faith efforts" to secure the

foreign witness's availability and is nevertheless rebuffed, the limits of the Court's subpoena

power leave the government with no further recourse. *See, e.g., United States v. Medjuck*, 156

F.3d 916, 920 (9th Cir. 1998) (concluding that "the Canadian witnesses were unavailable for trial

because they were beyond the subpoena power of the United States and refused voluntarily to

attend"); *United States v. Farfan-Carreon*, 935 F.2d 678, 680 (5th Cir. 1991) (noting, in the Rule

15 context, that a witness was "beyond the subpoena power of the court, and could not be

compelled to appear" because he was "a Mexican national" living abroad). In short, given Ms.

Amal's refusal to testify at trial, the Court fails to discern—and the defense fails to suggest—any further steps that the prosecutors reasonably could have taken to bring the witness before the jury. *See Burden*, 934 F.3d at 686; *see also Medjuck*, 156 F.3d at 920 ("There is no requirement that the Government go through a futile exercise before it may proceed to arrange for a defendant's remote participation."). "[H]aving taken reasonable (but ultimately unsuccessful) steps to make [Ms. Amal] available, the Government has shown that [s]he is unavailable for trial." *Abu Khatallah*, 282 F. Supp. 3d at 283.

2.    *Opportunity for Cross-Examination*

The Court, next, turns to the question of whether Trabelsi "has had a prior opportunity to cross-examine" the witness. *Crawford*, 541 U.S. at 59. Neither party contests that Trabelsi did, in fact, cross-examine Ms. Amal during her Rule 15 deposition on April 26 and 27, 2023. The question is only "whether the confrontation that occurred is constitutionally sufficient." *United States v. Yates*, 438 F.3d 1307, 1314 n.4 (11th Cir. 2006) (en banc). Trabelsi argues that it was not, contending both that he was impermissibly denied the opportunity to confront Ms. Amal "face to face" during the deposition and that he was provided with insufficient time to conduct a constitutionally adequate cross-examination. Dkt. 590 at 10 (arguing that the deposition did not "pass[] constitutional muster"). The defense asserts that this inquiry is governed by the standard articulated in *Maryland v. Craig*, 497 U.S. 836 (1990), where the Supreme Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where [(1)] denial of such confrontation is necessary to further an important public policy and [(2)] only where the reliability of the testimony is otherwise assured"—*i.e.*, where the "other elements of confrontation" were guaranteed. *Id.* at 850–51.

Neither the Supreme Court nor the D.C. Circuit have considered whether the *Craig* standard, which was announced in analyzing whether live video testimony *during trial* is permissible, also governs the question of whether video testimony taken during a pre-trial Rule 15 deposition is admissible under *Crawford* and the Confrontation Clause.  For present purposes, the Court need not decide this question and, instead, assumes that the *Craig* standard governs whether a "confrontation that occurred" over video before trial "is constitutionally sufficient" under *Crawford. Yates*, 438 F.3d at 1314 n.4; *see id.* (explaining that *Crawford* alone "does not answer th[e] question" of whether pretrial, remote testimony constituted "an opportunity to cross-examine"); *see also United States v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008) (applying *Craig* in considering the admissibility of a remote Rule 15 deposition at trial).[7]

All agree that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial"—a preference that, under the *Craig* standard, "must occasionally give way to considerations of public policy and the necessities of the case."  497 U.S. at 849 (first quoting *Roberts*, 448 U.S. at 63; then quoting *Mattox*, 156 U.S. at 243).  But the fact "[t]hat the face-to-

---

[7] The parties also agree—as does the Court—that the *Craig* test governs notwithstanding the fact that Ms. Amal testified via two-way closed-circuit televised video ("CCTV") and not, as in *Craig*, one-way CCTV (which did not allow the witness to see the defendant).  With the exception of the Second Circuit, *see United States v. Gigante*, 166 F.3d 75, 79–82 (2d Cir. 1999), the Courts of Appeals that have considered the issue have, generally speaking, applied *Craig* to remote two-way CCTV testimony in Rule 15 depositions or during trial, *see, e.g., Abu Ali*, 528 F.3d at 240–41; *Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir. 2017); *United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019); *United States v. Bordeaux*, 400 F.3d 548, 553– 54 (8th Cir. 2005); *United States v. Carter*, 907 F.3d 1199, 1205–07 (9th Cir. 2018); *Yates*, 438 F.3d at 1312–13.  That view is bolstered, moreover, by the Supreme Court's 2002 rejection of a proposed revision to Fed. R. Crim. P. 26, which would have allowed testimony by two-way CCTV; Justice Scalia's separate statement on the issue explained that such a proposal was "of dubious validity under the Confrontation Clause" because it failed to "limit the use of testimony via video transmission to instances where there has been a 'case-specific finding' that it is 'necessary to further an important public policy.'"  *Order of the Supreme Court*, 207 F.R.D. 89, 93 (2002) (statement of Scalia, J.) (quoting *Craig*, 497 U.S. at 850, 857–58).

face confrontation requirement is not absolute does not . . . mean that it may be easily dispensed with." *Id.* at 850. Rather, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where [(1)] denial of such confrontation is necessary to further an important public policy and [(2)] only where the reliability of the testimony is otherwise assured"—*i.e.*, where the "other elements of confrontation" were guaranteed. *Id.* at 850–51. In *Craig* itself, the Supreme Court approved a Maryland state court's use of one-way, closed-circuit televised video technology for a six-year-old child victim of sexual abuse to testify at trial; the Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853. Moreover, the Supreme Court explained, the "other elements of confrontation"—including an oath, a "full opportunity for contemporaneous cross-examination," and the jury's ability to view "the demeanor (and body) of the witness as he or she testifie[d]"—"adequately ensure[d] that the testimony [was] both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851; *cf. Crawford*, 541 U.S. at 57 (describing cross-examination as the "single safeguard" that "the Confrontation Clause demands").

Trabelsi contends that Ms. Amal's deposition, which occurred via two-way video conferencing, is inadmissible because neither prong of *Craig* is satisfied. First, he argues that no "important public policy" is served by depriving him of a face-to-face confrontation with Ms. Amal: "Being available to her adult child (as Ms. Amal asserted at her deposition) or a past incident involving two of her minor children (as the government claimed to the Court)," he contends, "are insufficient to meet the requirement under *Craig*." Dkt. 590 at 11 (italicization

added).  Second, he asserts that, unlike in *Craig*, the "'reliability' of Ms. Amal's testimony [i]s

not assured because she was not 'subject to rigorous adversarial testing in a manner functionally

equivalent to that accorded live, in-person testimony.'" *Id.* at 12 (quoting *Craig*, 497 U.S. at

851).  The Court considers each of these issues in turn.

> a.  <u>Public Policy Rationale</u>

"The requisite finding" that denying Trabelsi a face-to-face confrontation with Ms. Amal

is "necessary to further an important public policy" must "be a case-specific one," *Craig*, 497

U.S. at 850, 855, and the "public interest" reason for doing so must be "more substantial than

[the interest in] convicting someone of a criminal offense," *Abu Ali*, 528 F.3d at 241.  The Court

must articulate, in other words, a reason that is more particularized than the "need . . . to make a

case" or "to expeditiously resolve it." *Yates*, 438 F.3d at 1316.  The en banc Eleventh Circuit's

decision in *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006) (en banc), is instructive on this

point.  There, "the district court applied the *Craig* test to permit [two] Australian witnesses to

testify by two-way video conference broadcast on a television monitor at trial . . . based only on

the [g]overnment's assertions . . . that the Australian witnesses were unwilling to travel to the

United States." *Id.* at 1315.  The government had, at the time, proposed several "public interest"

reasons that purportedly necessitated remote testimony, including "providing the fact-finder with

crucial evidence, expeditiously and justly resolving the case, and ensuring that foreign witnesses

can so testify." *Id.* at 1315–16 (internal quotation marks and citations omitted).  The en banc

Eleventh Circuit reversed, emphasizing that the government's proposed "public interest"

reasons—if credited—would apply equally to any "criminal prosecution in which the

Government would find it convenient to present testimony by two-way video conference." *Id.* at

1316.  These justifications were particularly weak, the court further explained, because "there

[was] no evidentiary support [in the record] for a case-specific finding that the witnesses and

[d]efendants could not be placed in the same room for the taking of pre-trial deposition

testimony pursuant to [Fed. R. Crim. P.] 15." *Id.* at 1317. Significantly, there was nothing in

that case "prevent[ing] the [d]efendants from traveling to Australia to be present for a Rule 15

deposition." *Id.* at 1318. A similar principle governed the Ninth Circuit's decision in *United

States v. Carter*, 907 F.3d 1199 (9th Cir. 2018), where the court concluded that a witness's

difficult pregnancy did not justify her remote testimony at the defendant's trial, since the court

could have merely "continue[d] the trial" for "the duration of her pregnancy (which was two

months)" in "anticipation of [her] recovery," *id.* at 1208 (internal quotation marks and citations

omitted).

Yates and *Carter* instruct, then, that courts may not permit remote testimony if securing a

face-to-face confrontation is possible—even if doing so is more logistically complicated than the

alternative (because it requires, for example, that the Court delay trial by a few months, *see id.* at

1208, or that the government transport the defendants abroad for such confrontation, *see Yates*,

438 F.3d at 1318). In Trabelsi's view, Ms. Amal's stated need to "be[] available" to her children

falls closer to a logistical convenience than to the kind of "public policy" interest that

necessitates remote testimony—especially because Ms. Amal did not describe "the injuries to

[her] minor children . . . as permanent[] or so serious that no alternative could be found that

addressed both Ms. Amal's concerns and Mr. Trabelsi's constitutional rights." Dkt. 590 at 11–

12.

Trabelsi has not, however, proposed a satisfactory "alternative." Nor could he do so.

Here, unlike in *Carter* and *Yates*, the Court could not have simply delayed trial—or ordered the

government to transport Trabelsi to France—to facilitate a face-to-face confrontation between

him and Ms. Amal. To the contrary, as described above, Ms. Amal is beyond the Court's subpoena power and has repeatedly and consistently refused to travel to the United States either for a deposition or for live testimony at trial. She categorically declined to travel to the United States before, *see* Dkt. 570-1 at 2, and during the deposition, *see* Apr. 26, 2023 a.m. Dep. (Tr. at 12)—and has, since the deposition, "categorically refus[ed] to participate" in *any* "new witness hearing," Dkt. 600-2 at 1. Delaying the trial would not resolve that problem, and, in any event, as the Court has repeated explained, delaying the start of this trial was not a realistic option because it would have resulted in the government's loss of *at least* one essential witness, who is outside the subpoena power of the United States and who indicated that, given the numerous continuances and false starts in this matter and his competing obligations, he would decline to appear at trial, if his appearance was postponed yet again. *See* Dkt. 561 at 9 (quoting Dkt. 559 at 1–2); *see also* Dkt. 509 at 1 n.1 ("The essential witnesses in this case are outside the subpoena power of the United States, and multiple witnesses have expressed growing reluctance to testify as this matter has dragged on."); Dkt. 594-1 at 1 (Bonte Decl. ¶ 2) ("I am not willing to travel to Washington D.C. and testify if this trial is postponed again. Either I will testify as scheduled in May, or I will not testify.").

Moreover, unlike in *Yates*, there is also a strong, case-specific public policy reason why Trabelsi could not have been transported to France for a face-to-face confrontation with Ms. Amal during the Rule 15 deposition. Although "the officer who has custody of [a] defendant" must, as a general matter, "produce the defendant at [a Rule 15] deposition and keep the defendant in the witness's presence during the examination," Fed. R. Crim. P. 15(c)(1), a deposition "of a witness who is outside the United States may be taken without the defendant's presence if the court makes" a series of "case-specific findings," including that "the [in-custody]

defendant cannot be present because . . . secure transportation and continuing custody cannot be assured at the witness's location" and that the defendant "can meaningfully participate in the deposition through reasonable means," Fed. R. Crim. P. 15(c)(3)(D)–(E).  As the Court explained in making these findings under Fed. R. Crim P. 15(c)(3) in its prior memorandum opinion and order, Dkt. 578 at 8–10, the Chief of the Office of International Operations in the United States Marshals Service submitted a declaration attesting that his "office has determined [that] it cannot safely and securely arrange for . . . Trabelsi to travel to Europe," Dkt. 526-1 at 1 (Panepinto Decl. ¶ 2)—at least in part because "[t]he United States Marshals Service does not have authority to maintain custody of a prisoner in a foreign country," *id.* (Panepinto Decl. ¶ 3), and because "Trabelsi is subject to Special Administrative Measures (SAMs), which would be impossible for the U.S. Marshals to enforce while . . . Trabelsi is within a European country," *id.* at 2 (Panepinto Decl. ¶ 7); *see also United States v. McKeeve*, 131 F.3d 1, 7 (1st Cir. 1997) ("[T]he U.S. Marshals Service lacks jurisdiction to retain custody of federal detainees on foreign soil . . . .").  Panepinto further attested to the unsurprising propositions that "it is very likely that a European government would not permit . . . Trabelsi to enter their country . . . , especially while he is not in custody," Dkt. 526-1 at 1 (Panepinto Decl. ¶ 3), and that, because of the "heightened safety concerns" related to Trabelsi, "no commercial airline is likely to accept [him] as a passenger on one of their aircraft," *id.* at 2 (Panepinto Decl. ¶ 6).

Considering this declaration and the other relevant evidence, the Court is persuaded that a strong "public interest" precludes providing Trabelsi with a face-to-face confrontation with Ms. Amal in France.  Given the serious accusations against Trabelsi and the nature of the charges against him, including the allegation that he conspired to kill U.S. citizens in Europe, *see* Dkt. 6 (Superseding Indictment), the Court finds that there is a compelling national-security interest in

ensuring that Trabelsi remain in the custody of the U.S. government and remain subject to the

SAMs, neither of which would be possible if he were brought to Europe for a deposition or for

remote trial testimony. *See, e.g.*, *Medjuck*, 156 F.3d at 920 (concluding that, where the

government "demonstrat[ed] . . . the impossibility of obtaining [the defendant's] physical

presence on terms acceptable to the Government" at a Rule 15 deposition, admission of the

deposition did not violate the Confrontation Clause); *United States v. West*, No. 08-cr-669, 2010

WL 3324886, at *4 (N.D. Ill. Aug. 18, 2010) (concluding that a video deposition taken without

the defendants' physical presence was admissible where transporting the defendants to the

deposition would require either "releas[ing] [them] into a war zone" or "turn[ing] [custody] over

to the Afghan authorities because the United States Marshal's Service would be unable to keep

them in custody in Afghanistan"). The Court further finds that it is extremely unlikely that

France would have allowed Trabelsi to enter the country to cross-examine Ms. Amal,

particularly if he was not in custody. *See McKeeve*, 131 F.3d at 8 ("In cases where actions by, or

the laws of, a foreign nation effectively preclude the defendant's presence [at a Rule 15

deposition], furnishing the defendant with the capability for live monitoring of the deposition, as

well as a separate (private) telephone line for consultation with counsel, usually will satisfy the

demands of the Confrontation Clause."). In short, there was no way, consistent with national

security, to bring Trabelsi to France to confront Ms. Amal in person there.

Because Ms. Amal is beyond the subpoena power and emphatically refuses to travel to

the United States—and because, unlike in *Yates*, there were ample national-security reasons not

to produce Trabelsi at a deposition in France—denying Trabelsi a face-to-face confrontation with

Ms. Amal at the Rule 15 deposition (or trial) was, indeed, "necessary to further an important

public policy," *Craig*, 497 U.S. at 850, that is "more substantial than [the interest in] convicting

someone of a criminal offense," *Abu Ali*, 528 F.3d at 241. It is also relevant that, as in *Abu Ali*, this is a case in which the government faces unique and formidable obstacles to obtaining eyewitness testimony in the courtroom. Given the "global dimension" of terrorism cases, "flatly prohibit[ing]" the deposition of foreign witnesses "anywhere but in the United States . . . would jeopardize the government's ability to prosecute [those accused of] terror[ism] using the domestic criminal justice system." *Id.*; *cf. Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (explaining that in "terrorism cases" under the Foreign Sovereign Immunities Act, "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign"). This is not to say that, in every case involving allegations of international terrorism, using video testimony is permissible. But the public policy rationales are more than sufficient here, where the government has gone to extraordinary lengths to obtain live testimony in the courtroom, where Ms. Amal is uniquely situated to provide an eyewitness account of certain key events, and where the deposition was conducted in a manner designed, so far as possible, to maximize Trabelsi's confrontation rights.

> b.  Indicia of Reliability

Having resolved Trabelsi's threshold challenge to the admissibility of the video testimony, the Court turns, next, to the more specific question of whether the "other elements of confrontation" were guaranteed—in other words, whether Ms. Amal testified under oath, whether Trabelsi had a "full opportunity for contemporaneous cross-examination," and whether the jury will be able to view "the demeanor (and body) of the witness as . . . she testifies" so as to "adequately ensure[] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Craig*, 497 U.S. at 851; *cf. Crawford*, 541 U.S. at 57 (describing cross-examination as the "single safeguard" that

"the Confrontation Clause demands"); *Medjuck*, 156 F.3d at 920 (finding essential that the defendant could, at a Rule 15 deposition, "cross-examine the deposed witness[]").

Trabelsi does not contest that Ms. Amal testified under oath at the deposition[8] or that the video technology platform allowed him to see Ms. Amal in real time, to "listen to the proceedings as they occurred," *see United States v. Gifford*, 892 F.2d 263, 265 (3d Cir. 1989), and, if introduced, would offer the jury the opportunity to view the witness's "demeanor" and (part of) her "body . . . as . . . she testifies," [9] *Craig*, 497 U.S. at 851; *see also Abu Khatallah*, 282 F. Supp. 3d at 283 (noting, in deciding that the defendant had an effective opportunity to cross-examine a witness in a Rule 15 deposition, that the witness "testified under oath," the defendant "could view the proceedings and communicate with his counsel abroad," and that the deposition was videotaped to allow the jury "a full, visual impression of [the witness's] responses on cross-examination"). Similarly, Ms. Amal was able to see Trabelsi during the deposition—that is, she had to face him when he asked and she answered his questions. Nor does Trabelsi contend that he had any difficulty communicating with his standby counsel—who were present with him in the courtroom and with the witness in France—during the deposition. *See Gifford*, 892 F.2d at

---

[8] Notably, and as described in this Court's prior opinion on the Rule 15 deposition, Dkt. 578 at 12, the U.S. perjury statute expressly applies extraterritorially, *see* 18 U.S.C. § 1623(b), and the government represents—without objection or dispute from the defense—that "French law criminalizing perjury" will also apply. Dkt. 546 at 1–2 (citing Code Pénal (Penal Code), Art. 434-13 (https://www.legifrance.gouv.fr/ codes/article_lc/LEGIARTI000006418637 (Translation: https://cjad.nottingham.ac.uk/documents/implementations/pdf/France_Penal_Code.pdf)).

[9] Trabelsi does object, briefly, that playing the deposition for the jury would "leav[e] the jury with [the] false impression" that "Ms. Amal appeared by herself for questioning"—presumably because only her image is visible on the video recording of the deposition. Dkt. 590 at 12. Any such misimpression, however, can be easily cured by playing for the jury Ms. Amal's testimony on cross-examination that she is "not alone in the room." Apr. 26, 2023 p.m. Dep. (Tr. at 46). She elaborated: "There's a commander; there's the French police; someone from the FBI; an interpreter; Mr. Trabelsi; a social worker; and other people I don't know much about. So I'm not alone in the room." *Id.*

265 (concluding that the defendant's "right to a fair trial was not violated by the use of . . . deposition testimony" where the "[d]efendant was able to listen to the proceedings as they occurred[] and was afforded the opportunity to consult with his attorney"). Trabelsi's central objection to the admission of Ms. Amal's testimony, then, is not to the mechanics of the deposition. His principal argument is, rather, that he was afforded insufficient time at the deposition "to conduct a meaningful examination of Ms. Amal, a fatal flaw that was," in the defense's view, "compounded by the improper actions of the government, the French government, and Ms. Amal." Dkt. 590 at 13.

### i. *Confrontation Clause standard*

The Confrontation Clause does not afford a defendant unlimited cross-examination. Rather, it "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20 (emphasis in original); *see also Crawford*, 541 U.S. at 61 (explaining that the Confrontation Clause is a "procedural . . . guarantee," and not a substantive guarantee ensuring the reliability of testimonial evidence admitted against a defendant). Trial judges, moreover, "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Miller*, 738 F.3d 361, 375 (D.C. Cir. 2013) (same); *United States v. Hayes*, 369 F.3d 564, 566 (D.C. Cir. 2004) (explaining that the Court may reasonably limit "questions on cross-examination [that] go beyond the scope of the direct, deal with matters at the fringe of the case,

are repetitive, confuse the issues, harass the witness, or invite the jury to consider extraneous matters").

The Confrontation Clause is violated, then, when a defendant is deprived, by a time limit or otherwise, of the "opportunity for effective cross-examination" or "when the court bars a legitimate line of inquiry that might have given the jury a significantly different impression of [the witness's] credibility." *Miller*, 738 F.3d at 375 (internal quotation marks omitted) (quoting *Hayes*, 369 F.3d at 566); *see also United States v. Berrios-Bonilla*, 822 F.3d 25, 31 (1st Cir. 2016) (explaining that the Court first reviews "de novo to determine whether [the] defendant was afforded a reasonable opportunity to impeach adverse witnesses' consistent with the Confrontation Clause" and then, "[i]f that threshold is met," reviews "the specific limitation imposed by the trial court on the defendant's cross-examination for abuse of discretion" (internal quotation marks omitted) (emphasis omitted) (first alteration in original)).  The "opportunity" for effective cross-examination includes a reasonable opportunity to elicit "impeaching or discrediting testimony," *United States v. Hart*, 995 F.3d 584, 589 (7th Cir. 2021) (explaining that "any constitutional concerns vanish" once the defendant has been given that opportunity), or to "provid[e] the jury with essential information about key events and sufficient information to make a 'discriminating appraisal' of a witness's motives and possible bias," *United States v. Malik*, 928 F.2d 17, 20 (1st Cir. 1991); *see also McPherson v. Woods*, 506 F. App'x 379, 390 (6th Cir. 2012) (concluding that the Sixth Amendment was satisfied where the defendant "was given adequate opportunity to explore [the witness's] conflicting statements, her credibility, and her observations on the day of the shooting"); *United States v. Spangler*, 638 F. App'x 611, 613 (9th Cir. 2016) (noting that defense counsel "was able to question [the witness] about matters of

bias" and that it could, accordingly, "[]not be said that the jury lacked sufficient information to appraise the biases and motivations of [the witness]" (internal quotation marks omitted)).

ii. *Trabelsi's opportunity for cross-examination*

Trabelsi was provided a reasonable *opportunity* to "impeach [Ms. Amal's] credibility and establish that she ha[d] a motive to lie." *United States v. Clark*, 657 F.3d 578, 583–84 (7th Cir. 2011). In total, the government represents—and the defense does not contest—that Trabelsi's cross-examination of Ms. Amal lasted more than seven hours, "compared against the government's direct examination that took less than three hours." Dkt. 588 at 2. The Court estimates, moreover, that the government's direct examination occupied roughly 67 pages of the deposition transcript, *see* Apr. 26, 2023 a.m. Dep. (Tr. at 11–43); Apr. 26, 2023 p.m. Dep. (Tr. at 4–35), while Trabelsi's cross-examination occupied about 184 pages of the transcript, *see* Apr. 26, 2023 p.m. Dep. (Tr. at 44–70); Apr. 27, 2023 a.m. Dep. (Tr. at 9–82); Apr. 27, 2023 p.m. Dep. (8–49, 53–59, 63–91) (omitting time spent on the government's motion to end the deposition). To be sure, neither the length of Trabelsi's examination nor the comparison between the government's direct examination and his cross-examination—standing alone— answer the question of whether Trabelsi had an adequate opportunity to cross-examine the witness. But these facts do provide a helpful starting point. Most significantly, the proper scope of the cross-examination was limited by the scope of the direct, which was short and focused. Moreover, even with the necessary translation process, over seven hours of examination is substantial. In *United States v. Abu Khatallah*, 282 F. Supp. 3d 279 (D.D.C. 2017), by way of comparison, the court concluded that the "timing and circumstances" of a Rule 15 deposition "gave the defense ample opportunity to conduct a vigorous cross-examination" where "[c]ross-examination lasted approximately three hours and covered a wide range of topics." *Id.* at 283.

Similarly, in *United States v. Vest*, 116 F.3d 1179 (7th Cir. 1997), the Seventh Circuit
determined that the defense had "the 'reasonable chance' to pursue matters covered on direct that
the Confrontation Clause protects" where the defense counsel had "seven hours and twenty
minutes" to cross-examine an expert witness, and where "the Government used less than two
hours on direct." *Id.* at 1187; *see also id.* (noting approvingly that "[t]he District Court's time
limits were reasonably anchored to . . . the amount of time the Government used on direct"); *see
also Fenenbock v. Dir. of Corr.*, 692 F.3d 910, 920 (9th Cir. 2012) ("Petitioner presents no
cogent explanation as to why the time used by his defense counsel at trial (about three hours)
plus the unused four hours offered by the trial court would not have sufficed to explore the
intended material exhaustively."). And in *United States v. Smith*, 928 F.3d 1215 (11th Cir.
2019), the Eleventh Circuit observed, albeit with the apparent agreement of the parties, that
defense counsel had "tested [the witness's] testimony and credibility with sufficient cross-
examination" during a Rule 15 deposition where "the government's direct and redirect
examination of [the witness] total[led] approximately 32 pages, [and] the cross-examination by
defense counsel, together, total[led] 79 pages of the deposition transcript." *Id.* at 1227.

    More importantly, after studying the transcript in detail, the Court is persuaded that
Trabelsi was given sufficient opportunity, had he used his time wisely, to explore Ms. Amal's
credibility and the veracity of her testimony on direct. Indeed, during his seven hours of cross-
examination, Trabelsi explored some lines of questioning that were relevant to Ms. Amal's
"biases and motivations." *Spangler*, 638 Fed. Appx. at 613. He asked, for example, whether
Ms. Amal "fe[lt] under pressure or threatened by someone in France," Apr. 26, 2023 p.m. Dep.
(Tr. at 47), and whether "members of the U.S. government or the French government . . .
threaten[ed] [her] [that] if [she] did not testify against [him], [she] would be charged with a

crime," Apr. 27, 2023 p.m. Dep. (Tr. at 56). He asked her whether she "received money from the U.S. government related to [this] case," *id.* at 63,[10] and whether she received French citizenship in exchange for testifying against him, *id.* at 72; *see also id.* at 86 ("[I]s it time or is it money or the French citizenship that led you to tell the authorities what they wanted to hear?").[11] After his questions elicited Ms. Amal's account that Trabelsi had violently abused her, *see* Apr. 26, 2023 p.m. Dep. (Tr. at 64),[12] Trabelsi confronted the witness with letters she sent him after his arrest, in which she apparently expressed her love and affection for him, *see, e.g.*, Apr. 27, 2023 p.m. Dep. (Tr. at 40) ("You started from the beginning by saying: I love you, I love you, I love you until the last day of my life."); *see also* Apr. 26, 2023 p.m. Dep. (Tr. at 66). And,

---

[10] The defense notes that, in response to this question, Ms. Amal denied receiving anything of value from the United States related to the prosecution of Trabelsi, Apr. 27, 2023 p.m. Dep. (Tr. at 63–64, 66), and attaches to its motion an exhibit indicating that Ms. Amal was paid $2,000.00 by the FBI in 2005, *see* Dkt. 590-1. But, based on the deposition transcript, it appears that both Trabelsi and the witness had this exhibit in front of them at the time Trabelsi asked about the payment, and he could have asked the witness to review the document with the assistance of the interpreter. *See* Apr. 27, 2023 p.m. Dep. (Tr. at 63) (Trabelsi stating: "Exhibit 110, please."); *id.* (From the witness: "I have a document in front of me, but it's in English, so I didn't understand what it was.").

[11] The defense also notes that, while a question relating to such benefits was pending, "Ms. Amal spoke with a French Official who was present in the room and seated across from her." Dkt. 590 at 7. Judge Upadhyaya noticed the same at the time and asked Ms. Amal, "for clarity of the record, what the discussion was about with the person who was sitting across from her?" Apr. 27, 2023 p.m. Dep. (Tr. at 69). Ms. Amal answered that "they were explaining to me how to use the microphone switches properly, how to unmute myself." *Id.* Although defense counsel—who was standby counsel at the time—interjected that "[t]hat's not true," *id.* at 70, counsel has, to date, never proffered to the Court or to the government what, in counsel's view, the discussion with the French prosecutor entailed. *See* Dkt. 593 at 7 n.8 (representing that defense counsel has not responded to the government's request to "proffer what [she] heard the witness say during the few seconds that she was muted"). Nor has defense counsel submitted any evidence to contradict the witness's testimony that the discussion concerned a mute button.

[12] Many of the statements Trabelsi elicited about his alleged abuse have been struck, at the *defense's* request, Dkt. 618, before this testimony will be introduced into evidence. In resolving the parties' evidentiary objections to various questions and answers, counsel for the defense has candidly conceded that at least some of Trabelsi's questions were unwise and unhelpful.

perhaps most importantly, Trabelsi elicited, multiple times, that Ms. Amal's rendition of the relevant events changed between her initial interviews with the French authorities in 2001 and her later testimony before the U.S. grand jury in 2007, *see, e.g.*, Apr. 27, 2023 p.m. Dep. (Tr. at 85); *id.* at 88 (reading from the 2001 interview transcript in which the witness told authorities that "[they] went to Afghanistan to help poor people"). For example:

> Q. Ms. Amal, I have to ask a first question about all your testimony since your arrest on September 15th, 2001, all the way to your last statement in France to the French authorities. You swore to tell the truth, but is it true that you lied and you didn't tell the truth?
>
> . . .
>
> [A.] Yes, it's true that at the beginning I was very, very scared and I did lie. But after, I promised to tell the truth, and I did tell nothing but the truth.

Apr. 26, 2023 p.m. Dep. (Tr. at 52).

That Court does not doubt that Trabelsi might have done more to attempt to impeach Ms. Amal or to explore the sources of any biases. But the operative legal question is not whether Trabelsi did, in fact, expose any inconsistencies or biases or otherwise undermined her testimony on direct; it is, rather, whether he had the reasonable opportunity to do so. *See Fensterer*, 474 U.S. at 20. The answer to that question is "yes"—he had ample opportunity to explore additional areas of impeachment during his lengthy cross-examination. But instead of doing so, he devoted most of his time to questions that were of marginal relevance, at best; that were way beyond the scope of the direct; and that were often argumentative, harassing, or lengthy exhortations on his view of the facts and evidence. Among other topics, he explored the wellbeing of Ms. Amal's children, *see* Apr. 26, 2023 p.m. Dep. (Tr. at 44, 48–49); discussed at length (and repeatedly) the question of whether he was in a religious marriage with Ms. Amal, *see, e.g.*, Apr. 27, 2023 a.m. Dep. (Tr. at 11–14); Apr. 27, 2023 p.m. Dep. (Tr. at 30–31); and queried Ms. Amal again and again about the legal status of her prior romantic relationships, Apr. 27, 2023 a.m. Dep. (Tr. at

30, 38, 45).  Based on the record before the Court, it is unclear what relevance Ms. Amal's prior romantic relationships—much less the current well-being of her children—have to Trabelsi's defense.  To be sure, earlier in the litigation, the marriage-related questions might have been relevant to Trabelsi's motion to preclude privileged marital communications, Dkt. 511, but the Court had denied that motion in an oral ruling before the deposition began.  *See* Apr. 25, 2023 Hrg. Tr. (Rough at 10).  In that ruling, the Court explained that "the most relevant jurisdiction for purposes of determining whether there was a valid marriage" was Germany and that a religious ceremony, standing alone, was insufficient to establish a marriage "as a matter of German law."  *Id.* at 11–12.  Trabelsi's repeated questions about a religious marriage ceremony between himself and Ms. Amal were, accordingly, irrelevant to the application of the marital communication privilege.  To the extent the existence (or not) of a purely religious marriage is relevant to Trabelsi's defense, his theory is far from evident and, in any event, cannot possibly have justified the enormous amount of time that Trabelsi devoted to the topic.

Many of Trabelsi's questions also veered into personal attacks that the witness could reasonably have perceived as harassing and that were, at a minimum, argumentative:  "Is it because you are pregnant that you think you have the right to swear to God and then to lie to hurt other people to protect yourself?"  Apr. 26, 2023 p.m. Dep. (Tr. at 55).  And the next day:  "Mrs. Amal, I am a human being, and I was married with you, you are my son's mother and you swore to God to tell the truth. . . .  So I want to ask you again to pay special attention, because I don't want you to have problems."  Apr. 27, 2023 a.m. Dep. (Tr. at 30).  "[S]ince I've met you . . . all my life has changed," Trabelsi stated.  *Id.* at 13–14.  Later that morning:  "Were you a jealous woman?"  *Id.* at 64.  And that afternoon:  "Do you realize that . . . and you have God as a witness—that you committed adultery because you had a child with me out of wedlock?"  Apr.

27, 2023 p.m. Dep. (Tr. at 79). Trabelsi used his time for cross-examination, moreover, to essentially testify at length, telling winding stories about Ms. Amal's visits while Trabelsi was in prison and about interactions between the two at the beginning of their romantic relationship. *See, e.g.*, Apr. 26, 2023 p.m. Dep. (Tr. at 68–70); Apr. 27, 2023 p.m. Dep. (Tr. at 9–12).

Trabelsi was representing himself at the deposition, and it was up to him to decide how to use his time. But he cannot—after having spent most of his cross-examination time on repetitive, marginally relevant, and (at times) harassing questions—claim that he was deprived of the opportunity to do more. *See, e.g.*, *United States v. Pugh*, 436 F.2d 222, 224 (D.C. Cir. 1970) ("[I]f cross-examination of a witness has been extensive, repetitive and protracted, . . . the trial judge might properly limit the scope of cross-examination without in any way harming defendant's case."); *United States v. Stock*, 948 F.2d 1299, 1302 (D.C. Cir. 1991) (same); *see also United States v. Walker*, 917 F.3d 1004, 1010 (8th Cir. 2019) (affirming the district court's time limitation where "most of the cross-examination had been spent cumulatively reading an exhibit . . . that had been admitted into evidence and would be available to the jury"). It is true, of course, that Ms. Amal is an important witness, that her testimony covers, as the defense asserts, a broad "variety of events and issues," and that the flow of cross-examination was slowed down, to some extent, by the fact that each question and answer was translated for the record from French to English (and, for the witness, back from English to French again). Dkt. 590 at 5–6. But Trabelsi has failed to show that the seven hours of cross-examination afforded to him (even with the encumbrance of translation) did not provide him with the opportunity to explore Ms. Amal's "conflicting statements, her credibility, and [the limited] observations" she testified about on her three-hour direct examination (which was itself slowed down, to some extent, by English-to-French translation). *McPherson*, 506 F. App'x at 390; *see also Hart*, 995

F.3d at 589 ("[A]n opportunity [to cross-examine] is reasonable if the defendant merely ha[s] the chance to present a motive to lie." (internal quotation marks omitted)).  To be sure, Trabelsi squandered much of this opportunity, but had he spent the hours that he devoted to irrelevant, marginally relevant, argumentative, and otherwise improper questions on substantive matters, he would have had ample opportunity to conduct a constitutionally sufficient cross-examination. *See Vest*, 116 F.3d at 1186 (Where "the District Court . . . set a time limitation on cross-examination . . . during [which the defendant] had every opportunity to cover" the issues raised on direct, his "failure to address matters raised on direct might . . . be attributed to [his] poor time management during cross-examination.").  Although standby counsel asserted during the deposition that "even a lawyer would be hard-pressed to do this cross-examination in six hours," Apr. 27, 2023 p.m. Dep. (Tr. at 61), defense counsel has neither raised that argument in its filings nor endeavored to explain why—by reference to possible cross-examination topics or otherwise—seven hours would have been insufficient for a capable lawyer to "provid[e] the jury with essential information about key events and sufficient information to make a 'discriminating appraisal' of [this] witness's motives and possible bias." *Malik*, 928 F.2d at 20.

　　　iii. *Trabelsi's* pro se *status*

　　　Trabelsi argues that the length of his cross-examination was nevertheless insufficient because he was "proceeding *pro se*" and because he "ha[d] been imprisoned for ten years under extremely harsh conditions of confinement that ha[d] negatively affected his mental state and ability to concentrate and focus on his questions and her answers." Dkt. 590 at 6.  It is true, of course, that a capable lawyer might have more effectively and efficiently cross-examined Ms. Amal and that this Court has, in the past, given Trabelsi "some leeway because he is representing himself." *See, e.g.*, Dkt. 578 at 13–14.  But it is also true that Trabelsi cannot deprive the

government of a key witness, who is beyond the subpoena power of this Court, by electing to represent himself and then asserting a need for additional time (which was unavailable) as a result.

The Court warned Trabelsi at his *Faretta* hearing that he would "be better off with a trained lawyer," that learning and following the rules of evidence would be "complicated," and that the Court would not rule in his favor "just because [he was] representing [him]self." July 8, 2022 Hrg. Tr. (Rough at 20–21, 25). Trabelsi nevertheless insisted on cross-examining Ms. Amal himself, even after the Court offered two days before the deposition that, "subject to the government's consent, [the Court] would not have an objection to standby counsel . . . conducting the cross-examination of Ms. Amal on Wednesday and Thursday" in Trabelsi's place. Apr. 24, 2023 Hrg. Tr. (Rough at 102). But, Trabelsi's standby counsel had previously explained to the Court that Trabelsi "want[ed] to question this witness as part of his decision to represent himself," Jan. 10, 2023 Hrg. Tr. (Rough at 14), and, consistent with that intention, Trabelsi neither accepted this offer nor moved to relinquish his self-representation until after he had completed his cross-examination of Ms. Amal, *see* Dkt. 586. It is evident to the Court that Trabelsi wanted to represent himself in significant part so that he could confront—in every sense of the word—his former "spouse." *See, e.g.*, Dkt. 534 at 31 (Mar. 10, 2023 Hrg. Tr.) ("But face-to-face . . . how could it be said that I struck her? She loves me to death.").

Nor can Trabelsi plausibly assert that he was surprised by the length of the deposition or that he would have, if he had known that the deposition would end at 6:00 p.m. (12:00 a.m. Paris time) on the second day, managed his time more carefully. Before the deposition began, Trabelsi knew that the deposition would, in all likelihood, be limited to two days of questioning: Judge Upadhyaya warned, from the outset, that "[b]oth sides should be prepared to conclude their

questioning of Ms. Amal in the time allotted, by 6 p.m. EST on Thursday, April 27, 2023." Dkt. 579 at 3. The Court had also previously stressed, after observing Trabelsi's over-long and unfocused cross-examinations during a suppression hearing, that Trabelsi should "limit his examination to proper and relevant questions within the scope of the government's direct examination of its witness," Dkt. 587 at 14, and that, "as a rule of thumb," Trabelsi would typically "have twice the time the government takes with respect to [its] direct examination," unless he "ma[d]e a showing of specific need," Apr. 19, 2023 Hrg. Tr. (Rough at 4–5). And, from the very beginning of the deposition, Judge Upadhyaya warned Trabelsi again and again to "ask the important questions," and not "to waste time." Apr. 26, 2023 p.m. Dep. (Tr. at 37); *see also id.* at 60 (reminding Trabelsi "to focus on questions about the case"); Apr. 27, 2023 a.m. Dep. (Tr. at 15) (reminding Trabelsi "of [his] time today" and cautioning him to "use it wisely, please"); *id.* at 59 ("This is your time, so just use it wisely. I've said it a million times, I'm going to keep reminding you."); *id.* at 83 ("[T]here have been some topics which you have gone into over and over and over again . . . keep in mind how much time you have left and ask your questions accordingly."). The Court, moreover, did not apply its rule of thumb about providing Trabelsi twice the government's time in an inflexible manner: when the government did move to end the deposition because Trabelsi had "been going for a little over six hours" and had not "made effective and efficient use of his time," Apr. 27, 2023 p.m. Dep. (Tr. at 49–50), the Court denied the government's motion and offered Trabelsi more time to explore the three "buckets" of questions identified by his standby counsel, *id.* at 62–63. In short, Trabelsi was given every possible warning to make use of his opportunity for effective cross-examination. *See Spangler*, 638 F. App'x at 613 (noting, in approving of the district court's "time limit on defense counsel's cross-examination," that "the district court gave counsel timely warnings that his cross-

examination was becoming repetitive, argumentative, and unfocused" and noting that the defendant "had fair warning before he was told his examination was complete").

In addition to the Court's warnings and advice to Trabelsi, government counsel made efforts to ensure that time Trabelsi would have the opportunity to conduct a sufficient cross-examination. They cut their direct examination of Ms. Amal "down . . . to the bare minimum" in the interest of allowing Trabelsi sufficient time, Apr. 19, 2023 a.m. Hrg. Tr. (Rough at 4); *see also* Apr. 18, 2023 Hrg. Tr. (Rough at 230), and they gave up the opportunity to conduct a redirect examination, even after a lengthy and confusion cross-examination by Trabelsi. Notwithstanding these warnings and accommodations, Trabelsi chose to conduct the cross-examination himself (rather than asking standby counsel to do so), and he squandered much of the seven hours he was allotted.

Even when a *pro se* defendant "conduct[s] his own defense ultimately to his own detriment," *Faretta v. California*, 422 U.S. 806, 834 (1975)—as Trabelsi did in this case—the Court must "honor[] his choice by abstaining from interfering with his right to self-representation," *United States v. Curry*, 575 F. App'x 143, 146 (4th Cir. 2014). Although the Court granted Trabelsi substantial leeway where possible in light of his *pro se* status (including, for example, in ruling liberally on objections as to the form of specific questions or in allowing his tortuous examination of two witnesses at a suppression hearing), that leeway cannot extend so far that it alone deprives the government of the ability to present the testimony of a key witness.

### iv. *Deposition delays*

To be sure, the deposition, as a whole, was slightly shorter than initially anticipated by the parties and the Court. The parties devote significant attention in their briefs to finger-

pointing about who is responsible for these delays. The defense, for example, accuses government counsel of being "late and unprepared to proceed on time on April 26 and 27," causing the deposition to begin later than anticipated. Dkt. 590 at 3. The government, in response, credibly and quite reasonably explains that "AUSA Saunders was ready and outside the locked courtroom by 8:15am" on April 26, 2023, but that "it took longer than expected to set up all the equipment once the courtroom was opened" and to "ensure that everything . . . functioned properly." Dkt. 593 at 5 n.2. The government also explains that, on April 27, 2023, there was a short delay "primarily because of a technology issue in France." *Id.* Delays resulting from minor technical difficulties are unexceptional in any case and are to be expected in a case, such as this one, involving a transatlantic deposition. The Court, moreover, has no reason to believe that the government had any interest in limiting the length of the deposition; to the contrary, it had every incentive to provide Trabelsi with as much time for cross-examination as was possible under the circumstances, especially in light of the Court's repeatedly warnings that the deposition would not be admitted if Trabelsi was not given "a meaningful opportunity to conduct an adequate cross-examination." Dkt. 578 at 13.[13]

---

[13] The government argues that Trabelsi, in contrast, was well aware that a curtailed cross-examination would make it more difficult for the government to introduce the deposition at trial and that he, accordingly, had an incentive to delay the deposition where possible. In that vein, the government notes, for example, that Trabelsi took three restroom breaks during the government's three-hour direct examination—which occupied, in total, 50 minutes of break time—but that he never asked for a restroom break during his own examination of the witness. Dkt. 593 at 5 n.4. (The Court, for its part, has no reason to doubt Trabelsi's explanation that the bathroom breaks were related to a medical issue, which Trabelsi had previously brought to the Court's attention.). The government also asserts that, "[d]uring one break, standby counsel told the witness she could simply leave the deposition and come back on Friday," notwithstanding the fact that "[n]o arrangements were in place for the deposition to continue on Friday." Dkt. 593 at 6 n.5; *see also* May 11, 2023 Hrg. Tr. (Rough at 23) (statement from government counsel present in France that "[standby counsel] started to address the witness" during a break on April 26, 2023 and that standby counsel told the witness "it would be appropriate for the witness to leave,

More significantly, the defense asserts that the French authorities "unilaterally seized authority and control of the deposition from Magistrate Judge Upadhyaya" by summarily ending the deposition at 4:40 p.m. on April 26, 2023—one hour and twenty minutes before the anticipated end time of 6:00 p.m. that day.  Dkt. 590 at 3–4.  In response, the government contends that it was Trabelsi's standby counsel—who was present at the deposition in France—that announced, without corroboration, that the French officials were summarily ending the deposition for the day.  Dkt. 593 at 5 (arguing that "[s]tandby Counsel . . . ended the deposition early on Wednesday, reporting that 'the French prosecutor says they're done for the day,' even though no French official in the room had spoken"); *see* Apr. 26, 2023 p.m. Dep. (Tr. at 70) ("[T]he French prosecutor says they're done for the day.").  But, even if defense counsel's assertion as to the French government were credited—and there is conflicting evidence on this point[14]—neither Mr. Trabelsi nor his standby counsel objected to ending the deposition at 4:40

_____

that she could end for the day if she wanted to[,] and that we could come back on Friday").  Standby counsel responded that she did not "recall what [she] said," that she "recall[ed] feeling sympathetic or suggesting a longer break or something," but that she "d[idn't] think [she] addressed the witness."  May 11, 2023 Hrg. Tr. (Rough at 28).  The Court need not resolve this dispute for present purposes.

[14] The record reflects that, earlier in the day, the French authorities told government counsel that "they need[ed] to stop at 22:00 their time" (i.e., 4:00 p.m. EST).  Apr. 26, 2023 p.m. Dep. (Tr. at 50).  But there is no indication in the deposition transcript, other than standby counsel's statement that "the French prosecutor says they're done for the day," *id.* at 70, that the French authorities followed through on their stated intention to end the deposition earlier than anticipated.  *See, e.g.*, May 11, 2023 Hrg. Tr. (Rough at 22) (statement from government counsel explaining that they had asked the French authorities over text to "please, please keep going" and that, "when [10:00 p.m.] passed and they didn't cut it off, we were hoping it was going to keep going"); *id.* at 25 ("[W]e got to 10:00 p.m. and they did not raise the issue again.").  Standby counsel's account of what occurred, moreover, is subject to reasonable dispute.  Most notably, she has given the Court conflicting accounts of what prompted her statement that "the French prosecutor says they're done for the day."  Apr. 26, 2023 p.m. Dep. (Tr. at 70).  Standby counsel represented, first, that the French prosecutor made a "gesture of being done," relaying the impression that she was ending the deposition.  May 10, 2023 Hrg. Tr. (Rough at 67) (although not reflected in the record, standby counsel demonstrated what she meant by this by making a

p.m. on April 26, 2023. Had an objection been raised at the time, the Court could have endeavored to enforce the agreement to continue to 6:00 p.m. Ultimately, however, none of this back-and-forth between the parties is dispositive because the Court is persuaded that, even with these delays, Trabelsi had sufficient time to conduct a reasonable cross-examination of Ms. Amal.

### v. *Proffered topics for further exploration*

Nor has Trabelsi established that, by ending the cross-examination as scheduled at 6:00 p.m. on April 27, 2023, the Court effectively "bar[red] a legitimate line of inquiry that 'might' have given the jury a 'significantly different impression of [the witness's] credibility.'" *Miller*, 738 F.3d at 375 (quoting *Hayes*, 369 F.3d at 566); *see also, e.g.*, *Harrington v. Iowa*, 109 F.3d 1275, 1277 (8th Cir. 1997) (requiring a defendant to show that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination" (quoting *Van Arsdall*, 475 U.S. at 680)); *United States v. Bunchuk*, 799 F. App'x 100, 105 (3d Cir. 2019) (concluding, where "the trial court gave [the defendant] ample leeway to cross examine the Government's witnesses," that the trial court "properly denied [the defendant] the opportunity to present other testimony that would be irrelevant or redundant"). The Court addresses this question by reference to the specific lines of questioning proffered by the defense; any proposed questions not raised, at this stage, have been forfeited. *See United States v. Davis*, 127 F.3d 68, 71 (D.C.

---

hand gesture across her throat). The next day, standby counsel indicated that, "[a]s it came close to the time [of ending the deposition]," she recalled the French prosecutor "packing up" her work, May 11, 2023 Hrg. Tr. (Rough at 29), and she later amended her account yet again, asserting that the French prosecutor said something out loud about ending the deposition, *id.* at 31–32 ("I said the words, the French prosecutor said."), even though the record of the deposition reflects no such statement and none of the government personnel who were present saw or heard any of these things.

Cir. 1997) (citing *United States v. Martinez*, 776 F.2d 1481, 1485–86 (10th Cir. 1985) for the proposition that "the court has no way to determine whether there was an abuse of discretion" where the defendant "fail[s] to make a record of what he would have shown on cross-examination"); *see also Hart*, 995 F.3d at 590 n.3 (concluding that a defendant "forfeited [a] line of questioning" that he apparently wanted to explore during his cross-examination "by not raising it at trial").

The Court has before it two distinct proffers: an oral proffer that Trabelsi himself made during a May 3, 2023 motions hearing and a written proffer offered by Trabelsi's counsel on May 5, 2023, *see* Dkt. 590 at 7—the day after Trabelsi relinquished his right to self-representation. Although the two proffers overlap in substantial part, the Court will rely on the more focused proffer submitted by Trabelsi's counsel, who now speaks on his behalf. Nor, in any event, is Trabelsi's proffer particularly helpful because he merely asserted that he would have shown that Ms. Amal's statements were "false," "lie[s]," or "craziness," largely without providing the Court with a basis to understand *how* he would have made those showings with additional time for cross-examination. *See* May 3, 2023 Hrg. Tr. (Rough at 4–17).

The May 5, 2023 proffer asserts that Trabelsi would "seek to cover" fourteen subjects "in additional testimony." Dkt. 590 at 7. Those subjects fall, roughly, into seven buckets: (1) Ms. Amal's prior inconsistent statements about "her lack of knowledge of Mr. Trabelsi's activities in Afghanistan" and "statements about the purpose of their time in Afghanistan;" (2) Ms. Amal's "cooperation in investigations in Europe," "benefits conferred on Ms. Amal by foreign government officials," and "the current relationship between her and the French security services and whether their presence at the deposition intimidated her, or otherwise affected her testimony;" (3) "the status of [her] relationship [with Trabelsi] between 2000 and 2002,"

"statements Ms. Amal made about a religious marriage with Mr. Trabelsi in 2000," and "statements made about Ms. Amal's prior relationships;" (4) Ms. Amal's prior "illegal conduct . . . before she met Mr. Trabelsi;" (5) "Ms. Amal's contact with Mr. Trabelsi after his arrest;" (6) "statements about Mr. Trabelsi's alleged abuse of Ms. Amal;" and (7) "Ms. Amal's availability to travel to the United States for trial." *Id.*

Some of these topics, to be sure, cover traditional areas of cross-examination that, if explored further during cross-examination, might have been helpful to Trabelsi—including, for example, Ms. Amal's prior inconsistent statements and her receipt of any government benefits. But the Court cannot conclude, on the basis of this proffer alone, that merely "cover[ing]" these broad areas in more detail would be likely to "give[] the jury a significantly different impression of [the witness's] credibility," *Miller*, 738 F.3d at 375 (internal quotation marks omitted), because Trabelsi did—at least to some extent—address each of these topics in his cross-examination. Some of the topics he even covered in expansive form and in great detail: As described above, Trabelsi explored at length, and throughout the deposition, the "status" of his relationship with Ms. Amal, whether they had a "religious marriage," and Ms. Amal's statements as to her "prior relationships," notwithstanding the fact that these topics were (at best) marginally relevant to Trabelsi's case. Dkt. 590 at 7. For example:

> Q. We are going to talk about our marriage. Do you recall that you said yourself about me this: "Of this man, I . . . currently expect a child. In regards to the Quranic law, I am married to this man. . . . [T]here was a ceremony before the imam with two witnesses, two men. . . .
>
>    . . .
>
> A. So yes, I do remember this statement. But however, I was married to you, you know very well that you had said that I was married because of the Quran. I do remember this. But there was no ceremony. And according to Quranic law, yes, we were married. But according to French or German or Belgian or any other country's law, we were not married. You only brought to me a piece of paper that said we were married from the imam. And Your

Honor, this dates back to such a long time ago that I really have no memory of this.

Apr. 27, 2023 a.m. Dep. (Tr. at 11–12).  And later that same morning, he asked again:

> Q.  I'm asking you again, are you sure that you were never married before Mr. George Beyer?
>
> . . .
>
> Q.  Mrs. Amal, my question is this: In your mind, in your head, in your soul— and I'm thinking about the past, so you have no recollection of being married to your cousin, is that your testimony?
>
> . . .
>
> Q.  So here's my question, ma'am: You stated clearly that you've never been married before marrying Mr. Beyer.  So this is really clear, ma'am, that you've used this marriage as a mean to an end.  And you stated that you were not married, however you accused me of hitting you, of raping you.  You consider me as a human being who does not exist, and all you are doing is hurting all of us.

*Id.* at 30, 38, 45.  Within this line of inquiry, Trabelsi also asked Ms. Amal—albeit briefly—

about her prior (alleged) "illegal conduct . . . before she met Mr. Trabelsi," Dkt. 590 at 7,

including allegations that she was living "illegally in the federal republic [of Germany]," Apr.

27, 2023 a.m. Dep. (Tr. at 44), and allegations that she failed to pay taxes in Germany, *id.* at

28.[15]

Of arguably greater relevance, Trabelsi also addressed on multiple occasions throughout

the deposition "Ms. Amal's contact with [him] after his arrest."  Dkt. 590 at 7.  *See, e.g.*, Apr. 27,

2023 p.m. Dep. (Tr. at 40) ("You started from the beginning by saying: I love you, I love you, I

love you until the last day of my life."); *see also* Apr. 26, 2023 p.m. Dep. (Tr. at 66) ("Did you

---

[15]  The Court has sustained the government's objection to Trabelsi's question regarding Ms. Amal's alleged non-payment of taxes two decades ago as inadmissible under Fed. R. Evid. 403, but, giving Trabelsi the benefit of the doubt, overruled the government's objection to questions regarding her immigration status in Germany.

observe that your name is there [on the letter] and you signed on the second page with kisses and the baby and your son; and you said your son said this; and you said you wanted to build a family together, and may God hear us; and we'll join you after you get out of prison; there is your name and your signature there and lots of kisses?").  And, as an apparent corollary to Trabelsi's questions about the love letters Ms. Amal allegedly sent Trabelsi after his arrest, Trabelsi asked her several questions about his "alleged abuse of [her]," Dkt. 590 at 7, notwithstanding the fact that the government did not bring up such abuse on direct examination. As an example:

> Q. Mrs. Amal, do you remember making statements to the FBI in 2005 and to the FBI in 2007 and to the grand jury that you were a very unhappy woman, and that I was a violent husband who was depriving you of all your rights?
>
> A. Yes, I remember. I remember that once in Afghanistan, you had hit me violently, and also that in Belgium you didn't let me go out.  Do you remember that?
>
> Q. (In English) I never did that.
>
>     . . .
>
> Q. So here's another letter that you sent me to the jail, and you say that I was a husband who was violent and that I put a gun to your head.

Apr. 26, 2023 p.m. Dep. (Tr. at 64–65).  Absent explanation of why, exactly, further exploration of such abuse allegations would be helpful to Trabelsi, the Court cannot understand how "cover[ing]" that topic in further detail would be likely to "give[] the jury a significantly different impression of [the witness's] credibility," *Miller*, 738 F.3d at 375 (internal quotation marks omitted)—especially because Trabelsi's counsel has now moved to strike all of Ms. Amal's testimony "regarding any threats made by Mr. Trabelsi against Ms. Amal or others and any allegation that Mr. Trabelsi abused Ms. Amal," Dkt. 618 at 1.  Nor has Trabelsi explained why asking Ms. Amal more about her availability to travel to the United States for trial would be

fruitful in light of her testimony on cross-examination that she "cannot come to Washington, to the trial, because [she] ha[s] several sick children who need [her] 24 hours a day," Apr. 27, 2023 p.m. Dep. (Tr. at 57–58).

Trabelsi also explored, albeit sporadically and often unskillfully, Ms. Amal's prior inconsistent statements about "her lack of knowledge of Mr. Trabelsi's activities in Afghanistan" and about "the purpose of their time in Afghanistan," as well as her "cooperation in investigations in Europe," "benefits conferred on Ms. Amal by foreign government officials," and "the current relationship between her and the French security services." Dkt. 590 at 7. For example, he confronted Ms. Amal with what seemed to be one of her prior interviews:

> Q. Do you remember, there was another question that was asked: Did Nizar tell you what he was doing in Afghanistan? . . . The answer [was]: No.
>
> . . .
>
> Q. You said we went to Afghanistan to help poor people. . . . You said: I remember that we went to Afghanistan with a large sum of money and my husband was in the habit of spending over $10,000 per day. . . . [M]y husband was giving away bags of flour, of wheat, and he was building mosques and wells and houses for the poor.
>
> . . .
>
> A. I don't remember this, Mr. Trabelsi.

Apr. 27, 2023 p.m. Dep. (Tr. at 87–89). As to her relationship with foreign law enforcement, moreover, Trabelsi asked whether Ms. Amal felt "under pressure or threatened by someone in France?" Apr. 26, 2023 p.m. Dep. (Tr. at 47); *see also* Apr. 27, 2023 a.m. Dep. (Tr. at 9) (Q. "Yesterday when we stopped the interview until today, is there any people from the French government or the American government who told you what to say today?" A. "No, not at all . . . ."). He also questioned Ms. Amal about any benefits conferred upon her by the French or American governments in exchange for her testimony. *See, e.g.*, Apr. 27, 2023 p.m. Dep. (Tr. at

54) ("So when you came here in 2007 to be interviewed, did the U.S. government promise you that you would not be charged?"); *id.* at 66 ("Did you get anything of value from the U.S. government or the French government in relation to my case?"); *see id.* at 86 ("[I]s it time or is it money or the French citizenship that led you to tell the authorities what they wanted to hear?").

To be sure, Trabelsi's cross-examination of Ms. Amal may not have yielded his desired results, at least in part because he did not effectively follow up on Ms. Amal's answers: When Ms. Amal answered, for example, that she did not "remember" her prior statements about their visit to Afghanistan, Apr. 27, 2023 p.m. Dep. (Tr. at 87–89), Trabelsi did not seek to refresh her recollection with an exhibit memorializing her prior inconsistent statement. And when Ms. Amal denied receiving anything of value from the United States related to Trabelsi's prosecution, Apr. 27, 2023 p.m. Dep. (Tr. at 63–66), he did not use Exhibit 110, which shows that Ms. Amal was paid $2,000.00 by the FBI in 2005, *see* Dkt. 590-1, to refresh her recollection as to that fact. To be sure, an experienced criminal defense attorney could have used these exhibits more effectively and would have, in all likelihood, devoted considerably more time to cross-examining Ms. Amal about her prior inconsistent statements and about the source of any potential bias.[16] But, as discussed at length above, it is not the time limitation that precluded Trabelsi from engaging in more effective cross-examination about Ms. Amal's prior inconsistent statements or about any benefits she received from the U.S. government. Trabelsi made the decision to devote only a small percentage of his time to these topics, and, when she gave answers that were inconsistent with Trabelsi's exhibits, he could have but failed to follow up.

---

[16] To the extent that Trabelsi can now offer—consistent with the Rules of Evidence—evidence to undercut Ms. Amal's testimony on direct examination, he is of course welcome to do so.

Rather than home in on these key issues, he spent the majority of his cross-examination time on issues that were (at best) of marginal relevance. That was his choice.

If Trabelsi had heeded the Court's warnings to "focus his deposition preparation," Dkt. 578 at 14, and to "be as efficient as he can and . . . ask questions that are relevant[,] . . . and [that] relate to the direct testimony that the government is eliciting," Apr. 25, 2023 p.m. Hrg. Tr. (Rough at 4–5), he would have had ample time to further explore the topics his counsel now proffers as areas for further cross-examination. Tellingly, the defense does not argue in its briefs that a seven-hour cross-examination would have been (constitutionally) insufficient to explore these proffered topics, had the questioner focused his examination on the relevant issues from the outset and throughout the deposition. That Trabelsi chose to squander his opportunity for cross-examination on irrelevant, repetitive, and harassing questions, then, does not mean that he was deprived of the "*opportunity* for effective cross-examination." *Miller*, 738 F.3d at 375 (emphasis added). Opportunity and achievement are not the same thing, and, here, it seems unlikely that even days of additional cross-examination would have bridged this divide. Indeed, given the volume of Trabelsi's own cross-examination that his counsel has now moved to strike from the record, *see* Dkt. 618, it is unclear that a further opportunity for cross-examination would have been fruitful at all.

vi. *Due process*

Lastly, the Court briefly addresses Trabelsi's argument that the Court should "strike Ms. Amal's Rule 15 deposition" because Trabelsi was "not afforded procedural due process" at the deposition. Dkt. 590 at 15–16. The defense contends that, under the balancing analysis set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and in light of Trabelsi's strong interest in receiving a fair trial, he was entitled to "additional time and opportunity to complete his cross-

examination." Dkt. 590 at 16. Under *Mathews*, "identification of the specific dictates of due process generally requires consideration of three distinct factors:"

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

The Court notes, at the outset, that it is unclear whether the *Mathews*' balancing test for identifying "the specific dictates of due process," *id.*, applies to Trabelsi's right to cross-examination, which is governed by "an explicit textual source of constitutional protection," *Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (internal quotation marks omitted)—namely, the Sixth Amendment's Confrontation Clause. At least where a claim of *substantive* due process is at issue, the Supreme Court and the D.C. Circuit have explained that the constitutional amendment "provid[ing] an explicit textual source of constitutional protection," and "not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). But the Supreme Court has also explained that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations," including "an opportunity to . . . examine the witnesses against him, to offer testimony, and to be represented by counsel." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (quoting *In re Oliver*, 333 U.S. 257, 273 (1948)). Although "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process, . . . its denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely

62

examined." *Id.* at 295 (internal citation omitted) (quoting *Berger v. California*, 393 U.S. 314, 315 (1969)).

In any event, analyzing Trabelsi's opportunity to cross-examine Ms. Amal under the Due Process Clause yields the same result as the Court's analysis under the Confrontation Clause. Considering the *Chambers* standard, the Court concludes that Trabelsi had an adequate opportunity to "confront and to cross-examine" without "significant diminution." *Id.* at 295. And *Mathews* balancing leads the Court to the same outcome: Trabelsi does, of course, have a strong "private interest" in his liberty and in the truth-seeking function of cross-examination. *Mathews*, 424 U.S. at 335. But, as discussed at length above, Trabelsi had the opportunity to cross-examine Ms. Amal over the course of seven hours; he simply chose to use that time unwisely. The burden on the government of requiring further time, moreover, is substantial because Ms. Amal has categorically refused to appear for further cross-examination and because she is, as discussed, beyond the Court's subpoena power. Balancing these factors, and in light of Trabelsi's substantial "opportunity to subject [Ms. Amal] . . . to cross-examination," *Chambers*, 410 U.S. at 295, the Court reaches the same result under the Due Process Clause as it does under the Confrontation Clause.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the government's motion to admit Ms. Amal's Rule 15 deposition, Dkt. 588, is **GRANTED**, and that Defendant's cross-motion to strike Ms. Amal's testimony, Dkt. 590, is **DENIED**.

**SO ORDERED**.

_/s/ Randolph D. Moss_
RANDOLPH D. MOSS
United States District Judge

Date:  June 5, 2023